ᵓto crw/o

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

FILED
HARRISBURG

FEB 1 4 2002

MARY E. D'ANDREA, CLERK
Per_____
DEPUTY CLERK

|  |  |  |
|---|---|---|
| PENNSYLVANIA PROTECTION AND ADVOCACY, INC., | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Civil Action No. 1:CV-00-1582 |
| | : | |
| DEPARTMENT OF PUBLIC WELFARE OF THE COMMONWEALTH OF PENNSYLVANIA, et al., | : | (Judge William W. Caldwell) |
| | : | |
| Defendants. | : | |

## PLAINTIFF'S BRIEF IN OPPOSITION
## TO DEFENDANTS' MOTION TO DISMISS
## <u>SECOND AMENDED COMPLAINT</u>

Robert W. Meek
Robin Resnick
Disabilities Law Project
1315 Walnut Street, Suite 400
Philadelphia, PA  19107-4798
(215) 238-8070

Mark J. Murphy
Disabilities Law Project
1901 Law & Finance Building
429 Fourth Avenue
Pittsburgh, PA  15219-1505
(412) 391-5225

Counsel for Plaintiff

# TABLE OF CONTENTS

Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

Counterstatement of Procedural History . . . . . . . . . . . . . . . . . . . 1

Counterstatement of Facts . . . . . . . . . . . . . . . . . . . . 2

Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    I.    The Eleventh Amendment Does Not Bar
           Plaintiff's Rehabilitation Act Claims
           Against Defendant DPW . . . . . . . . . . . . . . . . . . . 5

          A.    Congress's Enactment of 42 U.S.C.
                 § 2000d-7(a)(1) Notified States that
                 They Waived Their Eleventh Amendment
                 Immunity Under the RA by Accepting
                 Federal Funds . . . . . . . . . . . . . . . . . . . . . . 7

          B.    Congress May Validly Condition the
                 Disbursement of Federal Funding on
                 States' Waiver of Eleventh Amendment
                 Immunity . . . . . . . . . . . . . . . . . . . . . . . . 11

          C.    There Is A Sufficient Nexus Between The
                 Limited Waiver of Sovereign Immunity
                 and the Federally-Funded Program . . . . . . . . . . 14

    II.    Plaintiff Can Pursue Its ADA and Rehabilitation
           Act Claims Against the Individual Defendants . . . . . . . . 18

          A.    Individuals Sued in their Official
                 Capacities Are Proper Defendants
                 Under the ADA and RA . . . . . . . . . . . . . . . . . 18

          B.    The *Seminole Tribe* Exception to the
                 *Ex parte Young* Doctrine is Inapplicable . . . . . . . . 21

    III.    Plaintiff Has Stated An Actionable Claim
           Under Section 504 of the Rehabilitation Act . . . . . . . . . 23

i

A.  Section 504's Integration Requirements . . . . . . . . .  24

B.  *Sandoval* and *South Camden* Do Not
    Preclude Plaintiff's RA Claims . . . . . . . . . . . . .  29

IV.  Plaintiff Has Stated An Actionable Claim
     Under Title XIX of the Social Security Act . . . . . . . . . .  33

A.  PP&A Can Enforce Title XIX through
    42 U.S.C. § 1983 on Behalf of SMRC
    Residents . . . . . . . . . . . . . . . . . . . . . . . .  34

B.  *South Camden* Does Not Bar PP&A's
    Title XIX Claims . . . . . . . . . . . . . . . . . . . .  39

V.   Plaintiff Has Standing . . . . . . . . . . . . . . . . . . .  40

A.  Review of Evidence Outside the
    Pleadings . . . . . . . . . . . . . . . . . . . . . . . .  40

B.  PP&A Has Standing to Litigate the
    ADA and RA Claims in its Own Right . . . . . . . . .  41

C.  PP&A Has Standing to Litigate the
    ADA and RA Claims on Behalf of
    SMRC Residents . . . . . . . . . . . . . . . . . . . .  47

    1.  SMRC Residents Would Have
        Standing . . . . . . . . . . . . . . . . . . . . . .  49

    2.  The Interests Which PP&A Seeks
        to Represent Are Germane to Its
        Organizational Purpose . . . . . . . . . . . . . . .  52

    3.  Prudential Considerations Do Not
        Deprive PP&A of Representational
        Standing . . . . . . . . . . . . . . . . . . . . . .  54

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . .  58

# TABLE OF AUTHORITIES

## Cases

*ADAPT of Philadelphia v. Philadelphia Housing Authority*,
Civil Action No. 98-4609, 2000 WL 433976
(E.D. Pa. Apr. 14, 2000) . . . . . . . . . . . . . . . . . . . . . 45

*Alden v. Maine*,
527 U.S. 706 (1999) . . . . . . . . . . . . . . . . . . . . . 5

*Alexander v. Choate*,
469 U.S. 287 (1986) . . . . . . . . . . . . . . . . . . 15, 30, 31, 32

*Alexander v. Riga*,
208 F.3d 419 (3d Cir. 2000), *cert. denied*,
531 U.S. 1069 (2001) . . . . . . . . . . . . . . . . . . . . . 43

*Alexander v. Sandoval*,
532 U.S. 275 (2001) . . . . . . . . . . . . . . . . . . 23, 29, 32, 33

*Alsbrook v. City of Maumelle*,
184 F.3d 999 (8th Cir. 1999), *cert. denied*,
529 U.S. 1001 (2000) . . . . . . . . . . . . . . . . . . . . . 21

*Armstrong v. Davis*,
275 F.3d 849 (9th Cir. 2001) . . . . . . . . . . . . . . . . 20

*Atascadero State Hosp. v. Scanlon*,
473 U.S. 234 (1985) . . . . . . . . . . . . . . . . . . . . 5, 7, 13

*Bd. of Trustees of the University of Alabama v. Garrett*,
531 U.S. 356 (2001) . . . . . . . . . . . . . . . . . . 6, 20, 21

*Bowers v. National Collegiate Athletic Ass'n*,
171 F. Supp.2d 389 (D.N.J. 2001) . . . . . . . . . . . . . . 9

*Brennan v. Stewart*,
834 F.2d 1248 (5th Cir. 1988) . . . . . . . . . . . . . . . 20

*Brown v. Stone*,
  66 F. Supp.2d 412 (E.D.N.Y. 1999) . . . . . . . . . . . . . . . . 42, 47

*Bryson v. Shumway*,
  177 F. Supp.2d 78 (D.N.H. 2001) . . . . . . . . . . . . . . . 27

*California v. United States*,
  104 F.3d 1086 (9th Cir.), *cert. denied*,
  522 U.S. 806 (1997) . . . . . . . . . . . . . . . . . . . . . 14

*Cherry v. University of Wisconsin System Bd. of Regents*,
  265 F.3d 541 (7th Cir. 2001) . . . . . . . . . . . . . . . . . 9

*Chisholm v. McManimon*,
  275 F.3d 315 (3d Cir. 2001) . . . . . . . . . . . . . . . . 26

*Clark v. Cohen*,
  794 F.2d 79 (3d Cir.), *cert. denied*,
  479 U.S. 962 (1986) . . . . . . . . . . . . . . . . . . . 27, 28

*Concourse Rehabilitation & Nursing Ctr. v. Whalen*,
  249 F.3d 136 (2d Cir. 2001) . . . . . . . . . . . . . . . . 36

*Consolidated Rail Corp. v. Darrone*,
  465 U.S. 624 (1984) . . . . . . . . . . . . . . . . . . . 30, 31

*Delaware Dep't of Health and Social Services, Div. for the
Visually Impaired v. U.S. Dep't of Educ.*,
  772 F.2d 1123 (3d Cir. 1985) . . . . . . . . . . . . . . . . 10

*Doe v. Stincer*,
  175 F.3d 879 (11th Cir. 1999) . . . . . . . . . . . . . . . 47, 49

*Doe v. Sylvester*,
  Civil Action No. 99-891, 2001 WL 1064810
  (D. Del. Sept. 11, 2001) . . . . . . . . . . . . . . . . . 21

*Douglas v. California Dep't of Youth Authority*,
  271 F.3d 812 (9th Cir. 2001) . . . . . . . . . . . . . . . . 8

*Ex parte Young*,
209 U.S. 123 (1908) . . . . . . . . . . . . . . . . 6, 18, 23, 21, 22, 23

*Fair Housing Council of Suburban Philadelphia v.*
*Montgomery Newspapers*,
141 F.3d 71 (3d Cir. 1998) . . . . . . . . . . . . . . . . . . . . 40, 42, 43

*Frederick L. v. Dep't of Public Welfare*,
157 F. Supp.2d 509 . . . . . . . . . . . . . . . . 3, 6, 7, 9, 14, 15, 16,
17, 19, 27, 28, 33, 50

*Frost & Frost Trucking Co. v. Railroad Comm'n*,
271 U.S. 583 (1926) . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Garcia v. S.U.N.Y. Health Sciences Center*,
No. 00-9223, 2001 WL 1159970 (2d Cir. Sept. 25, 2001) . . . . . . . 9

*Gibson v. Arkansas Dep't of Correction*,
265 F.3d 718 (8th Cir. 2001) . . . . . . . . . . . . . . . . . . . 21, 22, 23

*Goldstein v. Coughlin*,
83 F.R.D. 613 (W.D.N.Y. 1979) . . . . . . . . . . . . . . . . . . . . 48

*Gould Electronics, Inc. v. United States*,
220 F.3d 169 (3d Cir. 2000) . . . . . . . . . . . . . . . . . . . . . 41

*Gregory v. Administrative Office*,
168 F. Supp.2d 319 (D.N.J. 2001) . . . . . . . . . . . . . . . . . . 19

*Havens Realty Corp. v. Coleman*,
455 U.S. 363 (1982) . . . . . . . . . . . . . . . . . . . . 41, 42, 43

*Helen L. v. DiDario*,
46 F.3d 325 (3d Cir.), *cert. denied*,
516 U.S. 813 (1995) . . . . . . . . . . . . . . . . . . . 25, 26, 27, 28

*Hunt v. Washington State Apple Advertising Comm'n*,
432 U.S. 333 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . 54

*Jim C. v. United States,*
   235 F.3d 1079 (8th Cir. 2000), *cert. denied,*
   ___ U.S. ___, 121 S. Ct. 2591 (2001) . . . . . . . . . . . . . 9, 14, 16

*Kansas v. United States,*
   214 F.3d 1196 (10th Cir.), *cert. denied,*
   531 U.S. 1035 (2000)   . . . . . . . . . . . . . . . . . . . . . 14, 15

*Koslow v. Commonwealth of Pennsylvania,*
   158 F. Supp.2d 539 (E.D. Pa. 2001), *app. pending* . . . . . . . . . 10

*Lane v. Pena,*
   518 U.S. 187 (1996) . . . . . . . . . . . . . . . . . . . . . . . . 8

*Liberty Resources, Inc. v. Southeastern Pennsylvania Transp. Auth.,*
   155 F. Supp.2d 242 (E.D. Pa. 2001), *app. pending* . . . . . . . 42, 46

*Litman v. George Mason University,*
   186 F.3d 544 (4th Cir. 1999), *cert. denied,*
   528 U.S. 1181 (2000)   . . . . . . . . . . . . . . . . . . . . 5, 7, 9

*MCI Telecommunication Corp. v. Bell Atlantic-PA,*
   271 F.3d 491 (3d Cir. 2001) . . . . . . . . . . .    . . . . 5, 7, 13, 20

*Makin ex rel. Russell v. Hawaii,*
   114 F. Supp. 2d 1017 (D. Haw. 1999) . . . . . . . . . . . . . . . . 27

*Martin v. Voinovich,*
   840 F. Supp. 1175 (S.D. Ohio 1993) . . . . . . . . . . . . . . . . 39

*Nathanson v. Medical College of Pennsylvania,*
   926 F.2d 1368 (3d Cir. 1991) . . . . . . . . . . . . . . . . . . . 32

*New York v. United States,*
   505 U.S. 144 (1992) . . . . . . . . . . . . . . . . . . . . . . . 14

*Nihiser v. Ohio Environmental Protection Agency,*
   269 F.3d 626 (6th Cir. 2001) . . . . . . . . . . . . . . . . . . . 8

*Olmstead v. L.C.*,
     527 U.S. 581 (1999) . . . . . . . . . . . . . . . . . . . 25, 27, 33, 50, 57

*Pederson v. Louisiana State University*,
     213 F.3d 858 (5th Cir. 2000) . . . . . . . . . . . . . . . . . . . 9

*Pennsylvania Protection and Advocacy, Inc. v. Houstoun*,
     Civil Action No. 1:CV-00-1582 (M.D. Pa. Apr. 3, 2001) . . . . . . . 18

*Pennsylvania Psychiatric Society v. Green Spring
Health Services, Inc.*,
     No. 00-3403, 2002 WL 186008
     (3d Cir. Feb. 6, 2002) . . . . . . . . . . . . . . . . . . . 47, 48, 55, 56, 57

*Popovich v. Cuyahoga County Court of Common Pleas*,
     276 F.3d 808 (6th Cir. 2002) . . . . . . . . . . . . . . . . . . . 6

*Public Interest Research Group of New Jersey, Inc. v.
Magnesium Elektron, Inc.*,
     123 F.3d 111 (3d Cir. 1997) . . . . . . . . . . . . . . . . . . . 19

*Randolph v. Rogers*,
     253 F.3d 342 (8th Cir. 2001) . . . . . . . . . . . . . . . . . . . 19

*Retired Chicago Police Ass'n v. City of Chicago*,
     76 F.3d 856 (7th Cir.), *cert. denied*,
     519 U.S. 932 (1996) . . . . . . . . . . . . . . . . . . . 53

*Risinger v. Concannon*,
     117 F. Supp.2d 61 (D. Me. 2000) . . . . . . . . . . . . . . . . . . . 42, 47, 49, 53

*Robinson v. Block*,
     869 F.2d 202 (3d Cir. 1989) . . . . . . . . . . . . . . . . . . . 43

*Robinson v. Dalton*,
     107 F.3d 1018 (3d Cir. 1997) . . . . . . . . . . . . . . . . . . . 41

*Robinson v. Kansas*,
     117 F. Supp.2d 1124 (D. Kan. 2000) . . . . . . . . . . . . . . . . . . . 17

*Roe No. 2 v. Ogden*,
　　253 F.3d 1225 (10th Cir. 2001) . . . . . . . . . . . . . . . . . . 20

*Roe v. Operation Rescue*,
　　919 F.2d 857 (3d Cir. 1990) . . . . . . . . . . . . . . . . . 49

*Rolland v. Cellucci*,
　　52 F. Supp.2d 231 (D. Mass. 1999) . . . . . . . . . . . . . 39

*Sandoval v. Hagan*,
　　197 F.3d 484 (11th Cir. 1999), *rev'd on other grounds*
　　*sub nom. Alexander v. Sandoval*, 532 U.S. 275 (2002) . . . . . . . . 9

*School Bd. of Nassau County v. Arline*,
　　480 U.S. 273 (1987) . . . . . . . . . . . . . . . . . . . . 32

*Seminole Tribe v. Florida*,
　　517 U.S. 44 (1996) . . . . . . . . . . . . . . . 18, 21, 22, 23

*Smith v. National Collegiate Athletic Ass'n*,
　　266 F.3d 152 (3d Cir. 2001) . . . . . . . . . . . . . . . . 17

*South Camden Citizens in Action v. New Jersey Dep't of Environmental Protection*,
　　274 F.3d 771 (3d Cir. 2001) . . . . . . . . . . . . . . 23, 29, 38, 39, 40

*South Dakota v. Dole*,
　　483 U.S. 203 (1987) . . . . . . . . . . . . . . . . . 12, 14

*Stanley v. Litscher*,
　　213 F.3d 340 (7th Cir. 2000) . . . . . . . . . . . . . . . 7, 9

*Toyota Motor Mfg. v. Williams*,
　　___ U.S. ___, 122 S. Ct. 681 (2002) . . . . . . . . . . . . . . . . 57

*United Food  and Commercial Workers Union Local 751 v. Brown Group, Inc.*,
　　517 U.S. 544 (1996) . . . . . . . . . . . . . . . 42, 48, 52, 53, 55

*Unzueta v. Schalansky*,
    No. 99-4162-RDR, 2000 WL 1472749 (D. Kan. July 6, 2000)  . . . . 47

*W.B. v. Matula*,
    67 F.3d 484 (3d Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Warth v. Seldon*,
    422 U.S. 490 (1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

*Wilder v. Virginia Hospital Ass'n*,
    496 U.S. 498 (1990) . . . . . . . . . . . . . .    34, 35, 36, 37, 38, 39

*Will v. Michigan Dep't of State Police*,
    491 U.S. 58 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Wood v. Tompkins*,
    33 F.3d 600 (6th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . 37

*Yeskey v. Pennsylvania Dep't of Corrections*,
    118 F.3d 168 (3d Cir. 1997), *aff'd*,
    524 U.S. 206 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

## Statutes, Regulations, Legislative and Regulatory History

U.S. Const. Art. I, § 8, cl. 1  . . . . . . . . . . . . . . . . . . . .    7

Rehabilitation Act Amendments of 1992,
    Pub. L. 102-569, 106 Stat. 4344 (1992) . . . . . . . . . . . . . . . 26

29 U.S.C. § 701(a)(4) . . . . . . . . . . . . . . . . . . . . . . . . . 33

29 U.S.C. § 794(a)  . . . . . . . . . . . . . . . . . . . . . . . .    15, 24

29 U.S.C. § 794(b)(1)(A) . . . . . . . . . . . . . . . . . . . . . . . 16

29 U.S.C. § 794a  . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

29 U.S.C. § 794a(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . 30

29 U.S.C. § 794e(f)(3) . . . . . . . . . . . . . . . . . . . . . . . . 42

42 U.S.C. § 1396r(b) . . . . . . . . . . . . . . . . . . . . . . . . . 34, 37, 40

42 U.S.C. § 1396r(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

42 U.S.C. § 1396r(e)(7) . . . . . . . . . . . . . . . . . . . . . . . . . 34, 37

42 U.S.C. §§ 1396r(h) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

42 U.S.C. § 1983 . . . . . . . . . . . . . 23, 29, 33, 34, 35, 38, 39

42 U.S.C. § 2000d . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

42 U.S.C. § 2000d-1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

42 U.S.C. § 2000d-7(a)(1) . . . . . . . . . . . . . . . . . . 7, 8, 9, 10, 16

42 U.S.C. § 10805(a)(1)(B) . . . . . . . . . . . . . . . . . . . . . . . . 42

42 U.S.C. § 12101(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

42 U.S.C. § 12132 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

42 U.S.C. § 12133 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

42 U.S.C. § 12134 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

42 U.S.C. § 15043(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

47 U.S.C. § 252 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

28 C.F.R. § 35.130 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

28 C.F.R. § 41.51 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

42 C.F.R. § 483.15 . . . . . . . . . . . . . . . . . . . . . . . . . . . 34, 40

42 C.F.R. § 483.20 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

42 C.F.R. § 483.25 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

42 C.F.R. § 483.45 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

42 C.F.R. § 483.112 . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

42 C.F.R. § 483.114 . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

42 C.F.R. § 483.120 . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Executive Order No. 11,914, 41 Fed. Reg. 17,871 (1976) . . . . . . . . . 24

Exec. Order No. 12,250, 45 Fed. Reg. 72,995 (1980) . . . . . . . . . . . 24

43 Fed. Reg. 2132 (1978) . . . . . . . . . . . . . . . . . . . . . . . . 24

46 Fed. Reg. 40,686 (1981) . . . . . . . . . . . . . . . . . . . . . . . 24

S. Rep. No. 102-357 (1992), *reprinted in*
1992 U.S.C.C.A.N. 3712 . . . . . . . . . . . . . . . . . . . . . . 26, 27

H. Rep. No. 100-391(I) (1987), *reprinted in* 1987
U.S.C.C.A.N. 2313-1 . . . . . . . . . . . . . . . . . . . . . . . . . . 36

## Miscellaneous

*Governor's Executive Budget 2002/03* . . . . . . . . . . . . . . . . . . . 18

HCFA, *Olmstead Update No. 2* (July 25, 2000) . . . . . . . . . . . . . . 27

Daniel J. Meltzer, *Overcoming Immunity: The Case of Federal
Regulation of Intellectual Property*,
53 Stan. L. Rev. 1331 (2001) . . . . . . . . . . . . . . . . . . . . . . 17

## COUNTERSTATEMENT OF PROCEDURAL HISTORY

Plaintiff Pennsylvania Protection and Advocacy, Inc. ("PP&A") filed this case in September 2000 on behalf of itself and residents of South Mountain Restoration Center ("SMRC"), a state-operated nursing facility for persons with serious mental illness.  In its initial complaint, PP&A alleged:  (1) that officials of the Department of Public Welfare ("DPW") violated Title XIX of the Social Security Act, the federal Medical Assistance statute, based on inadequate conditions at SMRC and inadequate treatment provided to SMRC residents; (2) that DPW and Secretary of Public Welfare Houstoun violated the Americans with Disabilities Act ("ADA") and Section 504 of the Rehabilitation Act ("RA") by failing to provide community mental health and mental retardation programs to those SMRC residents for whom such services are appropriate and using discriminatory methods of administration that keep SMRC residents unnecessarily institutionalized; and (3) that DPW officials violated the Due Process Clause of the Fourteenth Amendment to the Constitution by, *inter alia*, authorizing "Do Not Resuscitate" orders for SMRC residents who were not terminally ill.  Plaintiff sought only declaratory and injunctive relief.

In October 2000, Defendants filed a Motion to Dismiss the Complaint. Defendants asserted that Plaintiff's claims under the ADA and RA are barred by the Eleventh Amendment to the Constitution; that the individual Defendants were not subject to suit under the ADA and RA; and that Plaintiff failed to state a claim

upon which relief can be granted.  Defendants subsequently withdrew that Motion without explanation.

Plaintiff filed a Motion for Leave to File a First Amended Complaint in January 2001 to name the Governor as a Defendant in the claims brought pursuant to the ADA and RA.  Defendants opposed that Motion, arguing, *inter alia*, that individual state officials cannot be sued under any circumstances under those statutes.  The Court, in a Memorandum and Order dated April 3, 2001, held that individual state officials could be sued in their official capacities for injunctive relief under those statutes, and granted Plaintiff's motion to amend.

By Order dated November 29, 2001, the Court granted Plaintiff's unopposed Motion for Leave to File a Second Amended Complaint.  The Second Amended Complaint deleted certain claims (including claims concerning conditions at SMRC and the unlawful imposition of Do Not Resuscitate orders) that during the pendency of the litigation had been substantially remedied by Defendant.

The parties completed non-expert discovery in September 2001.  Defendants produced over 30,000 pages of documents and Plaintiff produced several hundred pages of documents.  Both Plaintiff and Defendants propounded and responded to requests for admissions and interrogatories.  Defendants deposed PP&A's Executive Director, four PP&A employees, and a PP&A consultant.  Plaintiff deposed fifteen witnesses.  In addition, Plaintiff submitted four expert reports and Defendants have submitted seventeen expert reports.

2

Plaintiff filed a Motion for Partial Summary Judgment, along with a Brief, Exhibits, and a Statement of Undisputed Facts, in January 2002. Plaintiff contends that it is entitled to judgment as a matter of law on its claims under the ADA and RA since, *inter alia*, SMRC residents are wholly excluded from access to services provided through the community mental health system. Plaintiff seeks relief that would require independent reviews of the needs of SMRC residents and implementation of the recommendations of the independent reviewers.

After seventeen months of litigation and completion of extensive discovery and at a point when the Court should be considering the merits of the case, Defendants have chosen to re-assert the arguments (raised in their withdrawn Motion to Dismiss more than fifteen months earlier) that the Court lacks jurisdiction and that Plaintiff has failed even to state a claim. Without a trace of irony, Defendants request "prompt" consideration of the current Motion to Dismiss. Defs.' Br. at 5. This sudden urgency is puzzling particularly in light of the fact that these same Defendants -- represented by the same counsel -- litigated (and lost) these same issues nearly one year ago in a similar case, *Frederick L. v. Dep't of Public Welfare*, 157 F. Supp.2d 509 (E.D. Pa. 2001), which they, unsurprisingly, never cite in their Brief. Defendants' Motion should be denied for the reasons discussed below, and this Court should consider Plaintiff's Motion for Partial Summary Judgment.

# COUNTERSTATEMENT OF FACTS

SMRC, a nursing facility located in Franklin County, Pennsylvania, is operated by DPW. Second Am. Compl. ¶¶ 1, 17. Virtually all SMRC residents are admitted from state-operated psychiatric hospitals and have serious and persistent mental illness; many have been institutionalized for decades. *Id.* ¶¶ 2, 19, 20. Many SMRC residents could live in more integrated, community-based settings if they received appropriate services and supports. *Id.* ¶¶ 2, 52. Yet, these individuals remain unnecessarily institutionalized. *Id.* ¶¶ 2, 69(a). Further, Defendants use methods of administration that have the effect of keeping SMRC residents unnecessarily segregated, including, *inter alia*, not assuring the development of adequate community-based mental health alternatives to serve persons who are elderly and/or medically fragile; effectively cutting off the involvement of the county mental health and mental retardation programs in discharge planning for SMRC residents; and not allowing SMRC professionals to consider community-based mental health alternatives for SMRC residents. *See id.* ¶¶ 49, 53, 54, 70.

SMRC residents also are not provided with appropriate mental health treatment necessary to enable them to attain or maintain their highest level of mental and psychosocial well-being. Second Am. Compl. ¶¶ 3, 24-28. SMRC

4

lacks an appropriate array of necessary activities and staffing, leaving residents with nothing to do for long periods of time. *Id.* ¶¶ 35-43.

## ARGUMENT

## I. THE ELEVENTH AMENDMENT DOES NOT BAR PLAINTIFF'S REHABILITATION ACT CLAIMS AGAINST DEFENDANT DPW.

The Eleventh Amendment to the United States Constitution has been held to bar suits in federal courts against a state or state entity by its own citizens. *Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 238 (1985); *MCI Telecommunication Corp. v. Bell Atlantic-PA*, 271 F.3d 491, 503 (3d Cir. 2001). In essence, the Eleventh Amendment embodies the common law doctrine of sovereign immunity which shields states from lawsuits. *Alden v. Maine*, 527 U.S. 706, 713 (1999); *Litman v. George Mason University*, 186 F.3d 544, 549 (4th Cir. 1999), *cert. denied*, 528 U.S. 1181 (2000).

There are, however, three well-recognized exceptions to Eleventh Amendment immunity. *MCI Telecommunication Corp.*, 271 F.3d at 503. First, individual suits against states may proceed if Congress, pursuant to Section 5 of the Fourteenth Amendment, abrogates a state's immunity. *Id.* Second, individuals may sue the state or a state entity if the state has waived its sovereign immunity. *Id.* at 503-06. Third, individual suits that seek solely prospective relief for ongoing violations of federal law may be brought against state officials pursuant

to the doctrine of *Ex parte Young*, 209 U.S. 123, 159-60 (1908). *Id.* at 503, 506-08.

Defendants contend that Plaintiff's claims under the RA against Defendant DPW (as opposed to the individual Defendants) are barred by the Eleventh Amendment to the Constitution. Defs.' Br. at 12-20.[1] As discussed in this Section, DPW has waived its sovereign immunity to suit under Section 504 of the RA by accepting federal financial assistance, Second Am. Compl. ¶ 67, with full knowledge that, by doing so, it would be subject to suit in federal court under Section 504 if it did so.

---

[1] Defendants also contend that Plaintiff's ADA claim against DPW is barred by the Eleventh Amendment. The Supreme Court has held that Congress lacked authority to validly abrogate states' sovereign immunity under Title I of the ADA (concerning employment discrimination) because the Title I provisions were not congruent and proportional to the Equal Protection Clause's limitations on disability-based discrimination. *Bd. of Trustees of the University of Alabama v. Garrett*, 531 U.S. 356, 368-74 (2001). The Court declined to consider the validity of the abrogation of states' immunity under Title II of the Eleventh Amendment under either the Equal Protection Clause or the Due Process Clause. *Id.* at 360 n.1. The provisions of Title II of the ADA concerning integration that are at issue here arguably constitute a valid abrogation of states' immunity under the Due Process Clause. *Cf. Popovich v. Cuyahoga County Court of Common Pleas*, 276 F.3d 808, 813-16 (6th Cir. 2002) (en banc) (holding that requirement for the provision of accommodations to persons with hearing impairments under Title II of the ADA was a valid abrogation of states' sovereign immunity under the Due Process Clause). *Contra Frederick L.*, 157 F. Supp.2d at 523-30. In this case, however, Plaintiff is willing to withdraw its ADA claims against DPW (though not against the Defendants Schweiker and Houstoun which, as discussed below, can proceed pursuant to *Ex parte Young*).

**A. Congress's Enactment of 42 U.S.C. § 2000d-7(a)(1) Notified States that They Waived Their Eleventh Amendment Immunity Under the RA by Accepting Federal Funds.**

A state may waive its Eleventh Amendment immunity through overt consent (e.g., a state statute which explicitly specifies intent to subject the state to suit in federal court). *Litman*, 183 F.3d at 550. Alternatively, a state "may 'waive its immunity by voluntarily participating in federal spending programs when Congress expresses a clear intent to condition participation in the programs ... on a State's consent to waive its constitutional immunity.'" *Id.* (citations omitted). As the Third Circuit recently explained:

> [T]he disbursement of federal monies [is a] congres-
> sionally bestowed gift[] or gratuit[y], which Congress is
> under no obligation to make, which a state is not
> otherwise entitled to receive, and to which Congress can
> attach whatever conditions it chooses.

*MCI Telecommunication Corp.*, 271 F.3d at 505. The RA, a Spending Clause statute,[2] validly conditions federal funding on a limited waiver of sovereign immunity.

In response to the Supreme Court's 1985 holding that there was no evidence that Congress intended to waive states' immunity under the RA, *Atascadero*, 473

---

[2] Although Section 504 of the RA is silent as to its constitutional basis, many courts have concluded that it was enacted, at least in part, pursuant to the Spending Clause, U.S. Const. Art. I, § 8, cl. 1. *E.g., Stanley v. Litscher*, 213 F.3d 340, 344 (7th Cir. 2000); *Frederick L.*, 157 F. Supp.2d at 519-20 (collecting cases).

7

U.S. at 247, Congress amended the Rehabilitation Act, to make its intent clear.

That amendment provides in pertinent part:

> *A State shall not be immune under the Eleventh Amendment of the Constitution of the United States from suit in Federal court for a violation of section 504 of the Rehabilitation Act of 1973*, title IX of the Education Amendments Act of 1972, the Age Discrimination Act of 1975, title VI of the Civil Rights Act of 1964, or the provisions of any other Federal statute prohibiting discrimination by recipients of Federal financial assistance.

42 U.S.C. § 2000d-7(a)(1) (emphasis added).  The Supreme Court has described Section 2000d-7(a)(1) as an "*unambiguous waiver* of the States' Eleventh Amendment immunity ...." *Lane v. Pena*, 518 U.S. 187, 200 (1996) (emphasis added). The Court recognized that Section 2000d-7(a)(1) was an appropriate congressional response to the ruling in *Atascadero* and was precisely "the sort of unequivocal waiver that our precedents demand." *Id.* at 198.

Every appellate court which has considered the issue has held that Section 2000d-7(a)(1)'s plain language manifests an unmistakable intent to condition federal funds on a state's waiver of sovereign immunity and that states, by accepting such funds, waive their immunity to suit under the RA and similar civil rights statutes, such as Titles IX and IV of the Civil Rights Act.  *Douglas v. California Dep't of Youth Authority*, 271 F.3d 812, 819-21 (9th Cir. 2001); *Nihiser v. Ohio Environmental Protection Agency*, 269 F.3d 626, 628 (6th Cir. 2001); *Jim*

● ●

*C. v. United States*, 235 F.3d 1079, 1081-82 (8th Cir. 2000) (en banc), *cert. denied*, ___ U.S. ___, 121 S. Ct. 2591 (2001); *Pederson v. Louisiana State University*, 213 F.3d 858, 875-76 (5th Cir. 2000); *Stanley v. Litscher*, 213 F.3d at 344; *Sandoval v. Hagan*, 197 F.3d 484, 492-500 (11th Cir. 1999), *rev'd on other grounds sub nom. Alexander v. Sandoval*, 532 U.S. 275 (2001); *Litman*, 186 F.3d at 551-55. As the Seventh Circuit recently concluded with respect to Title IX (which, is also governed by 42 U.S.C. § 2000d-7(a)(1)):

> [W]hen the Board accepted federal education funds under Title IX, it was clearly put on notice that it may not discriminate in its programs on the basis of sex [citation omitted]; that if it does discriminate on the basis of sex, it may be sued by a private individual, [citation omitted]; and that in any such suit the Board may not assert its Eleventh Amendment immunity, [citations omitted].

*Cherry v. University of Wisconsin System Bd. of Regents*, 265 F.3d 541, 555 (7th Cir. 2001).[3] Several district courts in this Circuit have reached the same conclusion. *E.g.*, *Bowers v. National Collegiate Athletic Ass'n*, 171 F. Supp.2d

---

[3] The Second Circuit has held that a state did not knowingly waive its sovereign immunity to suit under the RA by accepting federal funds during the time that the state believed that its sovereign immunity had been validly abrogated under the similar ADA. *Garcia v. S.U.N.Y. Health Sciences Center*, No. 00-9223, 2001 WL 1159970 at *10-*11 (2d Cir. Sept. 25, 2001) (Exh. 1). Defendants here do not rely on *Garcia*. Aside from the flaws in its analysis, *Garcia* would not preclude this lawsuit which involves events that post-date decisions by the Supreme Court and Third Circuit that plainly put states on notice of arguments that the ADA abrogation of immunity is improper and, concomitantly, that their continued acceptance of federal funds would constitute a knowing waiver of immunity under the RA.

9

389, 408-09 (D.N.J. 2001); *Frederick L.*, 157 F. Supp.2d at 516-21.[4]  Accordingly, states which accepted federal funding after the enactment of Section 2000d-7(a)(1) voluntarily and knowingly agreed to waive their sovereign immunity to suit under the RA involving discrimination by those programs and activities which received federal financial assistance.

DPW does not dispute it accepted federal funding knowing that Congress conditioned its acceptance of such funds on its agreement to waive its Eleventh Amendment immunity to suit under the RA.  DPW instead contends:  (1) that Congress cannot lawfully require states to waive their Eleventh Amendment immunity through Spending Clause legislation; and (2) that there is not a sufficient nexus between the waiver of immunity and the federally-funded programs.  Neither argument has merit.

---

[4]  Although the Third Circuit has not addressed this question, it has recognized in a post-*Atascadero* decision that a state's agreement to participate in a federal program which specifies remedies can be sufficient to waive the state's Eleventh Amendment immunity and will subject the state to the remedies identified by the federal program.  *Delaware Dep't of Health and Social Services, Div. for the Visually Impaired v. U.S. Dep't of Educ.*, 772 F.2d 1123, 1137-38 (3d Cir. 1985).  Further, an appeal is currently pending in the Third Circuit that raises the issue of whether a state waives its Eleventh Amendment immunity to suit under the RA by its acceptance of federal funds.  *Koslow v. Commonwealth of Pennsylvania*, 158 F. Supp.2d 539 (E.D. Pa. 2001), *app. pending*.

### B. Congress May Validly Condition the Disbursement of Federal Funding on States' Waiver of Eleventh Amendment Immunity.

Citing a string of inapposite cases, Defendants contend that Congress can *never* require states to waive their Eleventh Amendment immunity as a legitimate condition of Spending Clause legislation. Defs.' Br. at 15-19. The cases on which Defendants rely all involved requirements by a government that a private citizen give up his constitutional rights in exchange for receipt of an important privilege or benefit. In these cases, the Court recognized the inherent disparity in bargaining power between a private individual or corporate citizen, on the one hand, and the government, on the other, which rendered the imposition of conditions inherently coercive. *E.g.*, *Frost & Frost Trucking Co. v. Railroad Comm'n*, 271 U.S. 583, 593 (1926) ("Having regard to form alone, the act here is an offer ... of a privilege, ... which [the complainant] is free to accept or reject. In reality, [the complainant] is given no choice, except a choice between the rock and the whirlpool, -- an option to forego a privilege which may be vital to his livelihood or submit to a requirement which may constitute an intolerable burden.").

Defendants have not -- and cannot -- cite a single case in which any court has held that Congress cannot condition the disbursement of federal funding to a state upon the state's agreement to waive its Eleventh Amendment immunity to suit in federal court. It is not surprising that the courts have not applied the

11

"unconstitutional conditions" doctrine to bargains between the states and the federal government since there is an inherent difference in the relationship between two sovereigns and the relationship between a citizen and a government.

In fact, Defendants' argument disregards the framework established by the Supreme Court to examine the validity of conditions imposed by Congress on states through Spending Clause statutes -- a framework that does not incorporate the "unconstitutional conditions" doctrine. *South Dakota v. Dole*, 483 U.S. 203, 207-08, 210, 211 (1987). While the Court has held that Congress cannot use Spending Clause legislation to induce states to engage in unconstitutional activities, it has explained that this language:

> stands for the unexceptional proposition that the power may not be used to induce the States to engage in activities that would themselves be unconstitutional. Thus, for example, a grant of federal funds conditioned on invidiously discriminatory state action or the infliction of cruel and unusual punishment would be an illegitimate exercise of the Congress' broad spending power.

*Id.* at 210-11. In *South Dakota*, the Court held that Congress could validly condition the disbursement of federal highway funds on a state's agreement to raise the drinking age to 21, even though the Court assumed that states had the *constitutional* authority under the Twenty-First Amendment to establish the drinking age and the condition imposed required the states to forsake that authority in order to receive funding. *Id.* at 206, 209.

12

Just as Congress could condition the receipt of federal funding on a state's agreement not to exercise its constitutional authority to establish the drinking age, Congress can condition the disbursement of federal funding on an agreement that the state waive its Eleventh Amendment immunity. The Supreme Court has acknowledged that if a statute enacted under the Spending Clause evinces a "clear intent to condition participation in the programs funded under the Act on a State's consent to waive its constitutional immunity," the state's acceptance of federal funds will be deemed to be a valid waiver of immunity. *Atascadero*, 473 U.S. at 247. Further, the Third Circuit recently held that Congress validly required the states to waive Eleventh Amendment immunity when it enacted the Telecommunications Act that conferred on states the "gratuity" to regulate local telecommunications. *MCI Telecommunication Corp.*, 271 F.3d at 509-13. In doing so, the court recognized that Congress can require waiver of a state's immunity in exchange for a gift or gratuity that it confers through a Commerce Clause or Spending Clause statute. *Id.* at 505. Thus, there simply is no apposite case law or doctrinal reason to support the Defendants' argument that Congress cannot require states, as a condition on its gift of federal funding, to waive their Eleventh Amendment immunity to suit in federal court.[5]

---

[5] The concerns about unequal bargaining power on which the "unconstitutional conditions" doctrine is premised may be analogously reflected in the Supreme Court's intimation that, under some circumstances, a condition imposed on a state through a Spending Clause statute may be unconstitutionally coercive. *South*

●                              ●

## C.  There Is A Sufficient Nexus Between The Limited Waiver of Sovereign Immunity and the Federally-Funded Program.

In *South Dakota v. Dole*, the Court noted that its "cases have suggested (without significant elaboration) that conditions on federal grants might be illegitimate if they are unrelated 'to the federal interest in particular national projects or programs.'" 483 U.S. at 208 (citation omitted); *see also New York v. United States*, 505 U.S. 144, 167 (1992) (indicating that conditions imposed through Spending Clause legislation must "bear some relationship to the purpose of the federal spending."). The Court in *South Dakota*, though, declined to "define the outer parameters of the 'germaneness' or 'relatedness' limitation on the imposition of conditions under the spending power," 483 U.S. at 208 n.3, since it determined that conditioning federal highway funding on states' enactment of laws increasing the legal drinking age was related to the interest in safe interstate travel. *Id.* at 208-09. In a single paragraph without any citation to supporting authority, Defendants assert that the RA's condition on the waiver of Eleventh

---

*Dakota v. Dole*, 483 U.S. at 211. Defendants here do not assert that the condition in this case is coercive but, instead, choose to rely on a blanket argument that Congress can never condition the receipt of federal funding on a state's agreement to waive immunity. In any event, the courts have not been receptive to coercion challenges to federal Spending Clause statutes. *E.g.*, *Jim C. v. United States*, 235 F.3d at 1081-82; *Kansas v. United States*, 214 F.3d 1196, 1203-04 (10th Cir.), *cert. denied*, 531 U.S. 1035 (2000); *California v. United States*, 104 F.3d 1086, 1092 (9th Cir.), *cert. denied*, 522 U.S. 806 (1997); *Frederick L.*, 157 F. Supp.2d at 522-23.

Amendment immunity is not sufficiently related to any particular program. Defs.'
Br. at 20. This argument cannot succeed.

The "relatedness" criteria of the Supreme Court's Spending Clause juris-
prudence is not onerous. *See Kansas v. United States*, 214 F.3d at 1200. There
need only be a general relationship between the condition and the federal interest
in programs it funds. The purpose of the RA is to eliminate disability-based
discrimination. *See Alexander v. Choate*, 469 U.S. 287, 295-97 (1986). By
conditioning federal funding on a state agency's waiver of sovereign immunity and
affording redress to persons who are subject to disability-based discrimination in
such programs, Congress advances its interest in eradicating such discrimination
in those state programs to which it provides federal funding. As one court in this
Circuit recently concluded:

> This [relatedness] requirement centers around the
> relationship between the condition imposed and the
> federal initiative. Through section 2000d-7(a)(1),
> Congress linked the federal government's legitimate
> interest in eliminating discrimination against disabled
> individuals in the programs it endows to State
> accountability for such discrimination.

*Frederick L.*, 157 F. Supp.2d at 522.

Congress determined that the relevant "program" under Section 504 was the
state agency which receives federal funds -- not each and every type of grant that
goes to the agency. Section 504 of the RA limits liability only to those
"program[s] or activit[ies]" that receive federal financial assistance. 29 U.S.C. §

15

794(a).  The term "program or activity" is narrowly defined, as to states, to mean

only those state departments or agencies that actually receive federal financial

assistance.   29 U.S.C. § 794(b)(1)(A).   By accepting federal funds for one

department of the state, the state waives its sovereign immunity *only* for that

department; it does not waive its sovereign immunity as to all state departments

and agencies.  As the Eighth Circuit explained:

> A State and its instrumentalities can avoid Section 504's
> waiver requirement on a piecemeal basis, by simply
> accepting federal funds for some departments and
> declining them for others.  The State is accordingly not
> required to renounce all federal funding to shield chosen
> state agencies from compliance with Section 504.

*Jim C.*, 235 F.3d at 1081; *accord Frederick L.*, 157 F. Supp.2d at 523.  The RA

thus affords states flexibility in determining the extent to which its sovereign

immunity will be waived.  The waiver of sovereign immunity is a limited, not a

blanket, waiver.

The limitation of the waiver of sovereign immunity to those departments or

agencies that receive federal financial assistance is sufficient.  The waiver need not

be further limited to specific federal grants to each department.  Congress has no

obligation to write waivers of sovereign immunity into the myriad federal funding

programs it creates.  It was entitled to advise states, as it did through Sections 504

and 2000d-7(a)(1) of the RA, that their acceptance of federal funds for particular

state departments and agencies would subject them to suit if those departments and

16

agencies engaged in disability-based discrimination.    "No dollar-for-dollar accounting need be made." *Robinson v. Kansas*, 117 F. Supp.2d 1124, 1133 (D. Kan. 2000); *accord Frederick L.*, 157 F. Supp.2d at 522.

Congress's decision to make the waiver of immunity agency-wide, rather than limiting it to a particular funding grant, is appropriate.  Congress does not want federal funds used for discriminatory purposes.  "[S]ince federal funding for one program frees up money for other programs that the agency operates, Congress has a legitimate interest in conditioning its funding on a waiver by the agency as to all of its operations." Daniel J. Meltzer, *Overcoming Immunity: The Case of Federal Regulation of Intellectual Property*, 53 Stan. L. Rev. 1331, 1378 (2001).

Analogously, the Third Circuit recently held that the NCAA may be a "program" subject to the requirements of Title IX of the Civil Rights Act, even though it does not receive federal funding directly and only receives an "indirect benefit" from federal financial assistance provided to others, to the extent that it is in a position to decide whether to accept or reject the federal funds and the concomitant obligations of Title IX. *Smith v. National Collegiate Athletic Ass'n*, 266 F.3d 152, 162 (3d Cir. 2001).  Here, DPW in its entirety receives the benefit of the federal funding -- either directly or indirectly -- and the Defendants are in a position to accept or reject the federal funding and the concomitant obligations

17

of the RA.  Accordingly, the Defendants cannot limit their liability under the RA only to specific DPW initiatives that receive direct federal funding.[6]

## II.  PLAINTIFF CAN PURSUE ITS ADA AND REHABILITATION ACT CLAIMS AGAINST THE INDIVIDUAL DEFENDANTS.

Defendants contend that Plaintiff cannot pursue either its ADA or its RA claims against Defendants Schweiker and Houstoun for two reasons.  First, they argue that individuals are not proper defendants under either statute.  Second, they contend that the exception to the *Ex parte Young* doctrine established in *Seminole Tribe v. Florida*, 517 U.S. 44 (1996), precludes suit against individual state officials under the ADA and RA.  Defs.' Br. at 21-24.  The former argument ignores the law of the case and both arguments ignore the state of the law.

### A.  Individuals Sued in their Official Capacity Are Proper Defendants Under the ADA and RA.

In arguing that individuals cannot be sued (even in their official capacity) under the ADA and the RA, Defs.' Br. at 21-22, Defendants astonishingly disregard the fact that this Court decided this precise issue in this case.  This Court held that the Governor, when sued in his official capacity, is a proper party under the statutory language of the ADA and RA.  *Pennsylvania Protection and Advocacy, Inc. v. Houstoun*, Civil Action No. 1:CV-00-1582, slip op. at 6 (M.D. Pa.

---

[6] Defendants' relatedness challenge is particularly disingenuous where, as here, DPW receives federal funding both to operate SMRC and to provide community-based mental health alternatives.  *See* Governor's Executive Budget 2002/03 at E32.28 (Exh. 2).

Apr. 3, 2001) (Exh. 3).  This conclusion is equally applicable to Secretary Houstoun, *e.g.*, *Frederick L.*, 157 F. Supp.2d at 530-31, and should be followed as the law of the case.  *See Public Interest Research Group of New Jersey, Inc. v. Magnesium Elektron, Inc.*, 123 F.3d 111, 116 (3d Cir. 1997).

Defendants have cited no authority since this Court's April 2001 ruling that would warrant a reconsideration of the issue.  In fact, recent case law fully supports this Court's decision.  In holding that an individual can pursue claims for injunctive relief against state officials acting in their official capacity under the RA and ADA, the Eighth Circuit explained:

> The State finally argues that because the statutory language of the ADA provides only for "public entity" liability, an *Ex parte Young* claim against the state officials in their official capacities, premised upon an ADA violation, must fail.  We agree that the public-entity limitation precludes ADA claims against state officials in their individual capacities, ... but we have never held that the public-entity limitation in the ADA prohibits *Ex parte Young* claims against state officers in their official capacities.  Nor have we ever held that the underlying federal statute relied upon in an *Ex parte Young* claim must provide explicit statutory authority to sue a state official in his official capacity.  ...  We believe that the District Court did not err in holding that [plaintiff] may proceed under *Ex parte Young* to seek prospective injunctive relief on his ADA and Rehabilitation Act claims against [defendant] in her official capacity.

*Randolph v. Rogers*, 253 F.3d 342, 348 (8th Cir. 2001); *accord Gregory v. Administrative Office*, 168 F. Supp.2d 319, 328-30 (D.N.J. 2001); *Frederick L.*,

157 F. Supp.2d 530-32. Indeed, the Supreme Court has implicitly acknowledged the availability of relief against individual state officials under the ADA in holding that the *Ex parte Young* doctrine can be used to secure injunctive relief against state officials under that statute. *Garrett*, 531 U.S. at 374 n.9; *accord Armstrong v. Davis*, 275 F.3d 849, 879 (9th Cir. 2001); *Roe No. 2 v. Ogden*, 253 F.3d 1225, 1233-34 (10th Cir. 2001).[7]

The Third Circuit's recent decision in *MCI Telecommunication Corp.* also supports the Court's ruling allowing suits against individuals. In that case, the court allowed an *Ex parte Young* action to proceed under the Telecommunications Act against individual PUC Commissioners (who, as the caption to the case evidences, were sued in the official capacities). 271 F.3d at 513-15. Just as the ADA and RA do not explicitly reference individuals, the statute involved in *MCI*

---

[7] While an official capacity action is, in essence, a suit against the state, and such a suit normally is barred by the Eleventh Amendment, the Supreme Court has declined to treat such actions brought for prospective, injunctive relief as suits against states for purposes of the legal fiction created in *Ex parte Young*. *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 n.10 (1989). "*Ex parte Young* creates 'the well-recognized irony that an official's unconstitutional conduct constitutes state action under the Fourteenth Amendment but not under the Eleventh Amendment.'" *Brennan v. Stewart*, 834 F.2d 1248, 1252 (5th Cir. 1988) (quoting *Halderman v. Pennhurst State School and Hosp.*, 465 U.S. 89, 105 (1984)). Likewise, a state official's violation of the ADA and Rehabilitation Act is deemed to be the action of the state (i.e., the public entity, program, or activity) under those statutes, even though suits against such officials for injunctive relief to remedy such violations are not considered actions of the state for purposes of the Eleventh Amendment.

20

*Telecommunication Corp.*, 47 U.S.C. § 252, refers only to state utility "commissions"; it does not reference individual commissioners.

### B. The *Seminole Tribe* Exception to the *Ex parte Young* Doctrine Is Inapplicable.

Defendants' reliance on the *Seminole Tribe* exception to the *Ex parte Young* doctrine is unavailing. The Supreme Court in *Garrett* expressly stated that *Ex parte Young* was applicable to cases brought for injunctive relief against state officials under Title I of the ADA. 531 U.S. at 374 n.9. As the Eighth Circuit recently concluded: "[T]he *Garrett* footnote is not contrary to Supreme Court precedent," and the *Seminole Tribe* exception to *Ex parte Young* relief is inapplicable to cases under the ADA. *Gibson v. Arkansas Dep't of Correction*, 265 F.3d 718, 720-22 (8th Cir. 2001); *accord Doe v. Sylvester*, Civil Action No. 99-891, 2001 WL 1064810 at *4-*5 (D. Del. Sept. 11, 2001) (Exh. 18).[8]

In *Seminole Tribe*, the Court held that an individual could not sue a state official for prospective relief under the Indian Gaming Regulatory Act ("IGRA"). IGRA governs the negotiation between Indian tribes and states of compacts to allow gaming on Indian lands. 517 U.S. at 73-76. IGRA authorizes a tribe to file

---

[8] Defendant cites two pre-*Garrett* decisions. Defs.' Br. at 24. In rejecting a *Seminole Tribe* challenge to *Ex parte Young* enforcement of an ADA claim against a state official, the Eighth Circuit distinguished one of those decisions, *Alsbrook v. City of Maumelle*, 184 F.3d 999, 1010 (8th Cir. 1999) (en banc), *cert. denied*, 529 U.S. 1001 (2000), noting that it involved an action against officials in their individual (not official) capacity and that it pre-dated *Garrett*. *Gibson*, 265 F.3d at 720 n.2.

suit in federal district court to enforce IGRA, but the statute severely limits the court's remedial authority. *Id.* at 50. The Court held that Congress did not intend to authorize federal jurisdiction under *Ex parte Young* to enforce IGRA. *Id.* at 74-76. The Court reasoned:

> [W]here Congress has prescribed a detailed *remedial* scheme for the enforcement against a State of a statutorily created right, a court should hesitate before casting aside those limitations and permitting an action against a state officer under *Ex parte Young*.

*Id.* at 74 (emphasis added). An *Ex parte Young* action would allow a tribe to secure much broader remedies (including contempt sanctions) than had been authorized by Congress under IGRA. *See id.* at 75.

The limitation on *Ex parte Young* actions identified in *Seminole Tribe* is simply inapplicable to claims under the ADA and RA. "There are significant differences between the ADA and IGRA that make the use of the *Ex parte Young* doctrine appropriate for one and not for the other." *Gibson*, 265 F.3d at 721-22. For example, unlike the IGRA's limitations on the types of equitable relief available, the ADA and RA do not limit the courts' authority to issue prospective relief; courts can issue any equitable relief that is appropriate. *See id.* at 721. Also, any procedural requirement that employees exhaust administrative avenues before pursuing ADA and RA claims in federal court does not create a "detailed

remedial scheme" that precludes use of *Ex parte Young* since Congress did not

limit the equitable *remedies* available from the courts. *Id.* at 721-22.[9]

## III. PLAINTIFF HAS STATED AN ACTIONABLE CLAIM UNDER SECTION 504 OF THE REHABILITATION ACT.

Defendants contend that Plaintiff has failed to state an actionable claim under

Section 504 of the RA because its claims are based solely on regulations promul-

gated under the RA. Defs.' Br. at 24-27. Plaintiff does not dispute that regula-

tions -- standing alone -- cannot be enforced, either through an implied private

right of action or through a claim under 42 U.S.C. § 1983. *Alexander v.*

*Sandoval*, 532 U.S. 275, 293 (2001); *South Camden Citizens in Action v. New*

*Jersey Dep't of Environmental Protection*, 274 F.3d 771, 788-790 (3d Cir. 2001).

Unlike *Sandoval* and *South Camden*, Plaintiff in this case does not seek to enforce

---

[9] Defendants state that the ADA and RA incorporate the "comprehensive internal enforcement mechanism" of Title VII of the Civil Rights Act. Defs.' Br. at 23-24. The ADA incorporates the rights, remedies, and procedures of the RA. 42 U.S.C. § 12133. The RA, in turn, incorporates the rights, remedies, and procedures of Title VII with respect to employment claims and of Title VI of the Social Security Act with respect to non-employment claims (such as that presented here). 29 U.S.C. § 794a. Title VI, in fact, has no administrative enforcement scheme whatsoever, but, rather, has been construed to create an implied private right of action. *See Alexander v. Sandoval*, 532 U.S. 275, 279-80 (2001). In any event, the relevant inquiry under *Seminole Tribe* is not whether there is a comprehensive *enforcement* scheme, but, rather, whether there is a comprehensive *remedial* scheme, i.e., whether the statute limits the remedies available. Even the administrative enforcement scheme created in Title VII (and adopted in the ADA and RA for employment claims) cannot preclude the enforcement of the ADA and RA in federal court against state officials under *Ex parte Young* because Title VII does not limit the injunctive remedies available to litigants. *Gibson*, 265 F.3d at 721.

23

a regulation; it seeks to enforce Section 504 of the RA. The cited regulations merely interpret the scope of Section 504 and do not purport to create independent obligations.

## A. Section 504's Integration Requirements.

Section 504 of the RA states a general prohibition on disability-based discrimination by federally-funded entities, but does not explicitly define the parameters of this non-discrimination ban. 29 U.S.C. § 794(a). In 1978, the federal Department of Health and Welfare ("HEW") promulgated "coordination regulations" for Section 504 in accordance with Executive Order No. 11,914, 41 Fed. Reg. 17,871 (1976). 43 Fed. Reg. 2132 (1978) (codified at 45 C.F.R. Pt. 85 (1978)). Those regulations included the following:

> Recipients [of federal financial assistance] shall administer programs and activities in the most integrated setting appropriate to the needs of qualified handicapped persons.

*Id.* at 2138 (codified at 45 C.F.R. § 85.51(d) (1978)). The RA's integration regulation (along with related requirements at issue here concerning the use of discriminatory methods of administration) remains valid. 28 C.F.R. §§ 41.51(d), 41.51(b)(3).[10]

_____

[10]    In 1980, President Carter transferred oversight of this coordination responsibility to the Attorney General and the Department of Justice ("DOJ"). Exec. Order No. 12,250, 45 Fed. Reg. 72,995 (1980). DOJ re-codified HEW's coordination regulations without change at 28 C.F.R. Pt. 41. 46 Fed. Reg. 40,686 (1981).

24

In 1990, Congress enacted the ADA. Like the RA, Title II of the ADA includes a general ban on disability-based discrimination by public entities. 42 U.S.C. § 12132. Also like the RA, Title II did not define the scope of the ban on discrimination but, rather, required DOJ to promulgate regulations that tracked the RA's coordination regulations. 42 U.S.C. § 12134. DOJ promulgated regulations that are virtually identical to the coordination regulations, including regulations relating to the provision of services in the most integrated setting and the use of discriminatory methods of administration. 28 C.F.R. §§ 35.130(b)(3), 35.130(d).

The Supreme Court in *Olmstead v. L.C.*, 527 U.S. 581 (1999), held that the ADA bars unnecessary institutionalization of people with disabilities and requires states to provide appropriate community alternatives (though a state may avoid liability if it can establish that compliance would result in a fundamental alteration). *Id.* at 607. Defendants, though, contend that the Supreme Court's interpretation of the ADA's integration mandate in *Olmstead* (and the Third Circuit's similar decision in *Helen L. v. DiDario*, 46 F.3d 325 (3d Cir.), *cert. denied*, 516 U.S. 813 (1995)) are inapplicable to Section 504, even though Section 504 includes an identical integration provision. Section 504's requirements concerning community integration should be interpreted in the same way as the ADA's integration mandate has been interpreted in *Olmstead* and similar cases. As the Third Circuit noted, the "integration mandate of § 35.130(d)" in the ADA,

25

"is almost identical to the section 504 integration regulation ..." codified at 28 C.F.R. § 41.51(d). *Helen L.*, 46 F.3d at 332-33; *see also Chisholm v. McManimon*, 275 F.3d 315, 324 n.9 (3d Cir. 2001) (indicating that the non-discrimination standards of the ADA and RA are equivalent).

The congressional intent that Section 504 and the ADA be construed congruently was further solidified by the enactment of the Rehabilitation Act Amendments in 1992, Pub. L. 102-569, 106 Stat. 4344 (1992). These amendments were designed to incorporate in the RA "the values and principles underpinning the ADA," which "has been referred to as the 20th century emancipation proclamation for individuals with disabilities." S. Rep. No. 102-357 at 7, 14 (1992), *reprinted in* 1992 U.S.C.C.A.N. 3712, 3718, 3725. In those amendments, Congress made the following findings:

> [I]ndividuals with disabilities continually encounter various forms of discrimination in such critical areas as ... institutionalization .... [and]

> [T]he goals of the Nation properly include the goal of providing individuals with disabilities with the tools necessary to -- ... achieve ... full inclusion and integration in society ... [and] independent living ... for such individuals.

Rehabilitation Act Amendments of 1992, Pub. L. 102-569, § 101, 106 Stat. 4344, 4346-47 (1992) (codified at 29 U.S.C. § 701(a)(4), (6)). These findings reflect "values and principles" which "include the right of persons with disabilities to independence, inclusion, choice and self-determination ...." S. Rep. No. 102-357

at 7 (1992), *reprinted in* 1992 U.S.C.C.A.N. 3712, 3718.  Most importantly, these

findings substantially tracked the congressional findings in the ADA, 42 U.S.C.

§§ 12101(a)(3), (8).

The conclusion that the integration requirements of the ADA and RA should

be construed consistently has been embraced by several district courts since the

Supreme Court's decision in *Olmstead*.  *Bryson v. Shumway*, 177 F. Supp.2d 78,

100 (D.N.H. 2001); *Frederick L.*, 157 F. Supp.2d at 534-36; *Makin ex rel. Russell*

*v. Hawaii*, 114 F. Supp.2d 1017, 1036 (D. Haw. 1999).   Similarly, the Health

Care Financing Administration, which provides federal Medical Assistance funding

to states, has informed state Medical Assistance directors:  "Although the Olmstead

decision interpreted the ADA, unjustified segregation by a Federally funded

program would also constitute disability discrimination under Section 504" of the

RA.  HCFA, *Olmstead Update No. 2*, Q15 (July 25, 2000) (Exh. 4).

Defendants rely exclusively on cases decided prior to *Helen L.* and *Olmstead*

to support their position that Section 504 does not require the provision of services

in integrated settings.  The Third Circuit, in a footnote in *Clark v. Cohen*, 794

F.2d 79, 84 n.3 (3d Cir.), *cert. denied*, 479 U.S. 962 (1986), indicated that

Section 504 did not require the provision of a community placement to a woman

who was unnecessarily institutionalized.  DPW can take no comfort in this state-

ment, however, since the Third Circuit later recognized that its ruling in *Clark* was

not premised on "the integration mandate of the ADA *or the Rehabilitation Act*."

*Helen L.*, 46 F.3d at 334 (emphasis added).  The *Helen L.* Court concluded:

> The 504 coordination regulations and the ADA make clear that the unnecessary segregation of individuals with disabilities in the provision of public services is itself a form of discrimination within the meaning of those statutes, independent of the discrimination that arises when individuals with disabilities receive different services than those provided to individuals without disabilities.

*Id.* at 335.  Indeed, Judge Schiller rejected DPW's argument that *Clark* ruled that the RA does not require services be provided in the most integrated setting appropriate.  *Frederick L.*, 157 F. Supp.2d at 535.

Further, *Clark* and the other cases cited by Defendants, all precede both the enactment of the ADA in 1990 (which evidenced Congress' intent to model the ADA on Section 504) and the 1992 amendments to the RA (which reiterated Congress' intent that the RA incorporate the values and principles of the ADA). These congressional statements further support the conclusion that the RA and the ADA should be interpreted in the same way, undermining the continued vitality of those pre-1990 decisions.

28

### B. *Sandoval* and *South Camden* Do Not Preclude Plaintiff's RA Claims.

In *Sandoval*, the Court held that individuals cannot maintain private rights of actions to enforce those regulations promulgated pursuant to Section 602 of Title VI of the Civil Rights Act, 42 U.S.C. § 2000d-1, which bar state laws and policies that have a disparate impact based on race or national origin. 532 U.S. at 285-93. The *Sandoval* Court stated unequivocally that individuals can pursue private rights of action to enforce the prohibition on race/national origin discrimination set forth in Section 601 of Title VI, 42 U.S.C. § 2000d, as well as those regulations promulgated under Title VI which apply Section 601's prohibition on intentional discrimination. *Id.* at 279-80, 284. The Court, though, concluded that its precedents limited "discrimination" under Section 601 to "only intentional discrimination," *id.* at 280-81, and, therefore, those regulations which forbid conduct that Section 601 permits (i.e., neutral rules with a disparate impact) cannot be enforced through a private right of action. *Id.* at 285-93. Following *Sandoval*, the Third Circuit held that an individual cannot enforce Title VI's disparate impact regulations using 42 U.S.C. § 1983 when the right embodied in the regulation (protection against actions that have a disparate impact) is not based on any federal right in the statute itself (the right to be free from intentional discrimination). *South Camden*, 274 F.3d at 788-790.

29

Defendants' reliance on *Sandoval* and *South Camden* is mistaken. Unlike Title VI, Section 504 of the RA is not limited to intentional discrimination (i.e., disparate treatment). Section 504 itself was intended to end segregation of people with disabilities, promote their integration, and remedy even neutral practices that have a disparate impact on such individuals. Thus, the RA regulations (including the integration regulations) that delineate the forms of discrimination encompassed by Section 504 are merely proper interpretations of that statute. Plaintiff here seeks to enforce Section 504 itself, as interpreted by the regulations; it does not seek to enforce regulations that are beyond the scope of the statute.

Section 504 was modelled to some extent on Title VI, *see Alexander v. Choate*, 469 U.S. 287, 293 n.7 (1985), and the Rehabilitation Act incorporates the remedies of Title VI, 29 U.S.C. § 794a(a)(2). However, the Supreme Court has cautioned that "too facile an assimilation of Title VI law to § 504 must be resisted." *Alexander*, 469 U.S. at 293 n.7; *see also Consolidated Rail Corp. v. Darrone*, 465 U.S. 624, 632-33 n.13 (1984) (in holding that Title VI's limitation of employment discrimination claims did not apply to Section 504, the Court acknowledged that there are significant differences between the statutes).

Specifically, *Alexander* provided a strong signal (though it ultimately did not decide the issue) that Section 504 -- unlike Title VI -- was not limited to claims of intentional discrimination, but that it also could address at least some types of

30

disparate impact.   The Court recognized the unique nature of disability-based discrimination and acknowledged the broad parameters of "discrimination" intended to be remedied through Section 504.   Citing the legislative history of Section 504, the Court stressed:   "Discrimination against the handicapped was perceived by Congress to be most often the product not of invidious animus, but rather of thoughtlessness and indifference -- of benign neglect."  469 U.S. at 295. The Court noted that Congress enacted Section 504 to address the "'shameful oversights,' which caused the handicapped to live among society 'shunted aside, hidden, and ignored.'"   *Id.* at 295-96 (citations omitted).   Further, the Court realized that "much of the conduct that Congress sought to alter in passing the Rehabilitation Act" -- such as elimination of architectural barriers and the "'discriminatory effect'" of job qualification procedures -- "would be difficult if not impossible to reach were the Act construed to proscribe only conduct fueled by a discriminatory intent."  *Id.* at 296-97.  The Court also noted that the appellate courts had unanimously agreed that some forms of disparate impact discrimination were barred by Section 504.  *Id.* at 297 n.17.

Both the Supreme Court and the Third Circuit have recognized that the regulations promulgated under Section 504 are entitled to controlling weight in interpreting the statute. *See Consolidated Rail Corp.*, 465 U.S. at 634; *Yeskey v. Pennsylvania Dep't of Corrections*, 118 F.3d 168, 170-71 (3d Cir. 1997), *aff'd,*

524 U.S. 206 (1998); *see also School Bd. of Nassau County v. Arline*, 480 U.S. 273, 279-80 (1987) (noting that Section 504 regulations are an important source of guidance on meaning of the statute).   The regulations promulgated under Section 504 -- unlike the Title VI regulation at issue in *Sandoval* -- fall well within the broad boundaries of disability-based "discrimination" that the statute seeks to remedy.   Indeed, the courts routinely have relied on those regulations in applying Section 504 in cases that do not involve intentional discrimination.   *E.g.*, *Alexander*, 469 U.S. at 301 n.21 (noting that Section 504 reasonable accommodation regulations are consistent with Court's view that Section 504 requires reasonable accommodations); *W.B. v. Matula*, 67 F.3d 484, 493 (3d Cir. 1995) (applying Section 504 regulations which require schools to provide appropriate educational services to students with disabilities); *Nathanson v. Medical College of Pennsylvania*, 926 F.2d 1368, 1386 (3d Cir. 1991) (applying Section 504's standards concerning reasonable accommodation and provision of auxiliary aids).

The failure to provide services in the most integrated setting appropriate to the needs of individuals with disabilities, therefore, constitutes "discrimination" within the meaning of Section 504 *itself*.  First, as the Supreme Court recognized in *Alexander*, Section 504 was designed to end the unnecessary segregation and exclusion of people with disabilities from society.  469 U.S. at 296.  Second, the legislative history of Section 504 is replete with evidence that Congress intended

32

Section 504 to achieve the full integration of people with disabilities and to end their isolation. *Frederick L.*, 157 F. Supp.2d at 534. Third, the Rehabilitation Act Amendments Act of 1992 amended the statute to include specific findings that people with disabilities "continually encounter various forms of discrimination in such critical areas as ... institutionalization ...." 29 U.S.C. § 701(a)(4). Finally, the Rehabilitation Act should be interpreted consistently with the ADA, which as the Supreme Court held in *Olmstead*, bars unnecessary segregation of people with disabilities in institutions. *See* discussion, *supra*, at 25-26. Accordingly, since discrimination under Section 504 itself includes the failure to provide services in the most integrated setting appropriate to the needs of people with disabilities and using methods of administration that result in continued unnecessary institutionali- zation, Plaintiff may enforce those rights through a private cause of action or through 42 U.S.C. § 1983. As Judge Schiller succinctly concluded in rejecting DPW's *Sandoval* arguments with respect to virtually identical RA claims: "The [RA] regulations at issue in this case do not expand the conduct proscribed by Congress in enacting section 504." *Frederick L.*, 157 F. Supp.2d at 538.

## IV. PLAINTIFF HAS STATED AN ACTIONABLE CLAIM UNDER TITLE XIX OF THE SOCIAL SECURITY ACT.

Plaintiff contends that the individual Defendants violate specified requirements of Title XIX of the Social Security Act, the federal Medical Assistance law. In particular, Plaintiff alleges that the individual Defendants:

33

- fail to provide an ongoing program of activities to meet the interests and physical, mental, and psychosocial well-being of SMRC residents in violation of 42 U.S.C. § 1396r(b)(4)(v) and 42 C.F.R. § 483.15(f);

- fail to assure that SMRC residents who use anti-psychotic medications receive appropriate behavioral interventions and to assure that the medications are reviewed at least annually by an independent consultant in violation of 42 U.S.C. § 1396r(c)(1)(D) and 42 C.F.R. § 483.25(*l*)(2)(ii);

- fail to identify and provide SMRC residents with services they need to maintain their highest practicable mental and psychosocial well-being in violation of 42 U.S.C. §§ 1396r(b)(2)-(4) and 42 C.F.R. §§ 483.20(b), 438.20(k), 483.25(f);

- fail to provide "specialized rehabilitative services" (specifically, mental health and mental retardation services) to SMRC residents in violation of 42 U.S.C. §§ 1396r(b)(4)(i), (vii) and 42 C.F.R. §§ 483.45(a), 483.120(c); and

- fail to arrange for the provision of specialized services for residents with mental retardation in violation of 42 U.S.C. § 1396r(e)(7) and 42 C.F.R. §§ 483.112, 483.114, 483.120.

Second Am. Compl. ¶ 62. Contrary to Defendants' arguments, Plaintiff PP&A can pursue these claims on behalf of SMRC residents.

## A. PP&A Can Enforce Title XIX Through 42 U.S.C. § 1983 on Behalf of SMRC Residents.

The Supreme Court has recognized that certain provisions of Title XIX may be enforced against persons acting under color of state law (such as the individual Defendants) pursuant to 42 U.S.C. § 1983 ("Section 1983"). In *Wilder v. Virginia Hospital Ass'n*, 496 U.S. 498 (1990), the Court held that a health care provider may bring an action pursuant to Section 1983 against a state official under the

"Boren Amendment," a Title XIX provision concerning states' reimbursement to health care providers. *Id.* at 508-24. The *Wilder* Court reaffirmed the Court's previously-established two-prong test for determining when a federal statute is enforceable pursuant to Section 1983, writing:

> A plaintiff alleging a violation of a federal statute will be permitted to sue under § 1983 unless (1) "the statute [does] not create enforceable rights, privileges, or immunities within the meaning of § 1983," or (2) "Congress has foreclosed such enforcement of the statute in the enactment itself."

*Id.* at 508 (citation and footnote omitted).

As for the first prong of the test, i.e., whether the statute creates enforceable rights, the Court identified three criteria that must be used to determine whether it is satisfied: (1) whether the provision in question was intended to benefit the plaintiffs; (2) whether the provision "reflects merely a 'congressional preference' for a certain kind of conduct rather than a binding obligation ..."; and (3) whether the interest that the plaintiffs assert is "'too vague and amorphous' such that it is 'beyond the competence of the judiciary to enforce.'" *Wilder*, 496 U.S. at 509. Defendants do not contend that the standards at issue in this case are too vague and amorphous to be enforced, but argue that PP&A cannot assert its Title XIX claims through Section 1983 because it is not an intended beneficiary and because the provisions do not create binding obligations. Defs.' Br. at 27-31.

35

While PP&A is not itself an intended beneficiary of Title XIX's provisions concerning nursing facility standards of care, the SMRC residents who PP&A is representing in this case certainly are the intended beneficiaries of those provisions. *Concourse Rehabilitation & Nursing Ctr. v. Whalen*, 249 F.3d 136, 143-44 (2d Cir. 2001). The House Committee on Energy and Commerce explained the *raison d'etre* for the enactment of these provisions:

> The *central purpose* of [the amendments to Title XIX] is to improve the quality of care for [MA]-eligible nursing home residents and either to bring substandard facilities into compliance with [MA] quality of care requirements or to exclude them from the program.

H. Rep. No. 100-391(I), at 453 (1987) (emphasis added), *reprinted in* 1987 U.S.C.C.A.N. 2313-1, 2313-272. Plaintiff's Title XIX claim is brought on behalf of SMRC residents. Though Defendants challenge PP&A's standing to pursue ADA and RA claims on behalf of SMRC residents, Defs.' Br. at 35-45, it makes no assertion that PP&A lacks standing to pursue Title XIX claims on behalf of SMRC residents.

Defendants also are incorrect in their assertion that the provisions at issue in this case do not impose any binding obligations. In *Wilder*, the Court emphasized several factors in concluding that the Boren Amendment was a "binding obligation" -- its mandatory, rather than precatory, terms and the authority of

36

the Secretary of the Department of Health and Human Services to withhold funds

for non-compliance.  *Wilder*, 496 U.S. at 512.

In this case, the Title XIX provisions at issue are phrased in mandatory

terms.  For example:

- "A nursing facility *must* provide services and activities to attain or maintain the highest practicable physical, mental, and psychosocial well-being of each resident in accordance with a written plan of care ...."  42 U.S.C. § 1396r(b)(2) (emphases added).

- "A nursing facility *must* conduct a comprehensive, accurate ... assessment of each resident's functional capacity ...."  42 U.S.C. § 1396r(b)(3)(A) (emphasis added).

- "[A] nursing facility *must* provide (or arrange for the provision of) -- ... specialized rehabilitative services ...; an ongoing program ... of activities ...; treatment and services requirement by mentally ill and mentally retarded residents ...."  42 U.S.C. §§ 1396r(b)(4)(i), (v), (vii) (emphasis added).

- A state "*must* review and determine" whether nursing facility residents with mental retardation require specialized services.  42 U.S.C. § 1396r(e)(7)(B)(ii) (emphasis added).

The use of mandatory language is sufficient to show that these provisions express

binding obligations.  *See Wood v. Tompkins*, 33 F.3d 600, 608 (6th Cir. 1994).

The nature of these provisions as binding obligations, rather than mere

congressional preferences, is further supported by the fact that compliance with

these requirements is a mandatory prerequisite of participation by a nursing facility

in the Medical Assistance program.  Title XIX specifies a number of remedies to

enforce compliance with its requirements, including denial of payment (as in

*Wilder*) and termination of non-compliant facilities' participation in the MA program. *See* 42 U.S.C. §§ 1396r(h)(3), (5). Thus, these provisions create a binding obligation that can be enforced through Section 1983 against state actors.

Defendants disregard the established criteria for determining whether a statute creates a "binding obligation" so as to allow enforcement through Section 1983. Instead, they cite to a case that held that nursing facility residents have no *implied private cause of action* to enforce the Title XIX nursing facility standards in a case against a non-public nursing facility. Defs.' Br. at 30 (citing *Brogdon v. National Healthcare*, 103 F. Supp.2d 1322, 1326 (N.D. Ga. 2000)). This argument mixes apples and oranges.

When a federal statute does not expressly create a private right of action (like Title XIX), there are two potential avenues by which a person can enforce the act: (1) an implied private right of action, or (2) enforcement against a state actor through 42 U.S.C. § 1983. *E.g.*, *Wilder*, 496 U.S. at 508 & n.9; *South Camden*, 274 F.3d at 778 n.4. As the Supreme Court stressed:

> The test [used to assess whether a federal statute may be enforced through an implied private cause of action] reflects a concern, grounded in separation of powers, that Congress, rather than the courts, controls the availability of remedies for violations of statutes. [citations omitted] Because § 1983 provides an "alternative source of express congressional authorization of private suits," [citation omitted], these separation of powers concerns are not present in a § 1983 case. Consistent with this view, we recognize an exception to the general rule that

38

> § 1983 provides a remedy for violation of federal
> statutory rights only when Congress has affirmatively
> withdrawn the remedy.

*Wilder*, 496 U.S. at 508 n.9.   A person, therefore, may be able to enforce a

federal statute against a state actor pursuant to Section 1983 even though the more

onerous standard for a private right of action is not met.   Since there is no

evidence (and Defendants do not argue) that Congress intended to affirmatively

preclude enforcement of Title XIX's nursing facility requirements against publicly-

operated nursing facilities pursuant to Section 1983, Defendants misplace their

reliance on a case that only precluded an implied private right of action to enforce

those requirements against a privately-operated nursing facility.[11]

**B.   *South Camden* Does Not Bar PP&A's Title XIX Claims.**

Defendants claim that the Title XIX regulations cited in the Second

Amended Complaint cannot be enforced through Section 1983, relying on *South*

*Camden*.  Defs.' Br. at 31.  This conclusory assertion reflects a misunderstanding

of *South Camden*, which merely held that Section 1983 cannot be used to enforce

regulations that are not tethered to any right created by a statute.  274 F.3d at 790.

---

[11]    One of Plaintiff's Title XIX claims stems from Defendants' violation
of the Pre-Admission Screening and Resident Review ("PASRR") requirements,
42 U.S.C. § 1396r(e)(7). Compl. ¶ 62(e). These requirements impose obligations
directly upon the state (not the nursing facility).  Courts have held that the PASRR
requirements can be enforced through Section 1983 against states.  *Rolland v.*
*Cellucci*, 52 F. Supp.2d 231, 235 (D. Mass. 1999); *Martin v. Voinovich*, 840 F.
Supp. 1175, 1200 (S.D. Ohio 1993).

*South Camden* does not stand for the proposition that a plaintiff, in enforcing a statutory right, cannot rely on regulations to "define or flesh out the content of a specific right conferred upon the plaintiffs by" the statute. *Id.* In this case, Plaintiff's claims are based on Title XIX's statutory provisions. Second Am. Compl. ¶ 62. In most instances, the cited regulations essentially mirror the statutory requirements (including the example cited by Defendants -- 42 U.S.C. § 1396r(b)(4)(v) and 42 C.F.R. § 483.15(f)). To the extent that there is some variation in language between the cited statutory and regulatory provisions, the regulations simply "define or flesh out the content" of the statutory rights; they do not create any unique rights unrelated to the statute.

## V. **PLAINTIFF HAS STANDING.**

### A. **Review of Evidence Outside the Pleadings.**

Defendants assert that Plaintiff PP&A lacks standing. Defs.' Br. at 32-46. In perhaps their most disingenuous argument, Defendants argue that Plaintiff's standing must be judged solely by the pleadings even though the case is now at the summary judgment stage and the Defendants have waited seventeen months after the case was initiated to challenge the Plaintiff's standing. *See Fair Housing Council of Suburban Philadelphia v. Montgomery Newspapers*, 141 F.3d 71, 76 (3d Cir. 1998) (explaining significant difference in requirements for standing between pleading and summary judgment stage). Discovery has been completed, including extensive discovery concerning Plaintiff's standing. Defendants deposed

40

PP&A's Executive Director, four PP&A staff persons, and a PP&A consultant. Plaintiff also produced numerous documents to Defendants that supported its standing. Defendants are well aware that Plaintiff can now readily *prove* -- not merely *plead* -- its standing to pursue the claims in this case. Plaintiff detailed the factual basis for its standing in its Statement of Undisputed Facts submitted with its Motion for Partial Summary Judgment that was served several weeks prior to Defendants' filing this Motion. *See* Statement of Undisputed Facts ## 1-3. Given the advanced stage of the proceedings, it is appropriate that the Court consider not merely the allegations in the pleadings, but, also, the factual evidence -- evidence which Plaintiff submitted along with its Motion for Partial Summary Judgment.[12]

### B. PP&A Has Standing to Litigate the ADA and RA Claims in its Own Right.

It is well-established that an organization may pursue a claim on its own behalf if it can satisfy the minimum requirements for standing under Article III of the Constitution. *E.g., Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378-79

---

[12]    Generally a court does not look beyond the pleadings when a facial attack on standing is launched. However, the courts have allowed defendants -- at the pleading stage -- to submit evidence to challenge standing. *See Gould Electronics, Inc. v. United States*, 220 F.3d 169, 176-77 (3d Cir. 2000); *Robinson v. Dalton*, 107 F.3d 1018, 1021 (3d Cir. 1997). It would certainly be odd for the court to disregard evidence put forward by a plaintiff to prove its standing (particularly where, as here, the case is in fact past the pleadings stage). At the very least, the Court should consider the evidence to determine whether the Plaintiff should be permitted, if necessary, to amend the pleadings to cure any technical defect in its standing allegations.

41

(1982); *Warth v. Seldon*, 422 U.S. 490, 511 (1975).  The Article III criteria for standing are that:  (1) the plaintiff has suffered an "injury in fact"; (2) there is a "causal connection between the injury and the challenged conduct"; and (3) there is "a likelihood that the injury will be redressed by a favorable decision."  *United Food and Commercial Workers Union Local 751 v. Brown Group, Inc.*, 517 U.S. 544, 551 (1996).[13]  PP&A meets each of these criteria.[14]

In *Havens Realty Corp.*, the Supreme Court recognized that an organization that provided housing counselling and referral services had standing to pursue a

---

[13]     In addition to the Article III standing requirements, courts, if they choose, may limit standing based on "prudential" considerations.  *Fair Housing Council of Suburban Philadelphia*, 141 F.3d at 74.  Congress, though, may direct that standing be limited only by Article III requirements, thus precluding courts from imposing further prudential requirements.  *Id.* at 75.  It is established that prudential considerations may not be used to limit standing to pursue claims under the ADA and the RA.  *E.g., Liberty Resources, Inc. v. Southeastern Pennsylvania Transp. Auth.*, 155 F. Supp.2d 242, 249-50 (E.D. Pa. 2001), *app. pending*.  Further, Congress has authorized PP&A to use litigation to ensure the protection of, and advocacy for, the rights of individuals with disabilities.  42 U.S.C. §§ 10805(a)(1)(B), 15043(a)(2)(A)(i); 29 U.S.C. § 794e(f)(3).  Since Congress conferred standing on P&A systems to pursue legal remedies to protect the rights of individuals with developmental disabilities, the courts may not use "prudential considerations" to constrict P&A agencies' standing; they need only assure that the agencies satisfy the Article III minimum criteria.  *Risinger v. Concannon*, 117 F. Supp.2d 61, 69-70 (D. Me. 2000); *Brown v. Stone*, 66 F. Supp.2d 412, 423-25 (E.D.N.Y. 1999); *cf. United Food and Commercial Workers Union Local 751*, 517 U.S. at 558 (holding that prudential considerations were abrogated by Congress in a statute that conferred standing on union to sue on behalf of members).

[14]     PP&A seeks to pursue the ADA and RA claims both in its own right and as a representative for SMRC residents.  PP&A seeks to pursue its Title XIX claims only as a representative for SMRC residents.  PP&A's representational standing is discussed in the following section.

42

Fair Housing Act claim to challenge defendants' steering practices that impaired its ability to provide such services and caused it to expend its resources. 455 U.S. at 379. Following *Havens*, the Third Circuit has repeatedly acknowledged that an organization's expenditure of time, money, and resources necessary to address unlawful conduct creates an injury in fact. *E.g., Alexander v. Riga*, 208 F.3d 419, 427 n.4 (3d Cir. 2000), *cert. denied*, 531 U.S. 1069 (2001); *Fair Housing Council of Suburban Philadelphia*, 141 F.3d at 75-76; *Robinson v. Block*, 869 F.2d 202, 207, 210 n.9 (3d Cir. 1989).

PP&A has been injured by, *inter alia*, Defendants' failure to make available community-based mental health and mental retardation services to SMRC residents for whom such services are appropriate.   One of PP&A's most important priorities, established by its Board of Directors, has been and continues to be advocacy to assure the provision of appropriate community-based services to persons who are unnecessarily segregated in institutions.  As part of this priority, PP&A spends substantial time, money, and resources to advocate for the development of an array of appropriate community alternatives for persons with mental, developmental, and physical disabilities to maximize their integration and participation in society.  Casey Decl. ¶ 3 (Exh. 5).[15]

---

[15]    The original of this Declaration is Exhibit 3 in support of Plaintiff's Motion for Partial Summary Judgment.

43

In pursuit of that priority, PP&A expended time, money, and resources to advocate for the provision of such services to SMRC residents.[16]  Specifically:

- In May 1999, several PP&A staff spent two days on-site at SMRC making observations about care and treatment; interviewing residents and staff; and reviewing resident records.  In July 1999, PP&A submitted its detailed findings to Charles Curie, the former Deputy Secretary for DPW's Office of Mental Health and Substance Abuse Services, raising a number of concerns about the environment and treatment at SMRC as well as the transfer of residents to SMRC from other state facilities instead of their placement in alternative community-based programs.  Letter from Mr. Casey to Mr. Curie dated July 26, 1999 and enclosed Report (Exh. 6); *see also* Letter from Mr. Casey to Mr. Curie dated Oct. 7, 1999 (Exh. 7); Leed Dep. at 17 (Exh. 8); Casey Decl. ¶ 6 (Exh. 5).

- PP&A staff returned to SMRC for ongoing, periodic reviews between late 1999 and August 2000.  At that time, they again made detailed observations about conditions and treatment; they interviewed residents and staff; and they reviewed resident records.  *See* Casey Decl. ¶ 7 (Exh. 5); Haugh Dep. at 27, 29-82 (Exh. 9) (spent approximately three days at SMRC); Leed Dep. at 17-34, 128-29 (Exh. 8) (spent approximately 30-40 days at SMRC); Beilharz Dep. at 42-43 (Exh. 10) (spent approximately 10 days at SMRC).  By letter dated June 15, 2000, PP&A submitted a report to SMRC Superintendent S. Reeves Power, Ph.D. that again raised concerns about conditions and treatment and about the lack of community alternatives for SMRC residents.  Letter from Ms. Beilharz to Dr. Power dated June 15, 2000 and Report (Exh. 11); Casey Decl. ¶ 7 (Exh. 5).

---

[16]     Although the Second Amended Complaint does not explicitly state that PP&A expended its time, money, and resources, the use of such magic words is not dispositive.  The Second Amended Complaint details PP&A staff's observations and resident reviews.  *See* Second Am. Compl. ¶¶ 28, 33-34, 37-39, 55-56, 58-59.  These activities are certainly sufficient for the Court to reasonably infer that PP&A expended its time, money, and resources.  Thus, even on the face of the pleadings alone, Defendants' standing challenge must fail.

- Between 1999 and 2000, PP&A staff met and corresponded with SMRC's superintendents to discuss issues of concern. *See* Casey Decl. ¶ 8 (Exh. 5); Letter from Ms. Beilharz to Dr. Power dated June 15, 2000 (Exh. 11); Letter from Ms. Beilharz to Dr. Power dated Feb. 28, 2000 (Exh. 12); Letter from Ms. Beilharz to Mr. Buckus dated Dec. 10, 1999 (Exh. 13). Additionally, PP&A's Executive Director discussed issues that are the subject of this litigation with former Deputy Secretary Curie. *See* Letter from Mr. Curie to Mr. Casey dated Oct. 29, 1999 (Exh. 14).

PP&A has finite resources with which to conduct numerous responsibilities. Casey Decl. ¶¶ 9-10 (Exh. 5). If DPW had adequately addressed the lack of community alternatives for SMRC residents when PP&A initially raised those issues in 1999, the time, money, and resources that PP&A subsequently spent (before this lawsuit was filed) in a continuing effort to have DPW address such issues could have been spent instead on some of the many other issues that affect its constituents with disabilities. *Id.* As a result of Defendants' failure to address the issue, PP&A diverted its time and resources from other efforts that impact its constituents. *Id.*

PP&A's expenditures of time, money, and resources due to DPW's failure to provide community-based mental health and mental retardation services to those SMRC residents for whom such services are appropriate -- and its concomitant diversion of its efforts and resources from other activities to benefit individuals with disabilities -- results in injury in fact to PP&A. In *ADAPT of Philadelphia v. Philadelphia Housing Authority*, Civil Action No. 98-4609, 2000 WL 433976

45

(E.D. Pa. Apr. 14, 2000) (Exh. 15), Judge Bartle ruled that time spent by organizations on advocacy related to the defendant's alleged violation of law, which diverted their time and resources away from other advocacy efforts, created an injury in fact to those organizations. *Id.* at *2, *6; *see also Liberty Resources, Inc.*, 155 F. Supp.2d at 251-52 (holding that advocacy organizations had standing based on, *inter alia*, time spent meeting with defendant on the issue in question and counselling individuals).

PP&A also meets the other two constitutional criteria to pursue these claims. PP&A's injury in fact -- its expenditure of time, money, and resources -- is caused directly by Defendants' failure to provide community-based alternatives for SMRC residents. Absent the challenged actions and inactions by Defendants, PP&A would not have had to expend its time, money, and resources on advocacy and counselling efforts related to the issue and to divert its efforts and resources from other activities. Thus, there is a causal connection between PP&A's injury and the challenged conduct.

In addition, PP&A's injury can readily be redressed by a favorable decision. Declaratory and/or injunctive relief would assure that Defendants make available appropriate community-based mental health and mental retardation services to those SMRC residents for whom such services are appropriate. As a result, PP&A could turn its attention to the many other issues affecting the rights of individuals with disabilities.

46

## C.  PP&A Has Standing to Litigate the ADA and RA Claims on Behalf of SMRC Residents.

PP&A seeks to represent the rights of SMRC residents[17] to pursue its ADA, RA, and Title XIX claims.[18]  An organization may have "representational" or "associational" standing to pursue a claim on behalf of its members or constituents.   Contrary to Defendants' assertion, Defs.' Br. at 33, 35, an organization may have standing to assert the rights of its members or constituents regardless of whether it has itself suffered an injury that would confer standing to pursue claims on its own behalf.  *Pennsylvania Psychiatric Society v. Green Spring Health Services, Inc.*, No. 00-3403, 2002 WL 186008 at *7, *10 (3d Cir. Feb. 6, 2002) (Exh. 16).[19]  Nor are Defendants correct that Plaintiff must join SMRC

---

[17]   Defendants incorrectly assert that PP&A seeks to represent people with mental illness generally.  Defs.' Br. at 35, 45-46.  PP&A only seeks to represent residents of SMRC.  Although representational standing typically is asserted by a membership organization on behalf of its members, formal membership is not a prerequisite for such standing.  *E.g., Doe v. Stincer*, 175 F.3d 879, 885-86 (11th Cir. 1999).  Protection and advocacy systems, such as PP&A, can assert claims on behalf of their constituents if they meet the Article III criteria for representational standing.  *Id.*; *Risinger v. Concannon*, 117 F. Supp.2d at 71.

[18]   Defendants' challenge to PP&A's standing to represent SMRC members, on its face, addresses only the ADA and RA claims.  Defendants apparently do not challenge PP&A's standing to assert the Title XIX claims on behalf of SMRC residents.

[19]   Courts have upheld the standing of P&A agencies to litigate cases -- as PP&A is doing here -- to protect the interest of their constituents who have been harmed.  *E.g., Unzueta v. Schalansky*, No. 99-4162-RDR, 2000 WL 1472749 at *5 (D. Kan. July 6, 2000) (Exh. 17) (holding that allegations of a P&A were sufficient to confer representational standing on behalf of residents of psychiatric facility); *Brown v. Stone*, 66 F. Supp.2d at 425 (holding that a P&A had standing

residents in order to establish representational standing.  Defs.' Br. at 43.  The Third Circuit recently held that an organization (which was the sole plaintiff) can represent its member-physicians and its member-physicians' patients.  *Id.* at *3-*10.[20]

The Article III requirements for representational standing are:  (1) that the organization's constituents (in this case SMRC residents) would have standing to sue in their own right (i.e., that they have suffered an injury in fact caused by the challenged conduct that could be remedied by the lawsuit); and (2) that the interests the organization seeks to protect are germane to the organization's purpose.  *United Food and Commercial Workers Union Local 751*, 517 U.S. at 555-56; *Pennsylvania Psychiatric Society*, 2002 WL 186008 at *3.  Both criteria in this case are satisfied.

---

to sue on behalf of individuals with mental illness who were charged for mental health services); *Goldstein v. Coughlin*, 83 F.R.D. 613, 614-15 (W.D.N.Y. 1979) (holding that a P&A had standing to represent interests of persons in institution, especially those other than the named plaintiff).

[20]    In discussing whether the plaintiff could sue on behalf of its member-physicians' patients, the court stressed that the stigma associated with mental illness, combined with the practical impairments caused by the patients' mental illness, may well preclude the patients' ability to assert their own claims. *Pennsylvania Psychiatric Society*, 2002 WL 186008 at *8.  The court's recognition of the impact of mental illness on the ability and willingness of individuals with that disability to assert their own claims fatally undermines the Defendants' contention that SMRC residents -- who have severe mental illness and many of whom have been subject to long-term institutionalization -- must be joined in the lawsuit.

48

### 1. SMRC Residents Would Have Standing.

Despite urging the Court to judge Plaintiff's standing on the face of the pleadings, Defendants essentially disregard the standards of notice pleading in their argument that Plaintiff has failed to *prove with particularity* that all 175 SMRC residents could independently establish liability under the ADA and RA. Defs.' Br. at 36-39. It is sufficient that Plaintiff has alleged that there are SMRC residents who, with appropriate services and supports, could live in more integrated settings than SMRC and, indeed, has identified four particular SMRC residents who should receive services in a more integrated setting. Second Amended Compl. ¶¶ 55-56, 58-59, 69. This is sufficient. *E.g.*, *Risinger v. Concannon*, 117 F. Supp.2d at 70 (holding that PP&A had representational standing to pursue claim for failure to provide Medical Assistance services where complaint identified two individuals who were not receiving such services).[21]

Defendants' challenges to these allegations go to the merits of the claims, not standing. For example:

---

[21]     It is not necessary for Plaintiff to identify particular individuals on whose behalf they have filed suit. The entire point of representational standing is that the organization can file suit on behalf of its members or constituents and need not represent or identify them individually. The Eleventh Circuit has expressly rejected the argument that a P&A system must name a specific individual to bring suit to redress the rights of its constituents. *Doe v. Stincer*, 175 F.3d at 884-85; *see also Roe v. Operation Rescue*, 919 F.2d 857, 865-66 (3d Cir. 1990) (allegations that actions of abortion opponents might impede access to abortion clinics by groups' members were sufficient for standing and group need not produce a member actually seeking an abortion).

- Defendants contend that there can be no liability under the integration requirements of the ADA and RA because the treatment professionals have not recommended discharge of some of the SMRC residents. In interpreting the ADA's integration requirement, the Supreme Court noted that states "generally may rely on the reasonable assessments of its own professionals" to determine whether individuals are able to live in the community. *Olmstead v. L.C.*, 527 U.S. 581, 602 (1999). It did not hold that the judgments of treatment professionals are dispositive. *Frederick L.*, 157 F. Supp.2d at 541.

- Defendants contend that Plaintiff has an obligation to identify with particularity the precise placement that is appropriate for particular SMRC residents. Again, this is not necessary.

- Defendants argue that the states' limitation on resources precludes any possibility of liability. This may go to the fundamental alteration defense acknowledged by the *Olmstead* Court, 527 U.S. at 603-06, but it cannot be used to preclude standing. *Cf. Frederick L.*, 157 F. Supp.2d at 541 (rejecting motion to dismiss based on plaintiff's placement on a waiting list).

Further, as Defendants are well aware, Plaintiff has identified numerous, *specific* SMRC residents in its Statement of Undisputed Facts in support of its Motion for Partial Summary Judgment who -- either based on Defendants' own assessments or the assessments of Plaintiff's experts -- could live in the community if they were provided with appropriate services and supports. Statement of Undisputed Facts ## 66-74. Plaintiff also has addressed in detail the issue of "opposition" to community placement, both identifying *specific* SMRC residents who have expressed their affirmative desire to leave SMRC and exposing the chimera of the "opposition" issue. Statement of Undisputed Facts ## 85-94; Pl.'s Br. in Support of Motion for Partial Summary Judgment at 10-11, 27-29. If

Defendants want this information in the pleadings (and the Court concludes that it is necessary), Plaintiff requests leave to amend its complaint to include this information (including incorporating by reference the Plaintiff's experts' reports). Plaintiff, though, submits that this would go well beyond the scope of the notice pleading required by the Federal Rules of Civil Procedure.

Looking at the pleadings and the factual record, there can be little dispute that Plaintiff has alleged that certain SMRC residents could, with appropriate supports and services, live in more integrated settings. Defendants' failure to provide those individuals with appropriate, community-based services has caused them injury in fact (i.e., their continued segregation at SMRC).

Further, Plaintiff has alleged that the injury caused to those individuals was caused by Defendants. Plaintiff alleges that it is Defendants' obligation to assure the provision of adequate mental health and mental retardation services to Pennsylvanians. Second Am. Compl. ¶¶ 15, 48. The continued unnecessary segregation of individuals at SMRC, therefore, can be traced to Defendants. But for the failure of the Defendants to fulfill their obligations, SMRC residents would be served in appropriate, integrated settings. Looking beyond the pleadings further supports Plaintiff's ability to meet the "traceability" requirement for standing. As Plaintiff sets forth in its Motion for Summary Judgment, Defendants have caused the continued unnecessary segregation of SMRC residents through, *inter alia*, Defendants' total exclusion of SMRC residents from access to community-based

51

residential mental health services.   Statement of Undisputed Facts ## 51-65; Br. in Support of Pl.'s Motion for Partial Summary Judgment at 6-7, 24-25.

Finally, the SMRC residents' injuries are redressable with appropriate declaratory and injunctive relief issued by this Court.   Contrary to Defendants' arguments, Defs.' Br. at 42-43, there is no need for Plaintiff to plead -- or prove -- what specific community alternatives should be developed for which specific SMRC resident.   As Plaintiff has requested in its proposed Order submitted with its Motion for Partial Summary Judgment, the Court could issue an order (1) that requires independent evaluations of all SMRC residents to determine what, if any, community-based mental health and mental retardation services would meet their needs; and (2) that requires Defendants to fund and develop any identified community services in accordance with the independent reviews.

## 2.   The Interests Which PP&A Seeks to Represent Are Germane to its Organizational Purpose.

The second Article III criteria for representational standing, i.e., that the interests which the organization seeks to represent be germane to its organizational purpose, is satisfied readily in this case.   Requiring that an organizational plaintiff "be organized for a purpose germane to the subject of its members' claim raises an assurance that the association's litigators will themselves have a stake in the resolution of the dispute, and thus be in a position to serve as the defendant's natural adversary."   *United Food and Commercial Workers Union Local 512*, 517

U.S. at 565-66. Here, the statutory role of PP&A in protecting the rights of individuals with disabilities *per se* makes access to community-based services for SMRC residents germane to its organizational purpose. Congress authorized PP&A to protect the rights of and advocate for the interests of persons with disabilities. *See* discussion, *supra*, at 42 n.13. By itself, this is sufficient to satisfy the second criteria. *E.g.*, *Risinger v. Concannon*, 117 F. Supp.2d at 70; *cf. United Food and Commercial Workers Union Local 512*, 517 U.S. at 556 n.6 (holding that the statutory role of unions in protecting interests of members was sufficient to make company's alleged violation of federal law germane to union's purpose).

Moreover, one of PP&A's most important priorities has been to assure the provision of appropriate community-based services to persons who are unnecessarily segregated in institutions. As part of this priority, PP&A spends substantial time advocating for the development of an array of appropriate community alternatives for persons with disabilities to maximize their integration and participation in society. Casey Decl. ¶ 3 (Exh. 5).

Defendants' contention that PP&A cannot meet the germaneness requirement because it has a conflict of interest with SMRC residents is absurd. The alleged conflict stems from the assertion that some SMRC residents do not support community placement. The courts have allowed only "profound" conflicts to preclude representational standing. *See Retired Chicago Police Ass'n v. City of Chicago*,

76 F.3d 856, 864 (7th Cir.), *cert. denied*, 519 U.S. 932 (1996). Such conflicts can arise in one of two ways: (1) the association seeks standing to directly sue some of its own members; or (2) the association's suit, if successful, would cause a direct detriment to the interests of some of its members and the litigation was not properly authorized. *Id.* Neither type of conflict is present here. PP&A is not suing any SMRC residents nor would the relief it requests directly harm the interests of SMRC residents. The limited relief that PP&A seeks assures that there will be no conflict since it does not require the placement of any SMRC resident who actually opposes such placement. SMRC residents who want to live in the community can secure relief without harming SMRC residents who can choose to remain at SMRC after they are presented with realistic and appropriate community options and are able to make an informed choice.

### 3. Prudential Considerations Do Not Deprive PP&A Of Representational Standing.

Defendants argue that PP&A should be denied the right to represent its constituents because individual participation of its constituents is necessary. Defs.' Br. at 44-45. Although the Supreme Court in *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977), indicated that an organization was required to show that "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit," it subsequently held that this prong of the *Hunt* test was not grounded on Article III, but, rather, was a

54

prudential requirement.  *United Food and Commercial Workers Union Local 512*, 517 U.S. at 556-58.  The Court observed that representational standing "rests on the premise that in certain circumstances, particular relationships ... are sufficient to rebut the background presumption ... that litigants may not assert the rights of absent third parties."  *Id.* at 557.  Because Congress chose to allow protection and advocacy agencies to represent individuals with disabilities, it effectively removed prudential limits on standing in cases brought by P&A agencies.  *See* discussion, *supra*, at 42 n.13.

Even assuming that it is proper to consider such a prudential limitation, Defendants err in their assertion that participation by individual SMRC residents is necessary and that the level of such participation should preclude representational standing.  The Third Circuit's recent decision in *Pennsylvania Psychiatric Society* is instructive.   In that case, the plaintiff sued several managed care organizations ("MCOs") on behalf of its member psychiatrists and their patients.  The organization asserted an array of common law tort and contract claims based on allegations that the MCOs impeded necessary psychiatric treatment by refusing to authorize and provide reimbursement for medically necessary mental health treatment, terminated relationships with psychiatrists, failed to render timely payments, referred patients to inconvenient locations, and deprived some patients of access to treatment.  2002 WL 186008 at *2.  The Third Circuit rejected defen-

dants' contention that the organization lacked standing to represent its member psychiatrists because individual participation was essential to the case. *Id.* at *4-*6. The court observed that individual participation by an association's members often is unnecessary in cases that seek purely prospective relief, rather than damages. *Id.* at *3, *4 n.3. Further, the court noted that representational standing is not precluded simply because some members might have to provide discovery or testify at trial, as long as participation by all allegedly injured parties is not necessary. *Id.* at *4. While the MCOs argued that the claims required fact-intensive, individualized inquiries (e.g., decisions about whether to authorize treatment based on each patient's condition and benefits available under the variety of health care plans at issue), the court accepted the plaintiff's argument that its case involved systemic issues about the MCOs' practices that could be established with "sample testimony" and "may not involve specific, factually intensive, medical care determinations." *Id.* at *5. The court therefore concluded that as long as the plaintiff is able to establish its claims "with limited individual participation, it would satisfy the requirements for associational standing." *Id.* at *6.

Defendants' insistence that this case cannot be litigated without participation from SMRC residents ignores the simple fact that it has been. All discovery has been completed and Plaintiff has filed a motion for partial summary judgment on

the ADA and RA claims without the individualized participation of the SMRC residents. Plaintiff's ADA and RA claims simply do not require individualized proof since Plaintiff, like the association in *Pennsylvania Psychiatric Society*, raises systemic issues concerning the Defendants' policies and practices, including, for example, Defendants' wholesale exclusion of SMRC residents from eligibility for community-based mental health and mental retardation services for those SMRC residents for whom such services are appropriate.[22] Further, the relief sought on those claims, as demonstrated by Plaintiff's proposed order, does not require any individualized proof or participation by all SMRC residents. Plaintiff is not asking the Court to order Defendants to place any particular (much less all) SMRC residents in the community or to order particular placements for those residents. Rather, they seek a general order that would require independent assessments of those residents' needs and, to the extent that the assessments determine that the resident could be served in the community, the development of appropriate community alternatives.[23] Accordingly, Defendants' argument that this case

---

[22]     Defendants' reliance on *Toyota Motor Mfg. v. Williams*, ___ U.S. ___, 122 S. Ct. 681 (2002), is misplaced. That case simply addressed whether an individual is a person with a disability under the ADA. While that often will require an individualized assessment, *id.* at 692, Defendants do not dispute that SMRC residents -- all of whom have been authorized by DPW for nursing facility care -- are not persons with disabilities protected by the ADA.

[23]     Defendants' reliance on *Olmstead* to support its argument that individualized relief is required, Defs.' Br. at 44, is misplaced. Indeed, *Olmstead* makes plain that broad-based challenges to unnecessary institutionalization are

requires extensive individual participation by SMRC residents so as to defeat PP&A's standing to represent those residents is not supported by the facts and should be rejected.

## CONCLUSION

For all the reasons stated above, Plaintiff respectfully requests that the Court deny Defendants' Motion to Dismiss the Second Amended Complaint.

Respectfully submitted,

Dated: February 15, 2002          By: _____

Robert W. Meek
Robin Resnick
Disabilities Law Project
1315 Walnut Street, Suite 400
Philadelphia, PA  19107-4798
(215) 238-8070

and

Mark J. Murphy
Disabilities Law Project
1901 Law & Finance Building
429 Fourth Avenue
Pittsburgh, PA  15219-1505
(412) 391-5225

Counsel for Plaintiff

---

preferable to individual challenges. In discussing the fundamental alteration defense to the ADA, the Court suggested that relief that would allow one plaintiff who needs community services to jump ahead of other similarly situated individuals would be inappropriate. 527 U.S. at 604-06.

# CERTIFICATE OF SERVICE

I, Robert W. Meek, hereby certify that true and correct copies of Plaintiff's Brief in Opposition to Defendants' Motion to Dismiss Second Amended Complaint were served on the following by first class mail, postage prepaid on February 15, 2002:

> Michael L. Harvey, Esquire
> Senior Deputy Attorney General
> Office of Attorney General
> Strawberry Square
> Fifteenth Floor
> Harrisburg, PA  17120
>
> Howard Ulan, Esquire
> Senior Assistant Counsel
> Department of Public Welfare
> Office of Legal Counsel
> Health & Welfare Building
> Third Floor West
> Harrisburg, PA  17120
>
> Thomas J. Blazusiak, Esquire
> Senior Assistant Counsel
> Department of Public Welfare
> Office of Legal Counsel
> Allentown State Hospital
> Room 130 Medical Services Building
> 1600 Hanover Avenue
> Allentown, PA  18103

Robert W. Meek