*26*

*2/20/02*

*Je*

*2 for V*

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

**FILED**
**HARRISBURG**

FEB 1 9 2002

MARY E. D'ANDREA, CLERK

Per_____

**DEPUTY CLERK**

|  |  |  |
|---|---|---|
| PENNSYLVANIA PROTECTION AND ADVOCACY, INC., | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Civil Action No. 1:CV-00-1582 |
| | : | |
| DEPARTMENT OF PUBLIC WELFARE OF THE COMMONWEALTH OF PENNSYLVANIA, et al., | : | (Judge William W. Caldwell) |
| | : | |
| Defendants. | : | |

**EXHIBITS IN SUPPORT OF PLAINTIFF'S BRIEF
IN OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS SECOND AMENDED COMPLAINT**

Robert W. Meek
Robin Resnick
Disabilities Law Project
1315 Walnut Street, Suite 400
Philadelphia, PA 19107-4798
(215) 238-8070

Mark J. Murphy
Disabilities Law Project
1901 Law & Finance Building
429 Fourth Avenue
Pittsburgh, PA 15219-1505
(412) 391-5225

Counsel for Plaintiff

# LIST OF EXHIBITS

*Garcia v. S.U.N.Y. Health Sciences Center of Brooklyn*,
No. 00-9223, 2001 WL 1159970 (2d Cir. Sept. 26, 2001) . . . . . . . . .  1

Excerpts from Governor's Executive Budget 2002/03 . . . . . . . . . . . .  2

*Pennsylvania Protection and Advocacy, Inc. v. Dep't
of Public Welfare*,
C.A. No. 1:CV-00-1582, slip op. (Apr. 3, 2001) . . . . . . . . . . . . .  3

HCFA, *Olmstead Update No. 2* (July 25, 2000) . . . . . . . . . . . . . .  4

Declaration of Kevin Casey  . . . . . . . . . . . . . . . . . . . . . . .  5

Letter from Kevin Casey to Charles Curie and Report
dated July 26, 1999  . . . . . . . . . . . . . . . . . . . . . . . . . .  6

Letter from Kevin Casey to Charles Curie dated Oct. 7, 1999  . . . . . .  7

Transcript of Deposition of Margaret Leed  . . . . . . . . . . . . . . .  8

Transcript of Deposition of Diana Carra Haugh  . . . . . . . . . . . . .  9

Transcript of Deposition of Jacqueline Beilharz  . . . . . . . . . . . . 10

Letter from Jacqueline Beilharz to S. Reeves Power and
Report dated June 15, 2000  . . . . . . . . . . . . . . . . . . . . . . 11

Letter from Jacqueline Beilharz to S. Reeves Power
dated February 28, 2000  . . . . . . . . . . . . . . . . . . . . . . . . 12

Letter from Jacqueline Beilharz to Thomas Buckus
dated December 10, 1999 . . . . . . . . . . . . . . . . . . . . . . . . 13

Letter from Charles Curie to Kevin Casey dated October 29, 1999  . . . 14

*ADAPT of Philadelphia v. Philadelphia Housing Authority*,
C.A. No. 98-4609, 2000 WL 433976 (E.D. Pa. Apr. 14, 2000) . . . . . 15

*Pennsylvania Psychiatric Society v. Green Spring Health Services, Inc.*,
No. 00-3403, 2002 WL 186008 (3d Cir. Feb. 6, 2002) . . . . . . . . . . 16

*Unzueta v. Schalansky*,
No. 99-4162-RDR, 2000 WL 1472749 (D. Kan. July 6, 2000) . . . . . . 17

*Doe v. Sylvester*,
C.A. No. 99-891, 2001 WL 1064810 (D. Del. Sept. 11, 2001) . . . . . 18

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

2001 WL 1159970
12 A.D. Cases 538, 22 NDLR P 30
**(Cite as: 2001 WL 1159970 (2nd Cir.(N.Y.)))**

United States Court of Appeals,
Second Circuit.

**Francisco GARCIA, Plaintiff-Appellant,**
**v.**
**S.U.N.Y. HEALTH SCIENCES CENTER OF**
**BROOKLYN; Stephen E. Fox, Ph.D.,**
**individually and in official capacity; Jacqueline S.**
**Jakway, individually and**
**in official capacity; Lorraine Terracina, Ph.D.,**
**individually and as Dean of**
**Academic Affairs or her successor, Irwin M.**
**Weiner, M.D., individually and as**
**Dean of the College of Medicine or his successor;**
**and Russell Miller, M.D.,**
**individually and as President of the State**
**University of New York Health**
**Sciences Center or his successor, Defendants-**
**Appellees,**
**and**
**United States of America, Intervenor.**

**No. 00-9223.**

Argued Jan. 25, 2001.
Decided Sept. 26, 2001.

Student who was dismissed from state university medical school brought action against the university and university administrators and professors, seeking damages for alleged violations of his rights under the First Amendment free speech clause, the Americans with Disabilities Act (ADA), and the Rehabilitation Act. The United States District Court for the Eastern District of New York, Reena Raggi, J., dismissed the complaint, and student appealed. The Court of Appeals, Walker, Jr., Chief Circuit Judge, held that: (1) no causal connection existed between letter co-authored by the student to department chairman and his dismissal 13 months later as would support his First Amendment retaliation claim; (2) student could not sue state university medical school administrators and professors in their individual capacities under either ADA or the Rehabilitation Act; (3) as a whole, Title II of the ADA exceeded Congress's Fourteenth Amendment enforcement authority; (4) student could not maintain private suit for money damages under Title II of the ADA absent evidence

that the alleged Title II violation was motivated by either discriminatory animus or ill will due to disability; and (5) state did not knowingly waive its sovereign immunity against suit under remedies provision of Rehabilitation Act when it accepted federal funds for state university.

Affirmed.

**[1] Constitutional Law k90.1(1)**

92k90.1(1)

Under the "public concern doctrine," expression is not afforded First Amendment protection when it cannot be fairly considered as relating to any matter of political, social or other concern to the community, but is simply a personal matter. U.S.C.A. Const.Amend. 1.

**[2] Constitutional Law k90.1(1.4)**
92k90.1(1.4)

The "public concern doctrine" does not apply to student speech in the university setting, but is reserved for situations where the government is acting as an employer. U.S.C.A. Const.Amend. 1.

**[3] Constitutional Law k90.1(7.2)**
92k90.1(7.2)

The key to the First Amendment analysis of government employment decisions is that the government's interest in achieving its goals as effectively and efficiently as possible is elevated from a relatively subordinate interest when it acts as sovereign to a significant one when it acts as employer; while the government cannot restrict the speech of the public at large just in the name of efficiency, where the government is employing someone for the very purpose of effectively achieving its goals, such restrictions may well be appropriate. U.S.C.A. Const.Amend. 1.

**[4] Constitutional Law k90.1(1.4)**
92k90.1(1.4)

University students are not employed by the



government, so the government's interest in functioning efficiently is subordinate to the students' interest in free speech, and the need for the public concern doctrine to accommodate an elevated efficiency interest is therefore wholly absent. U.S.C.A. Const.Amend. 1.

**[5] Constitutional Law k90.1(1.4)**
92k90.1(1.4)

University students' speech deserves the same degree of protection that is afforded generally to citizens in the community, not the curtailed protection afforded government employees. U.S.C.A. Const.Amend. 1.

**[6] Constitutional Law k90.1(1)**
92k90.1(1)

To survive summary dismissal, a plaintiff asserting a First Amendment retaliation claim must advance non-conclusory allegations establishing: (1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action. U.S.C.A. Const.Amend. 1.

**[7] Colleges and Universities k9.35(3.1)**
81k9.35(3.1)

No causal connection existed between letter which first-year medical student co-authored to department chairman opposing the state university medical school's requirement that he retake a failed course during that summer and the student's dismissal after he unsuccessfully repeated first-year curriculum, as would support his First Amendment retaliation claim; some 13 months passed between the date of the letter and his dismissal, numerous university officials on two academic committees approved his dismissal based on substantial evidence of his persistent academic deficiencies, and the university made a reasonable proposal in good faith that, if accepted, would have avoided his dismissal. U.S.C.A. Const.Amend. 1.

**[7] Constitutional Law k90.1(1.4)**
92k90.1(1.4)

No causal connection existed between letter which first-year medical student co-authored to department chairman opposing the state university medical school's requirement that he retake a failed course during that summer and the student's dismissal after he unsuccessfully repeated first-year curriculum, as would support his First Amendment retaliation claim; some 13 months passed between the date of the letter and his dismissal, numerous university officials on two academic committees approved his dismissal based on substantial evidence of his persistent academic deficiencies, and the university made a reasonable proposal in good faith that, if accepted, would have avoided his dismissal. U.S.C.A. Const.Amend. 1.

**[8] Federal Courts k269**
170Bk269

Insofar as dismissed medical student was suing state university medical school administrators and professors in their official capacities under the Americans With Disabilities Act (ADA) and the Rehabilitation Act, he was seeking damages from the state, and the Eleventh Amendment therefore shielded them to the same extent that it shielded the university. U.S.C.A. Const.Amend. 11; 29 U.S.C.A. § 794a(a)(2); 42 U.S.C.A. § 12132.

**[9] Civil Rights k207(1)**
78k207(1)

Dismissed medical student could not sue state university medical school administrators and professors in their individual capacities under either Title II of the Americans With Disabilities Act (ADA), which prohibits discrimination by public entity against qualified individual with a disability in the benefits or activities of the public entity, or under remedies provision of vocational rehabilitation statute. 29 U.S.C.A. § 794a(a)(2); 42 U.S.C.A. § 12132.

**[10] Federal Courts k265**
170Bk265

**[10] Federal Courts k267**
170Bk267

The ultimate guarantee of the Eleventh Amendment is that nonconsenting states may not be sued by private individuals in federal court. U.S.C.A. Const.Amend. 11.

**[11] Federal Courts k265**
170Bk265

Congress may abrogate Eleventh Amendment immunity when it both unequivocally intends to do



so and acts pursuant to a valid grant of constitutional authority. U.S.C.A. Const.Amend. 11.

**[12] Federal Courts k265**
170Bk265

Congress may not base its abrogation of the states' Eleventh Amendment immunity upon the powers enumerated in Article I of the Constitution. U.S.C.A. Const. Art. I; U.S.C.A. Const.Amend. 11.

**[13] Federal Courts k265**
170Bk265

The Fourteenth Amendment enforcement clause grants Congress the authority to abrogate the states' Eleventh Amendment sovereign immunity. U.S.C.A. Const.Amends. 11, 14.

**[14] Constitutional Law k82(6.1)**
92k82(6.1)

When operating under the Fourteenth Amendment enforcement clause, Congress may prohibit conduct that itself violates the Fourteenth Amendment's substantive guarantees, and may remedy or deter violations of these guarantees by prohibiting a somewhat broader swath of conduct than is otherwise unconstitutional, subject to the requirement that there be congruence and proportionality between the violation to be prevented or remedied and the means adopted to that end; Congress may go no further, however, for to do so would work a substantive redefinition of the guarantees of the Fourteenth Amendment. U.S.C.A. Const.Amend. 14.

**[15] Constitutional Law k82(6.1)**
92k82(6.1)

Congress has been given in the Fourteenth Amendment enforcement clause only the power to enforce, not the power to determine what constitutes a constitutional violation. U.S.C.A. Const.Amend. 14.

**[16] Constitutional Law k213.1(2)**
92k213.1(2)

Where disability discrimination is at issue, the Fourteenth Amendment only proscribes government conduct for which there is no rational relationship between the disparity of treatment and some legitimate governmental purpose. U.S.C.A. Const.Amend. 14.

**[17] Constitutional Law k213.1(2)**
92k213.1(2)

Where disability discrimination is at issue, so long as a state's disparate actions are rationally related to a legitimate purpose, no Fourteenth Amendment violation is presented even if the actions are done quite hard headedly or hardheartedly. U.S.C.A. Const.Amend. 14.

**[18] Constitutional Law k213.1(2)**
92k213.1(2)

Baseline considerations under the Fourteenth Amendment to determine whether a rational relationship exists between disparity of treatment and some legitimate governmental purpose where disability discrimination is at issue are, (1) the classification is permissible so long as there is any reasonably conceivable state of facts that could provide a rational basis for the classification, (2) a state has no obligation to produce evidence to sustain the rationality of a statutory classification, but rather, a statute is presumed constitutional and the burden is on the one attacking the legislative arrangement to negate every conceivable basis which might support it, and (3) the fit between the classification and the asserted government justification may be imperfect and may in practice result in some inequality. U.S.C.A. Const.Amend. 14.

**[19] Civil Rights k103**
78k103

In its entirety, Title II of the Americans With Disabilities Act (ADA), which prohibits discrimination by public entity against qualified individual with a disability in the benefits or activities of the public entity, exceeds Congress's authority under the Fourteenth Amendment enforcement clause; it is neither congruent nor proportional to the proscriptions of the Fourteenth Amendment, it shifts the burden of proof onto the state to defend the absence of an accommodation that would be presumptively permissible under the Fourteenth Amendment, with the burden of challenging it squarely on the plaintiff, and requires states to eradicate disparate effects divorced from any inquiry into intent. U.S.C.A. Const.Amend. 14; 42 U.S.C.A. § 12132.



**[19] Constitutional Law k225.1**
92k225.1

In its entirety, Title II of the Americans With Disabilities Act (ADA), which prohibits discrimination by public entity against qualified individual with a disability in the benefits or activities of the public entity, exceeds Congress's authority under the Fourteenth Amendment enforcement clause; it is neither congruent nor proportional to the proscriptions of the Fourteenth Amendment, it shifts the burden of proof onto the state to defend the absence of an accommodation that would be presumptively permissible under the Fourteenth Amendment, with the burden of challenging it squarely on the plaintiff, and requires states to eradicate disparate effects divorced from any inquiry into intent. U.S.C.A. Const.Amend. 14; 42 U.S.C.A. § 12132.

**[20] Civil Rights k200**
78k200

Title II of the Americans With Disabilities Act (ADA), which prohibits discrimination by a public entity against a qualified individual with a disability in the benefits or activities of the public entity, incorporates an implied private right of action, by virtue of its incorporation of the remedies provision of the Rehabilitation Act, which in turn incorporates the remedial scheme of Title VI of the Civil Rights Act of 1964, which prohibits discrimination by public entity against an individual on ground of race, color, or national origin, and which includes a judicially implied private cause of action. 29 U.S.C.A. § 794a(a)(2); 42 U.S.C.A. §§ 2000d, 12132, 12133.

**[21] Action k3**
13k3

When operating in the realm of judicially implied private rights of action, courts have a measure of latitude to shape a sensible remedial scheme that best comports with the statute.

**[22] Civil Rights k107(1)**
78k107(1)

To comport with the Fourteenth Amendment enforcement clause, a private suit for money damages under Title II of the Americans With Disabilities Act (ADA), which prohibits discrimination by a public entity against a qualified individual with a disability in the benefits or activities of the public entity, may only be maintained against a state if the plaintiff can establish that the Title II violation was motivated by either discriminatory animus or ill will due to disability. 42 U.S.C.A. §§ 12132, 12133.

**[23] Civil Rights k240(1)**
78k240(1)

To establish discriminatory animus, a plaintiff in a private suit for money damages under Title II of the Americans With Disabilities Act (ADA), which prohibits discrimination by a public entity against a qualified individual with a disability in the benefits or activities of the public entity, may rely on a burden-shifting technique similar to that adopted in *McDonnell Douglas,* or a motivating-factor analysis similar to that set out in *Price Waterhouse v. Hopkins,* both of which center on ferreting out injurious irrational prejudice. 42 U.S.C.A. §§ 12132, 12133.

**[24] Civil Rights k127.1**
78k127.1

Student who was dismissed from state university medical school after twice failing to successfully complete first-year curriculum, and who was subsequently diagnosed with attention deficit disorder (ADD) and a learning disability, was not entitled to monetary damages from the university, its administrators or professors under Title II of the Americans With Disabilities Act (ADA), which prohibits discrimination by a public entity against a qualified individual with a disability in the benefits or activities of the public entity, absent evidence that the defendants were motivated by irrational discriminatory animus or ill will based on his alleged learning disability; the crux of his claim was simply that the university denied him the accommodations he sought. 42 U.S.C.A. §§ 12132, 12133.

**[25] Civil Rights k103**
78k103

Remedies provision of the Rehabilitation Act exceeds Congress's authority under the Fourteenth Amendment enforcement clause. U.S.C.A. Const.Amend. 14; 29 U.S.C.A. § 794a(a)(2).

**[25] Constitutional Law k225.1**
92k225.1



Remedies provision of the Rehabilitation Act exceeds Congress's authority under the Fourteenth Amendment enforcement clause. U.S.C.A. Const.Amend. 14; 29 U.S.C.A. § 794a(a)(2).

**[26] Federal Courts k266.1**
170Bk266.1

When providing funds from the federal purse, Congress may require as a condition of accepting those funds that a state agree to waive its Eleventh Amendment sovereign immunity from suit in federal court. U.S.C.A. Const.Amend. 11.

**[27] Federal Courts k266.1**
170Bk266.1

That Congress clearly expressed intent in Rehabilitation Act to condition acceptance of federal funds on a state's waiver of its Eleventh Amendment immunity was not sufficient for Court of Appeals to find that state actually waived its sovereign immunity in accepting federal funds for state university. U.S.C.A. Const.Amend. 11; 42 U.S.C.A. § 2000d-7.

**[28] Federal Courts k266.1**
170Bk266.1

As is the case with the waiver of any constitutional right, an effective waiver of a state's Eleventh Amendment sovereign immunity requires an intentional relinquishment or abandonment of a known right or privilege. U.S.C.A. Const.Amend. 11.

**[29] Federal Courts k266.1**
170Bk266.1

In assessing whether a state has made a knowing and intentional waiver of its Eleventh Amendment immunity, every reasonable presumption against waiver is to be indulged. U.S.C.A. Const.Amend. 11.

**[30] Federal Courts k266.1**
170Bk266.1

State did not knowingly waive its sovereign immunity against suit under remedies provision of Rehabilitation Act when it accepted federal funds for state university. U.S.C.A. Const.Amend. 11; 29 U.S.C.A. § 794a(a)(2).

**[31] Civil Rights k107(1)**
78k107(1)

A plaintiff may recover money damages from a non-state governmental entity under either Title II of the Americans With Disabilities Act (ADA), which prohibits discrimination by a public entity against a qualified individual with a disability in the benefits or activities of the public entity, or under the remedies provision of the Rehabilitation Act, upon a showing of a statutory violation resulting from deliberate indifference to the rights secured the disabled by the acts. 29 U.S.C.A. § 794a(a)(2); 42 U.S.C.A. § 12132.

**[32] Civil Rights k262.1**
78k262.1

Private individuals may obtain injunctive relief for state violations of Title II of the Americans With Disabilities Act (ADA), which prohibits discrimination by a public entity against a qualified individual with a disability in the benefits or activities of the public entity. 42 U.S.C.A. § 12132.

Plaintiff-appellant Francisco Garcia appeals from a judgment of the United States District Court for the Eastern District of New York (Reena Raggi, District Judge), dismissing his complaint that alleged violations of the free speech guarantee of the First Amendment, see U.S. Const. amend. I, Title II of the Americans with Disabilities Act, see 42 U.S.C. § 12132, and § 504 of the Rehabilitation Act, see 29 U.S.C. § 794a(a)(2). Affirmed.

Benjamin Z. Holczer, New York, NY, for Plaintiff-Appellant.

Mark Gimpel, Deputy Solicitor General (Eliot Spitzer, Attorney General of the State of New York; Deon J. Nossel, Assistant Solicitor General, of counsel), New York, NY, for Defendants-Appellees.

(William R. Yeomans, United States Assistant Attorney General, Civil Rights Division; Jessica Dunsay Silver; Seth M. Galanter; Washington, DC; for the United States as Intervenor.).

(Richard N. Simpson; Amy Ledoux; Sam R. Hananel; Ross, Dixon & Bell, L.L.P.; Washington, DC; S. Mark Goodman; Michael Hiestand; Arlington, VA; for Amicus Curiae Student Press Law Center on behalf of Plaintiff-Appellant.).

(Ogden A. Lewis; Daniel E. Wenner; Andrew H.

Tannenbaum; Davis Polk & Wardwell; New York, NY; for Amici Curiae Access Now, The Center for Independence of the Disabled in New York, Disability Advocates, Judge David L. Bazelon Center for Mental Health Law, League for the Hard of Hearing, Mood Disorders Support Group, National Association of the Deaf, National Association of Protection and Advocacy Systems, The National Multiple Sclerosis Society New York City Chapter, New York Association of Psychiatric Rehabilitation Services, New York Lawyers for the Public Interest, New York State Independent Living Council, and the State of Connecticut Office of Protection and Advocacy for Persons with Disabilities in Support of Plaintiff-Appellant.).

Before WALKER, Chief Judge, OAKES and PARKER, Circuit Judges.

JOHN M. WALKER, JR., Chief Judge:

*1 This appeal stems from plaintiff-appellant Francisco Garcia's dismissal from a New York state medical school, the State University of New York Health Sciences Center at Brooklyn ("SUNY"), following his repeated failure to successfully complete the first-year medical school curriculum. After his dismissal, Garcia visited a psychologist who subsequently diagnosed him as having attention deficit disorder and a learning disability. Relying on this diagnosis, Garcia sought readmission to SUNY. Although SUNY agreed to readmit Garcia, the two could not come to terms on how much of the first-year curriculum Garcia would have to retake and so Garcia never actually re- enrolled.

Instead, Garcia brought suit against defendants-appellees SUNY and various SUNY administrators and professors. Garcia's complaint alleged violations of (1) the free speech guarantee of the First Amendment, *see* U.S. Const. amend. I, (2) Title II of the Americans with Disabilities Act ("ADA"), *see* 42 U.S.C. § 12132, and (3) § 504 of the Rehabilitation Act, *see* 29 U.S.C. § 794a(a)(2). The complaint was dismissed by the United States District Court for the Eastern District of New York (Reena Raggi, *District Judge* ). *See Garcia v. State Univ. of New York Health Sciences Ctr. at Brooklyn,* No. CV 97-4189, 2000 WL 1469551 (E.D.N.Y. Aug.21, 2000). We affirm the district court's judgment dismissing the complaint.

Among other issues, this appeal raises the following question of first impression: whether, consistent with the Eleventh Amendment's guarantee of state sovereign immunity, Title II of the ADA and § 504 of the Rehabilitation Act may be applied against non-consenting states in private suits seeking money damages.

## BACKGROUND

Garcia enrolled in the medical program at SUNY in the fall of 1993. His first year was not a successful one. Garcia failed four courses--gross anatomy, genetics, neuroscience, and epidemiology--and was in the lowest quartile in four others.

On May 12, 1994, after he received his failing mark in gross anatomy, Garcia and six other students who failed the course wrote a letter to the Chairman of the Department of Anatomy and Cell Biology, Dr. M.A.Q. Siddiqui. The letter requested a change in SUNY's policy that required them to retake the entire gross anatomy course over the summer. They sought instead to retake only the portions of the course they had failed. Their request was rejected.

Because of Garcia's poor grades, the First Year Grades Committee ("Grades Committee") recommended that he repeat the entire first year curriculum. Garcia appealed this decision to the Academic Promotions Committee ("Promotions Committee"). He denied that he had any "difficulty understanding concepts, solving problems or learning material" and stated that he could do better next year by working harder. The Promotions Committee upheld the Grades Committee's decision and required Garcia to repeat the first year curriculum.

*2 Garcia's second year at SUNY (1994-95), which represented his second try at the first year curriculum, while somewhat improved, was still unsuccessful. He failed neuroscience again and barely passed embryology and histology/cell biology. This time the Grades Committee, after reviewing his academic record, recommended that he be dismissed. The Promotions Committee agreed and, in June 1995, Garcia was officially dismissed from SUNY.

Thereafter, Garcia arranged to be examined by an outside psychologist, Dr. Elizabeth Auricchio. She diagnosed him as having attention deficit disorder ("ADD") and a learning disability ("LD"). On approximately August 1, 1995, Garcia forwarded this diagnosis to SUNY with a request that he be readmitted and either have his neuroscience grade

adjusted to a passing mark or be permitted to take a make-up neuroscience exam scheduled for August 14, 1995.

On August 7, 1995, SUNY agreed to readmit Garcia, but refused to adjust his neuroscience grade or to permit him to sit for the August 14th make-up. Instead, SUNY conditioned Garcia's readmission on his (1) retaking the second and third trimesters of the first year curriculum, (2) working with SUNY's counselors to develop a study regimen to overcome his ADD and LD difficulties, and (3) undergoing a psychiatric evaluation and, if appropriate, treatment for his ADD.

Garcia states that "given his age (31 at the time), [his] financial situation and the humiliation he would face in explaining to family and friends that he was redoing the first year curriculum a third time, he rejected SUNY's proposal." He responded with a counter-proposal that he be permitted to advance to the second year curriculum without successfully completing neuroscience, and the following summer retake a neuroscience make-up course or make-up exam. SUNY rejected this proposal, explaining that,

 [a] student must successfully complete all basic science courses in the year in order to progress into the succeeding year. With your "Unsatisfactory" grade in Neuroscience, a major course in the first year curriculum, you are not eligible to take second year courses.

No further proposals were made, and Garcia was not readmitted to SUNY.

Garcia filed suit in federal district court in Brooklyn seeking $5 million in damages from SUNY and the other defendants; Garcia did not request injunctive relief. His complaint alleged (1) that his dismissal from SUNY in June 1995 was in retaliation for the May 1994 letter he had co-authored to Dr. Siddiqui opposing SUNY's requirement that he retake gross anatomy during that summer, and (2) that the defendants' refusal to permit him to sit for the make-up neuroscience exam or to adjust his 1994-95 neuroscience exam to a passing mark violated both Title II of the ADA and § 504 of the Rehabilitation Act.

Judge Raggi granted summary judgment in favor of the defendants. She concluded, *inter alia,* that (1) the letter to Dr. Siddiqui did not involve speech on a matter of "public concern" and thus was not protected by the First Amendment, and (2) the accommodations Garcia sought under Title II and §

504 were unreasonable. This appeal followed.

**\*3** While the appeal was pending, the Supreme Court handed down its decision in *Bd. of Tr. of the Univ. of Ala. v. Garrett,* 531 U.S. 351, 121 S.Ct. 955, 148 L.Ed.2d 866 (2001). The Court held that Title I of the ADA, which prohibits the states, municipalities and other employers from "discriminat[ing] against a qualified individual with a disability because of th[at] disability ... in regard to ... terms, conditions, and privileges of employment," 42 U.S.C. § 12112(a), is not an effective abrogation of state sovereign immunity under the Eleventh Amendment. *See Garrett,* 121 S.Ct. at 967-68. In light of *Garrett,* we requested that the parties brief the question of whether Title II of the ADA and § 504 of the Rehabilitation Act validly abrogate state sovereign immunity. The United States intervened with respect to this question.

**DISCUSSION**

I. First Amendment Retaliation

[1] Garcia contends that in dismissing his First Amendment retaliation claim, the district court erroneously relied on the "public concern" doctrine to hold that his May 1994 letter to Dr. Siddiqui was not protected speech. Under the public concern doctrine, when "expression cannot be fairly considered as relating to any matter of political, social or other concern to the community," but is simply a personal matter, it is not afforded First Amendment protection. *Connick v. Myers,* 461 U.S. 138, 146, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983).

[2][3] SUNY correctly concedes that the public concern doctrine does not apply to student speech in the university setting, *see Qvyjt v. Lin,* 932 F.Supp. 1100, 1108-09 (N.D.Ill.1996), but is reserved for situations where the government is acting as an employer, *see, e.g., Pickering v. Bd. of Educ.,* 391 U.S. 563, 574-75, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968); *Hellstrom v. U.S. Dep't of Veterans Affairs,* 201 F.3d 94, 97 (2d Cir.2000); *Morris v. Lindau,* 196 F.3d 102, 109-10 (2d Cir.1999).

 The key to the First Amendment analysis of government employment decisions ... is this: The government's interest in achieving its goals as effectively and efficiently as possible is elevated from a relatively subordinate interest when it acts as sovereign to a significant one when it acts as employer. The government cannot restrict the speech of the public at large just in the name of

efficiency. But where the government is employing someone for the very purpose of effectively achieving its goals, such restrictions may well be appropriate.

*Waters v. Churchill,* 511 U.S. 661, 675, 114 S.Ct. 1878, 128 L.Ed.2d 686 (1994) (plurality).

If every speech-related personnel decision were subjected to "intrusive oversight by the judiciary in the name of the First Amendment," effective government administration would be threatened and, in turn, the efficient provision of services and benefits would be jeopardized. *Connick,* 461 U.S. at 146. Limiting First Amendment protection to speech related to matters of public concern ameliorates this risk: it strikes " 'a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs.' " *Id.* at 140 (quoting *Pickering,* 391 U.S. at 568).

*4 [4][5] University students are not "employed" by the government, so the government's interest in functioning efficiently is "subordinate" to the students' interest in free speech. *Waters,* 511 U.S. at 675. The need for the public concern doctrine to accommodate an elevated efficiency interest is therefore wholly absent. University students' speech deserves the same degree of protection that is afforded generally to citizens in the community, not the curtailed protection afforded government employees. *See Healy v. James,* 408 U.S. 169, 180, 92 S.Ct. 2338, 33 L.Ed.2d 266 (1972) (stating that "state colleges and universities are not enclaves immune from the sweep of the First Amendment" and the "First Amendment protections should apply with [no] less force on college campuses than in the community at large").

Despite conceding that the district court erred in applying the public concern doctrine to Garcia's case, SUNY argues that the dismissal of Garcia's claim should nonetheless be affirmed. SUNY contends that Garcia has failed to advance factual allegations supporting a prima facie case of retaliation. We agree.

[6][7] "To survive summary dismissal, a plaintiff asserting [a] First Amendment retaliation claim[ ] must advance non-conclusory allegations establishing: (1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." *Dawes v. Walker,* 239 F.3d 489, 492 (2d Cir.2001); *see also Thaddeus X v. Blatter,* 175 F.3d 378, 386 87 (6th Cir.1999) (en banc) (per curiam). Garcia has failed to meet the third showing. There is no material evidence of a causal relation between the May 1994 letter Garcia co-authored to Dr. Siddiqui and Garcia's dismissal from SUNY in June of 1995. In fact, the record belies his claim of retaliation: (1) some thirteen months passed between the date of the letter and his dismissal, (2) numerous SUNY officials on both the Grades Committee and the Promotions Committee approved his dismissal, (3) those officials did so based on substantial evidence of Garcia's persistent academic deficiencies, and (4) SUNY made a reasonable proposal in good faith that, if accepted, would have avoided Garcia's dismissal.

II. Disability Discrimination Claims

A. Title II of the ADA

[8][9] SUNY and the other defendants argue that Garcia's Title II claim for money damages against them is barred by the Eleventh Amendment. In *Dube v. State Univ. of New York,* we held that "[f]or Eleventh Amendment purposes, SUNY is an integral part of the government of the State [of New York] and when it is sued the State is the real party." 900 F.2d 587, 594 (2d Cir.1990) (internal quotation marks omitted). Insofar as Garcia is suing the individual defendants in their official capacities, he is seeking damages from New York, and the Eleventh Amendment therefore shields them to the same extent that it shields SUNY. *See, e.g., Will v. Michigan Dep't of State Police,* 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989); *Kentucky v. Graham,* 473 U.S. 159, 165-66, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985). Insofar as Garcia is suing the individual defendants in their individual capacities, neither Title II of the ADA nor § 504 of the Rehabilitation Act provides for individual capacity suits against state officials. *See Walker v. Snyder,* 213 F.3d 344, 346 (7th Cir.2000) (Title II), *cert. denied,* --- U.S. ----, 121 S.Ct. 1188, 149 L.Ed.2d 104 (2001); *Alsbrook v. City of Maumelle,* 184 F.3d 999, 1005 n. 8 (8th Cir.1999) (en banc) (Title II); *Calloway v. Boro of Glassboro Dep't of Police,* 89 F.Supp.2d 543, 557 (D.N.J.2000) (Title II and § 504) (collecting similar cases); *Montez v. Romer,* 32 F.Supp.2d 1235, 1240-41 (D.Colo.1999) (Title II and § 504).



### 1. Eleventh Amendment Principles

**\*5** The Eleventh Amendment of the Federal Constitution provides in relevant part:

> The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State....

U.S. Const. amend. XI. On its face, the Eleventh Amendment does not reveal its applicability to the case at hand, for Garcia is not bringing suit against New York as a "Citizen of another State." *See Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 54, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996) (stating "the text of the Amendment would appear to restrict only the Article III diversity jurisdiction of the federal courts").

[10] Yet, as the Supreme Court has confirmed for over a century, *see Hans v. Louisiana*, 134 U.S. 1, 13, 10 S.Ct. 504, 33 L.Ed. 842 (1890), the significance of the Eleventh Amendment is not what it provides in its text, but the larger "background principle of state sovereign immunity" that it confirms. *Seminole Tribe*, 517 U.S. at 72. "The ultimate guarantee of the Eleventh Amendment is that nonconsenting States may not be sued by private individuals in federal court." *Garrett*, 121 S.Ct. at 962.

[11] This guarantee is not absolute. Congress may abrogate the "immunity when it both unequivocally intends to do so and 'act[s] pursuant to a valid grant of constitutional authority.' " *Id.* at 962 (quoting *Kimel v. Florida Bd. of Regents*, 528 U.S. 62, 73, 120 S.Ct. 631, 145 L.Ed.2d 522 (2000)). With respect to Title II of the ADA, it is clear that the Congress fully intended to abrogate state sovereign immunity. *See* 42 U.S.C. § 12202 ("A State shall not be immune under the eleventh amendment to the Constitution of the United States from an action in [a] Federal or State court of competent jurisdiction for a violation of this chapter."). What is unresolved, however, is whether Title II was enacted pursuant to a grant of constitutional authority that empowers Congress to abrogate state sovereign immunity.

[12] In enacting Title II, Congress purported to rely on its authority under both the Commerce Clause of Article I and § 5 of the Fourteenth Amendment. *See* 42 U.S.C. § 12101(b)(4) (invoking the "sweep of congressional authority, including the power to enforce the fourteenth amendment and to regulate commerce, in order to address the major areas of discrimination faced day-to-day by people with disabilities"). To the extent that Title II rests on Congress's authority under the Commerce Clause, it cannot validly abrogate state sovereign immunity. This is because "Congress may not ... base its abrogation of the States' Eleventh Amendment immunity upon the powers enumerated in Article I." *Garrett*, 121 S.Ct. at 962; *see also Seminole Tribe*, 517 U.S. at 72-73 ("The Eleventh Amendment restricts the judicial power under Article III, and Article I cannot be used to circumvent the constitutional limitations placed upon federal jurisdiction.").

[13] "Section 5 of the Fourteenth Amendment, however, does grant Congress the authority to abrogate the States' sovereign immunity." *Kimel*, 528 U.S. at 80. Thus, if Title II is a valid exercise of Congress's § 5 power, then nonconsenting states may be hailed into federal court by private individuals seeking money damages. *See Garrett*, 121 S.Ct. at 962. We turn our attention to this critical issue.

### 2. Title II and § 5 of the 14th Amendment

**\*6** [14][15] Section 5 of the Fourteenth Amendment authorizes Congress to " 'enforce,' by 'appropriate legislation' the constitutional guarantee that no State shall deprive any person of 'life, liberty or property, without due process of law,' nor deny any person 'equal protection of the laws.' " *City of Boerne v. Flores*, 521 U.S. 507, 517, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997). When operating under § 5, Congress may prohibit conduct that itself violates the Fourteenth Amendment's substantive guarantees. Congress may also remedy or deter violations of these guarantees by "prohibiting a somewhat broader swath of conduct" than is otherwise unconstitutional, *Garrett*, 121 S.Ct. at 963 (internal quotation marks and citations omitted), subject to the requirement that there be "congruence and proportionality between the [violation] to be prevented or remedied and the means adopted to that end." *City of Boerne*, 521 U.S. at 520. Congress may go no further, however, for to do so would work a substantive redefinition of the guarantees of the Fourteenth Amendment, and Congress "has been given [only] the power 'to enforce,' not the power to determine *what constitutes* a constitutional violation." *Kimel*, 528 U.S. at 81 (citations omitted) (emphasis in original); *see College Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 672, 119 S.Ct. 2219, 144 L.Ed.2d 605 (1999) ( "[T]he term

'enforce' [in § 5] is to be taken seriously--... the object of valid § 5 legislation must be the carefully delimited remediation or prevention of constitutional violations.").

[16][17] We turn to the specific question of whether Title II of the ADA is within the ambit of Congress's authority under § 5. Where disability discrimination is at issue, the Fourteenth Amendment only proscribes government conduct for which there is no rational relationship between the disparity of treatment and some legitimate governmental purpose. *See Garrett,* 121 S.Ct. at 963-64; *Cleburne v. Cleburne Living Center, Inc.,* 473 U.S. 432, 442-47, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). Indeed, "so long as [a state's disparate] actions" are rationally related to a legitimate purpose, no Fourteenth Amendment violation is presented even if the actions are done "quite hard headedly" or "hardheartedly." *Garrett,* 121 S.Ct. at 964.

[18] Several baseline considerations are applied under the Fourteenth Amendment to determine whether such a rational relationship in fact exists. First, the classification is permissible so long as "there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *See Heller v. Doe,* 509 U.S. 312, 320, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993) (internal quotation marks and citations omitted). Second, "[a] State ... has no obligation to produce evidence to sustain the rationality of a statutory classification." *Id.* "A statute is presumed constitutional and [t]he burden is on the one attacking the legislative arrangement to negative every conceivable basis which might support it." *Id.* (internal citation and quotation marks omitted). And finally, because "[t]he problems of government are practical ones and may justify, if they do not require, rough accommodations," the fit between the classification and the asserted government justification may be "imperfect" and may "in practice ... result[ ] in some inequality." *Id.* at 321 (internal quotation marks omitted).

*7 [19] Assessing the strictures of Title II against these baselines, the extent to which Title II is neither congruent nor proportional to the proscriptions of the Fourteenth Amendment becomes apparent. Consider Title II's requirement (as implemented through the DOJ regulations, *see* 42 U.S.C. § 12134) that a state make reasonable modifications in its programs, services or activities, *see* 28 C.F.R. §§ 35.130(b)(3)-(8), for "qualified individual [s] with a disability,"

*id.;* 42 U.S.C. § 12131(2), unless the state can establish that the modification would work a fundamental alteration in the nature of the program, service, or activity, *see* 28 C.F.R. § 35.130(b)(7). While the absence of a reasonable accommodation would be permissible under the Fourteenth Amendment so long as there were *any* rational basis for the absence, this provision of Title II allows but a single basis for not providing the accommodation: a showing that a fundamental alteration in the nature of the program, service, or activity would occur. *See Thompson v. Colorado,* 258 F.3d 1241, 1252 (10th Cir.2001) ("In contrast to the Equal Protection Clause prohibition on invidious discrimination against the disabled and irrational distinctions between the disabled and the nondisabled, Title II requires public entities to recognize the unique position of the disabled and to make favorable accommodations on their behalf.").

Moreover, whereas under the Fourteenth Amendment the absence of an accommodation would be presumptively permissible with the burden of challenging it squarely on the plaintiff, Title II shifts the burden of proof onto the state to defend the absence. Indeed, this burden shift is consistent with the elevated scrutiny generally applied to suspect classifications such as race and nationality, suggesting that Title II is working a substantive elevation in the status of the disabled in equal protection jurisprudence. *See Garrett,* 121 S.Ct. at 967 ("[Title I of the ADA] ... makes it the employer's duty to prove that it would suffer [an undue burden], instead of requiring (as the Constitution does) that the complaining party negate reasonable bases for the employer's decision."); *cf. Kimel,* 528 U.S. at 87-88 ("Measured against the rational basis standard of our equal protection jurisprudence, the ADEA plainly imposes substantially higher burdens on state employers.... [T]he Act's substantive requirements nevertheless remain at a level akin to our heightened scrutiny cases....").

Finally, while the Fourteenth Amendment countenances inequality in the treatment of the disabled as long as the disparate treatment is rationally related to a legitimate government end, Title II's requirement that state governments make reasonable modifications is far broader: the eradication of unequal effects. Specifically, Title II focuses on disparate effects divorced from any inquiry into intent. *See generally* Roger C. Hartley, *The New Federalism and the ADA: State Sovereign*

*Immunity from Private Damage Suits After* Boerne, 24 N.Y.U. Rev. L. & Soc. Change 481, 481-82 & n. 7 ("No other civil rights statute so aggressively roots out needless impediments to full participation in the mainstream of American economic and social life."). Even in cases involving suspect classifications subject to heightened scrutiny under the Fourteenth Amendment, disparate effects alone are insufficient to establish an equal protection violation. *See Garrett,* 121 S.Ct. at 967 (citing *Washington v. Davis,* 426 U.S. 229, 239, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976)); *see also Alsbrook,* 184 F.3d at 1009 (stating that "it cannot be said that Title II identifies or counteracts particular state laws or specific state actions which violate the Constitution. Title II targets *every* state law, policy, or program"); *cf. City of Boerne,* 521 U.S. at 535 ("In most cases, the state laws to which RFRA applies are not ones which will have been motivated by religious bigotry.").

**\*8** Although we find that Title II in its entirety exceeds Congress's authority under § 5, this conclusion does not end our inquiry as to whether Title II validly abrogates state sovereign immunity. This is because Title II need only comport with Congress's § 5 authority to the extent that the title allows private damage suits against states for violations.

[20] Title II itself is silent as to the parameters of when a monetary recovery may be had. [FN1] *See* 42 U.S.C. § 12133. Instead, Title II simply incorporates the remedial scheme of the Rehabilitation Act of 1973, *see* 29 U.S.C. § 794a(a)(2) (incorporated into Title II by 42 U.S.C. § 12133), which in turn incorporates the remedial scheme of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, *et seq. See Ferguson v. City of Phoenix,* 157 F.3d 668, 673 (9th Cir.1998). And significantly, Title VI's remedial scheme includes a judicially implied private cause of action. *See Guardians Ass'n v. Civil Serv. Comm'n, N.Y.C.,* 463 U.S. 582, 594-95, 103 S.Ct. 3221, 77 L.Ed.2d 866 (1983). Thus, by referencing Title VI's remedial scheme, Title II (and § 504 of the Rehabilitation Act) incorporate an implied private right of action.

[21] This is significant because, when operating in the realm of judicially implied private rights of action, courts "have a measure of latitude to shape a sensible remedial scheme that best comports with the statute." *Gebser v. Lago Vista Independent Sch. Dist.,* 524 U.S. 274, 284-85, 118 S.Ct. 1989, 141

L.Ed.2d 277 (1998) ("Because Congress did not expressly create a private right of action under Title IX, the statutory text does not shed light on the scope of available remedies."). We believe this latitude allows us to restrict the availability of Title II monetary suits against the states in a manner that is consistent with Congress's § 5 authority, and that thereby validly abrogates state sovereign immunity from private monetary suits under Title II. Indeed, since Congress expressly intended to abrogate the states' sovereign immunity under Title II, *see* 42 U.S.C. § 12202, it is particularly appropriate that we "fashion the scope of [the] implied right in a manner" that effectuates this aim and, at the same time, does not offend the Constitution. *Gebser,* 524 U.S. at 284; *see also Franklin v. Gwinnett County Publ. Schs.,* 503 U.S. 60, 66, 112 S.Ct. 1028, 117 L.Ed.2d 208 (1992) ("[A]lthough we examine the text and history of a statute to determine whether Congress intended to create a right of action, we presume the availability of all *appropriate* remedies unless Congress has expressly indicated otherwise." (emphasis added) (citations omitted)). Moreover, to do otherwise would lead to the following anomalous result: Congress passing a law that leaves the courts responsible for establishing the contours of the remedial scheme, only to have the courts adopt a scheme that compels a conclusion that the statute exceeds Congress's constitutional authority. *Cf. Public Citizen v. United States Dep't of Justice,* 491 U.S. 440, 465-66, 109 S.Ct. 2558, 105 L.Ed.2d 377 (1989) (counseling that courts should avoid interpretations that would render a statute unconstitutional).

**\*9** The question, therefore, is how Title II monetary claims against the states can be limited so as to comport with Congress's § 5 authority. The answer, we believe, is to require plaintiffs bringing such suits to establish that the Title II violation was motivated by discriminatory animus or ill will based on the plaintiff's disability. Government actions based on discriminatory animus or ill will towards the disabled are generally the same actions that are proscribed by the Fourteenth Amendment--i.e., conduct that is based on irrational prejudice or wholly lacking a legitimate government interest. *See* James Leonard, *A Damaged Remedy: Disability Discrimination Claims against State Entities under the Americans with Disabilities Act after* Seminole Tribe *and* Flores, 41 Ariz. L.Rev. 651, 727-37 (1999).

[22] We believe that adopting any lesser culpability standard for Title II monetary suits against states

would do little to achieve the congruence and proportionality required under § 5 of the Fourteenth Amendment. The point is made clear by consideration of the next lower culpability standard available: allowing monetary awards upon a showing of an intentional or willful violation of Title II itself. Simply requiring a "knowing" violation of Title II would still leave states subject to monetary liability for the full spectrum of conduct proscribed by the title even though, as we have already discussed, these proscriptions far exceed the authority afforded Congress under § 5. In other words, only requiring proof of an intentional or willful violation would still leave state governments subjected to monetary liability for engaging in conduct that is constitutionally permissible.

[23] While we hold that a private suit for money damages under Title II of the ADA may only be maintained against a state if the plaintiff can establish that the Title II violation was motivated by either discriminatory animus or ill will due to disability, we recognize direct proof of this will often be lacking: smoking guns are rarely left in plain view. To establish discriminatory animus, therefore, a plaintiff may rely on a burden-shifting technique similar to that adopted in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802-05, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), or a motivating-factor analysis similar to that set out in *Price Waterhouse v. Hopkins,* 490 U.S. 228, 252-258, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989).

To be sure, both the *McDonnell Douglas* and *Price Waterhouse* approaches will lessen a plaintiff's difficulty in establishing animus relative to what would be demanded under traditional rational basis review, which requires that a plaintiff disprove the existence of any legitimate government justification. However, since both the *McDonnell Douglas* and *Price Waterhouse* approaches center on ferreting out injurious irrational prejudice, which after all is the concern of the Fourteenth Amendment where the disabled are concerned, and since both leave the ultimate burden of proof for establishing animus on the plaintiff, we believe they comport with Congress's enforcement authority under § 5.    *See Kimel,* 528 U.S. at 81 ("Congress' § 5 power is not confined to the enactment of legislation that merely parrots the precise wording of the Fourteenth Amendment."); *see also City of Boerne,* 521 U.S. at 532 ("Preventive measures prohibiting certain types of [state] laws may be appropriate when there is reason to believe that many of the [state] laws

affected by the congressional enactment have a significant likelihood of being unconstitutional.").

**\*10** [24] Having determined that a showing of discriminatory animus or ill will based on disability is necessary to recover damages under Title II in a private action against a state, we turn to the facts of the instant case. Garcia's allegations are devoid of any contention that SUNY or the other defendants were motivated by irrational discriminatory animus or ill will based on his alleged learning disability. The crux of Garcia's claim is simply that SUNY denied him the accommodations he sought, namely allowing him to take "an already scheduled Neuroscience make-up exam" after he had twice failed the course or adjusting his neuroscience grade to a passing mark.

Because Garcia's Title II claim does not allege discriminatory animus or ill will based on his purported disability, we affirm the district court's grant of summary judgment dismissing it.

B. Section 504 of the Rehabilitation Act

Garcia alleges that in denying him the reasonable accommodations he sought following his dismissal from the medical program, SUNY and the other defendants also violated § 504 of the Rehabilitation Act. 29 U.S.C. § 794(a). Section 504 provides in pertinent part that,

> [n]o otherwise qualified individual with a disability ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance....

*Id.* SUNY does not dispute that at the time of the purported violation it was receiving federal financial assistance.

[25] Because § 504 of the Rehabilitation Act and Title II of the ADA offer essentially the same protections for people with disabilities, [FN2] *see Randolph v. Rodgers,* 170 F.3d 850, 858 (8th Cir.1999), our conclusion that Title II of the ADA as a whole exceeds Congress's authority under § 5 of the Fourteenth Amendment applies with equal force to § 504 of the Rehabilitation Act. [FN3] However, unlike Title II of the ADA, § 504 was enacted pursuant to Congress's authority under the Spending Clause of Article I. *See* U.S. Const. art. I, § 8, cl. 1.

[26] When providing funds from the federal purse, Congress may require as a condition of accepting those funds that a state agree to waive its sovereign immunity from suit in federal court. *See College Savings Bank,* 527 U.S. at 686-87; *see also South Dakota v. Dole,* 483 U.S. 203, 207, 107 S.Ct. 2793, 97 L.Ed.2d 171 (1987). Here, Garcia argues that § 2000d-7 of Title 42 operates as such a condition. Section 2000d-7 provides in pertinent part that,

[a] State shall not be immune under the Eleventh Amendment of the Constitution of the United States from suit in Federal Court for a violation of Section 504 of the Rehabilitation Act of 1973.

[27][28][29] While we agree with Garcia that this provision constitutes a clear expression of Congress's intent to condition acceptance of federal funds on a state's waiver of its Eleventh Amendment immunity, that conclusion alone is not sufficient for us to find that New York actually waived its sovereign immunity in accepting federal funds for SUNY. *But see Jim C. v. United States,* 235 F.3d 1079, 1082 (8th Cir.2000) (en banc). As the Supreme Court instructed in *College Savings Bank,*
**\*11** [t]here is a fundamental difference between a State's expressing unequivocally that it waives its immunity and Congress's expressing unequivocally its intention that if the State takes certain action [e.g., accepting federal funds] it shall be deemed to have waived that immunity.
*College Savings Bank,* 527 U.S. at 680-81. As is the case with the waiver of any constitutional right, an effective waiver of sovereign immunity requires an "intentional relinquishment or abandonment of a *known* right or privilege." *Id.* at 682 (quoting *Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938)) (emphasis added); *see also College Savings Bank,* 527 U.S. at 682 ("State sovereign immunity, no less than the right to trial by jury in criminal cases, is constitutionally protected."); *see also McGinty v. New York,* 251 F.3d 84, 95 (2d Cir.2001) (noting "stringent" standard for finding waiver of state sovereign immunity). And in assessing whether a state has made a knowing and intentional waiver, the Supreme Court has instructed that "every reasonable presumption against waiver" is to be indulged. *College Savings Bank,* 527 U.S. at 682 (internal quotation marks omitted).

[30] Turning to the instant case, we are unable to conclude that New York in fact waived its sovereign immunity against suit under § 504 when it accepted federal funds for SUNY. At the time that New York

accepted the conditioned funds, Title II of the ADA was reasonably understood to abrogate New York's sovereign immunity under Congress's Commerce Clause authority. Indeed, the ADA expressly provided that "[a] State shall not be immune under the eleventh amendment to the Constitution of the United States from an action in [a] Federal or State court of competent jurisdiction for a violation...." 42 U.S.C. § 12202. Since, as we have noted, the proscriptions of Title II and § 504 are virtually identical, a state accepting conditioned federal funds could not have understood that in doing so it was actually abandoning its sovereign immunity from private damages suits, *College Savings Bank,* 527 U.S. at 682, since by all reasonable appearances state sovereign immunity had already been lost, [FN4] *see Kilcullen,* 205 F.3d at 82.

Accordingly, Garcia's § 504 damage claim against New York fails because New York had not knowingly waived its sovereign immunity from suit. [FN5]

C. Related Observations

[31] Two final points deserve mention. First, prior to today, we have held that a plaintiff may recover money damages under either Title II of the ADA or § 504 of the Rehabilitation Act upon a showing of a statutory violation resulting from "deliberate indifference" to the rights secured the disabled by the acts. *Bartlett v. New York State Bd. of Law Examiners,* 156 F.3d 321, 331 (2d Cir.1998), *vacated on other grounds by* 527 U.S. 1031, 119 S.Ct. 2388, 144 L.Ed.2d 790 (1999); *see also Duvall v. County of Kitsap,* No. 99- 35934, 2001 WL 909293, at \*9-11, --- F.3d ----, ---- (9th Cir. Aug.14, 2001). Although today's decision alters that holding by requiring proof of discriminatory animus or ill will for Title II damage claims brought against states, nothing we have said affects the applicability of the deliberate indifference standard to Title II claims against non-state governmental entities. Moreover, deliberate indifference remains the necessary showing for § 504 claims since the Rehabilitation Act was enacted pursuant to Congress's Spending Clause authority and therefore does not require that damage remedies be tailored to be congruent and proportional to the proscriptions of the Fourteenth Amendment. [FN6]

**\*12** [32] Second, our holding that private damage claims under Title II require proof of discriminatory animus or ill will based on disability does not affect

Title II's general applicability to the states, *see Garcia v. San Antonio Metro. Transit Auth.,* 469 U.S. 528, 555-57, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1984), as no such challenge was raised in this appeal, *cf. Thompson,* 258 F.3d at 1255 n. 11. Thus, actions by private individuals for injunctive relief for state violations of Title II have not been foreclosed by today's decision, *see Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908); *see also Garrett,* 121 S.Ct. at 968 n. 9.

## CONCLUSION

We have carefully considered the plaintiff's remaining contentions and find them without merit. Accordingly, the judgment of the district court dismissing the action is affirmed.

Each side to bear its own costs for this appeal.

FN1. This differs from Title I of the ADA which provided for monetary recovery for all violations of the provision. For example, while compensatory damages were available only for disparate treatment violations under Title I, *see* 42 U.S.C. § 1981a(a)(2), back pay was expressly available for all Title I violations (i.e., both disparate treatment and disparate impact violations), *see* 42 U.S.C. § 12117(a) (incorporating Title VII's provision of back-pay damage awards for both disparate treatment and disparate impact violations).

Thus, for it to validly abrogate state sovereign immunity, Title I, measured as a whole, had to target in a "congruent and proportional" manner conduct otherwise proscribed by the Fourteenth Amendment. *Garrett,* 121 S.Ct. at 963 ("[Section] 5 legislation reaching beyond the scope of § 1's actual guarantees must exhibit 'congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end.' "). The same was true for the Age Discrimination in Employment Act of 1967. *See* 29 U.S.C. §§ 630(b) & 633a(c); *see, e.g., Wheeler v. McKinley Enters.,* 937 F.2d 1158, 1162 (6th Cir.1991) ("Where a plaintiff proves that he was discharged because of his age in violation of the ADEA, he is entitled to recover, at a minimum, any back pay lost as a proximate result of the violation."); *see also Kimel,* 528 U.S. at 69.

FN2. Indeed, the most significant distinction between Title II of the ADA and § 504 of the Rehabilitation Act is their reach. While Title II applies to all state and municipal governments, § 504 applies only to those government agencies or departments that accept federal funds, and only those periods during which the funds are accepted. *See Jim C. v. United States,* 235 F.3d 1079, 1081 (8th Cir.2000) (en banc) ("A State and its instrumentalities can avoid § 504's waiver requirement on a piecemeal basis, by simply accepting federal funds for some departments and declining them for others.").

FN3. In *Kilcullen v. New York State Dep't of Labor,* 205 F.3d 77, 78-81 (2d Cir.2000), we relied on the legislative history of Title I of the ADA to hold that the employment provisions of the Rehabilitation Act were valid exercises of congressional authority under § 5 of the Fourteenth Amendment. *See id.* at 82 ("As Congress included identical unequivocal abrogation provisions in the ADA and the Rehabilitation Act, and as [Title I of] the ADA and Section 504 of the Rehabilitation Act impose identical obligations upon employers, the validity of abrogation under the twin statutes presents a single question for judicial review."). However, *Kilcullen* has since been implicitly abrogated by the Supreme Court's decision in *Garrett,* 121 S.Ct. at 965 ("The legislative record of [Title I of] the ADA, however, simply fails to show that Congress did in fact identify a pattern of irrational state discrimination in employment against the disabled.").

FN4. We recognize that an argument could be made that if there is a colorable basis for the state to suspect that an express congressional abrogation is invalid, then the acceptance of funds conditioned on the waiver might properly reveal a knowing relinquishment of sovereign immunity. This is because a state deciding to accept the funds would not be ignorant of the fact that it was waiving its possible claim to sovereign immunity.

Even supposing such an argument to have merit, we would still conclude that New



York did not waive its sovereign immunity here. This is because throughout the entire period involved in this dispute during which SUNY was accepting federal funds-- September 1993 until August 1995--even the most studied scholar of constitutional law would have had little reason to doubt the validity of Congress's asserted abrogation of New York's sovereign immunity as to private damage suits under Title II. *Compare Pennsylvania v. Union Gas Co.,* 491 U.S. 1, 19-20, 109 S.Ct. 2273, 105 L.Ed.2d 1 (1989) (plurality opinion) (holding that Interstate Commerce Clause granted Congress the power to abrogate state sovereign immunity), *with Seminole Tribe,* 517 U.S. at 72-73 (1996) (expressly "overruling *Union Gas* " and holding that "Article I cannot be used to circumvent the constitutional limitations placed upon federal jurisdiction" by the Eleventh Amendment). *Compare also Katzenbach v. Morgan,* 384 U.S. 641, 651-52 n. 10, 86 S.Ct. 1717, 16 L.Ed.2d 828 (1966) (suggesting in dicta that Congress can increase the substantive protections of the Fourteenth Amendment under its § 5 authority), *with City of Boerne,* 521 U.S. at 527-29 (1997) (stating that "[t]here is language in ... *Katzenbach v. Morgan* ... which could be interpreted as acknowledging a power in Congress to enact legislation that expands the rights contained in § 1 of the Fourteenth Amendment" but holding that, in fact, no such authority exists).

FN5. Several of our sister circuits have held that a state's acceptance of federal funds constitutes a waiver of its sovereign immunity from suit under § 504 of the Rehabilitation Act. *See, e.g ., Jim C.,* 235 F.3d at 1082; *Clark v. California,* 123 F.3d 1267, 1271 (9th Cir.1997). These cases are unpersuasive because they focus exclusively on whether Congress clearly expressed its intention to condition waiver on the receipt of funds and whether the state in fact received the funds. None of these cases considered whether the state, in accepting the funds, believed it was actually relinquishing its right to sovereign immunity so as to make the consent meaningful as the Supreme Court required in *College Savings*

*Bank,* 527 U.S. at 682.

FN6. Where Spending Clause legislation is concerned, the Supreme Court has generally adopted deliberate indifference as the necessary showing for private damage recoveries. *See, e.g., Davis v. Monroe County Bd. of Educ.,* 526 U.S. 629, 643-47, 119 S.Ct. 1661, 143 L.Ed.2d 839 (1999); *Gebser,* 524 U.S. at 290-91. Adoption of this standard has been based on a general recognition that "Congress surely did not intend for federal moneys to be expended to support the intentional actions it sought by statute to proscribe." *Franklin,* 503 U.S. at 75; *Guardians Ass'n,* 463 U.S. at 597-99.

END OF DOCUMENT



COMMONWEALTH OF PENNSYLVANIA
OFFICE OF THE GOVERNOR
HARRISBURG

THE GOVERNOR                                                              February 5, 2002

To the People of Pennsylvania:

Pursuant to Article VIII Section 12 of the Constitution of Pennsylvania, and Section 613 of the Administrative Code of 1929 (71 P.S. Section 233), I am transmitting to your representatives in the General Assembly my proposed budget for Fiscal Year 2002-03.

My friends, this is a budget year unlike any other in modern Pennsylvania history. You need only look at the front cover of the book now in your hands to understand why. Less than five months ago, our nation was attacked, thousands killed and injured. A Pennsylvania field became the final resting place for the heroes of Flight 93. It was a devastating day. But it was a day that defined us — as Americans and as Pennsylvanians. I deliver this budget proposal to you as the only governor in America who holds this office as a direct result of September 11th. It has been shaped in many ways by the events of that day, and the weeks and months that followed. We are presented with a host of new challenges – what lies within these pages are my choices as to how we face them.

Pennsylvanians should feel good about our readiness to handle these challenges. We are a safe state. We were prepared for September 11th. We are better prepared now. And this budget lays the groundwork to ensure that we are more prepared with each passing day. But Pennsylvanians must not only be safe from terrorism, they must be safe from the fear of losing their paychecks.

That's why this budget aggressively builds on the commitments made by my predecessor and partner, Tom Ridge, to Pennsylvania's working families and job-creating entrepreneurs. September 11th accelerated the national recession in which we find ourselves today. But because of actions we took over the last seven years, Pennsylvania was among the last states to feel the full affect of the tightening economy. We budgeted conservatively to grow a Rainy Day Fund from just $66 million to $1.1 billion. That's why I am able to deliver a budget proposal that does not include a tax increase – the first time in modern Pennsylvania history that our state can survive a recession without asking its citizens to pay higher taxes. Further, this budget proposes that state spending grow by only six-tenths of one percent. This is not a frugal budget, but it is a thrifty one. It is not elaborate, but it is decisive. I think Pennsylvanians will agree with me that the times demand it.

This budget continues our focus on education – particularly on 215,000 children in Philadelphia, Pennsylvania's largest school district. Philadelphia's public schools have not been getting the job done, tragically failing these kids. A City/State partnership will trigger a new era of academic achievement and financial stability. To make it work, I am proposing an additional $75 million in state support for the Philadelphia School District. Combined with new financial resources from the City and the oversight of a newly created School Reform Commission to oversee the changes, I am confident we can transform that school system into a world-class urban district.

Friends, this is my first and last budget proposal. Although my term as governor will be short in duration, with your help, it will be long on accomplishment.

Sincerely,

*Mark Schweiker*

Mark Schweiker

GO TO TABLE OF CONTENTS ➤



# DEPARTMENT OF
# PUBLIC WELFARE

*The mission of the Department of Public Welfare is to promote, improve and sustain the quality of family life, break the cycle of dependency, promote respect for employes, protect and serve Pennsylvania's most vulnerable citizens, and manage our resources effectively.*

This mission is accomplished by promoting the financial independence of clients through a range of services including employment and training, work support, day care, medical assistance and transportation. The mission is also accomplished by providing community living arrangements for those in need of assistance with activities of daily living and, when necessary, through institutional care and treatment in settings that are responsive to human needs.

Services are provided through regional and county agencies, county assistance offices and through various types of public and private institutions and community-based settings.

**E32.1**



**Public Welfare**

*PROGRAM OBJECTIVE: To maximize the individual's capacity for independent living through the provision of an array of service and support programs.*

## Program: Mental Health

This program provides for an integrated mental health system consisting of comprehensive community mental health services and State operated hospitals. Community mental health services are administered under the Pennsylvania Mental Health and Mental Retardation (MH/MR) Act of 1966 and the Mental Health Procedures Act (MHPA) of 1976. There are nine mental hospitals and one restoration (long-term care) center in the State mental hospital system.

***Program Element: Community Mental Health Services***

The MH/MR Act of 1966 requires county governments to provide an array of community-based mental health services, including unified intake, community consultation and education, support for families caring for members with mental disorders and community residential programs. Community services are targeted to adults with serious mental illness and children/adolescents with or at risk of serious emotional disturbance. A key for all community care is case management designed to assist both families and residents of care facilities to access and manage needed services. Non-residential services include family-based support, outpatient care, partial hospitalization, emergency and crisis intervention and after care. Community residential services consist of housing support, residential treatment, inpatient care, crisis services and community residential rehabilitation (CRR) care. Services are administered by single counties, county joinders or through contracts with private, nonprofit organizations or agencies. Services, with some exceptions, are funded with State funds and county matching funds.

***Program Element: State Mental Hospitals***

State mental hospitals provide long-term inpatient care for individuals who require intensive inpatient treatment or individuals who have no available alternatives. Additionally, they provide specialized inpatient care for adolescents, criminal offenders and elderly (long-term) populations. Efforts continue to transfer patients to community mental health programs, providing a less restrictive level of care through the Community/Hospital Integration Projects Program (CHIPPs).

***Program Element: Behavioral Health Services***

The Behavioral Health Program provides, through grants to county governments, community mental health and drug and alcohol treatment services to low-income persons who are not eligible for Medical Assistance. Mental health services are targeted to persons who have serious mental illness with a history of involuntary psychiatric commitment or are receiving psychiatric services to avert institutionalization. Drug and alcohol services are targeted to persons receiving non-hospital drug and alcohol services or requiring three or more hospital detoxification admissions per year.



### Mental Hospitals
**Population Compared to Capacity**

*As more people receive mental health services in the community, the population at State mental hospitals has declined since July of 1995 by 2,382 or nearly 50%.*



**Public Welfare**

Program: Mental Health (continued)

| Program Measures: | 2000-01 | 2001-02 | 2002-03 | 2003-04 | 2004-05 | 2005-06 | 2006-07 |
|---|---|---|---|---|---|---|---|
| Persons provided mental health services (unduplicated) | 203,812 | 205,760 | 207,852 | 209,900 | 212,000 | 214,100 | 216,300 |
| State mental hospital population at end of fiscal year | 2,692 | 2,585 | 2,552 | 2,552 | 2,552 | 2,552 | 2,552 |
| Reduction of State Mental Hospital capacity through Community Hospital Integration Projects Program | 1,892 | 2,170 | 2,203 | 2,203 | 2,203 | 2,203 | 2,203 |
| Percentage of adults readmitted to State Mental Hospitals within one year of last discharge | 19% | 18% | 17% | 16% | 15% | 14% | 13% |
| Persons served in community residential mental health facilities | 7,165 | 7,217 | 7,322 | 7,400 | 7,470 | 7,550 | 7,620 |
| Persons receiving intensive case management | 16,163 | 16,305 | 16,501 | 16,666 | 16,832 | 17,000 | 17,170 |
| Persons receiving family based mental health services | 4,451 | 4,496 | 4,540 | 4,590 | 4,630 | 4,680 | 4,730 |

**Hospital and Restoration Center Populations for the Prior, Current and Upcoming Year:**

| State Mental Hospitals | Population July 2000 | Population July 2001 | Projected Population July 2002 | Projected Bed Capacity July 2002 | Projected Percent of Capacity July 2002 |
|---|---|---|---|---|---|
| Allentown | 216 | 189 | 199 | 200 | 99.5% |
| Clarks Summit | 228 | 238 | 221 | 276 | 80.1% |
| Danville | 201 | 174 | 159 | 175 | 90.9% |
| Eastern State School and Hospital | 8 | - | - | - | N/A |
| Harrisburg | 323 | 312 | 296 | 308 | 96.1% |
| Mayview | 426 | 414 | 407 | 462 | 88.1% |
| Norristown | 513 | 481 | 446 | 500 | 89.2% |
| South Mountain | 229 | 182 | 182 | 210 | 86.7% |
| Torrance | 292 | 255 | 257 | 300 | 85.7% |
| Warren | 253 | 238 | 204 | 287 | 71.1% |
| Wernersville | 239 | 209 | 214 | 250 | 85.6% |
| TOTAL | 2,928 | 2,692 | 2,585 | 2,968 | 87.1% |



**Public Welfare**

**Program: Mental Health (continued)**

### Total Proposed Expenditures by Hospital, Restoration Center and Community Programs:

| | 2000-01 Actual | 2001-02 Available | 2002-03 Budget | | 2000-01 Actual | 2001-02 Available | 2002-03 Budget |
|---|---|---|---|---|---|---|---|
| **Allentown** | | | | **South Mountain State Restoration Center** | | | |
| State Funds | $ 24,875 | $ 25,769 | $ 26,572 | State Funds | $ 12,152 | $ 9,299 | $ 11,320 |
| Federal Funds | 2,685 | 2,618 | 2,204 | Federal Funds | 8,976 | 11,424 | 10,080 |
| Augmentations | 1,883 | 1,652 | 1,677 | Augmentations | 2,067 | 1,923 | 1,828 |
| TOTAL | $ 29,443 | $ 30,039 | $ 30,453 | TOTAL | $ 23,195 | $ 22,646 | $ 23,228 |
| | | | | | | | |
| **Clarks Summit** | | | | **Torrance** | | | |
| State Funds | $ 27,528 | $ 26,314 | $ 27,053 | State Funds | $ 31,303 | $ 32,161 | $ 33,168 |
| Federal Funds | 3,533 | 4,842 | 4,688 | Federal Funds | 3,446 | 3,242 | 2,916 |
| Augmentations | 2,012 | 1,954 | 1,944 | Augmentations | 2,306 | 1,934 | 2,047 |
| TOTAL | $ 33,073 | $ 33,110 | $ 33,685 | TOTAL | $ 37,055 | $ 37,337 | $ 38,131 |
| | | | | | | | |
| **Danville** | | | | **Warren** | | | |
| State Funds | $ 22,520 | $ 23,157 | $ 24,755 | State Funds | $ 27,684 | $ 26,654 | $ 28,679 |
| Federal Funds | 2,697 | 3,115 | 1,994 | Federal Funds | 3,335 | 4,877 | 3,636 |
| Augmentations | 1,878 | 1,682 | 1,742 | Augmentations | 2,180 | 2,201 | 2,126 |
| TOTAL | $ 27,095 | $ 27,954 | $ 28,491 | TOTAL | $ 33,199 | $ 33,732 | $ 34,441 |
| | | | | | | | |
| **Eastern State School and Hospital** | | | | **Wernersville** | | | |
| State Funds | $ 2,064 | $ 0 | $ 0 | State Funds | $ 26,227 | $ 25,970 | $ 27,674 |
| Federal Funds | 1,682 | 0 | 0 | Federal Funds | 3,850 | 4,979 | 4,067 |
| Augmentations | 5 | 0 | 0 | Augmentations | 1,974 | 2,044 | 1,768 |
| TOTAL | $ 3,751 | $ 0 | $ 0 | TOTAL | $ 32,051 | $ 32,993 | $ 33,509 |
| | | | | | | | |
| **Harrisburg** | | | | **Administrative Cost** | | | |
| State Funds | $ 33,506 | $ 34,664 | $ 35,762 | State Funds | $ 4,492 | $ 4,114 | $ 3,407 |
| Federal Funds | 2,873 | 3,430 | 2,810 | Federal Funds | 45 | 0 | 0 |
| Augmentations | 2,357 | 2,006 | 1,971 | Augmentations | 20 | 100 | 0 |
| TOTAL | $ 38,736 | $ 40,100 | $ 40,543 | TOTAL | $ 4,557 | $ 4,214 | $ 3,407 |
| | | | | | | | |
| **Mayview** | | | | **Community Programs** | | | |
| State Funds | $ 53,520 | $ 54,179 | $ 56,045 | State Funds | $ 259,843 | $ 294,256 | $ 282,366 |
| Federal Funds | 4,790 | 4,374 | 3,405 | Federal Funds | 205,968 | 216,206 | 227,080 |
| Augmentations | 2,293 | 2,155 | 1,955 | Augmentations | 8,154 | 6,387 | 1,250 |
| TOTAL | $ 60,603 | $ 60,708 | $ 61,405 | TOTAL | $ 473,965 | $ 516,849 | $ 510,696 |
| | | | | | | | |
| **Norristown** | | | | **Maintenance and security costs for closed facilities** | | | |
| State Funds | $ 68,121 | $ 67,170 | $ 68,987 | State Funds | $ 890 | $ 899 | $ 1,208 |
| Federal Funds | 5,133 | 6,547 | 5,861 | | | | |
| Augmentations | 2,232 | 2,202 | 2,152 | | | | |
| TOTAL | $ 75,486 | $ 75,919 | $ 77,000 | | | | |



# Public Welfare

**Program: Mental Health (continued)**

## Program Recommendations:
This budget recommends the following changes: (Dollar Amounts in Thousands)

| | | |
|---|---|---|
| | **Mental Health Services** | |
| $ 8,954 | —to annualize prior year community placements and diversion costs. | |
| 2,696 | —to continue current program for community mental health. | |
| –99 | —revision of Federal financial participation from 54.39% to 54.68%. | |
| –4,684 | —savings due to implementation of HealthChoices in the Lehigh/Capital region. | |
| 11,632 | —to continue current program for State mental hospitals including impact on Federal earnings. | |
| –15,966 | —to reflect increased availability of Federal disproportionate share earnings. | |
| –1,500 | —nonrecurring project. | |
| 1,357 | —PRR — Expanding Home and Community Based Services. This Program Revision provides home and community-based services for 33 persons currently residing in State hospitals. See the Program revision following the Human Services program for additional information. | |

**Psychiatric Services in Eastern Pennsylvania**
$   –3,500   —nonrecurring project.

$   2,390   *Appropriation Increase*

All other appropriations are recommended at the current year funding level.

This budget also recommends $5,605,000 in Federal funds for disaster counseling preparedness initiatives.

## Appropriations within this Program:
(Dollar Amounts in Thousands)

| | 2000-01 Actual | 2001-02 Available | 2002-03 Budget | 2003-04 Estimated | 2004-05 Estimated | 2005-06 Estimated | 2006-07 Estimated |
|---|---|---|---|---|---|---|---|
| **GENERAL FUND:** | | | | | | | |
| Mental Health Services ........................ | $ 594,725 | $ 624,606 | $ 626,996 | $ 627,405 | $ 626,463 | $ 626,463 | $ 626,463 |
| Behavioral Health Services .................... | 46,960 | 47,909 | 47,909 | 47,909 | 47,909 | 47,909 | 47,909 |
| Psychiatric Services in Eastern PA ........... | 3,500 | 3,500 | 0 | 0 | 0 | 0 | 0 |
| Mental Health Advocacy Program .............. | 400 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL GENERAL FUND ................... | $ 645,585 | $ 676,015 | $ 674,905 | $ 675,314 | $ 674,372 | $ 674,372 | $ 674,372 |

3

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

PENNSYLVANIA PROTECTION AND        :
ADVOCACY, INC.,
            Plaintiff              :

                                   :

            vs.                    :        CIVIL ACTION NO. 1:CV-00-1582

                                   :

DEPARTMENT OF PUBLIC WELFARE OF :
THE COMMONWEALTH OF PENNSYLVANIA;
FEATHER O. HOUSTOUN, in her        :
official capacity as Secretary
of Public Welfare for the          :
Commonwealth of Pennsylvania;
CHARLES G. CURIE, in his           :
official capacity as Deputy
Secretary for Mental Health and :
Substance Abuse Services; and
S. REEVES POWER, Ph.D., in his  :
official capacity as
Superintendent of South Mountain:
Restoration Center,
            Defendants             :

FILED
HARRISBURG, P

APR - 3 2001

MARY E. D'ANDREA, CLERK
PER _____ DEPUTY CLERK

M E M O R A N D U M

I.    Introduction.

        We are considering the motion of the Plaintiff,

Pennsylvania Protection and Advocacy, Inc., under Fed. R. Civ. P.

15(a) for leave to file an amended complaint.  The amended

complaint would add Thomas J. Ridge, the Governor of the

Commonwealth of Pennsylvania, as a defendant in his official

capacity.

        Plaintiff, the entity charged with protecting the rights

of institutionalized Pennsylvanians, is suing the Pennsylvania

Department of Public Welfare (DPW) and the following defendants in

their official capacities: Feather O. Houstoun, the Secretary of

DPW; Charles G. Curie, the Deputy Secretary for Mental Health and

Substance Abuse Services; and S. Reeves Power, the Superintendent

of South Mountain Restoration Center, a state-run nursing

facility.  Plaintiff is suing under Title XIX of the Social

Security Act, 42 U.S.C. §§ 1396 to 1396v (West 1992 & Supp. 2000),

providing federal grants for state medical assistance programs;

the Rehabilitation Act, 29 U.S.C. § 794; the Americans with

Disabilities Act (ADA), 42 U.S.C. § 12101; and the Fourteenth

Amendment.  The Plaintiff claims that treatment being given to

residents at the Center violates these acts.  It seeks only

declaratory and injunctive relief.

The amended complaint would add Governor Ridge to all

the claims.  The Defendants have filed an answer to the original

complaint.


II.   Discussion.

When a defendant has already filed an answer, Rule 15(a)

authorizes an amended complaint only by leave of court.  However,

such leave should be granted "freely" . . . "when justice so

requires."  Resolution of the issue usually turns on whether the

nonmoving party would be prejudiced by the amendment.  See Lorenz

v. CSX Corp., 1 F.3d 1406, 1414 (3d Cir. 1993).  If there would be

no prejudice, then amendment should be allowed, regardless of the

2

moving party's delay in seeking amendment, unless the delay was undue or unexplained, or the party acted in bad faith or from a dilatory motive, or if the amendment would be futile.  Id.

"'Futility' means that the complaint, as amended, would fail to state a claim upon which relief could be granted." In re Burlington Coat Factory Secs. Litig., 114 F.3d 1410, 1434 (3d Cir. 1997) (citing Glassman v. Computervision Corp., 90 F.3d 617, 623 (1st Cir. 1996)).  Thus, in determining futility, we use the standard for deciding a Rule 12(b)(6) motion: "[A]ll facts alleged in the complaint and all reasonable inferences that can be drawn from them must be accepted as true." Malia v. General Elec. Co., 23 F.3d 828, 830 (3d Cir. 1994).

Although the Governor would be added to all the claims, in moving to amend, Plaintiff concentrates on the Rehabilitation Act claim, asserting that Governor Ridge is a proper defendant because he is "potentially the only Commonwealth official with the authority to accept federal Medicaid funds." (Pl. Br. at 5).  He would thus be the only proper defendant on the Rehabilitation Act claim since, as Plaintiff argues, the state recipient of those funds must be named as a defendant for that claim.  The Plaintiff also argues that the addition of Governor Ridge is not sought in bad faith nor would it cause undue delay.  Further, the Plaintiff does not intend to call the Governor as a witness or to involve him in discovery; he would be named solely to insure that it can obtain complete relief.

3

In opposition, Defendants only argue that amendment would be futile for two reasons, both based solely on the statutory language.  First, they contend that Governor Ridge cannot be added to the lawsuit because individuals cannot be sued under the Rehabilitation Act, only state agencies, and even if individuals could be, Governor Ridge is not the proper party to sue under the relevant provisions of the Act.  They rely on the Act's language prohibiting discrimination against individuals with a disability "under any program or activity receiving Federal financial assistance," 29 U.S.C. § 794(a) (West 1999 & Supp. 2000), and the Act's definition of "program or activity" as not including an individual.[1]

Defendants also rely on cases decided under the ADA to support their argument which, in their view, ruled that "state officials like Governor Ridge could not be sued for violating Title II of the ADA," (Def. Br. at 3), citing Walker v. Snyder,

---

[1]The Act defines "program or activity" as:

all of the operations of--

(1)(A) a department, agency, special purpose district, or other instrumentality of a State or of a local government; or

(B) the entity of such State or local government that distributes such assistance and each such department or agency (and each other State or local government entity) to which the assistance is extended, in the case of assistance to a State or local government . . . .

29 U.S.C. § 794(b)(1)(A), (B) (West 1999).

4

213 F.3d 344 (7th Cir. 2000), cert. denied, 121 S.Ct. 1188, 69

U.S.L.W. 3281 (U.S. Feb. 26, 2001)(No. 00-554); Lewis v. New

Mexico Dept. of Health, 94 F. Supp. 2d 1217 (D. N.M. 2000); and

Yeskey v. Pennsylvania, 76 F. Supp. 2d 572 (M.D. Pa. 1999)

(Caldwell, J.).

Second, Defendants argue that, even if the

Rehabilitation Act allows suits against state officials, the

Governor would not be a proper defendant because he is not an

official with the departments, agencies, entities or

instrumentalities made a part of the definition of "program or

activity" subject to the Act.  Rather, "[a]s Governor, he stands

apart from those agencies."  (Def. Br. at 4).

In reply to the first argument, Plaintiff points out

that Governor Ridge would be sued only in his official capacity

(as the other individual defendants have already been) and only

for declaratory and injunctive relief (no damages).  It argues

that under these circumstances Ex parte Young, 209 U.S. 123, 28

S. Ct. 441, 52 L.Ed. 714 (1908), authorizes his joinder under the

Rehabilitation Act and the ADA, citing among other cases, Sandoval

v. Hagan, 197 F.3d 484 (11th Cir. 1999), cert. granted sub nom.,

Alexander v. Sandoval, 121 S.Ct. 28 (2000); Nelson v. Miller, 170

F.3d 641 (6th Cir. 1999); and Armstrong v. Wilson, 124 F.3d 1019

(9th Cir. 1997).

As we view Defendants' first argument, it is not based

on the Eleventh Amendment, just on the statutory language, which

5

they say does not subject individuals to the Rehabilitation Act, or the ADA.  Thus, we see no need to analyze Plaintiff's cases dealing with _Ex parte Young_.  We can dispose of this argument against the joinder of the Governor simply by noting that he will be sued in his official capacity.  A suit against an individual in his official capacity is really one against the state.  See _Hafer v. Melo_, 502 U.S. 21, 112 S. Ct. 358, 116 L.Ed. 2d 301 (1991).  Hence, Defendants cannot defeat the Governor's joinder by relying on cases that reject Rehabilitation Act or ADA claims against individuals.

We turn now to Defendants' second argument, that Governor Ridge "stands apart" from the departments, agencies, entities or instrumentalities made a part of the definition of "program or activity" subject to the Act.  Plaintiff counters this argument, in part, by noting that under state law, Pa. Stat. Ann. tit. 62, § 201(1), (2) (West 2000), defendant DPW is the agency charged with obtaining eligible federal funds, but only "[w]ith the approval of the Governor."  We thus agree with Plaintiff that the Governor does not stand apart from this agency.

We will issue an appropriate order.


_William W. Caldwell_
William W. Caldwell
United States District Judge

Date: April 3, 2001

6

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

PENNSYLVANIA PROTECTION AND          :
ADVOCACY, INC.,
          Plaintiff                   :

                                      :

     vs.                              :        CIVIL ACTION NO. 1:CV-00-1582

                                      :

DEPARTMENT OF PUBLIC WELFARE OF :
THE COMMONWEALTH OF PENNSYLVANIA;
FEATHER O. HOUSTOUN, in her           :
official capacity as Secretary
of Public Welfare for the             :
Commonwealth of Pennsylvania;
CHARLES G. CURIE, in his              :
official capacity as Deputy
Secretary for Mental Health and :
Substance Abuse Services; and
S. REEVES POWER, Ph.D., in his        :
official capacity as
Superintendent of South Mountain:
Restoration Center,
          Defendants                  :

**FILED**
**HARRISBURG, PA**

APR - 3 2001

MARY E. D'ANDREA, CLERK

PER _____ DEPUTY CLERK

O R D E R

AND NOW, this *3rd* day of *April* , 2001, upon

consideration of Plaintiff's motion for leave to file an amended

complaint (doc. 15), it is ordered that:

    1.  Plaintiff's motion is granted.

    2.  The Clerk of Court shall docket the
first amended complaint, attached as exhibit B
to Plaintiff's exhibits (doc. 17) in support
of its motion, and issue a summons for
Governor Thomas J. Ridge.

    3.  Plaintiff is directed to serve the
summons and complaint on Governor Ridge.

William W. Caldwell
William W. Caldwell
United States District Judge



## Health Care Financing Administration

**Medicare**    **Medicaid**    **SCHIP**    **What's New**    **Site Index**

**Olmstead Update No: 2**
**Subject:** Questions and Answers
**Date:** July 25, 2000

Dear State Medicaid Director:

In our January 14, 2000 letter to you we conveyed our initial approach to compliance with the decision in Olmstead v. L.C., 119 S.Ct. 2176 (1999) and outlined a framework for us to respond to the challenge of crafting comprehensive, fiscally responsible solutions that comply with the Americans with Disabilities Act. As that letter indicated, the Olmstead decision challenges States to prevent and correct inappropriate institutionalization of persons with disabilities and to review intake and admissions processes to assure that persons with disabilities are served in the most integrated setting appropriate. We indicated our willingness to work closely with States to make effective use of Medicaid support in your planning and implementation of Olmstead. In that letter we also recognized that States may have specific issues and questions about the interaction between the ADA and the Medicaid program and we invited you to submit your comments to the DHHS Working Group for ADA/Olmstead.

Since the issuance of that letter we have received numerous questions from States and the disability community. We have begun to review, analyze and develop responses to those questions. Attached to this letter are some of the questions we have received along with our responses.

We urge you to continue to submit your questions and recommendations to us so that we may assist you. Such written correspondence may be sent to:

> DHHS Working Group for ADA/Olmstead
> c/o Center for Medicaid and State Operations
> HCFA, Room S2-14-26, DEHPG
> 7500 Security Boulevard
> Baltimore, MD 21244-1850

or e-mailed to:

ADA/Olmstead@hcfa.gov

This letter, as well as future questions and answers, will be posted on the Health Care Financing Administration's ADA/Olmstead website. That site can be found at http://www.hcfa.gov/medicaid/olmstead/olmshome.htm.

We look forward to continuing our work with you to improve the nation's community service system.

Sincerely,

Timothy M. Westmoreland                    Thomas Perez
Director                                   Director
Center for Medicaid and State Operations   Office for Civil Rights
Health Care Financing Administration

Enclosure

cc:
All HCFA Regional Administrators
All HCFA Associate Regional Administrators for Medicaid and State Operations
American Public Human Services Association
Association of State and Territorial Health Officials
National Association of State Alcohol and Drug Abuse Directors, Inc
National Association of State Directors of Developmental Disabilities Services
National Association of State Mental Health Program Directors
National Association of State Units on Aging
National Conference of State Legislatures
National Governors' Association

---

# Olmstead/ADA Questions and Answers

On January 14, 2000, the Department of Health and Human Services issued a letter to State Medicaid Directors discussing the Supreme Court's decision in Olmstead v. L.C., 119 S.Ct. 2176 (1999). In Olmstead, the Supreme Court affirmed that the unjustified segregation and institutionalization of people with disabilities constitutes unlawful discrimination in violation of the Americans with Disabilities Act (ADA). The January 14 letter sets out a process for technical assistance and information sharing, and indicated that questions and recommendations sent to the departmental workgroup would be posted on a special website. Accordingly, the following set of Qs&As has been posted on the site (see http://www.hcfa.gov/medicaid/olmstead/olmshome.htm).

## QUESTIONS ABOUT COMPLAINT INVESTIGATION AND DEVELOPING "COMPREHENSIVE, EFFECTIVELY WORKING" PLANS

Q1. Since the Supreme Court's ruling, the Department of Health and Human Services (DHHS) has received over 150 complaints from individuals and organizations alleging that States are not providing services to qualified individuals with disabilities in the most integrated setting. How is DHHS addressing these complaints?

A. DHHS' Office for Civil Rights (OCR) is responsible for investigating complaints alleging discrimination on the basis of disability by public entities related to health and human services, and by entities receiving funds from DHHS. OCR's first objective is to work promptly and cooperatively with all parties involved, including States and individuals with disabilities, to obtain voluntary compliance whenever possible that reflects the balanced approach outlined in Olmstead.

The Olmstead v. L.C. decision indicates that a court might find a State in compliance with the ADA integration mandate if it can demonstrate that it has a

"comprehensive, effectively working plan[s]" for providing services to individuals with disabilities in the most integrated setting, and a waiting list that moves at a reasonable pace not motivated by a desire to keep institutions full. While the court did not require States to undertake planning, we believe planning is a prudent and very practical recommendation for moving forward.

In appropriate cases, therefore, OCR is urging States to bring all relevant stakeholders together to develop and implement comprehensive and effective working plans for providing services to all qualified individuals with disabilities in the most integrated setting. OCR also is working with States to cooperatively resolve complaints filed on behalf of individuals. Only if OCR cannot negotiate a satisfactory resolution will ADA title II complaints be referred to the Justice Department (DOJ) for resolution.

Q2. What is the Federal government doing to aid States in developing these plans, and to help States increase their capacity to provide community-based treatment and supports for people with disabilities?

A. DHHS is providing technical assistance to promote effective implementation of its longstanding policy of facilitating care and service provision in the most integrated setting. Specifically, OCR is working with the Health Care Financing Administration (HCFA) to provide technical assistance regarding individual State's compliance with the ADA. Also, Federal financial participation is available at the administrative rate to design and administer plans to serve individuals with disabilities in the most integrated setting, subject to the normal condition that the changes must be necessary for the proper and efficient administration of the State's Medicaid program.

Even more significantly, DHHS is reviewing its own policies, programs, statutes and regulations to identify ways to enhance and improve the availability of community-based services. The Department recognizes that key programs, such as Medicaid, may sometimes present difficulties for people with disabilities to have access to quality care in the community. The Department is developing and will implement its own comprehensive plan to eliminate these barriers. Recognizing that housing is a critical need, we are also working with the Department of Housing and Urban Development (HUD) to improve affordable, accessible housing opportunities for people with disabilities (see Q17 below). DHHS is committed to working with States to increase community-based alternatives to institutional care.

Q3. What recommendations does DHHS have regarding the elements of a comprehensive, effectively working plan?

A. HCFA and OCR have developed a set of plan recommendations which were attached to the January 14, 2000 State Medicaid Director letter and we encourage States to follow them. Listed below are some of the principles underlying the recommendations contained in the letter. For complete information regarding how to effectively carry out each principle, please consult the January 14 letter.

Comprehensive, Effectively Working Plans

Principle: Develop and implement a comprehensive, effectively working plan (or plans) for providing services to eligible individuals with disabilities in more

integrated, community-based settings.

**Plan Development and Implementation Process**

Principle: Provide an opportunity for interested persons, including individuals with disabilities and their representatives, to be integral participants in plan development and follow-up.

**Assessments on Behalf of Potentially Eligible Populations**

Principle: Take steps to prevent or correct current and future unjustified institutionalization of individuals with disabilities.

**Availability of Community-Integrated Services**

Principle: Ensure the Availability of Community-Integrated Services.

**Informed Choice**

Principle: Afford individuals with disabilities and their families the opportunity to make informed choices regarding how their needs can best be met in community or institutional settings.

**Implications for State and Community Infrastructure**

Principle: Take steps to ensure that quality assurance, quality improvement and sound management support implementation of the plan.

Q4. Does the Olmstead decision require States to have plans to provide services to people with disabilities in the most integrated setting?

A. The decision does not require a State to have such a plan. However, developing and implementing a comprehensive plan or supplementing existing plans to address unmet needs is an important way States may be able to demonstrate that they are in compliance with ADA requirements and actively address discrimination.

The decision indicates that a court might find a State in compliance with the ADA integration mandate if it can demonstrate that it has a "comprehensive, effectively working plan[s]" for providing services to individuals with disabilities in the most integrated setting.

Ideally, all people with disabilities would already be provided with services in integrated settings, thereby eliminating the need for planning. As a practical matter, however, many States-- including those that have made significant investment in the development of community-based services--still face unmet needs. Developing and implementing the kind of plan described by the Supreme Court in Olmstead is a recommended step towards addressing these needs.

Q5. If a State already has a plan, does it need to develop a new one?

A. It depends on how comprehensive and effective the existing plan is. Ultimately, States must be able to demonstrate that their existing plans are

comprehensive and effectively working. States are encouraged to evaluate their existing plans using the Recommendations attached to DHHS' January 14 letter, supplement existing plans as necessary, and monitor them to ensure that they are being implemented.

Q6. Why should a State engage in planning activity undertaken in response to an OCR complaint? Will it protect the State from other investigations or litigation?

A. Regulations issued under title II of the ADA direct OCR to investigate complaints against health and human service-related State and local government entitles. OCR has informed States against which it has received Olmstead-type complaints of its desire to try and resolve complaints by helping the State convene stakeholders to develop a comprehensive, effectively working plan to serve individuals with disabilities in the most integrated setting appropriate to their needs. Where States or other "respondents" (entities against which OCR has received complaints) engage in planning processes in good faith and at a reasonable pace, OCR may determine it is possible to allow plan development to proceed in lieu of investigation. Where a State or other respondent evinces no intent to undertake planning, or where delays in doing so evidence a lack of good faith, or where States or other respondents utterly fail to involve stakeholders in plan development, OCR may determine it necessary to commence full-blown investigation. Following investigation, if a violation is found and no resolution is reached, cases may be referred to DOJ for litigation.

The next question concerns the effect of such planning efforts upon legal claims brought by private litigants, or by non-OCR government actors, such as the DOJ. An agreement between a State and OCR would not have any direct impact on pending and future title II litigation brought by a private party or DOJ unless the private parties or DOJ enter into explicit agreements with the State that incorporate OCR's agreement, either in whole or in part.

That said, although there is no direct linkage between OCR complaint investigations and resolution activities and pending investigations or litigation brought by other private parties and DOJ, there may be situations where creating linkages may result in opportunities to bring all parties to the table to resolve pending claims through negotiation.

Q7. If a State decides to develop a comprehensive plan, what form must it take? Must there be only one plan, or can there be multiple plans?

A. The precise form of the plan is best determined by those who are responsible for developing and implementing it. That said, if OCR has a complaint against a State, and OCR has determined it possible as a preliminary matter to address the complaint by allowing plan development to proceed, OCR may require the State to have a framework that pulls together the essential elements of the various plans. In other words, to address a complaint filed with OCR, the State typically will be asked to demonstrate the pace at which services to people with disabilities are being provided in the most integrated setting, even if more detailed planning documents are developed as "subplans."

Q8. In its letter to State Medicaid Directors dated January 14, 2000, DHHS recommends that States "actively involve people with disabilities in the

planning process." Does this mean the Department believes that groups should be involved in medical treatment decisions?

A. The Department strongly encourages States to provide an opportunity for interested persons, including individuals with disabilities and their representatives, to participate in the State's overall plan development process. All stakeholders, including advocacy organizations, should participate in the plan development process to ensure that any plan is comprehensive, works effectively and is designed to meet the needs and concerns of all people with disabilities. Consumer directed organizations, such as independent living centers, often have specific expertise in helping people with disabilities transition from nursing homes and institutions into the community which States may wish to utilize. Decisions regarding the treatment and specific placement of an individual with a disability must be made by that individual in conjunction with the individual's treating professionals.

## QUESTIONS ABOUT WHO IS AFFECTED BY OLMSTEAD V. L.C.

Q9. The decision in Olmstead v. L.C. involved two women with mental retardation and mental illness. Is the decision limited to people with similar disabilities?

A. No. The principles set forth in the Supreme Court's decision in Olmstead apply to all individuals with disabilities protected from discrimination by title II of the ADA. The ADA prohibits discrimination against "qualified individual(s) with a disability." The ADA defines "disability" as:

>   (A) a physical or mental impairment that substantially limits one or more of an individual's major life activities;
>   (B) a record of such an impairment; or
>   (C) being regarded as having such an impairment.

To be a "qualified" individual with a disability, the person must meet the essential eligibility requirements for receipt of services or participation in a public entity's programs, activities, or services. For example, if the program at issue is open only to children, and that eligibility criterion is central to the program's purpose, the individual must satisfy this eligibility requirement.

Q10. To meet the definition of disability under the ADA and Section 504, a physical or mental impairment must be serious enough to limit a major life activity. What kinds of life activities are considered "major," and when does an impairment "substantially limit" a major life activity?

A. Examples of major life activities include caring for oneself, walking, seeing, hearing, speaking, breathing, working, performing manual tasks, and learning. They also include such basic activities as thinking, concentrating, interacting with others, and sleeping.

An impairment "substantially limits" a major life activity when the individual's important life activities are restricted as to the conditions, manner, and duration under which they can be performed in comparison to most people. Some examples of impairments which may, even with the help of medication or devices, substantially limit major life activities are: AIDS, alcoholism, blindness or visual impairment, cancer, deafness or hearing impairment, diabetes, drug



addiction, heart disease, and mental illness. The determination whether an impairment "substantially limits" a major life activity must be made on a case-by-case basis.

Q11. What do the other two prongs of the definition, "record of" or "regarded having" a disability mean?

A. The ADA also protects people who are regarded by others as having a substantially limiting physical or mental impairment, and people who have a record of a substantially limiting physical or mental impairment. For example, a person who is discriminated against based on his or her history of a serious seizure disorder is protected by the ADA, even if he or she no longer experiences seizures. Likewise, a person with a very mild seizure disorder that does not substantially limit any major life activity and is completely controlled by medication that has no side effects is protected by the ADA if he or she is discriminated against because he or she is perceived as, or "regarded as," having a disability.

Q12. What about elderly people and children? Are they covered?

A. No matter what specific impairment or group of people is at issue--including elderly people and children--each must meet the same threshold definition of disability in order to be covered by the ADA. The question is: "Does the person have an impairment, have a record of impairment, or is he or she being regarded as having an impairment, that substantially limits a major life activity?"

With respect to elderly people, age alone is not equated with disability. However, if an elderly individual has a physical or mental impairment that substantially limits one of more of his or her major life activities, has a record of such an impairment, or is regarded as having such an impairment, he or she would be protected under the ADA.

Q13. Are people with substance abuse problems covered by the ADA?

A. People with substance abuse problems, except for those currently using illegal drugs, are covered by the ADA if they have a disability that substantially limits a major life activity. This means that people who have alcoholism, people who are addicted to non-controlled substances and people who have a history of drug addiction are covered by the ADA if important life activities are restricted as to the condition, manner, and duration under which they can be performed in comparison to most people. In addition, although current illegal drug users are not covered by the Act, persons who use illegal drugs may still be covered if they are discriminated against based on another disability, such as a mental or physical impairment that substantially limits a major life activity.

Q14. What is the relationship between the ADA and Section 504 definition of a person with a disability and the definition of disability used to establish eligibility for entitlement programs such as SSDI/SSI?

A. The definitions of disability used by entitlement programs are not the same as that used by the ADA and Section 504. Thus, the fact that an entitlement program such as SSDI/SSI or Medicaid has determined that a person is not disabled does not mean that they are not covered by the ADA or Section 504.



That said, the fact that someone has been found disabled for purposes of an entitlement program, while not conclusive, is usually good evidence to support a finding of disability under the ADA and Section 504.

## ADDITIONAL QUESTIONS [SECTION 504; HUD AND DHHS]

Q15. What, if any, relationship does Olmstead v. L.C. have to Section 504 of the Rehabilitation Act of 1973 (Section 504)?

A. Section 504, which was enacted some seventeen years before the ADA, prohibits discrimination on the basis of disability by entities which receive Federal funding. Section 504 and the ADA use the same definition of disability. Title II of the ADA extends Section 504's prohibition of discrimination in Federally assisted programs to all activities of State governments, including those that do not receive Federal financial assistance. Although the Olmstead decision interpreted the ADA, unjustified segregation by a Federally funded program would also constitute disability discrimination under Section 504. A State program receiving Federal funds must comply with both Section 504 and title II of the ADA.

Q16. What about the Department of Housing and Urban Development? Is HUD involved in the Federal government's Olmstead implementation efforts?

Historically, the lack of accessible, affordable housing and necessary community based services has been a major barrier to the integration of people with disabilities. Access to affordable housing is frequently a necessary but missing prerequisite for moving out of a nursing home or other institutional settings. HHS and HUD are strongly committed to assisting States to develop comprehensive working plans to strengthen community service systems and to actively involve people with disabilities and their families in the design, development and implementation of such plans. In some States HUD's "community builders" are aiding plan development, and we urge States to take advantage of the opportunity to call upon the expertise of our Federal partners, including HUD, in developing home and community-based infrastructure. Partnerships among housing, health and human services agencies and other key stakeholders in the disability and aging communities will prove central to a State's success.

Q17. We have many questions regarding the impact of this decision and how we can come into compliance with the law. Who should we talk to at HHS?

A. States should direct any questions or requests for technical assistance regarding their ADA and Section 504 obligations in response to the Olmstead decision to the OCR regional office that handles complaints filed in that State. A list of regional contacts – local staff designated to handle "most integrated setting" issues in each region – may be found at the conclusion of this document. Questions regarding Medicaid or Medicare policy should be directed to your HCFA regional office.



# OCR REGIONAL OLMSTEAD CONTACTS

REGION   I     Peter Chan        (617) 565-1353    (617) 565-3809 fax

REGION II Patricia Holub (212) 264- 4997 (212) 264 -3039 fax

REGION III Ed Lewandowski (215) 861- 4445
Paul Cushing (Backup) (215) 861- 4441 (215) 861- 4431 fax

REGION IV Mildred Wise (404) 562-7866
Roosevelt Freeman (404) 562-7886 (404) 562-7881 fax

REGION V Michael Kruley (312) 886-5893
Al Sanchez (312) 353-5531 (312) 886-2301 fax

REGION VI George Bennett (214) 767- 4546
Ralph Rouse (Backup) (214) 767- 4056 (214) 767- 0432 fax

REGION VII Jean Simonitsch (816) 426 - 6513
John Halverson (816) 426 - 7236
Peter Kemp (Backup) (816) 426 - 7236 (816) 426 - 3686 fax

REGION VIII Andrea Oliver (303) 844- 4774
Jean Lovato (303) 844- 7835
Velveta Golightly-Howell(303) 844- 5101 (303) 844- 6665 fax

REGION IX Mario Sagatelian (415) 437- 8326
Monica Eskridge (415) 437- 8324 (415) 437- 8329 fax

REGION X Bennett Prows (206) 615- 2621
Carmen Rockwell (206) 615 -2288 (206) 615- 2297 fax



Medicare.gov | Department of Health and Human Services | NMEP

Home | Privacy Policy | Feedback | Help | Website Accessibility





*5*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| PENNSYLVANIA PROTECTION AND ADVOCACY, INC., | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Civil Action No. 1:00-CV-1582 |
| | : | |
| DEPARTMENT OF PUBLIC WELFARE OF THE COMMONWEALTH OF PENNSYLVANIA, *et al.*, | : | Judge Caldwell |
| | : | |
| Defendants. | : | |

## DECLARATION OF KEVIN CASEY

I, Kevin Casey, declare as follows based upon personal knowledge:

1.    I am the Executive Director of Pennsylvania Protection and Advocacy, Inc. ("PP&A"), a non-profit Pennsylvania corporation and the Plaintiff in this lawsuit.  I have served as PP&A's Executive Director for over a decade.

2.    The Commonwealth has designated PP&A as the agency with the responsibility under the Protection and Advocacy for Individuals with Mental Illness Act, 42 U.S.C. § 10801 *et seq.*, the Developmental Disabilities Assistance and Bill of Rights Act, 42 U.S.C. § 15043, and the Protection and Advocacy for Individual Rights statute, 29 U.S.C. § 794e, to advocate for and protect the rights of individuals with disabilities, including those who are institutionalized.

3.     One of PP&A's most important priorities, established by its Board of Directors, has been and continues to be advocacy to assure the provision of appropriate community-based services to persons who are unnecessarily segregated in Pennsylvania institutions.  As part of this priority, PP&A spends substantial time, money, and resources to advocate for the development of an array of appropriate community alternatives for persons with mental, developmental, and physical disabilities to maximize their integration and participation in society.

4.     PP&A staff also routinely visit Pennsylvania's state institutions to assess conditions and treatment issues and to identify and respond to residents' concerns.

5.     Since 1999, PP&A has devoted substantial time, money, and resources to addressing issues relating to the care and treatment of residents of South Mountain Restoration Center ("SMRC").

6.     In May 1999, several PP&A staff spent two days on-site at SMRC making observations about care and treatment; interviewing residents and staff; and reviewing resident records.  In July 1999, PP&A submitted its detailed findings to Charles Curie, the former Deputy Secretary for the Office of Mental Health and Substance Abuse Services, raising a number of concerns about the environment and treatment at SMRC as well as the transfer of residents to SMRC

2

from other state facilities instead of their placement in alternative community-based programs. At the same time, PP&A wrote to Nancy Thaler, Deputy Secretary for the Office of Mental Retardation, to raise concerns about the lack of appropriate mental retardation services for SMRC residents diagnosed with mental retardation.

7.    PP&A staff returned to SMRC for ongoing, periodic reviews between late 1999 and August 2000. At that time, they again made detailed observations about conditions and treatment; they interviewed residents and staff; and they reviewed resident records. By letter dated June 15, 2000, PP&A submitted a report to SMRC Superintendent S. Reeves Power, Ph.D. that again raised concerns about conditions and treatment and about the lack of community alternatives for SMRC residents.

8.    Between 1999 and 2000, PP&A staff met and corresponded with SMRC's superintendents to discuss issues of concern. Additionally, I personally discussed issues that are the subject of this litigation with former Deputy Secretary Curie, including the need to develop community-based alternatives for SMRC residents.

9.    There are numerous issues that affect the rights of Pennsylvanians with disabilities. PP&A engages in both individual and systemic advocacy on an array of issues, including:

3

a.    investigating and addressing individual and systemic abuse and neglect in institutions and community-based facilities;

b.    advocating for the provision of community alternatives to persons who are unnecessarily institutionalized;

c.    advocating for increased consumer choice and control in services provided;

d.    combatting discrimination in and assuring equal access to housing, transportation, employment, government services, and public accommodations;

e.    advocating to assure access to necessary physical and behavioral health care services;

f.    providing individual counselling and advocacy services and/or information and referral services for individuals with disabilities and their families on a variety of issues.

10.    PP&A has finite financial resources and personnel. As such, it cannot spend its time, money, and resources to work on every individual and systemic issue that affects individuals with disabilities. If the Defendants had fully and promptly addressed the issues concerning treatment and conditions at SMRC and the development of community alternatives for SMRC residents when PP&A

4

initially raised those issues in 1999, the time, money, and resources which PP&A subsequently spent in a continuing effort to have the Defendants address such issues could have been spent instead on the many other issues which affect its constituents with disabilities.  As a result of the Defendants' failure to timely and fully address the issues underlying this litigation, PP&A diverted its time and resources from other efforts that affect its constituents.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this __19ᵗʰ__ day of December, 2001.

_____
Kevin Casey

5



Kevin T. Casey *Executive Director*
Hikmah Gardiner *President*

PENNSYLVANIA PROTECTION AND ADVOCACY, INC.

RECEIVED
JUL 2 9 1999
By_____

July 26, 1999

Charles Curie, Deputy Secretary
OMHSAS
502 Health and Welfare Building
Harrisburg, PA 17105

Dear Mr. Curie;

Enclosed you will find a copy of the report recently completed after a review of services at South Mountain Restoration Center (SMRC). On July 20, 1999, this report was presented to the staff at SMRC.

I have a number of concerns with the services and conditions we found there, however, they all seem to relate back to a few major areas. First, people are often placed at SMRC from state hospitals without prior notice, without other options being given them, without an appropriate transition and without their consent. Secondly, there are a large number of residents of SMRC who are appropriate for community-based services and could be discharged, but the Department has made no provisions for development of appropriate services in their home communities. Finally, there are far too few staff at SMRC to allow for appropriate, quality and necessary care. As stated in the report, the numerous deaths over the last 6 months combined with the many residents who have a diagnosis of aspiration or aspiration pneumonia and the staff's practice of placing residents in a reclined position to eat or immediately after eating, all raises concern over staffing patterns and practices at SMRC.

Each of these issues is a significant concern and has prompted us to make a number of recommendations that are necessary to ensure the health and safety of the residents.  Please advise me by no later than August 9, 1999 as to what action you will take to protect the residents of that facility.

If you have any questions, please do not hesitate to contact me.

Sincerely,

Kevin T. Casey
Executive Director

KTC/jab

cc:    Ilene Shane, Disabilities Law Project

enclosure



Kevin T. Casey *Executive Director*
Hikmah Gardiner *President*

PENNSYLVANIA PROTECTION AND ADVOCACY, INC.

## REPORT OF VISIT TO SOUTH MOUNTAIN RESTORATION CENTER
### Presented on July 20, 1999

On May 18 and 19, 1999, staff from Pennsylvania Protection and Advocacy, Inc. visited South Mountain Restoration Center (SMRC). During our visit it was our goal to determine resident satisfaction with care and treatment, the process used to transfer residents to SMRC from other state-run and community facilities, the adequacy of services and potential for resident discharge to community services. The Administration and staff of SMRC were open and receptive and provided us with the information we requested, as well as necessary access. This report is based on the information we gathered during our review and subsequent information provided to us by the Administration of SMRC.

We were advised that the facility uses only one building which contains 7 wards. All except the Special Needs Ward are open and unlocked. The most capable residents reside on Ward 2A, with the individuals on 3A being the next most capable. Wards on floors 5 and 6 serve more physically/medically involved persons and Ward 3B is the Special Needs unit, serving primarily people with Alzheimers and other forms of dementia. The current resident census is 247. SMRC can serve no more than 250 residents with its current staff complement, which has only 3 unfilled positions. At present 21 people are planning for discharge. There are 2 residents at SMRC for whom English is a second language and 1 person who speaks Spanish. It was reported that no residents use sign language.

SMRC is licensed as a nursing facility, not a mental health program. The staff complement consists of 378 people. There are 196 nursing and direct care staff, 7 medical staff, 2 beauticians/barbers and 24 social and rehabilitative staff (that includes PT, OT, Social Services, Speech and Hearing, Activities Staff and Chaplains). The remaining 149 positions are administrative, clerical, medical records, custodial, dietary, maintenance, fiscal, personnel and safety/security staff. SMRC is in the process of adding 15 new Restoration Aide trainees to backfill a number of vacancies which have been or will be created by the early retirement option currently being offered to staff.

According to SMRC, at the time of the Somerset State Hospital closing, 29 residents were assessed as appropriate for nursing home care. Twenty-two (22) residents were placed in community nursing homes and 7 were sent to SMRC. Those 7 people were between 30 and 90 years of age. Three (3) residents were from Cambria County, 2 from Fayette County and 2 from Somerset/Bedford Counties. To date, 3 of the 7 have died, 2 were discharged to community nursing homes, 1 person was transferred to Harrisburg State Hospital and then to Torrance State Hospital, and 1 person remains at SMRC. In the last 9 months, there have been 5 transfers from

Allentown State Hospital and 5 from Norristown State Hospital.

Currently there are at least 32 people with a diagnosis of mental retardation, 10 of whom have been admitted in the last 3 years. Eight (8) individuals have been diagnosed as having severe or profound MR, 5 people have moderate MR and 10 people have mild MR. The remaining 9 individuals have no specified level of MR. Of this group of 32 people, at least 2 people have been at SMRC for 31 years and 3 of the 32 live on the Special Needs unit.

Posted on each ward (2, 3A, 3B, 5A, 5B, 6A and 6B) were the AAA Ombudsman's phone number, the Client Representative's (Paul Miller) office location and phone number, an 8 ½" by 11" PP&A poster with phone number, DOH's new toll free grievance and complaint hotline number, the SMRC "Rights of Residents and Employees" document, and a bin containing Patient Grievance forms (on Ward 6A the bin was empty).

**ENVIRONMENT:**
In general, the building seemed to be in good repair; however, there were on-going problems with pervasive odors of feces and urine, which seemed to result from a combination of inadequate supervision of the residents, poor hygiene and no privacy for toileting. On every unit we observed bathroom doors that were open while residents were using the facilities. Sometimes a curtain was drawn across the door opening, but this did not afford any level of real privacy and did nothing to prevent very offensive odors from drifting into the hall, bedroom and activity/day room areas.

We also observed residents who were not changed promptly after urinating or defecating, or who needed assistance to get out of their wheelchair/geri-chair to use the bathroom, but who had to wait an extended period of time for staff to help them. This seemed to be due to the fact that there were inadequate numbers of direct care staff available.

On Ward 2A, where the most ambulatory and capable individuals live, the odors were most strong and offensive. One resident there complained that the other residents living on that unit were careless about their toileting habits, urinating in inappropriate places or discarding their used "Attends" on the floor where it would remain for a lengthy period of time. It seems that ward staff were unable to follow up on these issues due to their limited numbers. The result was a very unpleasant environment for anyone in the vicinity.

Another area of concern with the environment was the excessive noise which seemed to be resulting, in part, from the predominance of hard surfaces throughout the facility. There were no carpets, most furniture was made of wood or metal and coverings were made of a non-porous "hard" surfaced material. The walls were made primarily of concrete block or other hard materials and curtains, where they existed, were small valance type coverings offering little sound absorption. The cumulative effect was an echoing din. We found it very difficult to hear when people used a normal speaking voice and, although we were only in the facility for 12 to 14 hours each day, most of our staff had difficulty with our hearing after we left the building.

Staffing patterns appear to be very inadequate. On May 18 we found the following staff on the wards:

- on 2A during the morning hours, we found a ratio of 8 residents to 1 staff. Activities were posted and the ward schedule was being followed. We observed 12 people in a music group singing with words that were displayed on a screen. We also observed the "Memory Sharing" activity which was a slide show that seemed rather juvenile for the audience. The speaking portion of the presentation was offered in a manner and tone of voice as might be used with a young child.

- again, at approximately 6:00 PM we entered Ward 2A, and twice walked the entire unit, looking for staff to whom we could return a record we had reviewed. We found residents in their rooms, in day rooms and wandering the halls, but no staff. As we were preparing to leave the ward to find staff, the nurse walked onto the unit and took the chart. She explained that she had been in the dining room. However, when we initially entered the ward, we had stopped at the dining room and found only 2 people - a resident who was eating and someone who was cleaning tables. We advised her that in one day room there were 9 people, with one person who seemed very upset. She said she had heard him and would attend to his needs. We turned to again walk toward the exit and another staff person entered the ward and just as we were leaving, a 3rd staff person stepped off the elevator.

-3B (the Special Needs unit) had a 5 to 1, resident to staff ratio. Although scheduled activities were posted, we did not observe anyone involved in activities. Most residents were wandering the halls, sleeping, were alone in day rooms/activity rooms or were sitting in their wheelchairs/geri-chairs in the halls. In one room we found 7 residents. The TV was on, 4 residents were sleeping and 1 was interacting with a staff person. Staff reported that every Thursday some residents go to the village store with the recreation staff. Occasionally a few go to the Chambersburg Mall or out to lunch. They regularly have 1 volunteer on the unit once a week. When the Seminarians are in session, they visit once a week. The Humane Society visits twice a month with pets and youth from the ABRAXAS program escorts residents to church, and help with some of the programming under the supervision of the minister and staff. Family visits vary from weekly for some residents, to never for others.

- at approximately 5:00 PM on Ward 5A we found 29 residents in the day room with no staff. Many were in geri-chairs and wheelchairs.

- 5B had a 4 or 5 to 1, resident to staff ratio. Although activities were posted, none were observed. Residents were eating lunch or watching a movie. Just prior to lunch we observed 9 residents in wheelchairs/geri-chairs sitting in the TV room alone. When we first went into the room to speak with residents, no staff were around. Shortly thereafter staff entered the room and repositioned some of the wheelchairs so they all faced the TV. We saw no one using a powered chair and no positioning devices in or on any of the chairs.

- 6B (the least capable people are on the 6th floor) had a 6 to 1, resident to staff ratio. Again, we saw no one involved in activities although an activities schedule was posted.

During the May 19th visit we found:

- 2A (this ward houses the most capable people at SMRC) 9 people had left the grounds at 8:00AM for a Senior Day at Wilson College. At 3:45PM a walking group was scheduled. These were the only 2 activities scheduled for the day.

- 3A had a 6 or 7 to 1, resident to staff ratio during the day. Activities were posted. We observed no one in a treatment program or other activities during our time on the ward. Most resident and staff interactions involved moving residents from one location to another. We witnessed a resident who asked to be changed several times before she was assisted and saw numerous unsupervised residents in the day rooms and bedrooms.

- during the evening shift (2nd shift), on Ward 2A there were 4 staff scheduled and on duty to serve 41 residents; on Ward 3B there were 4 staff scheduled and on duty to serve 40 residents; Ward 5B had 5 staff scheduled and on duty to serve 33 residents; Ward 6A had 4 staff scheduled and on duty to serve 20 residents; and on 6B there were 4 staff scheduled and on duty to serve 36 residents. As stated before, floors 5 and 6 house the most physically and medically needy residents; however, they still had a staff to resident ratio of between 1 to 5 and 1 to 9. This does not adequately meet the needs of the residents.

## CONDITIONS AND TREATMENT:

We observed that most staff were caring and respectful of the residents. Some staff were unaware of our presence as they provided personal care for residents and responded to resident requests for assistance. In at least one case we witnessed a staff person deal with a situation, which had the potential for being very embarrassing to the resident, in a dignified and respectful manner. Our observations were reinforced by some residents who, during their interview, said that they were treated well by staff. In only one case did a resident state that he had been verbally abused by staff. We immediately reported that allegation and requested an investigation.

We had an opportunity to observe one recreation program taking place in the unit. It was a baking class. Of course the number of participants was limited, but the recreation aide did an excellent job of working with the residents who attended. She clearly had a routine that was familiar to everyone who participated which included having the residents read through the recipe, assist with assembling and mixing the ingredients and then baking the food and clean-up after. She went through each procedure step-by-step and gave everyone an opportunity to participate in the process. Unfortunately, she can schedule only one baking class per week and rotates throughout the unit to each ward, which allows for limited and infrequent opportunities for residents to participate in this activity. The lack of adequate numbers of recreation staff results in less than optimal opportunities for all residents to participate in programs. SMRC is located in a very remote and rural setting. There is no opportunity for residents to leave the grounds to shop for clothing, gifts, go to recreational activities, etc. without staff assistance. This

is due primarily to the facility's isolated location. We did see some evidence of planned outings to the closest town (Chambersburg), located many miles from the facility and allowed only a minimal number of residents to leave the facility. Although all the wards except one are unlocked, most residents seem not to move much past the lobby, the basement smoking area or an enclosed area in the rear of the building. This may be due, in part, to the fact that the majority of exterior entrances are not accessible and many of the residents use wheelchairs or geri-chairs. There are accessible exits in the rear of the building, but they are not easy to find and the route leading to them is not marked inside the building. Even if one is successful in finding the accessible exits, there is really nothing for people to do once they get outside.

A very serious area of concern was large numbers of residents, many in wheelchairs or geri-chairs, who sat unattended in day rooms or activity rooms with no staff in sight. At one point we counted no less than 29 people sitting idly in a room, without staff. Frequently we also observed individuals who were unable to ambulate without assistance and unable to call for help, but were left unattended in geri-chairs, in beds, etc. with no staff in sight. It was not uncommon to find people, especially on the fifth and sixth floors completely alone. In most cases there were no call bells or phones within reach, that they could use to ring for assistance. We observed people who were lying on the floor, people who needed assistance to use the bathrooms, people who were sitting in very awkward, non-therapeutic positions in geri-chairs and wheelchairs for extended periods of time, up to an hour or more, with no staff intervention. This seemed to be due to a severe shortage of staff on most units. During the April 1998 Licensing inspection, SMRC was cited for failing to ensure that each resident was being watched and had assistive devices when needed to prevent accidents.

While observing various routines on different wards we witnessed: 22 people sitting in a "dining room" for the evening meal, many of whom need considerable, if not total, assistance to eat. Staff were able to help just a few people eat at a time, while all the other residents watched as they waited for their turn to be fed. There were no more than 5 staff available to assist with feeding. It goes without saying that staff had to feed people rapidly to accomplish their goal. At the lunch meal while on 5B, we observed 12 people in the dining room with 2 staff. All but 3 or 4 had to be fed by staff. One woman, who was edentulous, was eating whole cherries and was choking the whole time. Staff did not intervene. Most of the residents were placed in a reclined position immediately after eating their meal and 2 residents were placed in bed. When we shared our concerns with the RN, stating the risk of aspiration pneumonia and reflux, she responded that they never placed anyone in that position who was known to have reflux for at least 30 minutes after eating, and that none of the folks who had been reclined were known to have reflux. Later that night we again observed staff feeding numerous residents in a semi-reclined position, which appeared to be greater than 45 degrees. In very few instances did we see residents being placed in an upright and aligned position to eat. We reported this to the administrator on duty for further investigation. It is important to note that between November of 1998 and April of 1999, there have been 30 deaths at SMRC. Of those 30 people, at least:

- 7 had a current diagnosis of aspiration or recurrent aspiration or aspiration pneumonia;
- 1 had a current diagnosis of acute aspiration;
- 14 had a current diagnosis of pneumonia;
- 1 had a current diagnosis of recurrent esophageal stricture;

- 4 had a current diagnosis of gastroesophageal reflux; and
- 1 had a current diagnosis of recurrent regurgitation.

For many people no clear cause of death was noted; however:
- for 3 people cause of death was pneumonia;
- for 1 person cause of death was aspiration pneumonia; and
- for 1 person cause of death was gastroesophageal reflux.

Of even greater significance is that all, but 2 of those individuals lived on wards on the 5th or 6th floors (where we observed residents being fed in the reclined position or being reclined immediately after eating) at some time during the last 6 months of their lives. Additionally, in the paperwork we received on 27 of those deaths, there was no coroner or police involvement. As a result we assume there were no autopsies. All deaths were assumed to be natural. In at least one death it appears that the resident died as a result of the injuries she sustained after having 3 falls within a three month time period. There was no investigation into those falls. This is a very serious concern.

Information gathered from staff and records indicates that there may be as many as 32 people at SMRC with a diagnosis of mental retardation. There appears to be no working, on-going relationship between OMR and SMRC to plan for community-based, MR appropriate, services for this population. In at least one case, a woman with MR and some behavioral issues had been transferred to SMRC from an LTSR to stabilize her diabetes. A combination of diet and medication change seemed to stabilize her illness in a relatively short period of time, but when the LTSR and home county were contacted so that she could return to her former program, SMRC was told she was no longer a viable candidate for that slot. She remains at SMRC. We saw encouraging evidence that at least one physician at SMRC, Dr. Strite, was attempting to reduce levels of psychotropic medications for some residents and, where there was an MR diagnosis, he would sometimes recommend that the staff look at manipulating environmental factors that maybe impacting the person's behavior as opposed to continuing the use of psychotropic medications.

## TRANSFER OF RESIDENTS FROM FACILITIES AND PROGRAMS ACROSS THE STATE:

Resident interviews and record reviews revealed that residents are sent to SMRC from all over the State. In many cases, the residents interviewed stated that they were not given an option as to whether or not they wanted to transfer to SMRC and often were not told until the last minute about the planned move. Additionally, some people stated that if given a choice, they would not have chosen to transfer to SMRC. In a number of cases residents were moved many miles from their families and home communities which had a very negative impact on their ability to visit with family and friends. This was particularly true for people from Norristown and Allentown State Hospitals. No one we interviewed indicated that they had an opportunity to visit SMRC prior to their transfer nor were residents aware of their families being asked if they agreed with or opposed their move.

- R.M. was admitted in March of 1999 from Norristown State Hospital (NSH). This resident reported that he was told he was moving to SMRC, but was not given a choice

and did not want to move. No one asked him how he felt about moving and he did not have an opportunity to visit before his move. He has no "pertinent psychiatric diagnosis", but was transferred to SMRC on Zoloft and Buspar. The SMRC physician has questioned the need for these medications and has requested a psychiatric consult as a result. According to his record, his potential for discharge is fair to good.

- L.H. was admitted in 1997 from NSH in "stable medical condition". He reports that he was not told he was moving to SMRC and did not have a chance to visit before his move. He has no visitors and wants to leave SMRC as soon as possible. His record indicates that he refused a community nursing home placement because he wanted to go home. His potential for discharge is described as poor because of his "behaviors and unrealistic expectations".

- V.C. was admitted in 1997 from Allentown State Hospital (ASH). She was told she was moving to SMRC, but she did not want to move because she had friends at ASH. She had been there for 15 years. No one asked her how she felt about moving and she did not have a chance to visit prior to her move. She was given no other choices and was told by the social worker that she must move because "older people go there". She lives on 2A, but rarely leaves the ward and only occasionally leaves the grounds. She reports now that she is at SMRC, she likes it better than ASH, but would prefer to live in a more personal setting such as her own apartment. Records reveal that an Options assessment was completed in 1997 that said she needed nursing home care and offered no other alternatives. The reason stated for the need for nursing home care was "chronic persistent mental illness". A physical assessment dated 5/22/97 stated that she had a stable medical condition with schizophrenia in remission, hyperlipidemia, TD, osteoarthritis and a left adrenal mass. She was described as fully functioning and active and does not require any assistance with activities of daily living. She is self-directed.

- H.S. (this individual was interviewed by PP&A staff who are Spanish speaking and bi-cultural) was admitted in 1997 from ASH. When asked if anyone at ASH told her about the move she said, "No, no one there can speak Spanish". She also reports that she did not visit SMRC before the move. Additionally, she was given no choice about where she was to move. Her need for nursing home care was based on her diagnosis of early dementia, diabetes and schizophrenia. A medical assessment completed in November of 1998 states that she is fully active, participates in organized activities and needs supervision for bathing only. The physician's note upon admission finds her alert and stable with no complaints. Her primary diagnosis is schizophrenia with a secondary diagnosis of dementia. She has a goal to prepare her for community re-entry and they recommend a Spanish speaking support group. A 1998 Social Assessment indicates that she has had no family visits in a year ( her family lives in Allentown and New Jersey). She is upset that her family does not visit. She is appropriate for discharge to a Personal Care Home, but it is difficult to find such placements in her home city.

- E.F. was admitted on 3/31/99 from NSH. She was not told ahead of time that she was being transferred to SMRC. She reports that she was the only person in the van and didn't

know where she was going. When NSH staff had suggested that she go to SMRC she said, "No". She told everyone, "No" she didn't want to move to SMRC. She was given no options.

- P.S. was admitted in 1997 from NSH. She reports that no one told her she was going to SMRC. The reason given for her need for SMRC was, "wandering secondary to dementia". Her records state that she has good potential for discharge, but her family wants her to remain at SMRC.

- D.P. was admitted in 1997 from ASH. She reports that she did not want to move, but was told she would be given a watch and a bear if she agreed to the move. She reports that her family does not often visit her. Her PASARR states that she needs nursing home care because she has chronic mental illness and the need to monitor her behavior for decompensation and to monitor her psychotropic medications. Her primary diagnosis is paranoid schizophrenia with early dementia. Her discharge plan says that she is waiting for an opening at Stroud Manor. No vacancies are currently available in her home area of East Stroudsburg. Her family is interested in her moving closer to home.

- C.L. was admitted in 1997 from ASH. She reports that she was told a few weeks before her transfer and was frightened. No one asked her how she felt about moving and she did not have an opportunity to visit SMRC before her transfer. While she was at ASH, her family visited her almost every Sunday. After her move to SMRC they visit only occasionally.  A note in her record, dated 2/16/99, states that she is not appropriate for nursing home care at this time. She was referred to a community placement, but was turned down because there was no dentist near by. She has a serious dental problem and needs on-going treatment.

- D.M. was admitted in 1997 from ASH. He was told about his move to SMRC, but was not given any options, was not asked how he felt about the move, and did not have an opportunity to visit first. He reports that his family was opposed to his move and that at ASH they visited frequently, but can only visit once a month at SMRC. A Social Assessment dated 12/1/98 states that his potential for discharge is good and he should be close to his family. His Plan of Care dated, 12/16/98 says essentially the same thing. A February progress note states that he is independent in his ADL's and his condition is stable. A 2/99 Social Service note says his mother wants him placed close to home. A 6/17/98 medical assessment states that he does not have dementia.

- H.C. reports that he was admitted to SMRC in 1997 from ASH. He was told he was moving to SMRC, but did not want to do so. No one asked how he felt about moving, he was given no options and did not visit prior to his move.

- C. C. Reports that she moved to SMRC 6 to 8 months ago from ASH. She reports that she wanted to move, but not to SMRC.

- E.Z. was admitted in 1993 from Haverford State Hospital (HvSH). His diagnosis is a

seizure disorder, glaucoma, cataracts, varicose veins and OBS. His record indicates that his family wants him closer to home.

- C.G. was admitted in 1987 from Clark's Summit State Hospital. She reports that she was told about the move and agreed to it. Her record indicates that her discharge potential is good and that she could do well in a Personal Care Home. A Social Assessment dated 7/28/98 states that she wants to be discharged to her home community and her brother wants her to return as well. Her family does not visit due to the distance and their health. A letter from DPW dated 5/21/93 states that she does not need nursing home care.

- E.H. was admitted in 1991 from Mayview State Hospital (MSH).She also reports that she did not want to move, was not given an option, was not asked how she felt about moving and did not visit prior to her move. She would like to live in her own home. Her family never visits her. She could be discharged to a community nursing home according to her record.

- J.W. was admitted to SMRC in 1998 from an LTSR in Bedford County. Reason given for the need for nursing home care was to control her brittle diabetes. She also has an MR diagnosis. She reports that she was told she was moving and that it was OK with her, but she was given no other options. She reports that she likes it at SMRC, but it was hard to get used to and her own home would be better. She reports that her family never visits her. After her transfer to SMRC, her diabetes was brought under control with diet and some medication changes. When the LTSR and County were contacted to plan her return, they informed SMRC that she could not return. At present there are no plans for discharge because the LTSR and home county will not take her back. The obstacles to her discharge are her behaviors. She is loud and disruptive in groups and prefers her own space.

- P. M. was admitted in 1996 from the Department of Corrections. His family lives in Philadelphia. He has been referred to nursing homes in the Philadelphia area and wants to return there. He has been refused admission to any community nursing homes contacted thus far due to his history of aggression. He has been discharged from the correctional system and his parole is complete. He was assessed for an augmentative device, but was denied by MA. That decision is being appealed.

## CONCLUSIONS:

According to the information we gathered during our review, it seems clear that residents are transferred to SMRC from across the State without regard for their preferences concerning where and how they live, and often without consideration for how it will impact their relationships with family and friends. SMRC's isolated location makes it an unreasonable place for people to live when their attachments are hundreds of miles across the State.

It is apparent that SMRC is being used by OMHSAS as more than a nursing home, considering the fact that some of the residents have a primary diagnosis of mental illness that requires on-

going treatment, and some have no pressing medical needs. It is equally true that the residents at SMRC are not a priority for OMHSAS. Otherwise, there would be greater emphasis made with home counties to serve their residents who are ready for discharge. There is no obvious planning or communication between OMHSAS and OMR regarding the large number of persons at SMRC who have been labeled as having mental retardation. Many residents are, and have been, ready for discharge but remain at SMRC.

It is no secret among staff at SMRC that they have more residents than for whom they can adequately care. The inadequate numbers of staff does not allow for an acceptable level of supervision and care and therefore places residents at risk. This has not however, resulted in an initiative out of OMHSAS to decrease the resident population to a more manageable size by creating appropriate community-based service opportunities.

Some residents at SMRC are daily placed at risk of illness and death due to the practice of placing individuals in a reclined position immediately after meals. The practice of feeding people whose bodies are in poor alignment makes them more vulnerable to the possibility of developing digestive problems, of which there appears to be no shortage at SMRC. Although we saw one staff person attempting to properly position a resident's head and neck while feeding her, it was clear that the staff was unused to doing so evidenced by the way in which she handled the patient's head. She was trying to place the resident's head in an acceptable position to eat, while allowing her body to remain in a position that fought her efforts.

The physical environment is lacking the attention necessary to keep it free of unpleasant odors. The practice of using curtains at bathroom doors does not afford residents adequate levels of privacy or comfort.

The noise levels in the building would be difficult for anyone to endure much less people who have few opportunities to leave that environment. This situation may in fact be impacting resident behavior resulting in the potential for increased use of medications.

**RECOMMENDATIONS:**

- Investigate the high incidence of deaths and illness at SMRC involving aspiration, aspiration pneumonia, pneumonia, reflux and other digestive track related diseases.

- Re-evaluate the staff's ability and willingness to properly position all residents while assisting them with meals. Retrain staff where necessary and supervise the meal times continuously.

- Develop a meal protocol that does not require residents to sit in the dining rooms and watch other residents while they await their turn to eat. Provide adequate numbers of staff during meal times to ensure that all residents taken to the dining rooms have the opportunity to eat their meals in a timely manner and are not required to watch others eat while they wait. Additionally, ensure that residents are given adequate time to eat their food and are not hurried through meals so that staff can move on to the next person who needs to be fed.

- Prohibit the practice of placing any patient in a reclined position while eating or immediately thereafter. If there is a medical reason that requires that a patient eat in a reclined position, have an expert develop a program to ensure the safest positioning possible for feeding the person. Frequently and routinely review that program.

- Review every resident at SMRC for the need for adaptive equipment for wheelchairs and geri-chairs to support proper body alignment, especially during and after meals.

- Provide adequate numbers of staff to ensure resident safety, proper care and a variety of community-based, as well as facility activities.

- Develop a protocol that ensures that every resident who can call staff for assistance is always within reach of some sort of calling device when it is needed, to which staff will respond within a predetermined period of time. For individuals who cannot call for assistance, ensure that they are never unsupervised.

- Determine why large groups of residents are gathered into common areas. Determine why they are left unattended and remedy the situation.

- Modify the environment to allow for greater absorption of sound and to create a more pleasant environment.

- Develop a program to modify the behavior of any patient that is known to urinate in inappropriate places and who does not dispose of their soiled clothing appropriately.

- Provide enhanced privacy and reduce unpleasant odors by using doors instead of curtains on bathrooms.

- Clearly mark the accessible routes allowing residents to easily find their way from their ward to the exits.

- OMHSAS should immediately stop all admissions to SMRC from state hospitals. Identify and/or create community options to SMRC and nursing home care.

- Significantly decrease the resident census at SMRC by creating CHIPP's opportunities for all residents who have been identified as having potential for discharge. Look at community program examples, across the State, that were created to prevent nursing home placements for people who left other institutions. Look at community programs developed specifically to serve persons with dementia.

- OMHSAS should develop a process for screening all referrals to SMRC which fully involves the consumer, their family and advocates in the process of determining the best placement option for the individual. Where programs do not exist that can serve people in their home communities, make the development of such programs a CHIPP's priority, requiring counties to make appropriate community services available to their senior-aged population with mental health

issues.

- Create a working agreement with OMR to review every person with suspected MR at SMRC and develop community-based services for them.



Kevin T. Casey *Executive Director*
Hikmah Gardiner *President*

PENNSYLVANIA PROTECTION AND ADVOCACY, INC.

October 7, 1999

Charles Curie, Deputy Secretary
OMHSAS
502 Health and Welfare Building
Harrisburg, PA 17105

Dear Mr. Curie;

Recently, we received a response from Mr. Thomas Buckus to the report of findings based on our review of services at South Mountain Restoration Center (SMRC). In his letter, Mr. Buckus stated that he could not respond to a number of issues/recommendations because they were outside his realm of authority. I am writing to request that you provide me with a response.

Among the issues/recommendations that Mr. Buckus could not address were the following:
- to immediately stop all admissions to SMRC from state hospitals;
- to identify and/or create community options to SMRC and nursing home care;
- to significantly decrease the resident census at SMRC by creating CHIPP's opportunities for all residents who have been identified as having potential for discharge. Look at community program examples, across the State, that were created to prevent nursing home placements for people who left other institutions. Look at community programs developed specifically to serve persons with dementia; and
- to develop a process for screening all referrals to SMRC which fully involves the consumer, their family and advocates in the process of determining the best placement option for the individual. Where programs do not exist that can serve

people in their home communities, make the development of such programs a CHIPP's priority, requiring counties to make appropriate community services available to their senior-aged population with mental health issues.

If you have any questions, please do not hesitate to contact me.

Sincerely,

Kevin T. Casey
Executive Director

KTC/jb

```
 1              IN THE UNITED STATES DISTRICT COURT
            FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
 2
 3   PENNSYLVANIA PROTECTION AND        :
     ADVOCACY, INC.,                    :
 4              PLAINTIFF               :
                                        :
 5      VS                              :    NO. 1:00-CV-01582
                                        :
 6   DEPARTMENT OF PUBLIC WELFARE OF    :
     THE COMMONWEALTH OF PENNSYLVANIA;  :
 7   FEATHER O. HOUSTOUN, IN HER        :
     OFFICIAL CAPACITY AS SECRETARY     :
 8   OF PUBLIC WELFARE FOR THE          :
     COMMONWEALTH OF PENNSYLVANIA;      :
 9   CHARLES G. CURIE, IN HIS OFFICIAL  :
     CAPACITY AS DEPUTY SECRETARY FOR   :
10   MENTAL HEALTH AND SUBSTANCE ABUSE  :
     SERVICES; AND                      :
11   S. REEVES POWER, PH.D.,            :
     IN HIS OFFICIAL CAPACITY AS        :
12   SUPERINTENDENT OF SOUTH MOUNTAIN   :
     RESTORATION CENTER,                :
13              DEFENDANTS              :
14
15
16
17
18              DEPOSITION OF:  MARGARET LEED
19              TAKEN BY:       DEFENDANTS
20              BEFORE:         KIMBERLY L. INTRIERI
                                REPORTER-NOTARY PUBLIC
21
                DATE:           MARCH 20, 2001, 9:40 A.M.
22
                PLACE:          PENNSYLVANIA PROTECTION AND
23                              ADVOCACY, INC.
                                1414 NORTH CAMERON STREET
24                              HARRISBURG, PENNSYLVANIA
25
```

LEED, MARGARET
03/20/01

PENNA PROTECTION & ADVOCACY VS
DPW

---

**Page 2**

```
 1   APPEARANCES:
 2     DISABILITIES LAW PROJECT
       BY:  ROBERT MEEK, ESQUIRE
 3
           FOR - PLAINTIFF
 4
     COMMONWEALTH OF PENNSYLVANIA
 5     DEPARTMENT OF PUBLIC WELFARE
       BY:  HOWARD ULAN, SENIOR ASSISTANT COUNSEL
 6       THOMAS BLAZUSIAK, SENIOR ASSISTANT COUNSEL
 7     AND
 8   OFFICE OF THE ATTORNEY GENERAL
       BY:  MICHAEL L. HARVEY, SENIOR DEPUTY ATTORNEY GENERAL
 9
           FOR - DEFENDANTS
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

---

**Page 4**

```
 1               STIPULATION
 2        It is hereby stipulated by and between
 3   counsel for the respective parties that sealing,
 4   certification and filing are waived; and that all
 5   objections except as to the form of the question are
 6   reserved to the time of trial.
 7
 8        MARGARET LEED, called as a witness, being
 9   sworn, testified as follows:
10
11           DIRECT EXAMINATION
12
13   BY MR. ULAN:
14      Q     State your name for the record, please.
15      A     Margaret Leed.
16      Q     Thank you. I am Howard Ulan. I am one of
17   the counsel for the defendants in the PP&A v. Department
18   of Public Welfare case. With me today is Tom Blazusiak
19   who is also from the DPW legal office and Michael Harvey
20   who is with the Attorney General's Office.
21        This is a deposition that is being taken in
22   connection with that litigation. The deposition may be
23   used in various ways in connection with the litigation. I
24   assume you've had the opportunity to talk to your counsel
25   about this matter.
```

---

**Page 3**

```
 1           TABLE OF CONTENTS
 2
 3            WITNESS
 4
 5   FOR DEFENDANTS              DIRECT
 6   Margaret Leed          4
 7
 8
 9            EXHIBITS
10
                        PRODUCED
     LEED EXHIBIT          AND MARKED
11
     A - Record Review packet relating to Blaine
12   L_____          28
13   B - Record Review packet relating to Harold M___  41
14   C - Record Review packet relating to Roberta D___  43
15   D - Record Review packet relating to Patricia S___  45
16   E - SMRC Review packet relating to Maurice F___  48
17   F - SMRC Review packet relating to John H___  52
18   G - SMRC Review packet relating to Caroline K___  54
19   H - SMRC Review packet relating to Harry A___  55
20   I - SMRC Review packet relating to Nancy S___  56
21   J - Observation packet dated 7/18/00 at 12:30    57
22   K - Observation packet dated 7/18/00 at 12:15    60
23   L - Observation packet dated 7/20/00 at 10:00    73
24   M - Observation packet dated 7/25 in p.m.    79
25   N - Complaint          82
```

TABLE OF CONTENTS — WITNESS — FOR DEFENDANTS DIRECT — Margaret Leed 4 — EXHIBITS — PRODUCED AND MARKED — A - Record Review packet relating to Blaine L 28; B - Record Review packet relating to Harold M 41; C - Record Review packet relating to Roberta D 43; D - Record Review packet relating to Patricia S 45; E - SMRC Review packet relating to Maurice F 48; F - SMRC Review packet relating to John H 52; G - SMRC Review packet relating to Caroline K 54; H - SMRC Review packet relating to Harry A 55; I - SMRC Review packet relating to Nancy S 56; J - Observation packet dated 7/18/00 at 12:30 57; K - Observation packet dated 7/18/00 at 12:15 60; L - Observation packet dated 7/20/00 at 10:00 73; M - Observation packet dated 7/25 in p.m. 79; N - Complaint 82

---

**Page 5**

```
 1        It is important that you try to answer
 2   audibly so that the court reporter can record your
 3   response. And if a question I ask is not clear, please
 4   ask me to clarify it or repeat it --
 5      A     Okay.
 6      Q     -- or so on. Thank you. Where are you
 7   currently employed?
 8      A     Pennsylvania Protection and Advocacy.
 9      Q     In what capacity?
10      A     I am an advocate specialist with the central
11   team.
12      Q     Since when approximately?
13      A     January of '95.
14      Q     Do you know approximately how many
15   professional staff PP&A employs? By professional staff I
16   mean other than clerical.
17      A     I think there are approximately 15 to 18
18   people.
19      Q     Do they all work out of this office or some
20   work out of other offices.
21      A     Some work out of other offices.
22      Q     Where are the other offices?
23      A     There are several people who work with the
24   western team who work out of their homes, and there are
25   center advocates who are assigned to the state centers.
```

---

LEED, MARGARET
03/20/01

PENNA PROTECTION & ADVOCACY  VS
DPW

---

**6**

1   Q    Does that 15 to 18 that you mentioned, is
2  that paid staff or does that include volunteers?
3   A    That would be paid staff.
4   Q    And are there volunteers in addition?
5   A    Not to my knowledge.
6   Q    Are there any people on contract in addition
7  to those 15 to 18?
8   A    I would assume -- I don't know.
9   Q    Okay. Have you been working here full time
10  since January '95?
11   A    Yes.
12   Q    Prior to that time where did you work?
13   A    I was employed by the Center for Independent
14  Living.
15   Q    Is that in Harrisburg?
16   A    That's in Camp Hill.
17   Q    And for how long?
18   A    I was employed there for about a year and a
19  half.
20   Q    And what did you do there?
21   A    I was in charge of a grant for the Americans
22  with Disabilities Act.
23   Q    And before that?
24   A    I was a public housing manager.
25   Q    Where?

---

**7**

1   A    Franklin County Public Housing Authority.
2   Q    For how long?
3   A    I was there approximately two years.
4   Q    Before that?
5   A    Center for Independent Living in Camp Hill.
6   Q    Uh-huh. For how long?
7   A    I was there about two years.
8   Q    Same sort of thing that you did later with
9  grants?
10   A    There I was an independent living
11  specialist.
12   Q    Was that different from what you did later
13  with CIL?
14   A    Yes. The first employment that I had with
15  the Center for Independent Living was more client based or
16  consumer based activity. The second time I was there I
17  did more with public accessibility.
18   Q    And before that?
19   A    I was in college and stay-at-home mom.
20   Q    What college?
21   A    I went to Centenary College for Women in
22  Hackettstown, New Jersey, Dickinson College and graduated
23  from Shippensburg University.
24   Q    What year?
25   A    1989.

---

**8**

1   Q    Majored in what?
2   A    Public administration.
3   Q    Now, prior to your first employment with CIL
4  which I take it goes back to '90, '91, somewhere in that
5  area -- early '90s?
6   A    Yes. That's correct.
7   Q    Prior to that employment did you have any
8  employment in the field of disabilities advocacy or
9  anything relating to disabilities at all?
10   A    I was employed at Carlisle Hospital as a
11  nurse's aide, and then I was selected to implement their
12  training program for scrub technicians in the operating
13  room.
14   Q    Approximately when was that?
15   A    (No response.)
16   Q    Ballpark. Mid '80s or mid '70s or --
17   A    Mid '70s.
18   Q    All right. Okay. Are you licensed either
19  in Pennsylvania or any other state in any health care or
20  social service field?
21   A    If you would consider my public housing
22  manager license as social service.
23   Q    Is there a license? There's licensing?
24   A    Yes. There's certification.
25   Q    Is that by the state or who does the

---

**9**

1  certification?
2   A    That's through the housing and urban
3  development.
4   Q    Federal?
5   A    Federal. Federal, yes.
6   Q    Housing management. And when did that
7  happen? Do you recall roughly?
8   A    1993 approximately.
9   Q    That's all right.
10   A    I'm guessing.
11   Q    I understand it's just approximate. Did you
12  have to take some kind of exam to get certified?
13   A    Yes. Yes.
14   Q    Okay. Nothing other than that? I mean a
15  degree in --
16   A    I have my certification for district justice
17  through the Supreme Court of Pennsylvania.
18   Q    Oh. Okay. Have you served as a district
19  justice?
20   A    No. I just -- I passed the qualifying
21  course. I lost the election.
22   Q    Oh. I see. Okay. How many nursing homes
23  do you believe you have visited ever for any reason?
24  Rough estimate. The best estimate you can.
25   A    (No response.)

---

LEED, MARGARET
03/20/01

PENNA PROTECTION & ADVOCACY VS
DPW

---

**10**

1  Q    Is it more like five or more like 50 or --
2  A    Oh, my.
3  Q    If it's easier --
4  A    I would say conservative 15.
5  Q    Fifteen.  If I asked you since 1990, would
6  that be less?  I mean did most of this happen after 1990
7  or before 1990?
8  A    Most of it would have happened after 1990.
9  Q    After.  Okay.  And the reasons for visiting,
10  were these personal because you knew someone there or in
11  some professional capacity or --
12  A    Both.
13  Q    More of one than the other or about even
14  split or what?
15  A    (No response.)
16         MR. MEEK:  Off the record.
17         (Discussion held off the record.)
18         THE WITNESS:  Probably more in a
19  professional capacity.
20  BY MR. ULAN:
21  Q    So would it be a reasonable estimate -- and
22  I understand this is an estimate -- that since, say, 1990
23  in some professional capacity you have visited perhaps ten
24  nursing homes?  Are we in the ballpark?
25  A    That would be reasonable.

---

**11**

1  Q    And what were the purpose of these visits?
2  Was this for any of these professional organizations that
3  you mentioned, either PP&A or CIL?
4  A    It would be through PP&A and CIL.
5  Q    And would these visits typically be to see a
6  particular resident or would they be more in the nature of
7  a survey about whether this place was a good place or bad
8  place generally?
9  A    Would you ask the question again, please?
10  Q    Yes.  The approximately ten visits to
11  nursing homes that you have conducted or made since, say,
12  1990 in a professional capacity as opposed to a personal
13  capacity, can you -- can you identify which ones or say
14  what proportion were for the purpose of visiting a
15  particular person at the home and which ones were for some
16  more general purpose like surveying a home to see if it's
17  a nice home or isn't?
18  A    I think I would have to say almost an
19  even -- even split.
20  Q    Okay.  And that implies that roughly five
21  homes you have done some sort of survey of?
22  A    Yes.
23  Q    In the last -- well, since 1990?
24  A    Yes.
25  Q    Can you recall which homes they were?

---

**12**

1  A    (No response.)
2  Q    If you can't recall them all, I'll take as
3  many as you can recall.
4  A    I'll give you as many as I can remember.
5  Q    And, if you can, about when, if you can
6  remember that?
7  A    Okay.  Valley View Nursing Home in
8  Williamsport, Pennsylvania.  And that was 1999.
9  Q    And the purpose of that visit was?
10  A    (No response.)
11  Q    That's when you were working here for PP&A?
12  A    That's correct.
13  Q    So it was on behalf of PP&A?
14  A    Correct.
15  Q    And you were there because?
16  A    I did a walk through -- just a walk through
17  to see if -- what kind of activities the residents were
18  involved in.
19  Q    Excuse me.  How long were you there
20  approximately?  An hour?  All day?  Half day?  Do you
21  remember?
22  A    Probably a full day.
23  Q    Uh-huh.  And the reason you went to that
24  particular home as opposed to any, you know, 50 others was
25  what?

---

**13**

1  A    It was just -- it was in northern
2  Pennsylvania.
3  Q    Did you pick it out or did someone pick it
4  out for you?
5  A    I did.
6  Q    Was this done partly just to educate
7  yourself about what's out there as opposed to you think
8  there's something in advance wrong with this place?
9  A    No.  There was no advance --
10  Q    You had no --
11  A    -- knowledge.  No.  Just picked it.
12  Q    And what did you think of the place
13  generally?  Okay?  Not okay?
14  A    It was okay.
15  Q    Any others you can recall that you had
16  visited in sort of survey like fashion in the 1990s?
17  A    A nursing home in Franklin County.
18  Q    Do you recall whether it was the county home
19  or --
20  A    It was the county home.
21  Q    It was the county home?
22  A    Yes.  The other one was a county home too.
23  Valley View was a county nursing home.
24  Q    Okay.  And approximately when?
25  A    That would have been 1999.

---

4

LEED, MARGARET
03/20/01

PENNA PROTECTION & ADVOCACY VS
DPW

14

1    Q    Okay. And were the circumstances the same
2  as for Valley View or was there anything different? Did
3  you pick it out to go to?
4    A    I picked it out, yes.
5    Q    And you picked it out for no particular
6  reason? There was not any accusations of bad care?
7    A    No. Just --
8    Q    And on these surveys -- both of these
9  surveys -- I assume you talked to staff and to residents
10 during the survey or did you just look around?
11   A    Initially I did walk throughs; just, you
12 know, like a walk through the hall. I would say hello to
13 residents. Just observed.
14   Q    Did you make any formal finding about any of
15 these two places like some record that says you found this
16 place okay or not okay or anything like that?
17   A    You mean as to the --
18   Q    Did you make a report to PP&A about these
19 places?
20   A    I found two residents in Valley View who
21 needed assistive technology.
22   Q    What kind?
23   A    One gentleman was in bed because he did not
24 have an appropriate wheelchair.
25   Q    How did you know that?

15

1    A    He told me he did not get out of bed because
2  the wheelchair he used made his bottom hurt and his legs
3  hurt.
4    Q    And you made some sort of report to --
5    A    I spoke to his social worker --
6    Q    Uh-huh.
7    A    -- and asked if we could start the process
8  to have him evaluated for an appropriate power chair.
9  They did start the process, and he did get the power
10 chair.
11   Q    And there was another resident there? I
12 think you said two residents.
13   A    A young woman with severe head injury.
14   Q    And what was the problem with her? Same
15 thing or did it --
16   A    We were trying to find some rehabilitative
17 services in the Williamsport -- her family requested that
18 it be in the Williamsport area.
19   Q    Did you produce a written report about these
20 two individuals? Do you know?
21   A    It would be in their case notes.
22   Q    You mean like in a PP&A record or back at
23 the nursing home?
24   A    A PP&A record.
25   Q    So there might be some report?

16

1    A    Yes.
2    Q    At Franklin County county home any problems
3  with any individuals that you recall?
4    A    One woman could not hear, and she told me
5  that she needed hearing aids. So I spoke to the
6  administrator, and they had her re-evaluated for hearing
7  aids and were getting ready to order the hearing aids and
8  she decided she didn't want them.
9    Q    Generally these particular cases, are these
10 cases that you would find as you toured the facility or
11 that you know about in advance?
12   A    In these two cases I found them as I toured
13 the facility. There have been times where I know of
14 problems through our intake system.
15   Q    So we've spoken about the county homes in
16 Lycoming and Franklin. Any others that you recall making
17 such visits to since 1990?
18   A    I know there have been more.
19   Q    Okay. Well, if you don't recall them at the
20 moment, we'll go on. Perhaps you'll recall them later
21 on.
22       When did you first visit South Mountain
23 Restoration Center?
24   A    (No response.)
25   Q    What year, if you recall?

17

1    A    I believe that was in 1999.
2    Q    And that was for PP&A in your capacity --
3    A    Correct.
4    Q    -- as an employee of PP&A?
5        If we leave aside the visit that you did
6  earlier this month with Mr. Meek and others in connection
7  with this litigation -- leave that aside for the moment --
8  what's the total number of visits you have made to South
9  Mountain since the first in 1999?
10   A    I have no idea.
11   Q    Did you go there every month? Every week?
12 Every -- once a year?
13   A    It was sporadic.
14   Q    So it was not -- whatever it was, it was not
15 a regular thing like once a month or once a week?
16   A    This summer it was once a week.
17   Q    This last summer; 2000?
18   A    This last summer, correct.
19   Q    From approximately -- when you say once a
20 week for a month, two months, three months? Do you
21 recall?
22   A    Probably from June until August.
23   Q    And that was as you indicated much greater
24 frequency of visits than had been the case up till then?
25   A    Correct.

**18**

1   Q     Which up to then -- I'm in the ballpark if I
2  say maybe once a month up to then or even less than once a
3  month on average?
4   A     Less than once a month.
5   Q     Why did the number of visits increase as
6  you've described in the summer of 2000?
7   A     When we -- we had gone on a monitoring visit
8  in May of that year.
9   Q     We meaning you and who else?
10   A     Staff from Pennsylvania Protection and
11  Advocacy.
12   Q     Do you recall who?
13   A     On that particular visit it was Jackie
14  Beilharz, Dave Groninger.
15   Q     Is that it? The three of you?
16   A     No. There were more people.
17   Q     All from PP&A?
18   A     Yes.
19   Q     Everyone there from PP&A?
20   A     All from PP&A.
21   Q     And who decided to make that May 2000
22  visit? Whose decision was that?
23   A     (No response.)
24   Q     Do you recall?
25   A     I don't recall.

**19**

1   Q     Somebody told you you were going? It wasn't
2  you personally who decided let's go?
3   A     Correct.
4   Q     Somebody else decided?
5   A     Correct.
6   Q     And you're not sure whether it was Mr.
7  Casey?
8   A     I'm not sure.
9   Q     So you went on May 2000. Was that an
10  all-day visit?
11   A     Yes.
12   Q     And what did you do? Did you split up in
13  groups or were you together all the time?
14   A     We split up in groups.
15   Q     Who was with you?
16   A     I believe the majority of the time on that
17  particular visit I was by myself.
18   Q     What did you do?
19   A     Just walked through the halls and made
20  observations.
21   Q     Okay.
22   A     Sat in the lounges.
23   Q     So this was -- I mean your visit that day
24  consisted primarily of looking around and seeing things
25  and not talking to staff and not talking to residents?

**20**

1   A     I probably talked to some residents. I
2  don't recall talking to staff.
3   Q     The residents you spoke with, were those
4  people who you just happened upon in walking around? It
5  wasn't people you had planned in advance?
6   A     Correct.
7   Q     Did you or the others produce any written
8  reports about this visit?
9   A     Yes.
10     MR. ULAN: Do we have copies?
11     MR. MEEK: You ought to.
12  BY MR. ULAN:
13   Q     Are these the reports -- that's from May
14  2000?
15   A     The first one -- the one we're speaking of
16  now was May of --
17   Q     2000? No? Last year?
18     MR. MEEK: If I may say, I believe there was
19  a tour she's referring to which was in May of '99. I
20  think she misspoke when she said 2000.
21     THE WITNESS: I'm sorry if I said 2000.
22  BY MR. ULAN:
23   Q     Okay. Well, then let's clarify. You did
24  speak earlier about the frequency of your visits -- that
25  is, you personally -- increasing from less than once a

**21**

1  month to once a week.
2     And what you said was the summer of 2000.
3   A     Okay.
4   Q     Now, is that right or was that the summer of
5  '99?
6   A     No. That was the summer -- that was last
7  summer; the summer of 2000.
8   Q     Summer of 2000 that it increased. So can
9  you recall the first of this series of visits that was of
10  the once-a-week visits from the summer of 2000? Do you
11  know what month that was?
12   A     I'd have to refer back to my notes. I --
13   Q     Leaving aside what month it was, do you
14  recall the visit?
15   A     Yes.
16   Q     And you and who else were on the visit?
17     MR. MEEK: I'm sorry. Can you -- which
18  visit are we talking about?
19     MR. ULAN: The witness cannot recall what
20  month the first of the series of more frequent visits
21  which apparently was in the summer of 2000; what she
22  described as being once a week and that frequency
23  beginning in the summer of 2000.
24     And the witness I believe said -- excuse me
25  -- I believe said that she could recall the first of the

LEED, MARGARET
03/20/01

PENNA PROTECTION & ADVOCACY  VS
DPW

22

1  visits but could not recall the month in which the first
2  of those visits occurred.
3  BY MR. ULAN:
4      Q      Is that correct?
5      A      May I refer to my notes?
6      Q      Sure.
7      A      Do you — you have all of my notes.
8      Q      Whether this is all of your notes I'm not --
9  I have the records you made of individual residents, and
10  there may be others beyond that.
11      A      That's July.
12      Q      Those are from July.  The bulk of these are
13  from July.  The bulk of these are from July.
14      A      That's my writing.  That's May.
15          MR. MEEK:  That's a different date.
16          THE WITNESS:  That's May.
17  BY MR. ULAN:
18      Q      I believe I have at least the individual
19  resident notes here.
20      A      Uh-huh.
21      Q      Was there anything other than the individual
22  residents notes that you produced or know others to have
23  produced besides relating to individual residents?

24

1      A      Okay.
2      Q      And I was trying to identify insofar as you
3  can recall when those more frequent visits in 2000 began.
4  Spring? Summer?
5      A      I said that I had started them in spring.
6  Let me say early spring of 2000.
7      Q      All right.  So I'm referring now to the
8  first of these visits in the early spring of 2000.  And
9  when I say these visits, I mean the first of the series of
10  once-a-week visits.
11      A      Okay.
12      Q      Up to that point you had been making visits
13  -- at least you personally -- less than once a month I
14  believe you said?
15      A      Right.
16      Q      Why did it change from less than once a
17  month to 2000?  Let me distinguish between you going
18  personally and other PP&A people going.
19          That is to say, when you say the frequency
20  of visits increased, am I correct that that means PP&A
21  visits?  I mean it's not you substituted for somebody
22  else?
23      A      I went.

LEED, MARGARET
03/20/01

PENNA PROTECTION & ADVOCACY  VS
DPW

26

1    Q      When these visits started with increased
2   frequency -- the one a week, spring of 2000 -- who was it
3   who told you that you're going to go more frequently now?
4    A      My supervisor.
5    Q      Who's that?
6    A      Jackie Beilharz.
7    Q      And did she give you any reason?
8    A      That we were going to monitor South
9   Mountain. That was the reason.
10    Q      Well, you had been monitoring it up to then,
11   although much less frequently?
12    A      We were going to do more frequent
13   monitoring.
14    Q      And she gave no reason why as far as you
15   remember?
16    A      (Witness shakes head negatively.)
17    Q      You didn't ask?
18    A      No, I did not.
19    Q      The team that visited in the summer of 2000
20   for PP&A, was that the same team on all visits or did it
21   change from visit to visit?
22    A      I believe there was an additional person who
23   had not been on previous visits.
24    Q      Who was that?
25    A      Pat Madigan.

28

1    A      Generally looked for the same kinds of
2   information.
3    Q      And what kind of information was that?
4    A      Well, on the -- it would be on those forms
5   (indicating).
6    Q      All right. Well, that's -- let's -- I
7   should have four copies of this.
8          MR. ULAN:  Let this be marked Deposition
9   Exhibit 2.
10          (Discussion held off the record.)
11          (Record Review packet relating to Blaine
12   L██████ produced and marked as Leed Exhibit A.)
13   BY MR. ULAN:
14    Q      Miss Leed, you have in your hand a document
15   that has been marked Leed Exhibit A and is titled record
16   review. It's a form titled record review?
17    A      Uh-huh.
18    Q      And it indicates that you completed this, is
19   that correct?
20    A      That's correct.
21    Q      All right. Now, this form is dated
22   7/20/2000, correct?
23    A      Correct.
24    Q      And I assume that means that this is based
25   on a visit made on that date?

LEED, MARGARET                                    PENNA PROTECTION & ADVOCACY  VS
03/20/01                                                                    DPW

30

1    Q      How were these individuals selected for the
2  record review?  Why this individual or any one of these
3  individuals as opposed to any other?
4    A      I'd like to refer to the note on the side of
5  the record review.
6    Q      Uh-huh.  Is that your handwriting?  Is all
7  the handwriting yours?
8    A      No.  It is not.
9    Q      Whose handwriting on the side outside the
10 box?
11   A      I don't know.
12   Q      Somebody from PP&A I assume?
13   A      I would assume so.  Okay.  Does that mean
14 that she completed this or she completed the form?
15        MR. MEEK:  I can't tell you that.
16        THE WITNESS:  I don't know.
17        MR. MEEK:  I can tell you what it says.  I
18 can guess what it means.
19        THE WITNESS:  It would be a guess on my
20 part.
21 BY MR. ULAN:
22   Q      You mean how this individual was selected?
23   A      It would be a guess on my part as to who

32

1    A      They may have been put on the list because
2  of conversations that I had with them on previous visits.
3    Q      Would the list be given to you by someone
4  else or did you construct your own list?
5    A      I constructed my own list.
6    Q      If a resident's name was on your list, does
7  that mean it was almost certain that you would in fact
8  conduct a record review or does that just mean that you
9  might conduct a record review?
10   A      It would mean that I might conduct a record
11 review.
12   Q      Did you personally speak with most of the
13 residents for whom you conducted a record review or
14 generally not?
15   A      I don't think I could state one way or the
16 other.  I mean it just --
17   Q      Sometimes you did, and sometimes you didn't?
18   A      Sometimes I did, and sometimes I didn't.
19   Q      When you did conduct a record review in the
20 summer of 2000, did you create a record on a form that
21 looks like the one we have marked as Leed Exhibit A that's
22 in front of you?
23   A      Yes.

LEED, MARGARET
03/20/01

PENNA PROTECTION & ADVOCACY  VS
DPW

34

1    Q    Is it possible in some cases the information
2 is not relevant or -- when you say information not
3 available, in each case of a blank box here does that mean
4 you sought out either in the record or otherwise the
5 information that addressed the subject of the box and you
6 couldn't find it?
7    A    This says record review, so this information
8 would have come from the record.
9    Q    Yes. South Mountain's record?
10    A    South Mountain's record. Yes, this record.
11 And if the information wasn't here, then when I was doing
12 the record review, I did not find it so I did not fill out
13 the blank.
14    Q    Well, if we turn to the third page which all
15 the boxes are blank, there's a specific reference to
16 mental retardation in the third box. Do you see where I'm
17 looking?
18    A    Yes, I do.
19    Q    Now, does the fact that there's a blank box
20 here mean that this person is not mentally retarded and,
21 therefore, the several boxes relating to mental
22 retardation are not filled out?
23    A    I would have to go back through the file
24 again to answer that question.
25          MR. ULAN: I'd be happy to take a break; a

36

1          And if you can't think of anything right
2 now, well, then that's fine. We'll go to another case.
3    A    It is my recollection that this particular
4 person was in a wheelchair or -- strike that. Let me find
5 out exactly what kind of chair he was in.
6          It's my recollection that every time I saw
7 Mr. L████████ he was in his room, and he was isolated.
8    Q    When you say isolated, you mean he was in
9 his own -- nobody else was in his room with him?
10    A    Correct.
11    Q    Do you know whether that was his choice or
12 not?
13    A    According to the chart it was his choice.
14    Q    Do you have reason to believe the chart's
15 wrong?
16    A    When I would say hello to him, he would
17 acknowledge me. He -- I would, you know, say a few words
18 to him, and he seemed receptive to, you know, my
19 conversation.
20          I noted that he had some blisters on his
21 buttocks.
22    Q    How many times did you observe that?
23    A    I noted that that was in the chart.
24    Q    You're saying the chart?
25    A    The chart notes. The chart says that he has

LEED, MARGARET
03/20/01

PENNA PROTECTION & ADVOCACY  VS
DPW

38

1  Q    And you believe he should have gotten some
2  other kind of therapy?
3  A    I think it would have been worth a try.
4  Q    Why is that?
5  A    Because he continued to have disruptive
6  behaviors, and it was noted in the chart that he received
7  no therapies for that disruptive behavior.
8  Q    No therapy other than medication?
9  A    Correct.
10  Q    Let's return to this issue of mental
11  retardation on the third page of Exhibit A where the boxes
12  are left blank.
13  A    Okay.
14  Q    Now, is it your position that you were
15  unable to determine whether he's mentally retarded or not
16  from the record and that's why you left it blank or that
17  just meant that mental retardation is not relevant to him?
18  A    I don't recall seeing it in the chart.
19  Q    And do you have any reason to believe that
20  he was mentally retarded?
21  A    I'm not qualified to answer that question.
22  I don't know.
23  Q    Are you qualified to determine whether

40

1  A    Those were things that I noted because I
2  thought that they may explain some of his behaviors.
3  Visual limitations, he had no glasses.  But he had
4  cataracts, so he couldn't see.  You know, maybe he
5  couldn't -- maybe his vision was diminished I should say.
6  It says leaves food on the side of his
7  plate, and I thought perhaps that may be because he had
8  visual limitations due to no glasses.
9  Q    You mean he might not see it?  Is that what
10  you mean?
11  A    Correct.
12  Q    The next one; dehydration episode?
13  A    He's supposed to be on intake/output which
14  means that his fluid is to be measured.  The amount of
15  fluid that he takes in and the amount of fluid that he
16  puts out is to be measured.
17  Q    And the reason that's noted here is what?
18  A    Because if he was getting an adequate
19  intake, he should not be dehydrated.
20  Q    What's the last one?  Behaviors may be
21  related?
22  A    May be related to painful medical problems.
23  In other words, UTI which is a urinary tract infection or

LEED, MARGARET
03/20/01

PENNA PROTECTION & ADVOCACY VS
DPW

42

1    Q    You have a copy, Miss Leed, of Exhibit B
2    which concerns a resident named Harold M___  The date is
3    7/25/2000, and this appears to be on the same form as
4    Exhibit A, is that right?
5    A    That's correct.
6    Q    And you filled out this form?
7    A    Yes.
8    Q    And do you know why Mr. M___ came to the
9    attention of PP&A?
10   A    Yes, I do.
11   Q    Can you explain?
12   A    We -- I observed him sitting in the hallway
13   in his wheelchair, and his legs and feet were very
14   swollen. And he complained of back pain, and he rubbed
15   his back on his right side while moaning. His clothing
16   was very dirty.
17   Q    When you say dirty, do you mean, you know,
18   soiled with urine or feces or --
19   A    It's my recollection that he was soiled with
20   urine. There was food spilled on his clothing.
21   Q    What time of day was it, do you recall, when
22   you saw him in this condition?
23   A    It was in the morning.
24   Q    Can you be more specific about the time?
25   A    No, I can't.

44

1    And she stopped me in the hallway and said,
2    you know, I like your jumper. And I said, thank you. And
3    I said, I made it. She said, I used to sew. And we got
4    into a conversation about sewing.
5    Q    I see. In the case of Miss D___ is there
6    anything that you believe South Mountain should be doing
7    for her that it was not doing in July of 2000?
8    A    She told me that she wanted to move back to
9    the Norristown area to visit -- to live closer to her
10   sister and said that -- she told me that nothing had --
11   that she knew had been done about that.
12   Q    Anything else?
13   A    I note on the back of my notes here she said
14   she's bored, there aren't enough activities that she's
15   interested in. I suggested she talk with her social
16   worker to see if perhaps they could get some of those
17   activities.
18   Q    Did you follow up on that to see whether
19   anything was done?
20   A    Yes, I did.
21   Q    And the result was what?
22   A    Nothing was done.
23   Q    Did you speak with staff at South Mountain
24   about this?
25   A    No. I spoke with Miss R___

LEED, MARGARET                    PENNA PROTECTION & ADVOCACY  VS
03/20/01                                                      DPW

46

1    Q    I believe the resident's name is Patricia
2    S███k, S-█████████?
3    A    Correct.
4    Q    And how did Miss S███ come to your
5    attention?  Do you recall?
6    A    Yes.  She stopped me as I was walking in the
7    hall and told me that she wanted to move from Unit 5-A to
8    5-B because her friends were on 5-B.
9    Q    And what did you do in response to that?
10   A    I spoke to a nurse, and I do not recall the
11   name.
12   Q    A nurse on the unit she was on 5-A?
13   A    Correct.
14   Q    And what happened?
15   A    They said, yes, they were aware of that.
16   Q    Give you any reason why she couldn't be
17   moved at this time?
18   A    No.
19   Q    Any reason at all?
20   A    No.  She was moved.  Subsequently she was
21   moved.
22   Q    Do you know of any inaccuracies in South
23   Mountain's records regarding this resident?
24   A    What do you mean by inaccuracies?
25   Q    Well, that there's something in the record

47

1    that you believe is not true about a resident or something
2    that is true that normally is in a record and in your view
3    should be and isn't there?
4    A    (No response.)
5    Q    Let me ask it a simpler way, if I may.  Your
6    form that you filled out on this individual, am I correct
7    that it does not identify any inaccuracies in the chart?
8    A    Correct.
9    Q    Okay.
10   A    I would just like to say that she's at South
11   Mountain, and there are no options for — no options have
12   been explored to move her out of South Mountain.  She
13   wanted to live in the community.
14   Q    Is that conclusion based on speaking with
15   her, speaking with the staff or the records only or some
16   combination?
17   A    I believe you'll find that record.
18        (Witness confers with counsel.)
19        THE WITNESS:  It's noted in here that she
20   likes the center and is not interested in being
21   discharged.  She told me otherwise.
22   BY MR. ULAN:
23   Q    Okay.
24        MR. MEEK:  Just for the record that's page
25   three of the social services assessment.

48

1        MR. ULAN:  Okay.  That's all I have for D.
2        (SMRC Review packet relating to Maurice
3    F█████ produced and marked as Leed Exhibit E.)
4    BY MR. ULAN:
5    Q    This is Leed E.  This appears to be a
6    different form, is that correct?
7    A    Yes.
8    Q    This one doesn't seem to be dated.  Do you
9    know when this was completed?  There's a date on the
10   consent form.  The next-to-the-last page on mine has a
11   consent form dated May 18th.
12        Do you see where I'm looking?
13        (No response.)
14   Q    Next to the signature?
15   A    Uh-huh.  Yes.
16   Q    Is it a fair assumption that this form that
17   you completed here was done on or about that date?
18   A    Correct.
19   Q    So this is a form used earlier than the
20   others up to now that we've been talking about which were
21   from July?
22   A    Right.
23        MR. MEEK:  If I may, it's not just earlier.
24   It's a year earlier, '99.
25        MR. ULAN:  Oh.  Pardon me.  Yes.  This is a

49

1    year -- yes.  Over a year earlier.
2    BY MR. ULAN:
3    Q    These are forms in May of '99, right?
4    A    (Witness nods head affirmatively.)
5    Q    The forms that we just were talking about in
6    Exhibits A through D up to now, did they exist earlier
7    than -- to your knowledge exist earlier than July of 2000
8    or was the first time you saw them around the time you
9    actually completed them?
10   A    The first time I saw them was about the time
11   I completed them.
12   Q    Am I correct then that as far as you know
13   they didn't exist earlier?  At least you never saw them or
14   were aware of their existence prior to --
15   A    I was not aware of them before that.
16   Q    The form that's used here in Exhibit E and
17   had been used in the spring of '99, was this done for a
18   different purpose than the later 2000 form or is it the
19   same purpose, but just a different form for some reason?
20        Do you know?
21   A    (No response.)
22        MR. MEEK:  If I may, perhaps it would make
23   sense to ask for what purpose it was, not just whether it
24   was different or not.
25   BY MR. ULAN:

LEED, MARGARET
03/20/01

PENNA PROTECTION & ADVOCACY VS
DPW

50

```
 1    Q    Well, answer either question.
 2    A    Okay. This -- the form that I have in front
 3  of me now -- the review -- would have been a facility
 4  review. The other would have been a record review.
 5    Q    Well, this one is tied to a particular
 6  resident, correct?
 7    A    Correct.
 8    Q    I mean it's not about general conditions in
 9  a facility, it's about --
10    A    This would have been a general review. It
11  wouldn't have been -- it wouldn't have been used just for
12  a record review.
13    Q    What's the difference between a general
14  review and a record review?
15    A    I would have filled this form out as I was
16  going through the facility and maybe I talked to
17  somebody. We used a number of different forms.
18    Q    Well, the question -- this has a series of
19  questions on the first page about having family and do you
20  want to move and about coming to South Mountain, possibly
21  leaving South Mountain and so on, is that correct, on the
22  first page?
23    A    That's correct.
24    Q    Now, in this particular case a resident's
25  name is Maurice or Morris, M-a-u-r-i-c-e, is that
```

51

```
 1  correct?
 2    A    That's correct.
 3    Q    I mean you filled out this form? This is
 4  yours, correct?
 5    A    That's correct.
 6    Q    On page one there is nothing below the line
 7  that says Allentown where you lived before. And do you
 8  know why there's nothing filled out?
 9    A    No, I do not.
10    Q    Was it generally your practice to fill out
11  all of these lines on a form?
12    A    If the resident was able to communicate and
13  give me an answer, yes.
14    Q    So one possible explanation for the form not
15  being completely filled out is that the resident wasn't
16  able to communicate?
17    A    Or did not want to.
18    Q    Or did not want to?
19    A    Correct.
20    Q    And that might be the explanation for the
21  remainder of the form mostly being blank?
22    A    Correct.
23    Q    On the third page of the form there's a line
24  where the question is, how often do you leave the unit
25  slash building. It says, don't, haven't been out in a
```

52

```
 1  long time.
 2    Q    Now, would that be based on what the
 3  resident told you or what staff told you about him or
 4  records?
 5    A    I would assume that's what he told me.
 6    MR. ULAN:  Leed F.
 7    (SMRC Review packet relating to John H▆▆
 8  produced and marked as Leed Exhibit F.)
 9  BY MR. ULAN:
10    Q    Leed F is the same form as E, correct?
11    A    Correct.
12    Q    And the date -- somebody wrote 5/99 on the
13  top. So it was around the same time, right?
14    A    Correct.
15    Q    Do you know who made this form up?
16    A    No, I do not.
17    Q    Somebody gave it to you?
18    A    Yes.
19    Q    Who gave it to you? Do you remember?
20    A    I would assume my supervisor.
21    Q    Is that Miss Beilharz?
22    A    Yes.
23    Q    Do you recall when you first saw this form?
24  Would that have been around when you completed these or
25  had you seen them earlier?
```

53

```
 1    A    I would assume that this was the first
 2  time.
 3    Q    Okay. Were you given any special
 4  instructions about how to fill out the form?
 5    A    As I recall just, you know, ask the resident
 6  questions and fill out the form according to what they
 7  said.
 8    Q    Can I assume that this resident, Mr. H▆▆
 9  is also someone who either -- well, apparently he
10  communicated some things, but not much. Is that fair?
11    A    That's correct.
12    Q    Regarding either of these individuals in the
13  new form -- that is Exhibit E and Exhibit F -- Maurice and
14  Mr. H▆▆, do you know of anything that South Mountain
15  should be doing for them that they are not at least either
16  at the time you completed the form or now? Either one.
17    A    In Mr. H▆▆'s case when I saw him, he was in
18  a Geri-chair. It's like a reclining chair.
19    Q    Yes.
20    A    I did not at any time see anybody go into
21  his room and try to reposition him to get him off his
22  buttocks.
23    Q    How long were you there? Do you recall?
24    A    This particular time I noted from 10:00 to
25  2:30.
```

LEED, MARGARET
03/20/01

PENNA PROTECTION & ADVOCACY  VS
DPW

---

**54**

1  Q    You were with him alone? I mean --
2  A    I was on the floor in that vicinity of his
3  room.
4  Q    He was in his room?
5  A    Correct.
6  Q    In this Geri-chair. And the period of time
7  you noted in the chart was the time you spent on the
8  entire unit, is that correct?
9  A    Correct.
10  Q    And of that time do you recall approximately
11  how much you actually spent in his room?
12  A    No, but I was in the hallway outside his
13  room walking up and down the hallway talking to other
14  residents.
15  MR. ULAN: Leed G.
16  (SMRC Review packet relating to Caroline
17  K████ produced and marked as Leed Exhibit G.)
18  BY MR. ULAN:
19  Q    This concerns Caroline K████,
20  K████, correct?
21  A    Correct.
22  Q    And this is a form you completed, and
23  apparently it was around the same time as the other ones?
24  A    Yes.
25  Q    May of '99?

---

**55**

1  A    Yes.
2  Q    Anything that South Mountain should have
3  been doing for her that it wasn't?
4  A    She was -- I observed her over a period of
5  40 to 50 minutes. She was in a chair in the same
6  position.
7  Q    And you think --
8  A    And during the entire time I was with her no
9  staff came to check on her.
10  Q    And you think all residents should be
11  checked at least every 40 or 50 minutes?
12  A    I think so. Another notation here, she
13  became very agitated, and she kept banging on her chair.
14  Q    Uh-huh.
15  A    I don't -- I had to cut the interview
16  short. You know, I don't know why she became agitated,
17  but there was no staff interaction at all.
18  MR. ULAN: Leed H.
19  (SMRC Review packet relating to Harry A████
20  produced and marked as Leed Exhibit H.)
21  BY MR. ULAN:
22  Q    Your form about the same time, correct?
23  A    Correct.
24  Q    This -- the last name is -- I'm not sure.
25  Can you spell the last name of this resident?

---

**56**

1  A    It looks like A-████.
2  Q    The spelling is --
3  A    A-████.
4  Q    A-████? Okay. And do you recall whether
5  South Mountain was doing anything -- was failing to do
6  anything for him that it should have been doing?
7  A    On my particular visit or on my visit on
8  that particular day he had a strong smell of urine, so he
9  needed to have his clothing changed.
10  Q    Do you recall how long you were with him?
11  A    No, I don't.
12  MR. ULAN: Leed I.
13  (SMRC Review packet relating to Nancy S████
14  produced and marked as Leed Exhibit I.)
15  BY MR. ULAN:
16  Q    Do you recall how these other residents came
17  to your attention; Mr. A████ and Miss K████? The
18  previous two exhibits; G and H.
19  A    I don't recall.
20  Q    I is Nancy S████. Do you know how Nancy
21  S████ came to your attention?
22  A    I believe I first saw Nancy when she was --
23  she was sitting in the hallway.
24  Q    Uh-huh. And then?
25  A    I began a conversation. She told me that

---

**57**

1  staff became very annoyed when she asked to see her social
2  worker. She told me she wants to go to a nursing home in
3  Maryland.
4  Q    Did you talk to staff about that?
5  A    I don't recall.
6  Q    Was there anything South Mountain should
7  have been doing then or now for her that they are not?
8  A    Based on what Nancy told me, probably
9  looking for a placement in Maryland for her.
10  Q    Do you know whether South Mountain was doing
11  that or was not doing it?
12  A    Not to my knowledge.
13  Q    Did you make any specific inquiry about that
14  of the staff?
15  A    No. I spoke to Nancy.
16  MR. ULAN: I have a different form here. We
17  are now up to Leed J.
18  (Observation packet dated 7/18/00 at 12:30
19  produced and marked as Leed Exhibit J.)
20  BY MR. ULAN:
21  Q    Now, this form -- first of all, this is a
22  form you recognize?
23  A    Yes.
24  Q    And this particular one you completed, is
25  that correct?

LEED, MARGARET
03/20/01

PENNA PROTECTION & ADVOCACY VS
DPW

---

**58**

1   A    Correct.

2   Q    And it's dated July 18, 2000, Unit 6-A,

3  correct?

4   A    Correct.

5   Q    Do you know who prepared this form and made

6  the form itself; the blank form?

7   A    I would assume that my supervisor, Jackie

8  Beilharz, did.

9   Q    That's who you got it from?

10   A    Yes.

11   Q    Were you given any particular instructions

12  about how to complete it?

13   A    Just write down what I saw.

14   Q    Do you know whether this form was used

15  specifically for South Mountain -- prepared specifically

16  for South Mountain or whether it is used for other

17  institutions?

18   A    I don't know definitely.

19   Q    This form is based -- Exhibit J is based on

20  what observation?  The time says 12:30, Unit 6-A.  Where

21  were you sitting and what were you looking at and so

22  forth?

23   A    I was sitting in Room 688-A, and it was meal

24  time.  And staff were feeding residents.  And I noted that

25  all staff were seated, and they were feeding the residents

---

**59**

1  at a slow pace.

2   Q    When you say slow, is that good or bad?

3   A    That's good.

4   Q    Oh.  And this area was air conditioned 78

5  degrees, is that --

6   A    That's another room that was air conditioned

7  at 78 degrees.

8   Q    Oh.  I see.  The 0680 is a room number?

9   A    Correct.

10   Q    And what area was that?  Do you know?  Is

11  that a lounge or something like that?  What is it?

12   A    That's -- yeah.  That's a lounge area like a

13  sun room.

14   Q    Okay.  At the top of the next page it says,

15  residents on this unit are sitting upright to eat, is that

16  correct?

17   A    Correct.

18   Q    Is that good or bad?

19   A    That's good.

20   Q    Then in the next page you have a couple of

21  boxes marked issues, and you have no for these two issues?

22   A    Correct.

23   Q    That means you didn't see -- at least on

24  that date at that place you didn't see problems relating

25  to these things?

---

**60**

1   A    Correct.

2   Q    Is that correct?  And the other boxes are

3  not filled out just because it's not relevant to what you

4  were looking at?

5   A    Correct.

6   Q    Is that correct?  Okay.

7         MR. ULAN:  Leed K.

8         (Observation packet dated 7/18/00 at 12:15

9  produced and marked as Leed Exhibit K.)

10  BY MR. ULAN:

11   Q    This is the same form as the previous

12  exhibit, correct?

13   A    That's correct.

14   Q    Same form, the date indicated.  You filled

15  this out and so on, okay?

16   A    Yes.

17   Q    Now, on the left column it's handwritten in

18  room.  Is this -- am I correct that this refers to

19  residents who are fed in their room or at least they were

20  on the day you were there?

21   A    Correct.

22   Q    The first one, tube feeding, mucus coming

23  out of mouth, semi --

24   A    Reclined.

25   Q    Does any of that reflect a problem;

---

**61**

1  something that South Mountain is doing wrong?

2   A    Yes.

3   Q    What?

4   A    The mucus coming out of the mouth and

5  semi-reclined.

6   Q    Okay.  And the mucus coming out of the mouth

7  should be addressed or corrected how?

8   A    Probably some dysphagia evaluation which

9  would be swallowing evaluation.  The resident should be

10  sitting in a more upright position so that the contents of

11  the stomach can empty instead of coming back up the

12  esophagus.

13   Q    Am I correct that your opinions about all

14  this are a lay person's opinion?  You have no professional

15  training in the areas --

16   A    That came from dysphagia training that I

17  attended.

18   Q    You had dysphagia training?

19   A    Correct.

20   Q    Where and when?

21   A    Through the state OMR or state Office of

22  Mental Retardation.

23   Q    When was this training roughly?  What year?

24   A    I don't recall what year.

25   Q    You mean might it have been two, three, four

---

**GEIGER & LORIA REPORTING SERVICE - 1-800-222-4577**

LEED, MARGARET
03/20/01

PENNA PROTECTION & ADVOCACY  VS
DPW

---

**62**

1  years ago?
2  A    Probably two, three years ago.
3  Q    How long did it last? Do you recall? A
4  day? A week? A month?
5  A    It was a day.
6  Q    One day. All right. Rosemary Y▮▮▮▮, next
7  one, slumped in RC. That stands for recliner or something
8  like that?
9  A    Correct.
10  Q    By slumped in, she was on her back, not her
11  stomach, is that correct?
12  A    Correct.
13  Q    And what -- this is bad? I'm questioning.
14  Is this bad, and they should have done something about
15  this?
16  A    Yes.
17  Q    What should they have done?
18  A    Got her into a more upright position.
19  Q    Should they have done that even if she
20  objected?
21  A    I think if they had explained to her what
22  they were going to do and why they were going to do it and
23  asked her if she would try it so she would be a little
24  more comfortable, that she may have participated.
25  Q    But if she still objected, should they have

---

**63**

1  done it over her objection?
2        MR. MEEK: I'm going to object to the
3  question because there's no indication anywhere that she
4  objected to it. You're asking her to speculate about
5  that.
6        MR. ULAN: We don't know what the record
7  will show about that. I don't know.
8        MR. MEEK: This record doesn't show that, so
9  I don't know how she can answer that question. There's
10  nothing there. There's no indication of objection, so I
11  don't see how you can ask a question that's not relevant
12  to this document.
13        MR. ULAN: You can ask witnesses
14  hypothetical questions.
15        MR. MEEK: I object because it's
16  speculative.
17        MR. ULAN: I mean if she has -- if she can
18  answer, she should answer. There's nothing wrong with a
19  hypothetical question in a deposition, neither in a trial
20  under a lot of circumstances.
21        MR. MEEK: It calls for speculation.
22        MR. BLAZUSIAK: The objection is noted for
23  the record. That's the rules that we're operating under.
24  So she can answer the question.
25        MR. MEEK: I know that. I didn't say -- I

---

**64**

1  didn't direct her not to answer the question.
2        MR. BLAZUSIAK: No.
3        MR. MEEK: Okay.
4        THE WITNESS: So I answer the question? Is
5  that what you're telling me?
6        MR. MEEK: If you can.
7        THE WITNESS: I don't think I can answer the
8  question.
9  BY MR. ULAN:
10  Q    You don't have an opinion as to whether or
11  not South Mountain should change her position in the
12  recliner over her objection, is that correct? You do not
13  have an opinion?
14  A    There are so many factors involved that
15  would, you know, reflect on my answer that I don't know
16  how I could truthfully answer the question.
17  Q    You refer to so many factors. What are some
18  of these factors?
19  A    If she's slumped in the reclining chair,
20  it's going to impinge on her ability to swallow, to
21  breathe. If she's left in that position for a period of
22  time, it could cause pressure sores.
23        And I -- it would be my opinion that staff
24  should do everything possible to try to get the resident
25  to change positions.

---

**65**

1  Q    Which may include doing it over their
2  objection under some circumstances?
3  A    It could.
4  Q    Okay. The next resident, Pat S▮▮▮▮, tube
5  feeding. When you say tube feeding, are you referring to
6  a nasogastric tube or a peg tub?
7  A    I believe this was a peg tube.
8  Q    This says tube feeding and RC again. Is it
9  the same problem as with the previous resident?
10  A    I don't recall.
11  Q    Natalie Foreman. I think this says gurgling
12  dash semi-reclined, tube feeding. Do you recall the facts
13  that caused you to write this?
14  A    The fact that she was gurgling. She should
15  not be gurgling.
16  Q    Do you know what they should do in order to
17  prevent the gurgling?
18  A    Feed the patient in a more -- or the
19  residents in a more upright position.
20  Q    And is that opinion based on this dysphagia
21  course that you had two, three years ago; however many it
22  was?
23  A    Correct.
24  Q    Is it based on anything else except that?
25  Is that course the only source you have of technical

---

LEED, MARGARET
03/20/01

PENNA PROTECTION & ADVOCACY  VS
DPW

---

**66**

1  information relating to dysphagia?
2  A    I've done some reading on the subject.
3  Q    Reading what?
4  A    Information that would come in the mail to
5  me from -- maybe things that -- information that I had got
6  from medical sites off the Internet.
7  Q    But it is not articles in medical journals
8  you're talking about?
9  A    The information that came from the medical
10  sites from the Internet were from medical journals.
11  Q    Can you remember any of that?
12  A    American Medical -- I guess the New England
13  Journal of Medicine.
14  Q    And what did it say?
15  A    That when feeding people, that they should
16  be in an upright position.  They should remain upright for
17  at least 30 minutes after completion of eating to allow
18  the stomach contents to empty into the intestinal tract
19  rather than staying in the stomach and coming back up into
20  the esophagus.
21  Q    Do you recall when that article was
22  published and what year?
23  A    No, I don't.
24  Q    Do you know anything about it?
25  A    No.

---

**67**

1  Q    It might have been this year, last year, the
2  year before?
3  A    I don't know.
4  Q    Do you know the name of the author?
5  A    No, I don't.
6  Q    Do you know the title?
7  A    No.
8  Q    Do you think you could retrieve the
9  article?  Did you print it somewhere so you have it?
10  A    No.  Just I read it.
11  Q    You read it off the screen?
12  A    Uh-huh.
13  Q    And didn't save it?  Didn't print it?
14  A    No.
15  Q    The last resident identified on the first
16  page of K, Robert -- I'm not sure that I can read the
17  name.  Can you read the name of the last one?
18  A    L███████.
19  Q    L████████?
20  A    Correct.
21  Q    Tube feeding, scratches all over face and
22  head, almost prone?
23  A    Prone, uh-huh.
24  Q    And does prone mean you're laying on your
25  stomach?  Is that what prone means?  Or laying on your

---

**68**

1  back?  That's a dumb question I guess.  Prone means on
2  your --
3  A    Maybe I should --
4  Q    -- stomach, right?
5  A    Maybe I should have said --
6  MR. MEEK:  Supine would be the appropriate
7  word --
8  THE WITNESS:  Supine, yes.
9  MR. MEEK:  -- for flat on your back.  Prone
10  probably is --
11  MR. ULAN:  Is your stomach.
12  MR. MEEK:  I don't know what prone means.
13  BY MR. ULAN:
14  Q    Well, on either side what did you mean by
15  prone?
16  A    I meant lying flat.
17  Q    On back or stomach?
18  A    On back.
19  Q    On back.  And wheezing.  The scratches all
20  over face and head, did you talk to any staff about that?
21  A    No, I did not.
22  Q    You weren't alarmed by that or you didn't
23  think that was an immediate problem?
24  A    Let me recall.  I think this particular
25  resident I talked to staff, and they said that he had

---

**69**

1  scratched himself on his face and head and those were some
2  of his behaviors.
3  Q    And you didn't pursue the matter any further
4  at least at that time?
5  A    I was doing observations.
6  Q    So the answer to that question is no?
7  A    Right.
8  Q    Did you pursue the matter any further at any
9  later time?  The matter being his scratches on his face
10  and head.
11  (Witness confers with counsel.)
12  THE WITNESS:  I made a note back here on
13  page whatever it is -- page five that he had facial and
14  scalp scratches.
15  BY MR. ULAN:
16  Q    This form and the early ones are the same
17  kind.  Were they submitted to South Mountain at any time
18  other than in connection with this litigation?
19  A    I don't know.
20  Q    Not to your knowledge?
21  A    Not to my knowledge.
22  Q    And any of the forms -- Exhibits A through
23  the current forms -- to your knowledge were not submitted
24  to South Mountain except in connection with this
25  litigation, is that correct?

---

LEED, MARGARET
03/20/01

PENNA PROTECTION & ADVOCACY VS
DPW

---

**70**

1    A    Not to my knowledge. I don't know.
2    Q    Fine. The next page, J. C██████, is that
3  the name at the top?
4    A    I was standing up when I wrote that.
5  C███████████
6    Q    C███████?
7    A    Yes.
8    Q    Sitting in chair. Is that okay or not okay?
9    A    That's correct.
10   Q    That is okay?
11   A    Yes.
12   Q    TV on fuzzy?
13   A    Uh-huh.
14   Q    Can't be seen by either resident?
15   A    Uh-huh.
16   Q    Can't be seen because it's fuzzy or is the
17  reason separate from the fuzziness?
18   A    Can't be seen because it's fuzzy.
19   Q    The next one, M. C██████.
20   A    Uh-huh.
21   Q    What's the first --
22   A    That's supposed -- that's prone. Lying
23  flat.
24   Q    You mean on back?
25   A    Yes.

---

**71**

1    Q    You mean by prone laying on back. Coughing,
2  wheezing?
3    A    Correct.
4    Q    Mildred L████. Tube feeding, almost
5  prone. Again, meaning on back?
6    A    Uh-huh.
7    Q    Charlie S████. Tube feeding, lying on --
8  lying on --
9    A    Plastic.
10   Q    Plastic?
11   A    Uh-huh.
12   Q    Holding stuffed dog?
13   A    Uh-huh.
14   Q    Plastic? You mean the bed was covered with
15  plastic?
16   A    Correct. No sheets.
17   Q    And they should have been covered with
18  sheets?
19   A    Correct.
20   Q    Going back to Mildred L████, all of these
21  individuals that you wrote in prone or almost prone, you
22  object to that?
23   A    Yes.
24   Q    Is that right?
25   A    Yes.

---

**72**

1    Q    They should have been in a different
2  position?
3    A    Yes.
4    Q    Next page. Eleanor, using some kind of cup?
5    A    Sippy cup.
6    Q    Is that good or bad?
7    A    That's good.
8    Q    What's a sippy cup?
9    A    A sippy cup is a cup with a little spout on
10  it. It has a cover on it so if they have tremors, they
11  can't spill.
12   Q    I see. Okay. Fine.
13   A    If you have grandchildren --
14   Q    Yes. Okay. The bottom one, Isabelle
15  M██████. Something about pudding?
16   A    Eating pudding.
17   Q    Eating pudding. Staff spoke to her in a
18  reassuring way. I assume that's good?
19   A    Yes.
20   Q    The bottom of the next page, 6-A, yes,
21  meaning free of odors, clean and so forth, correct?
22   A    Right.
23   Q    The next page, that's fairly self
24  explanatory, right?
25   A    Yes.

---

**73**

1    Q    Yes, no, yes and so forth. Okay.
2  Next-to-last page about information posted so they can see
3  it. The bulletin board is too high? Is that -- is that
4  the point of that?
5    A    Correct.
6    Q    Too high to see? And then this is a list of
7  activities; movie, music awareness. What's 1:30?
8  Reminiscence?
9    A    Reminiscence, yes.
10   Q    That's where people tell stories about
11  things? Is that what reminiscence means? I'm not sure.
12   A    I saw the activities posted, but I was never
13  able to observe any.
14   Q    So you're not certain what the reminiscence
15  means?
16   A    No.
17   Q    And the reading interests at 2:30, do you
18  know exactly what that entails?
19   A    No.
20   Q    All right. We have a couple of more of
21  these, and then I think probably we should take a break,
22  if that's okay with everybody.
23       MR. ULAN: Leed L.
24       (Observation packet dated 7/20/00 at 10:00
25  produced and marked as Leed Exhibit L.)

---

LEED, MARGARET                          PENNA PROTECTION & ADVOCACY  VS
03/20/01                                                              DPW

---

**74**

1              (Discussion held off the record.)
2    BY MR. ULAN:
3        Q       Miss Leed, this is a form you filled out,
4    correct?
5        A       Correct.
6        Q       Dated 7/20/2000, Unit 5-A.  And nothing on
7    the first page.  On the second page, Madeline ████, RC
8    meaning recliner?
9        A       Correct.
10       Q       Head hyperextended.  What do you mean by
11   hyperextended?
12       A       Her head was leaning way off to the side of
13   her chair hanging out over the edge of her chair.
14       Q       The next says asked what?  I can't read
15   the next word.
16       A       Aide.
17       Q       Asked aide Jeff --
18       A       Jeff.
19       Q       -- for pillow to put -- did she get the
20   pillow as far as you know?
21       A       Yes.
22       Q       So this was okay?  She got the pillow?
23       A       It was okay that she got the pillow, but it
24   was not okay that nobody observed that she needed a
25   pillow.

---

**75**

1        Q       It says asked aide.  Who asked aide?
2        A       I did.
3        Q       The resident or you did?  You asked the
4    aide.  I see.  The page beyond that about Penny Bunch,
5    R.N., hostile attitude and so forth.
6                Am I correct that at least the first half of
7    that -- the quotes -- this was based on your personal
8    observation, what you heard?
9        A       That's correct.
10       Q       So when you say sarcastic answers and so on,
11   am I correct that you're referring to the tone of voice in
12   which she said this?  I mean the statement, no one would
13   throw her glasses away, by itself --
14       A       I'm referring to the tone of voice.
15       Q       The tone of voice.  Did you complain to
16   management about her at any time?
17       A       No.
18       Q       Next page.  Is there a reason you didn't
19   complain to management about this nurse who you thought
20   was hostile and sarcastic?
21       A       My focus was there for the residents.  It
22   was -- she was directing her hostility at me.
23       Q       Oh.  Okay.  So that -- I see.  Okay.  Fine.
24   Next page.  Nothing has been done for patient, bed still
25   unmade, sheets in bunches and so on.

---

**76**

1                The time of day listed on the first page is
2    10:00 o'clock.  So is that fair to say that this was 10:00
3    o'clock or this might have been a different time?
4        A       It was around that time.
5        Q       Plus or minus fifteen minutes or something?
6        A       Yes.
7        Q       And the entire floor smells of urine?
8        A       Yes.
9        Q       Was that unusual for South Mountain?
10       A       No.
11       Q       A lot of floors smell of urine?
12       A       Yes.
13       Q       Compared to other nursing homes you've been
14   in -- you said you've been in a half a dozen or so the
15   last decade -- more urine smell at South Mountain than
16   others or about the same or come at different times of day
17   and can't tell or what?
18       A       South Mountain had more of a problem.
19       Q       You mean much more of a problem or just a
20   little more of a problem?
21       A       Depending on the unit, yes.  More of a
22   problem.
23       Q       Are there any nursing homes you've been in
24   that had a urine smell problem that was about the same or
25   maybe even worse than South Mountain?  Any nursing home?

---

**77**

1        A       I recall one nursing home that had a bad
2    problem.
3        Q       Do you recall which one it was?
4        A       Yes, I do.
5        Q       What was that?
6        A       It was a Manor Care in Dauphin County.
7        Q       The next page.  Harold ████ feet look less
8    black, still very swollen.  I gather that's some
9    improvement over when you first looked?
10       A       Some improvement.
11       Q       Some?
12       A       Yes.
13       Q       Was there anything at that point when you
14   wrote this that you thought they should be doing for him
15   that they weren't doing at South Mountain?
16       A       I think you'll recall from an earlier sheet
17   that we looked at that his legs were very swollen and very
18   black.  And we had asked that -- asked the staff and then
19   reported to Dr. Power that he did have -- his legs looked
20   bad.  They did attempt to get his legs up more.
21       Q       Next page is some reference to the nurse
22   Penny Bunch again.  Gwen -- what's the name?  Welty?  Is
23   that the second name?
24       A       Yes.
25       Q       Said she threw them away.  I mean is she an

---

78

1    aide or what's going on here?
2    A    I didn't mark it down.
3    Q    Was it staff?
4    A    Staff, yes.
5    Q    Madeline -- that's the resident -- said they
6    weren't hers. She wants a full bifocal. Did you ever
7    follow up on this to see about what happened to her
8    regarding the glasses?
9    A    Yes. And as I recall they said she had just
10   had an eye exam and she had her glasses.
11   Q    Oh. All right. And that was shortly after
12   this form was filled out or was that like the year later?
13   A    No. That was -- they said she had already
14   had an eye exam and she wasn't entitled to another eye
15   exam.
16   Q    The rest of this page is a description of
17   what's going on in the -- what's the R slash C?
18   A    Recliner chair.
19   Q    And 5-E is some kind of lounge or day room
20   or --
21   A    Yes.
22   Q    Lounge and day room mean the same thing
23   here?
24   A    Yes.
25   Q    When you say no staff -- about the middle of

79

1    that page, the bottom of that page -- over what period of
2    time was there no staff? Was that over like a couple
3    hours?
4    A    I wrote down 10:00 to 10:30.
5    Q    So that means you were there continuously
6    between 10:00 and 10:30 and no staff came in --
7    A    Correct.
8    Q    -- during that period? Okay. Next page.
9    Information posted, many in W slash --
10   A    Wheelchairs.
11   Q    Oh. I see. Board information very high for
12   people in wheelchairs. And the last page, no magazines.
13   There's some name here.
14   A    Pat S█████.
15   Q    That's the resident?
16   A    Correct.
17   Q    Requested reading material, could not find
18   any. Okay.
19        MR. ULAN: Leed M.
20        (Observation packet dated 7/25 in p.m.
21   produced and marked as Leed Exhibit M.)
22   BY MR. ULAN:
23   Q    On this one I don't see anything until the
24   next-to-last page. Am I correct?
25   A    Correct.

80

1    Q    And this was from -- this says 7/25 on the
2    date. I assume this was 2000. Is that correct?
3    A    Yes.
4    Q    Okay. There's a resident's name there,
5    right? The first person's a resident?
6    A    Yes.
7    Q    Abused in elevator --
8    A    Observed.
9    Q    Observed. Okay. Observed in elevator,
10   could not keep his trousers up, appeared to have no
11   underwear, zipper broke and -- I'm sorry. What's the rest
12   of that?
13   A    Broken on pants.
14   Q    Oh. I see. And then took him to his
15   floor. That means you took him?
16   A    Correct.
17   Q    Asked staff to assist him. Did they assist
18   him?
19   A    Yes.
20   Q    And last page. Water container on 2-A empty
21   at 2:30. When you say -- is this like one of those water
22   bottles or a pitcher? What do you mean?
23   A    It was -- they're big orange, plastic
24   containers. And it was the middle of July, and as I
25   recall it was very hot. They had nothing to drink.

81

1    Q    Did you ask anybody about that?
2    A    Yes.
3    Q    And did they do anything about it?
4    A    No.
5    Q    Who did you ask?
6    A    I asked the aides.
7    Q    The aides wouldn't do anything about it?
8    A    They said, well, maybe somebody will take
9    care of it later. But nothing was done.
10   Q    Do you recall the names of any of the aides
11   you spoke with?
12   A    No.
13        MR. ULAN: That's it for these forms. My
14   guess is I've got possibly another hour.
15        MR. MEEK: Okay.
16        MR. ULAN: I don't think more than another
17   hour possibly.
18        MR. MEEK: Let's take a break.
19        MR. ULAN: Let's take an hour or something.
20        (Luncheon recess.)
21   BY MR. ULAN:
22   Q    Hello, Miss Leed. I'm going to give you a
23   copy of the complaint in this matter and ask you if you've
24   ever seen it before.
25   A    Yes.

82

1     (Discussion held off the record.)

2     (Complaint produced and marked as Leed

3  Exhibit N.)

4  BY MR. ULAN:

5    Q    Miss Leed, have you ever seen this complaint

6  before?

7    A    Yes.

8    Q    Have you had the opportunity before today to

9  look at it fairly carefully?

10    A    Yes.

11    Q    Now, I'm going to call your attention to

12  page seven of the complaint beginning with Paragraph 25

13  and ask you whether or not the allegations therein to your

14  knowledge are based in whole or in part on your own

15  personal observation.

16    A    They're based on my own personal observation

17  and those of others that visited the facility with me.

18    Q    So 25 -- and who are the others?

19    A    It would have been other PP&A staff.

20    Q    Such as Jackie Beilharz and the others who

21  you mentioned?

22    A    Correct.

23    Q    Any particular one over the others or

24  just --

25    A    No. Everyone.

83

1    Q    Does what you described this morning about

2  urine odors pretty much describe your experience or was

3  there anything else that's covered within No. 25 that you

4  haven't talked about?

5    MR. MEEK: Can you clarify the question?

6  Are you referring to specifics because the question before

7  was referencing a specific exhibit? I forget which one it

8  was.

9    MR. ULAN: There was testimony this morning

10  about at least urine odors at any rate.

11    MR. MEEK: Right. But it was confined to

12  one unit. That particular document confined itself to one

13  unit. I think it was 6-A or some other -- I can't

14  remember which.

15    MR. ULAN: I'm asking the witness if she can

16  recall whether there's anything beyond what she testified

17  to this morning.

18    MR. MEEK: Okay. But -- you can answer.

19    THE WITNESS: There were -- there were

20  strong odors of urine and feces on most of the units that

21  I visited.

22  BY MR. ULAN:

23    Q    When you say most of the units, do you mean

24  most of the units most of the time or most of the units at

25  least --

84

1    A    Most of the units most of the time.

2    Q    No. 26. Do you have any personal

3  observation about No. 26?

4    A    Yes, I do.

5    Q    Was there any PP&A staff besides yourself

6  who observed this?

7    A    I believe this was my observation.

8    Q    Okay. All right. Do you recall the names

9  of any staff members who were there?

10    A    No, I do not. You're referring to South

11  Mountain?

12    Q    Pardon me. Yes. Indeed. South Mountain

13  staff.

14    How far away were you standing when you saw

15  the -- from the feces on the floor? Do you have any

16  recollection? Five feet? Thirty feet?

17    A    Approximately five feet.

18    Q    No. 27. Are any of the allegations in 27

19  based on your --

20    A    Yes.

21    Q    Does this involve anything beyond that which

22  you testified to this morning?

23    A    (No response.)

24    Q    I don't think you testified about bathroom

25  doors being closed.

85

1    A    No. I didn't.

2    Q    Is this statement -- staff failed to assure

3  that bathroom doors are closed -- when you say bathroom

4  doors, do you mean the door to the bathroom itself or the

5  door to the stall?

6    A    The doors -- the openings to the bathrooms

7  themselves have a curtain. Many times that was not

8  closed, and there were times when the stalls in the

9  bathrooms which also have curtains were not closed.

10    Q    Was this true throughout the facility?

11    A    Yes.

12    Q    Did you complain to anybody about it?

13    A    Yes, I did.

14    Q    Who?

15    A    I complained to Dr. Power.

16    Q    In what year? Do you recall?

17    A    No, I don't. Probably during, you know,

18  some of my visits there.

19    Q    And what did he say about it?

20    A    He said he would address the issue with

21  staff.

22    Q    And has anything been done to your knowledge

23  to improve the situation?

24    A    It did not appear to me that it improved at

25  all. The problem continued.

LEED, MARGARET
03/20/01

PENNA PROTECTION & ADVOCACY VS
DPW

---

**86**

1　Q　Okay. 27 B specifically, about men in
2　women's bathroom, even when women are using it.
3　A　Yes.
4　Q　Is that something you brought to Dr. --
5　A　Yes, I did.
6　Q　-- Power's attention? Has anything been
7　done about it to present day?
8　A　Not to my knowledge, no.
9　Q　Have you --
10　A　I observed men going into the women's
11　bathrooms. I would hear the women who were in the
12　bathrooms yelling get out. And there were, you know,
13　persistent problems.
14　Q　When was the last time you observed that?
15　Do you recall? This year? Last year? The year before?
16　Women in men's -- pardon me -- men in women's bathrooms.
17　A　Let's see. I'm trying to recall when my
18　last -- my last visit -- I think --
19　Q　Including the one this month.
20　A　Yeah. I would say probably December of 2000
21　would be my last observation.
22　Q　Okay. No. 28, is that based in part on your
23　personal observation?
24　A　Correct.
25　Q　And is this typically the case that these

---

**87**

1　doors are open when residents are asleep?
2　A　Yes.
3　Q　Or just occasionally?
4　A　It was typically the case.
5　Q　Is this when -- these are during daytime
6　hours you're talking about?
7　A　Yes. Yes, I am.
8　Q　Now, did you tell anybody about that? Tell
9　any management people or any staff?
10　A　We talked to Dr. Power about it. It was
11　addressed in a report that we wrote and sent to Dr.
12　Power.
13　Q　When would that have been?
14　A　(No response.)
15　Q　Last year sometime? 2000?
16　A　I'm sure you have a record of the report.
17　Q　And you said that has not improved or has
18　improved?
19　A　My last visit other than this last time in
20　-- I believe it was December -- it had not changed.
21　Q　Had it been improved when you visited in
22　March this year?
23　A　There were -- we observed many doors
24　closed. What was going on behind the closed doors, I
25　don't know.

---

**88**

1　Q　No. 29, the noise level. Is that based on
2　your observation?
3　A　Yes.
4　Q　On how many occasions in all of your visits
5　would you say there was an extremely high noise level in
6　the common areas?
7　A　Every visit the noise level was just -- it
8　was deafening.
9　Q　Compared to other nursing homes you've been
10　in --
11　A　Extremely high.
12　Q　Compared to other --
13　A　Yes.
14　Q　You've never been in a nursing home that had
15　this high --
16　A　Not with that noise level, no.
17　Q　No. 30, is this yours also?
18　A　Yes, it is.
19　Q　And I assume when it says exceeds 81
20　degrees, is that a thermometer you had or was on the wall
21　at the facility?
22　A　It was a thermometer I had with me.
23　Q　And where it says June 25, 2000, staff
24　recorded temperatures up to 90 degrees Fahrenheit in some
25　rooms, do you know what rooms that was? Do you know

---

**89**

1　offhand?
2　A　No. I don't recall what rooms offhand.
3　Q　But they were common areas as opposed to
4　bedrooms?
5　A　They were common areas and bedrooms.
6　Q　No. 31, is that based in part on your
7　observations?
8　A　Yes, it is.
9　Q　And are there any instances of it other than
10　those you testified about this morning?
11　A　Yes. I can recall one incident in
12　particular. I was in the dementia unit, and a staff
13　person was -- as I walked past the lounge room, I observed
14　a staff person seated on one of the lounges watching a
15　game show.
16　　　And I went past that door and came in the
17　back of the room and stood there unobserved. And one of
18　the other residents kept talking. And she turned around
19　to him and said, would you shut up, I can't hear, if you
20　don't keep quiet, don't sit here.
21　Q　When was that approximately? Can you tell
22　us the year that it happened?
23　A　I don't recall the date. It's documented in
24　my notes.
25　Q　In the notes we went over --

---

LEED, MARGARET                          PENNA PROTECTION & ADVOCACY VS
03/20/01                                                              DPW

---

90

1    A    Not the notes we went over this morning.
2  There are -- there are other notes that I have.
3    Q    That were submitted to us?
4        MR. MEEK:  I have no idea.
5        MR. ULAN:  I thought I pulled all the stuff
6  that she had written.  I could be mistaken.
7        MR. MEEK:  We'll check to see if there's
8  something missing.
9        MR. ULAN:  All right.
10        MR. MEEK:  We certainly don't want to miss
11  any of those.
12  BY MR. ULAN:
13    Q    Did you complain to anybody about this?
14    A    Yes, I did.
15    Q    To whom?
16    A    I complained to Dr. Power.
17    Q    Do you recall the name of the staff member?
18    A    Not offhand I don't.  No.  It's in my notes.
19    Q    Was it as far as you know an aide?
20    A    I think it's an aide, yes.
21    Q    No. 32, is this based on your observation?
22    A    Yes, it is.
23    Q    And were there any other PP&A staff who saw
24  this besides yourself?
25    A    This was my observation.

---

91

1    Q    Was any report made to management about this
2  incident?
3    A    Yes, there was.  I talked to Dr. Power.
4    Q    So that was sort of an oral report rather
5  than anything in writing?
6    A    I'm sorry?
7    Q    That was an oral report to him?  You talked
8  to him about it as opposed to --
9    A    About this, yes.  Yes.  He took written
10  information about the verbal abuse.
11    Q    You mean you made up a written report?
12    A    No.
13    Q    Somebody else did that?
14    A    I dictated it to him, and he wrote it down.
15    Q    I see.  Fine.  No. 33, was that your
16  observation?
17    A    Yes.
18    Q    Any other PP&A staff or just you?
19    A    I believe there were other staff with me,
20  and I do not recall who they were.
21    Q    Do you know the name of the resident
22  involved?
23    A    No, I don't.
24    Q    No. 34, is that your observation?
25    A    Yes.

---

92

1    Q    Any other staff besides yourself?
2    A    No.  That was my observation.
3    Q    Any PP&A staff.
4    A    No.  That was my observation.
5    Q    Any report to anybody?
6    A    Yes.  I asked staff to please change her
7  shirt, and they didn't do it for some time until later
8  that morning.
9    Q    Okay.  35, is that your observation?
10    A    Yes, it is.
11    Q    Anyone else from PP&A besides you?
12    A    No.  Not that I recall.
13    Q    No. 36.  Was No. 36 based on your
14  observation?
15    A    Yes, it is.
16    Q    Any other PP&A staff?
17    A    I'm sure other staff observed the same
18  instances on other visits because many of the residents
19  either had on no shoes or the shoes were too big because,
20  as they walk down the hall, the shoes flopped up and
21  down.
22        I asked several of them where they got their
23  shoes, and they said that staff would order them.  And I
24  said did anybody fit you for your shoes, and they said,
25  no, staff would just guess what size we needed and order

---

93

1  them through mail order.
2    Q    No. 37, is that based on your --
3    A    Yes.
4    Q    -- own observation?  I assume this is based
5  on what staff tell you or residents tell you?
6    A    Correct.  And sometimes by, well,
7  observation.
8    Q    You mean you look --
9    A    They smell dirty.
10    Q    Somebody looks so dirty they couldn't have
11  been --
12    A    They smell dirty.
13    Q    No. 38, was this based on your own
14  observation?
15    A    Yes.
16    Q    And what period of time are we talking about
17  in No. 38?  Do you recall?
18    A    That would be doing some of the periodic
19  chart reviews that we -- or some of the chart reviews that
20  we alluded to this morning.
21    Q    So that would be 2000?
22    A    Uh-huh.
23    Q    Mostly 2000 probably?
24    A    Probably mostly 2000.
25    Q    No. 39, is that yours as well?

---

94

1   A    Yes. And other staff as well.
2   Q    Do you know in the case of No. 39 some DNR
3   orders -- have any sense of the number? Whether that
4   means two or three or 30 or 40 or any sense of the
5   magnitude of the issue there?
6   A    It appeared to be to me a majority of the
7   charts that we looked at.
8   Q    The charts you looked at were not selected
9   randomly? They were selected because you had some
10  interest in the resident, is that correct?
11  A    Correct.
12  Q    No. 40. Is the answer the same for 40?
13  A    Uh-huh. Yes.
14  Q    Is the answer the same for 41?
15  A    Yes.
16  Q    Answer the same for 42?
17  A    Yes.
18  Q    Beginning with 43 the complaint has this
19  sectioned off in a different category. Were you the
20  person who made the conclusions about No. 43 based on your
21  observation?
22  A    Me and other PP&A staff from our visits
23  there.
24  Q    The same folks you've spoken about earlier?
25  A    Yes, sir.

95

1   Q    Jackie Beilharz and Mr. Groninger?
2   A    Dave Groninger, and I believe Judy Banks was
3   along.
4   Q    Okay.
5        MR. MEEK: Can I ask just a quick question?
6   Are you asking her whether the allegation in the complaint
7   is based solely on her observation? I can tell you the
8   answer would be no.
9        MR. ULAN: She wouldn't know solely. She is
10  one of them.
11       MR. MEEK: That's fine.
12       MR. ULAN: I'm not representing -- unless
13  she knows that. I'm asking if she has personal knowledge
14  to support these allegations.
15  BY MR. ULAN:
16  Q    No. 44, same question.
17  A    Yes.
18  Q    45, same question.
19       MR. MEEK: What's the question? Whether she
20  has personal knowledge?
21       MR. ULAN: The question is whether she has
22  personal knowledge which she believes support the
23  allegation in that paragraph.
24       THE WITNESS: Yes.
25  BY MR. ULAN:

96

1   Q    In No. 44 it says the residents' -- S plural
2   -- risk. Does that mean there's more than one resident in
3   No. 44 or is there actually only one resident?
4   A    More than one resident.
5   Q    How many? Do you recall?
6   A    I don't know the exact number.
7   Q    Is it more like two or three or more like 20
8   or 30?
9   A    More like 20 or 30.
10  Q    When you say -- when it says brought to
11  DPW's attention, to whose attention in particular?
12  A    In a report to Dr. Power.
13  Q    I see. I assume you mean a written report?
14  A    Yes.
15  Q    And No. 45, same question.
16  A    Yes.
17  Q    No. 46?
18  A    Yes.
19  Q    The consultant to PP&A, do you know who that
20  was?
21  A    I believe -- that consultant was Dean
22  Haugh.
23  Q    Okay. But you were there with him?
24  A    Yes, I was.
25  Q    47. Did you observe the matters recited in

97

1   47?
2   A    I did some of the observations. That was a
3   visit done by the central team from PP&A which would have
4   been Jackie Beilharz, Pat Madigan, Diana Haugh and
5   myself.
6        And these observations weren't only on these
7   particular dates. They were ongoing.
8   Q    You mean there were other occasions --
9   A    Yes.
10  Q    -- when you saw similar things?
11  A    Yes.
12  Q    No. 48?
13  A    Yes.
14  Q    To your knowledge any other PP&A people who
15  saw this?
16  A    Yes.
17  Q    Who?
18  A    The people who were -- accompanied us on the
19  visits.
20  Q    The same people --
21  A    Same people.
22  Q    -- that you mentioned earlier? All right.
23  49, same question.
24  A    Same thing.
25  Q    50?

98

```
 1    A    Same thing.
 2    Q    51?
 3    A    Same thing. Same answer.
 4    Q    52?
 5    A    Same answer.
 6    Q    53?
 7    A    Same answer.
 8    Q    54?
 9    A    Same answer.
10    Q    55?
11    A    Same answer.
12    Q    56?
13    A    Same answer.
14    Q    Would this also involve other PP&A staff
15  besides yourself?
16    A    Yes.
17    Q    And that would include the people you
18  mentioned earlier?
19    A    Correct.
20    Q    57?
21    A    This was in response to a written report
22  that we had sent to Dr. Power; that the --
23    Q    It says well over a year, and this complaint
24  was filed last fall. So this would have been in '99?
25    A    Correct.
```

99

```
 1    Q    So since '99. And how has he responded, if
 2  at all?
 3    A    I don't think there's been much progress.
 4    Q    And your conclusion is based on your visits
 5  since that time?
 6    A    Some of the -- I can think of two residents
 7  that I observed on my last visit to South Mountain which
 8  would have been last week -- the week before -- who need
 9  and can use a power chair to ambulate. And they have
10  none.
11    Q    No. 58?
12    A    My observations as well as other staff.
13    Q    The kind of assistive equipment referred to
14  would be what, for example?
15    A    We're talking about weighted spoons. We're
16  talking about the sippy cups. We're talking about the
17  dishes with a lip on them to help the residents get the
18  food onto the plate without spilling it over the sides.
19    Q    When you say some residents here, you mean
20  two or three, 20 or 30, 80 or 90? I mean ballpark what
21  are we talking about?
22    A    Probably 50, 60. That's an estimate.
23    Q    59?
24    A    There were several residents who were
25  nonverbal. I asked staff if any kind of assessment had
```

100

```
 1  been done for augmentative communication for them, and
 2  they said, well, we tried, but they weren't really
 3  receptive.
 4        I asked if there had been different kinds of
 5  equipment tried or if it was just one particular brand,
 6  and they said, well, they weren't sure, but it just wasn't
 7  successful, so they gave up.
 8    Q    The kind of equipment we're talking about in
 9  No. 59 to communicate is?
10    A    Augmentative communication like a talking
11  board.
12    Q    One of those computers that has a voice
13  synthesizer?
14    A    Yes. Or it prints out on a screen.
15    Q    All right. Okay. And, again, here some
16  mean two or three, 20 or 30?
17    A    (No response.)
18        MR. MEEK: Can you answer?
19        THE WITNESS: Three.
20  BY MR. ULAN:
21    Q    I'm sorry. In 59?
22    A    I'd say three.
23    Q    Three. If we wanted to know specifically
24  who these three are or in the earlier case of 58 who the
25  50 or 60 are, how would we find that out?
```

101

```
 1    A    South Mountain staff should be able to tell
 2  you.
 3    Q    You believe then that, in other words, the
 4  South Mountain staff agree with you about who needs the
 5  equipment referred to in 58 and the equipment in 59?
 6    A    I don't know that they necessarily agree or
 7  maybe they would have been more aggressive about getting
 8  it for them.
 9    Q    But you don't -- you don't have a list? If
10  I want to find out who these 50 or 60 are, do you have a
11  -- in No. 58 I believe you said 50 or 60 -- that's a rough
12  estimate.
13        If I want to find out who the 50 or 60 are,
14  you do not have a list?
15    A    There was a list generated by -- I believe
16  the gentleman's name was Phil Keffer on staff at South
17  Mountain who had said that he had done an assessment for
18  everybody for assistive technology or assistive --
19    Q    I'm sorry. The last name?
20    A    K-e-f-f-e-r.
21    Q    Okay. So he has the best list you know of
22  on this issue No. 58?
23    A    That's the best list that I've seen South
24  Mountain come up with, yes.
25    Q    You don't have a separate list?
```

LEED, MARGARET
03/20/01

PENNA PROTECTION & ADVOCACY VS
DPW

---

102

1   A   No. Well, other than the report that was
2 generated by the consultant for the wheelchairs, the
3 positioning. So we have that report.
4   Q   58 is talking about eat and drink
5 independently.
6   A   Okay. You were also talking about -- I'm
7 sorry. When I say assistive technology, I think of
8 wheelchairs. And we're talking about eating.
9   Q   Let's clarify. 58 is about eating and
10 drinking --
11   A   Okay.
12   Q   -- only. Is the 50 to 60 the correct
13 estimate for that or did that include wheelchairs in 57?
14   A   I'm sorry. I got off the track there.
15   Q   I'm sorry. I wasn't clear enough.
16   A   I would say 50 or 60 with eating and
17 drinking.
18   Q   And the wheelchairs -- the number of people
19 involved in the wheelchairs in No. 57 is roughly how many?
20   A   That number may be higher, but that's also
21 included on a list that was furnished to us by South
22 Mountain.
23   Q   A list from South Mountain?
24   A   Yes.
25   Q   Do you remember who made that list?

---

103

1   A   That was Phil Keffer also. It's all one
2 report.
3   Q   All right. Okay. So that for 57, 58 and
4 59, the only lists you know about that identify South
5 Mountain people -- South Mountain residents I mean who
6 need wheelchairs in 57 or eating and drinking devices in
7 58 or communications devices in 59 are lists created by
8 South Mountain?
9   MR. MEEK: If I may, other than those which
10 generated work product by me.
11   MR. ULAN: Leaving aside what may be work
12 product.
13   THE WITNESS: Okay. The wheelchairs are
14 addressed in a report generated by our consultant. That's
15 another list. There's --
16 BY MR. ULAN:
17   Q   Is that Mr. Haugh?
18   A   Haugh, yeah. There was one list that was
19 generated by South Mountain by Mr. Phil Keffer. That has
20 a list of all of the residents and whether they're in a
21 recliner chair, a wheelchair, whether they use a sippy cup
22 or hearing aids and so on.
23   Q   And so this list generated by Mr. Haugh --
24 we have an exhibit that was marked Exhibit A in the Haugh
25 deposition.

---

104

1   A   Okay.
2   Q   Is that the report you're talking about;
3 Mr. Haugh's report?
4   A   No. That's another report.
5   Q   He generated more than one report?
6   A   He generated -- Mr. Haugh generated this
7 report.
8   Q   Yes.
9   A   There was another report prior to that that
10 we -- was furnished to us by South Mountain staff.
11   Q   Yes.
12   A   That was an assessment done on all of their
13 residents that said -- listed whether they used a
14 wheelchair, assistive eating devices, whether they used
15 hearing aids and so on.
16   This is the only list that addresses the
17 seating and the wheelchairs.
18   Q   Just for the record when you say this is,
19 you're talking about --
20   A   This is the report.
21   Q   -- the Haugh Exhibit A?
22   A   Correct.
23   Q   And that to your knowledge is the only list
24 relating to wheelchairs generated by Mr. Haugh?
25   A   Correct.

---

105

1   (Discussion held off the record.)
2 BY MR. ULAN:
3   Q   No. 60 is a new section of the complaint.
4 Continuing with the same question -- whether the
5 allegations in the paragraph are to your knowledge based
6 at least in part on your own observations -- is that true
7 for No. 60?
8   A   Some of my observations, yes.
9   Q   How do you determine what adequate mental
10 health treatment is?
11   A   I've observed people in the facility with
12 obvious behavior problems. There appeared to be no
13 ongoing treatment, no --
14   Q   May I interrupt? Again, when you say no
15 treatment --
16   A   No behavior treatment.
17   Q   You mean treatment other than medication?
18 You don't count medication as treatment for mental
19 illness?
20   A   No, because there are other ways to treat
21 mental illness besides -- you know, if you give somebody
22 medicine and they continue to have outbursts of behavior
23 problems or they're striking out at other residents, then
24 you need to do something else to see if you can address
25 the problem.

LEED, MARGARET                              PENNA PRO. _CTION & ADVOCACY VS
03/20/01                                                                    DPW

---

106

1  Q    Excuse me. Do you have any formal training
2  in the treatment of mental illness?
3  A    I've worked here for six years. I've worked
4  around people with mental illness.
5  Q    But other than that you don't have --
6  A    No.
7  Q    -- any formal training in the treatment
8  of --
9       MR. MEEK: You asked her the question.
10 She's answering the question. If you don't like her
11 expertise, that's your problem.
12      MR. ULAN: That's not my problem at all. I
13 just want the record to be clear, Mr. Meek.
14 BY MR. ULAN:
15 Q    No. 61, same question.
16 A    (No response.)
17 Q    Is this based in part --
18 A    That's based on a conversation with Dr.
19 Power.
20 Q    Between you and Dr. Power?
21 A    And other PP&A staff.
22 Q    Okay. 62?
23 A    Observations of myself and other PP&A
24 staff.
25 Q    When you say in 62 the only consistent form,

---

107

1  do you mean the only form that's used a lot? Is that what
2  you mean by consistent?
3  A    Yes. And that would be based on the record
4  reviews that we went over this morning.
5  Q    63?
6  A    Same answer.
7  Q    64?
8  A    Same answer.
9  Q    In the Subsection A and B are they based in
10 part on your personal observation?
11 A    Personal observation and record review that
12 we reviewed this morning.
13 Q    For the record can we have -- BL, is that
14 the same person we spoke about this morning I think on the
15 first exhibit?
16 A    Yes. I believe so.
17 Q    And in B HM is -- you talk about HM. Is
18 that the same HM we spoke about this morning?
19 A    Correct.
20 Q    No. 65, is that based on your observation?
21 Do you recall?
22 A    No. That was not my observation.
23 Q    Do you know who made that observation?
24 A    That was Diana Haugh.
25 Q    The second -- in Paragraph 66 the first

---

108

1  sentence is about the law. The second sentence though is
2  the facts, the factual allegation. It says, rather than
3  provide specialized mental health services in the nursing
4  facilities in South Mountain, DPW has implemented this
5  requirement by providing that persons who need such
6  services can be admitted to psychiatric institutions.
7       I just want to make sure I understand what
8  that means. Did you mean that instead of providing mental
9  health care -- let's say in the broadest sense -- at South
10 Mountain, people who really need mental health care badly
11 are sent to psychiatric hospitals?
12      Is that what that means?
13 A    It says they can be admitted to psychiatric
14 hospitals or psychiatric institutions. I don't believe
15 that's the only treatment that should be available. Is
16 that what you're asking me?
17 Q    I'm trying to make sure I understand the
18 statement here. It says -- the bottom of 66 says, rather
19 than providing specialized mental health services in the
20 nursing facilities including South Mountain, DPW has
21 implemented this requirement -- referring to the previous
22 sentence about federal law -- by providing that persons
23 that need such services can be admitted to psychiatric
24 institutions.
25      I'm just trying to make sure I understand.

---

109

1  Let me ask you. Do you think you understand that
2  sentence? Do you think you understand that sentence?
3  A    I didn't write that sentence, so I don't
4  know what the intent would be.
5  Q    All right. Fine. Then we'll leave it at
6  that. That's fine. 67 and 68 are matters of law. No. 69
7  about mentally retarded individuals, were you involved in
8  that?
9  A    How do you mean involved?
10 Q    Well, do you have personal knowledge of
11 that?
12 A    That there are some people with mental
13 retardation there?
14 Q    Yes.
15 A    Yes.
16 Q    Or approximately 18. Do you know the number
17 yourself?
18 A    I believe 18 is probably a ballpark figure.
19 Q    Does PP&A have a list of these 18?
20 A    We have a list that was furnished to us by
21 South Mountain.
22 Q    That's the only list to your knowledge that
23 exists?
24 A    Yes.
25 Q    No. 70 concerning resident RL, is this a

---

GEIGER & LORIA REPORTING SERVICE - 1-800-222-4577

LEED, MARGARET
03/20/01

PENNA PROTECTION & ADVOCACY  VS
DPW

110

1    matter about which you have personal knowledge?
2    A    That was the person we spoke about this
3    morning, and that was an observation by another PP&A
4    staff.
5    Q    Do you know who this staff was?
6    A    (No response.)
7    Q    Do you know in No. 70?
8    A    (No response.)
9    Q    No. 70 was not based on your personal
10   knowledge?
11   A    Oh, no. I'm sorry. Wait. I'm sorry.
12   Q    I'm sorry. If I'm going too fast -- I mean
13   obviously I don't want to --
14   A    I was confused with another resident.
15   Q    Pardon?
16   A    RL we did not speak about this morning.
17   Q    Do you know who RL is? I mean the name, the
18   full name.
19   A    (No response.)
20   Q    If this item is --
21   A    I'm not -- I'm not sure.
22   Q    So you may or may not have personal
23   knowledge of this one?
24   A    No.
25   Q    You're not sure whether you have personal

111

1    knowledge of this?
2    A    I'm trying to remember who he is.
3    Q    Well, we can come back. Whatever. No. 71,
4    do you have personal knowledge of resident RR?
5    A    Yes.
6    Q    Do you know the name of RR?
7    A    Yes, I do.
8    Q    What is that?
9    A    Richard R———.
10   Q    The last name?
11   A    Remaly, R-————
12   Q    Is the information in this paragraph to your
13   knowledge taken from the record of the facility?
14   A    I believe it is.
15   Q    Again, we're moving to a different topic for
16   Paragraph 72. Do you have personal knowledge of many
17   residents having nothing to do for long periods of time?
18   A    Yes, I do.
19   Q    By many residents do you mean a few, most,
20   just about all?
21   A    Most.
22   Q    So many you mean most?
23   A    Most.
24   Q    More do than don't fit in this category?
25   A    Correct.

112

1    Q    Now, when you say for long periods of time,
2    roughly what are you talking about?
3    A    Days.
4    Q    And when you say nothing to do, watching
5    television doesn't count or does count as something to do?
6    A    Sometimes the television isn't available to
7    them.
8    Q    Excuse me. But if they do have a television
9    available to them, does that count as something to do or
10   it doesn't count?
11   A    Well, yeah, but you wouldn't want them
12   sitting watching television all day long. They can't go
13   outside because there's not enough staff to take them
14   outside.
15        There's not enough staff to take them off
16   grounds to go shopping. There's not enough staff to take
17   them out to get something to eat. There's not enough
18   activity staff for them to --
19   Q    When you say enough staff, that means more
20   staff than they have now?
21   A    Correct.
22   Q    Is that what you mean?
23   A    I believe they have three or four activity
24   staff.
25   Q    Well, in your judgment how many more staff

113

1    would they need to hire to be satisfactory?
2    A    They have enough staff to keep the
3    residents -- to have enough activities for the residents
4    to do. As I indicated to you this morning some of the
5    women talked to me. They want to take up sewing classes.
6        Others wanted to play bingo other than just
7    one night a week. Other residents wanted to go for walks
8    outside. Those things aren't available to them.
9    Q    Is there any standard governing nursing
10   homes known to you which would require the hiring of more
11   staff than South Mountain already has?
12   A    The standard I would think would be enough
13   -- would be so that the residents would have activities of
14   their choice so that they would have things to do other
15   than just wander up and down the halls.
16   Q    And that standard is your personal
17   standard. You're not referring to some standard that
18   exists in some publication --
19   A    No.
20   Q    -- somewhere?
21   A    Not to my knowledge.
22   Q    No. 73, same question. Is this based on
23   your personal observation in part at least?
24   A    In part, yes.
25   Q    Would you describe the statements in

LEED, MARGARET                          PENNA PROTECTION & ADVOCACY VS
03/20/01                                                              DPW

---

114

1    Paragraph 73 as typical?
2    A    Yes.
3    Q    Have you ever been in a nursing home in
4    which staff interaction with residents was different?
5    A    Yes.
6    Q    Which nursing home?
7    A    I would say many of the nursing homes that I
8    visited.
9    Q    Can you name any?
10   A    Todd Home in Carlisle,.
11   Q    How often did you visit that?
12   A    Maybe five times, ten times.
13   Q    In the '90s? I assume that was in the '90s?
14   A    '90s and 2000.
15   Q    So that was in your capacity as a --
16   A    PP&A.
17   Q    -- representative of PP&A?
18   A    (Witness nods head affirmatively.)
19   Q    No. 74, same question.
20   A    Mine and other staff.
21        (Discussion held off the record.)
22   BY MR. ULAN:
23   Q    I asked you about 74 already?
24   A    Uh-huh.
25   Q    75?

---

115

1    A    (No response.)
2    Q    Personal observation of yours?
3    A    Yes.
4    Q    76, same question.
5    A    That was another PP&A staff.
6    Q    Do you know who?
7    A    No. I don't recall.
8    Q    77?
9    A    My observations and other staff; PP&A
10   staff.
11   Q    When you say other than on organized trips,
12   the residents in your opinion could go somewhere on their
13   own without somebody with them?
14   A    There are -- yes. There are a few.
15   Q    A few meaning two or three, 20 or 30?
16   A    Maybe ten. But there's no way for them to
17   go anywhere. There's no transportation.
18   Q    No. 78?
19   A    Mine as well as other PP&A staff.
20   Q    79?
21   A    Same answer.
22   Q    No staff is present overnight meaning -- do
23   you know approximately what hours you mean by overnight?
24   A    (No response.)
25   Q    Were PP&A there overnight or was this from a

---

116

1    staff roster?
2    A    We were -- that was based on a visit that we
3    made in -- we left I believe it was midnight.
4    Q    You left at midnight?
5    A    Yes.
6    Q    So this is true for like dusk to midnight
7    you mean?
8    A    Yes.
9    Q    And was this on one occasion?
10   A    Yes.
11   Q    Can you tell me what year or anything about
12   when this was?
13   A    That would have been this past summer;
14   2000.
15   Q    2000. And 80, same answer?
16   A    Same answer.
17   Q    Again, switching topics now. Paragraph 81,
18   was that based on your personal observation of residents
19   or residents' records?
20   A    Yes.
21   Q    Some individuals are admitted means how
22   many? Two to three? 20 or 30? I feel like the eye
23   doctor that says -- flips and says is this better, is that
24   better.
25   A    Maybe 20 to 30.

---

117

1    Q    Do you have a list of these individuals?
2    A    It would be on their charts.
3    Q    So there's no list other than what's in
4    South Mountain's records? Is that what you're saying? To
5    your knowledge.
6    A    Not to my knowledge.
7    Q    82, is this something of which you had
8    personal knowledge?
9    A    That would have been from the record review
10   we did this morning.
11   Q    This refers to a resident that we talked
12   about this morning?
13   A    Yes.
14   Q    83?
15   A    Same answer.
16   Q    We talked about PS this morning?
17   A    Yes. We did.
18   Q    Pardon me. 84?
19   A    Offhand I don't recall who that is.
20   Q    And you don't recall whether this is
21   something you have personal knowledge about?
22   A    No. I can't recall who JB is.
23   Q    All right. That's fine. Switching again,
24   No. 85, do you know what facts are the basis for this
25   allegation?

---

LEED, MARGARET
03/20/01

PENNA PROTECTION & ADVOCACY VS
DPW

118

1    A    Paragraph 85?
2    Q    Yeah.
3    A    From personal observation, my trips up there
4    and talking to residents who've indicated to me that they
5    want to leave there. They want to go back to where their
6    families are because it's so isolated that families can't
7    come to see them.
8    Q    Approximately how many residents have told
9    you that; that they want to leave?
10   A    Approximately 15.
11   Q    Do you have any --
12   A    It could be higher.
13   Q    Do you have any list of such residents?
14   Does PP&A?
15   A    It would be in the records.
16   Q    The records at South Mountain?
17   A    Yes.
18   Q    Is that what you mean?
19   A    Yes.
20   Q    So PP&A does not have a separate list of
21   these individuals to your knowledge?
22   A    Not a list per se, no.
23   Q    Can you recall the names of any of the 15
24   approximately in No. 85 that have told you that they want
25   to leave?

119

1    A    Yes.
2    Q    And who are they as best you can recollect?
3    A    Charlotte L█████, David M█████, Roberta
4    D█████ Nancy S██, John B██.
5    Q    The last name again?
6    A    John B██, B████. That might be who the
7    JB is.
8    Q    In 84 you mean?
9    A    Yes. Thank you.
10   MR. MEEK:    That's just a guess.
11   THE WITNESS:    Let me think.
12   BY MR. ULAN:
13   Q    When you visit a resident at South Mountain,
14   do you always inquire as to whether they want to leave?
15   Is that a question you always ask?
16   A    Usually, yes. I ask them how long they've
17   been there, are there any plans for you to leave, would
18   you like to leave, would you like to live some place
19   else.
20   Q    Approximately how many South Mountain
21   residents have you interviewed either during the time when
22   you've been visiting there which goes back to early '99 --
23   is that when you first visited?
24   A    (Witness nods head affirmatively.)
25   Q    Do you know approximately how many offhand?

120

1    A    How many I've interviewed?
2    Q    Yeah. Approximately.
3    A    Maybe 30, 40.
4    Q    Paragraph 86. The second sentence says,
5    nursing facilities are not the most integrated setting
6    appropriate for their needs despite the fact that they may
7    qualify for nursing facility services.
8    Is that something you believe personally?
9    A    Yes.
10   Q    What are the most integrated settings
11   appropriate for South Mountain's residents?
12   A    It's my strong belief that people can live
13   in community settings in family living centers or living
14   facilities with family.
15   Q    With their family or a foster family?
16   A    With their -- either. Either one.
17   Q    So in your view most South Mountain
18   residents do not need to have licensed nursing staff on
19   site?
20   A    That's correct.
21   Q    They don't need that?
22   A    That's correct.
23   Q    And why do you believe they don't need that?
24   A    Because I believe that they can be cared for
25   in family settings with caring people around them and

121

1    maybe some community support services coming in such as --
2    you know, if they do have some medical needs, they could
3    have visiting nurse service, they could have attendant
4    care service, things like that.
5    Q    Do you know of any such services for persons
6    like the South Mountain residents -- when I say like they,
7    in terms of their age, their physical condition,
8    their mental condition -- in Pennsylvania at the present
9    time?
10   A    You're speaking about family living?
11   Q    Any kind of --
12   A    Let me give you a personal experience. My
13   sister and I are caring for our elderly mother at home
14   with some community supports in place. And I think that
15   every person -- every elderly person, every person with a
16   mental illness should be afforded that same privilege.
17   Q    Do you believe there are any residents of
18   South Mountain who need to reside in a setting that has
19   24-hour on-site licensed nursing staff?
20   A    No.
21   Q    If you could turn your attention to
22   Paragraph 96.
23   A    (Witness complies.)
24   Q    If I might, back up to 95. I apologize.
25   95. Is the statement in 95 based in part on your personal

LEED, MARGARET
03/20/01

PENNA PROTECTION & ADVOCACY VS
DPW

122

1   observation?
2       A       Yes.
3       Q       Which South Mountain social workers are you
4   referring to? Could you identify any of them by name?
5       A       One that comes to my mind immediately is
6   Nancy Mulich, M-u-l-i-c-h.
7       Q       Any others?
8       A       I'm sorry. I can't recall a name right
9   now.
10      Q       But are there others besides her on which
11  the statement in 95 is based?
12      A       Yes.
13      Q       Can you say how many others? One or two?
14  Three or four?
15      A       I would have to assume that it would be the
16  rest of the staff because she seemed to have no or very
17  little knowledge about the availability. And when I
18  suggested some things to her, she was very surprised.
19      Q       When did you speak with her? What's
20  referred to here, is that one conversation or several or
21  what?
22      A       There was several conversations.
23      Q       Approximately over what period of time?
24      A       Maybe eight, nine months.
25      Q       In what year?

123

1       A       Probably '99, 2000.
2       Q       No. 96. Do you have personal knowledge of
3   any of the facts --
4       A       Yes.
5       Q       -- in 96? Do you know who CL is?
6       A       Yes, I do.
7       Q       Who is CL?
8       A       Charlotte L███████. She's been told a
9   number of times that community placement is impending and,
10  you know, that she'll be moving shortly.
11              And I would go down. I would see her maybe
12  a month or two afterwards after our conversation, and she
13  would still be there. I'd say, what happened, and she'd
14  say, I don't know.
15              She uses a wheelchair, and at one point they
16  did take her to see a facility and pulled up in front of
17  the facility and said, oop, you can't stay here because it
18  has steps. They took her back to South Mountain.
19      Q       Have you personally spoken with South
20  Mountain staff about her?
21      A       I spoke to the patient rights advocate.
22      Q       Who is that?
23      A       Paul Miller.
24      Q       How recently? Do you recall?
25      A       Probably -- my last conversation with him

124

1   about this issue probably would have been in the fall of
2   2000.
3       Q       2000? Okay. Any other South Mountain staff
4   you can recall talking about this resident?
5       A       I spoke to her social worker. I believe
6   that was Nancy Mulich.
7       Q       No. 97.
8       A       Same answer. My observations and other
9   staff.
10      Q       Can you give me a rough time period about
11  the observations you're talking about in 97? Who is RL?
12  Is that the RL from this morning?
13      A       I believe so.
14      Q       99?
15      A       I believe that is the resident that was
16  referred to earlier; Richard R███████.
17      Q       Do you have the personal knowledge about the
18  matters --
19      A       Yes.
20      Q       -- asserted in 99? 100.
21      A       JB.
22      Q       Do you know who JB is?
23      A       I can't recall offhand.
24      Q       So you're not certain about whether you have
25  personal knowledge about this or not?

125

1               MR. MEEK: Is it John B███? We spoke about
2   John B███ before.
3               THE WITNESS: Oh. If it's John B███, yes, I
4   do have personal knowledge. Yes. It does describe John.
5   BY MR. ULAN:
6       Q       I think that that's it for -- No. 109.
7   Paragraph 109?
8       A       Personal knowledge and knowledge of other
9   PP&A staff.
10              MR. MEEK: Can I ask, who is GL? Just for
11  the record what's the name?
12              THE WITNESS: GL. I remember the case, but
13  I can't -- I can't recall the name right now. Can we come
14  back to that?
15  BY MR. ULAN:
16      Q       We'll resolve it later. And No. 114?
17              (Mr. Blazusiak withdrew from the deposition
18  room.)
19              THE WITNESS: I remember the case, but I
20  don't recall who RL is.
21  BY MR. ULAN:
22      Q       Could I just go back briefly to 112?
23  Nursing facilities almost invariably decline -- do you see
24  where I'm reading? Paragraph 112?
25      A       Yes, I do.

LEED, MARGARET
03/20/01

PENNA PROTECTION & ADVOCACY  VS
DPW

---

**126**

```
 1    Q     Is that based partly on your knowledge?
 2    A     Yes, from what I've read from the records at
 3  South Mountain and just hearing other staff -- PP&A staff
 4  discussing cases that they've worked on.
 5    Q     115?
 6    A     Yeah.  We'd have to get that information
 7  from the record.
 8    Q     You don't know who RR is?
 9    A     I can't recall right now.  It could be
10  Richard R████
11    Q     R████ maybe?
12    A     Yeah.
13    Q     116?
14    A     That would be John B███.
15    Q     And are these facts based on your personal
16  observation or review of records --
17    A     Yes.
18    Q     -- and so forth?
19    A     Yes.
20    Q     All right.  We're concluded with the
21  complaint part.  I've got perhaps 20 minutes left with
22  this witness.  We can take a break for five minutes or
23  keep going through, if you want.
24    A     I'm okay.  It's warm.
25    Q     All right.  Miss Leed, the Department of
```

---

**127**

```
 1  Health last year surveyed or inspected -- whatever the
 2  right word is -- South Mountain, and it's my understanding
 3  found they had zero deficiencies or zero violations of
 4  their regulations.
 5          Are you aware of that?
 6    A     Yes, I am.
 7    Q     Now, why do you think the Health Department
 8  gave South Mountain's a good rating and you apparently
 9  give it a bad rating?  Do you have -- can you account for
10  the difference?
11    A     It's my opinion that they based their survey
12  on just a one- or two-day visit.  The facility knew they
13  were coming ahead of time, so they were well prepared.
14          After I spent a lot of time at South
15  Mountain -- like I was there day after day, and people got
16  used to seeing me on-site -- I observed many things that
17  probably people that they -- the staff were expecting to
18  visit wouldn't have seen because I observed more odors in
19  the facility.
20          When I was there during the JCAHO review --
21    Q     That's JCAHO?
22    A     Yes.  I'm sorry. -- a strong smell of
23  Clorox permeated the facility.  When I would go back on my
24  weekly visits, the strong odors would be there.  There
25  would be very little resident activity.  There would be
```

---

**128**

```
 1  little interaction with staff.
 2          So it's my opinion that if the Department of
 3  Health would do an unannounced visit and would be there
 4  for an extended period of time, they would have seen a lot
 5  of the things that I saw.
 6    Q     Is the same true for the Joint Commission;
 7  the JCAHO review?
 8    A     Yes.
 9    Q     Next to South Mountain -- let me strike
10  that.  Am I correct that you have been at South Mountain
11  more days than you have been at any other nursing home?
12    A     Yes.
13    Q     Is it correct that you have been at South
14  Mountain for more days than all the other nursing homes
15  you have visited combined?
16    A     I don't know that you could say more days.
17    Q     Can you estimate --
18    A     Most of what of my job is involved in seeing
19  people in nursing homes and --
20    Q     How many -- let me ask this.  Your estimate
21  of the number of days you spent at South Mountain since
22  the first day you visited which was in '99 -- correct?
23    A     Uh-huh.
24    Q     -- to the present day is roughly how many
25  days?  Could you --
```

---

**129**

```
 1          MR. MEEK:  Eight-hour days?
 2  BY MR. ULAN:
 3    Q     Well, full days?  Do you sometimes spend
 4  just half day?  Do you generally spend a full day?
 5    A     Most of my days were full days.  Maybe 30,
 6  40.
 7    Q     And if you go to the next lower down nursing
 8  home on the list in terms of days you spent there since
 9  you've been working for PP&A which was 1990 --
10    A     Five.
11    Q     Five. -- what home is next on the list in
12  terms of number of days you spent there?
13    A     Probably the nursing home in Franklin
14  County.  It was the county nursing home.
15    Q     About how many days there approximately?
16    A     Probably 15.
17    Q     And when was that approximately?
18    A     Approximately '98, '99.
19    Q     And how did you find that facility to be
20  compared to South Mountain?
21    A     There was more staff interaction.  I didn't
22  notice the urine and feces smell in the facility.
23  Residents generally appeared to be cleaner.  Their clothes
24  appeared to be cleaner.
25    Q     Do you believe the residents of that nursing
```

---

LEED, MARGARET
03/20/01

PENNA PROTECTION & ADVOCACY VS
DPW

130

1 home should be cared for in the community as opposed to in
2 a nursing home?
3     A     I believe they could be, yes.
4     Q     All of them or nearly all of them?
5     A     I couldn't make an assumption on that
6 because I didn't speak to the majority of them. I don't
7 know.
8     Q     When you interviewed a resident at South
9 Mountain, can you give me a general sense of how long
10 these interviews lasted?
11     A     They could last anywhere from ten minutes to
12 an hour or more. If the resident indicated they didn't
13 want to speak to me, then that was their choice. I didn't
14 push the issue.
15     Q     Do you know of any situations at South
16 Mountain that in your opinion constitute violations of the
17 residents' rights that are not within the matters we've
18 already talked about today or just outside what we've
19 talked about that would constitute any violation of the
20 residents' rights?
21     A     The clothing issue comes to mind.
22     Q     Tell me about that, please.
23     A     On one of my visits I noted that a company
24 had come into the facility and set up a clothing display
25 in the auditorium. So I stood at the doorway and observed

131

1 staff pushing residents into the auditorium in their
2 wheelchairs.
3         The residents were left in the middle of the
4 aisle. There were aisleways set up with clothing on
5 either side. The residents were pushed to the middle of
6 the aisle. The staff person had a list in their hands.
7         And as I walked up to listen to what they
8 were saying, the staff person would read from the list
9 what the resident wanted. The resident was given -- was
10 not asked about color; choice; did they want skirts,
11 blouses; yellow, white, pink, blue, red.
12         It didn't matter. The staff just gathered
13 up the clothing, and it was stuffed in a bag. The bag was
14 placed on the resident's lap. The resident was pushed up
15 to the cash register.
16         The paper that the staff person had in their
17 hand was handed to I assume an employee of the clothing
18 manufacturer, and it was tallied up. Then the resident
19 was pushed out of the room. That entire process took
20 maybe five to ten minutes.
21         Many of the residents complained to me later
22 that they were not given a choice for clothing. They
23 weren't given a choice to purchase clothing.
24     Q     When was this? Approximately when?
25     A     This was in probably July of this past

132

1 summer; 2000.
2     Q     2000. Okay.
3     A     Residents complained because staff would
4 come in in the morning and pull clothing out of the
5 closet, and it would be put on their beds.
6         I already addressed the shoe issue.
7 Residents told me that they wanted to go to the mall to
8 buy their shoes. They weren't given that choice.
9         Earlier -- let's see. I think it was last
10 spring they were replacing the windows at the facility,
11 and -- I don't know what direction it was, but one side of
12 the building they had replaced the windows.
13         But there had been no account taken for the
14 fact that the sun would shine -- it had to be east -- the
15 sun would come up and shine in the residents' bedrooms.
16 So they were awakened at 4:30, 5:00 o'clock in the morning
17 because the sun was up. There were no shades put on the
18 windows.
19         The residents wanted to go outside for
20 walks, and they were told there wasn't enough staff to go
21 with them.
22         The exercise classes. A couple of times I
23 would observe what they called the exercise class, and it
24 was the same residents that were chosen to go -- by staff
25 to go to the exercise classes.

133

1         One time in particular I said to staff, what
2 about the other residents. Oh, they probably don't want
3 to go. So I said to the residents, would you like to go
4 to the exercise class, and they said, let's go. All but
5 one of them wanted to go to the exercise class, and they
6 had a wonderful time.
7     Q     Let me just for a moment go back to the
8 Department of Health standards we were talking about a few
9 moments ago.
10         You said that the reason that you don't
11 think too well of South Mountain whereas the Health
12 Department gave it a rating of zero violations, that that
13 was largely a result of the fact that you were there a lot
14 more often than they were and you essentially knew about
15 South Mountain a lot better than they do.
16         Is that a fair summary?
17     A     Yeah.
18     Q     All right. Do you -- is it correct to say
19 then that if the Health Department knew what you know or
20 you believe you know about South Mountain, that the Health
21 Department would not give it a high rating? If the Health
22 Department knew what you know or at least the facts as you
23 believe.
24     A     I think that would be a safe assumption.
25     Q     Is it also correct then that you think the

LEED, MARGARET
03/20/01

PENNA PROTECTION & ADVOCACY  VS
DPW

134

1  Health Department's regulations concerning nursing homes,
2  assuming that they're properly enforced based on adequate
3  information, that the regulations themselves are okay?
4      It's just that the Health Department doesn't
5  know enough about the home; in this case South Mountain?
6  Or do you think the regulations themselves are not
7  reflective of the rights of residents?
8      MR. MEEK:  If I may, her testimony was not
9  that she knew the facility better, but also that she came
10  and was there a lot, and, therefore, there was no
11  preparation for her coming to the units.  But the
12  Department of Health had announced visits.  I think that's
13  what her testimony was.
14  BY MR. ULAN:
15      Q    Assume for the moment that that's true; that
16  additional issue as well if that is so which I'm not sure
17  about, but for the present purpose we'll assume it.
18      Do you believe that the Health Department
19  regulations governing nursing homes in Pennsylvania are
20  themselves deficient?  Are the regulations deficient?
21      A    I think to answer that question fairly I
22  would almost have to take each regulation and answer it.
23  There are some that are adequate, and there are some that
24  are not.
25      (Mr. Blazusiak returned to the deposition

135

1  room.)
2      THE WITNESS:  I'm basing my -- I'm answering
3  my question based on my personal observations and what I
4  believe.
5  BY MR. ULAN:
6      Q    The most -- what I believe was the most
7  recent visit you made was in connection with this
8  litigation on March 9th, correct?
9      A    Correct.
10      Q    Did you find South Mountain to be in any way
11  different from the way you had found it on previous
12  visits?
13      A    Yes.
14      Q    How?
15      A    I would say probably 90 to 95 percent of the
16  residents had on newer -- new clothes.  They were washed.
17  The clothes were clean.  Almost all of the residents had
18  on shoes.  They had all obviously had baths.  Their hair
19  was -- hair washed.
20      There was one floor that I noticed a faint
21  odor of urine.  I didn't observe any residents with urine
22  soaked clothes that I had observed on other visits.  There
23  seemed to -- there appeared to be more staff.
24      Q    Did you find anything on the most recent
25  visit -- the March 9th visit -- that you found

136

1  objectionable?
2      A    It appeared that because there were so many
3  people in the group that residents were very, very
4  reluctant to talk to us.  I found that objectionable, and
5  I think that -- go ahead.
6      Q    Well, you were objecting to the size of the
7  group or --
8      A    Yeah, because I don't think that -- I think
9  it was intimidating to the residents.  When it was just --
10  when I was by myself or there were, you know, maybe just a
11  few people visiting, the residents seemed to be more
12  willing to say hello and to converse.
13      Q    Are there any professional staff at South
14  Mountain that you regard as better than average?  Better
15  than average social workers, better than average
16  physicians, better than average anything in the
17  professional staff?
18      A    I didn't have that much interaction with the
19  staff.  I was there just to observe.
20      Q    Pardon me.  That's my fault.  I'm not
21  referring just now to the visit of March 9th.  I'm
22  referring to your whole experience.
23      A    That's what I'm referring to.
24      Q    Oh.  I'm sorry.
25      A    I didn't have that much interaction with

137

1  staff other than Dr. Power and the patient rights
2  advocate.
3      Q    That's Mr. Miller?
4      A    Mr. Miller, yeah.  He appeared to me that he
5  had the patients' interests at heart.
6      Q    Uh-huh.  Would you say the same of Dr.
7  Power?
8      A    For the most part.
9      Q    When you say for the most part, that implies
10  not entirely in the case of Dr. Power?
11      A    It's my opinion maybe some of these things
12  could have been corrected more rapidly than they were.
13      MR. ULAN:  Could we just have a minute?
14  We're done or very near it.
15      MR. MEEK:  Sure.
16      (Recess.)
17  BY MR. ULAN:
18      Q    I think we're very close to the end.  We
19  just have a couple of more things.  The visit that you,
20  along with others, were on on March 9th of this year we
21  talked about a little bit.
22      If the conditions you found at South
23  Mountain on that day were maintained into the future
24  indefinitely, would that meet your standard of
25  acceptability?  Would you find that okay?

LEED, MARGARET                    PENNA PRO . _CTION & ADVOCACY VS
03/20/01                                                        DPW

138

1    A    I still do not believe people should be
2    institutionalized.
3    Q    So that is it your view then that regardless
4    of the correction of any of the alleged deficiencies that
5    are in the complaint, you would still object to South
6    Mountain providing care to these people? Is that fair?
7    A    I would still object to the people being
8    housed at South Mountain. I think there could be other
9    placements for the people who reside at South Mountain.
10   Q    And when you say the people at South
11   Mountain, you mean all or nearly all of them? You don't
12   just mean a couple dozen?
13   A    No. I mean --
14   Q    You mean all or nearly all?
15   A    That's correct.
16   Q    Just one more thing. This morning we went
17   through a lot of documents and these forms that you
18   wrote. Did you say earlier that there are some other
19   notes separate from what's on these forms that you made
20   relating to these visits?
21   A    Yes.
22        MR. ULAN: Have they been provided to us or
23   is there some privilege to that?
24        MR. MEEK: I don't know. She would have to
25   tell me what they are, and I would have to look at them.

139

1    I have to compare them with what we already gave you. So
2    I'll do that. I'm happy to do that. I'm not trying to
3    hide anything from you. I got -- I asked them for
4    everything they had.
5         MR. ULAN: We understand.
6         MR. MEEK: If they exist and they're not
7    privileged or whatever, we will copy them.
8         MR. BLAZUSIAK: Part of it is we need to
9    know -- if you're claiming a privilege, we need to know at
10   least some identification of those documents you're going
11   to have privilege on.
12        MR. MEEK: Oh, sure. That's not a problem.
13        MR. ULAN: Then this deposition is concluded
14   subject -- I mean in the event there are any that
15   come up in connection with these documents, assuming that
16   you're not asserting privilege, there's a chance -- I hope
17   small, but a chance we may need to continue the
18   deposition.
19        I hope that's not necessary. I don't expect
20   it will be. But just in the event something comes up
21   there that's beyond what we've talked about.
22        MR. MEEK: Let's deal with that when it
23   happens.
24        MR. ULAN: It appears unlikely. I just --
25        MR. MEEK: I'm not going to say anything one

140

1    way or the other about it.
2         MR. ULAN: That's fine. Other than that
3    this deposition is concluded.
4         MR. MEEK: No questions.
5         (The deposition concluded at 2:41 p.m.)

141

1    COMMONWEALTH OF PENNSYLVANIA :
                                        : ss
2    COUNTY OF DAUPHIN          :
3
4         I, Kimberly L. Intrieri, Reporter-Notary
5    Public, authorized to administer oaths within and for the
6    Commonwealth of Pennsylvania and take depositions in the
7    trial of causes, do hereby certify that the foregoing is
8    the testimony of Margaret Leed.
9         I further certify that before the taking of
10   said deposition, the witness was duly sworn; that the
11   questions and answers were taken down stenographically by
12   Kimberly L. Intrieri, a Reporter-Notary Public, approved
13   and agreed to, and afterwards reduced to typewriting under
14   the direction of the Reporter.
15        I further certify that the proceedings and
16   evidence are contained fully and accurately in the notes
17   taken by me on the within deposition, and that this copy
18   is a correct transcript of the same.
19        In testimony whereof, I have hereunto
20   subscribed my hand this 5th day of April, 2001.
21
22
23        _____
          Kimberly L. Intrieri
          Reporter-Notary Public
24
     My commission expires
25   on December 17, 2001

Multi-Page™

1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT

OF PENNSYLVANIA

* * * * * * *

PENNSYLVANIA          *

PROTECTION AND        *

ADVOCACY, INC.,       * No.

    Plaintiff        * 1:00-CV-01582

    vs.              *

DEPARTMENT OF         *

PUBLIC WELFARE OF     *

THE COMMONWEALTH      *

OF PENNSYLVANIA;      *

FEATHER O.            *

HOUSTOUN, IN HER      *

OFFICIAL CAPACITY     *

AS SECRETARY OF       *

PUBLIC WELFARE FOR    *

THE COMMONWEALTH      *

DEPOSITION OF

DIANA CARRA-HAUGH

JUNE 28, 2001

Any reproduction of this document

is prohibited without authorization

by the certifying agency

COPY

Multi-Page™

Page 6

```
1              EXHIBIT PAGE
2                                    PAGE
3   NUMBER    IDENTIFICATION    IDENTIFIED
4     1   Resident of Interview
5         of Madeline K█████      37
6     2   Record Review packet
7         relating to Epifanio
8         Z██████              40
9     3   Observation packet
10        dated 7-18-00 at 2:30
11        p.m.                  46
12    4   Observation packet
13        dated 7-25-00 for
14        Unit 5B               50
15    5   Observation packet
16        dated 7-27-00 at 5:55
17        p.m.                  55
18    6   Observation packet
19        dated 7-27-00 at 9:40
20        p.m.                  63
21    7   Observation packet
22        dated 7-18-00 at 1:45
23        p.m.                  67
24    8   Observation packet
25        dated 7-18-00 at 12:17 69
```

Page 7

```
1     9   Observation packet
2         dated 7-18-00 at 5:05
3         p.m.                  77
4    10   Record Review packet
5         relating to Edna H█████ 81
6    11   Handwritten notes      83
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 8

```
1              OBJECTION PAGE
2   ATTORNEY                      PAGE
3          NONE.
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 9

```
1          PROCEEDINGS
2   - - - - - - - - - - - - - - - - - -
3   DIANA CARRA-HAUGH, HAVING FIRST BEEN
4   DULY SWORN, TESTIFIED AS FOLLOWS:
5   - - - - - - - - - - - - - - - - - -
6          STIPULATION:
7          It is hereby
8      stipulated by and between
9      counsel of record that all
10     objections, except as to
11     the form, are reserved
12     until the time of trial.
13  EXAMINATION
14  BY ATTORNEY ULAN:
15  Q.    Hello, Ms. Haugh.  You
16  prefer Carra-Haugh or ---?
17  A.    Whatever.
18  Q.    Ms. Haugh, my name is
19  Howard Ulan.  As you probably know,
20  I represent the Defendants in the
21  action in which PP&A is the
22  Plaintiff.
23         I'm going to be asking you
24  questions about this lawsuit.  And I
25  will try and make myself clear, but
```

Multi-Page™

**Page 2**

```
 1  OF PENNSYLVANIA;   *
 2  CHARLES G. CURIE,  *
 3  IN HIS OFFICIAL    *
 4  CAPACITY AS DEPUTY *
 5  SECRETARY FOR      *
 6  MENTAL HEALTH AND  *
 7  SUBSTANCE ABUSE    *
 8  SERVICES; AND S.   *
 9  REEVES POWER,      *
10  PH.D., IN HIS      *
11  OFFICIAL CAPACITY  *
12  AS SUPERINTENDENT  *
13  OF SOUTH MOUNTAIN  *
14  RESTORATION CENTER *
15       Defendants   *
16              * * * * * *
17          DEPOSITION OF
18         DIANA CARRA-HAUGH
19          JUNE 28, 2001
20
21
22
23
24
25
```

**Page**

```
 1          A P P E A R A N C E S
 2
 3  ROBERT MEEK, ESQUIRE
 4  Disabilities Law Project
 5  1315 Walnut Street, Suite 400
 6  Philadelphia, PA  19107-4798
 7      COUNSEL FOR PLAINTIFF
 8
 9  HOWARD ULAN, ESQUIRE
10  DANIEL M. FELLIN, ESQUIRE
11  Commonwealth of Pennsylvania
12  Department of Public Welfare
13  Third Floor West, H & W Building
14  7th and Forster Streets
15  Harrisburg, PA  17120
16      COUNSELS FOR DEFENDANTS
17
18
19
20
21
22
23
24
25
```

**Page 3**

```
 1          DEPOSITION
 2              OF
 3
 4  DIANA CARRA-HAUGH was taken on
 5  behalf of the Defendants herein,
 6  pursuant to the Rules of Civil
 7  Procedure, taken before me, the
 8  undersigned, Denise J.
 9  Khoray-Harriman, a Registered Merit
10  Reporter and Notary Public in and
11  for the Commonwealth of
12  Pennsylvania, at the offices of the
13  Pennsylvania Protection and
14  Advocacy, Inc., 1414 North Cameron
15  Street, Harrisburg, Pennsylvania, on
16  Thursday, June 28, 2001, at 2:14
17  p.m.
18
19
20
21
22
23
24
```

**Page 5**

```
 1            I N D E X
 2  WITNESS: DIANA CARRA-HAUGH
 3  EXAMINATION
 4      By Attorney Ulan       8 - 111
 5  CERTIFICATE               113
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Multi-Page™

1 if you think I'm not being clear
2 please let me know and I will try
3 and rephrase the questions.
4        ATTORNEY MEEK:
5        I just have one
6 question. Did you have
7 your appearance entered on
8 the record, too, Dan?
9        ATTORNEY FELLIN:
10       No, I haven't
11 entered.
12       ATTORNEY MEEK:
13       And also appearing or
14 at least present Daniel
15 Fellin, both depositions,
16 please. Thank you.
17       ATTORNEY ULAN:
18       Okay.
19 BY ATTORNEY ULAN:
20 Q.     Do you have any
21 questions?
22       ATTORNEY MEEK:
23       You have to say yes
24 or no.
25 A.    No.

1 BY ATTORNEY ULAN:
2 Q.     Could you state your name
3 for the record?
4 A.     My name is Diana
5 Carra-Haugh.
6 Q.     Thank you. Where are you
7 currently employed?
8 A.     Pennsylvania Protection
9 and Advocacy.
10 Q.    In what capacity?
11 A.    I'm an advocacy
12 specialist.
13 Q.    For how long have you
14 worked for PP&A?
15 A.    I've been employed for
16 PP&A for seven and a half years.
17 Q.    And have you had the same
18 position for that whole length of
19 time?
20 A.    That's correct.
21 Q.    And where were you
22 previously employed?
23 A.    Parent education network.
24 It was a bilingual consultant and

1 Q.     For about how long?
2 A.     That was a part-time
3 position and it ran for eight years.
4 Q.     Okay. Before that, going
5 back to college, I guess.
6 A.     Sure. York, in York
7 County, I was a case manager and
8 life skills instructor for the York
9 Spanish American Association. And
10 that would have been '84 to '86.
11 And prior to that, I don't have a
12 work record.
13 Q.    All right. And did you
14 attend college?
15 A.    No.
16 Q.    And, therefore, you are
17 not licensed in any health care or
18 social service profession; is that
19 correct?
20 A.    That's correct.
21 Q.    Approximately how many
22 nursing homes have you visited,
23 either in connection with employment
24 or for personal reasons to visit a
25 friend or relative or any reason?

1 A.     That's a very difficult
2 estimate to make. It would
3 certainly be more than 20. I doubt
4 that it would --- it --- I'm sorry.
5 That's a very difficult estimation.
6 Q.     All right.
7 A.     Let's say more than 20.
8 Q.     All right. And in those
9 cases, was that in connection with
10 employment?
11 A.    In the majority of cases,
12 that was in connection with
13 employment.
14 Q.    And are all these nursing
15 homes you're referring to in
16 Pennsylvania?
17 A.    Yes.
18 Q.    And when you say that most
19 of them you visited in connection
20 with your employment, what would be
21 the purpose of the visit?
22 A.    The purposes would be
23 several. Do you wish me to
24 enumerate them all?

Multi-Page™

1 A.    At times I have had
2 clients, folks with developmental
3 disabilities, who have been either
4 placed in a nursing home or entered
5 a nursing home for care and
6 treatment. And as such, it would be
7 my duty to visit them.
8 Q.    Okay.
9 A.    To communicate with them.
10 At other times, it has been in
11 response to a Complaint or an
12 allegation of abuse and neglect.
13 And in other cases it has been to
14 visit a nursing home as a proposed
15 placement site for my clients. Oh,
16 I'm missing a whole in other
17 category.
18 Q.    Okay.
19 A.    Folks who live in nursing
20 homes and wanted to get out and go
21 live in community placements.
22 Q.    I see. So generally
23 speaking then these visits dealt
24 with specific clients. These were
25 not surveys of the whole facility?

1 A.    I've never done a facility
2 survey. That's not within the
3 scope. We do do monitoring visits
4 and I have done monitoring visits,
5 but a survey of a facility would be
6 work of the Department of Health
7 licensing folks. We don't do that
8 here, but monitoring visits are
9 another thing.
10 Q.    Well, what is --- the
11 phrase monitoring visit means what?
12 A.    A monitoring visit which
13 is under the duties of the mandate
14 of Pennsylvania Protection &
15 Advocacy would be of a facility that
16 provides care and treatment to folks
17 with disabilities and in my specific
18 area, people with mental health or
19 mental retardation issues come into
20 these facilities. And we would go
21 look to see whether standards ---
22 --- our first look would be rights
23 violation, abuse or neglect and
24 standards would be met in regard not
25 to medical issues, not that

1 licensing would look at, but
2 standards of protection from abuse
3 and neglect and observance of rights
4 violations.
5 Q.    When you do that, what
6 standards do you use?
7 A.    Generally I would take
8 with me and use as a guideline
9 sections from Pennsylvania codes
10 such as the mental health and mental
11 retardation rights of folks, the
12 patients bill of rights and that's
13 your most general --- that's in the
14 5100 regs. That would be your most
15 general outline.
16 Q.    Are there any others?
17 A.    Sure. There's --- there's
18 --- are you asking for what
19 legislation or what regulation?
20 Q.    No, what standard ---
21 well, I'm asking for what standards
22 you use when conducting a particular
23 monitoring visit or these other
24 kinds of visits that have to do with
25 specific clients of yours and ---?

1 A.    I have taken along Chapter
2 19, the Title 19 regs for nursing
3 home visits. But once again, I'm
4 not doing surveying. That would
5 just be for comparison purposes.
6 We're looking to see when we go in
7 whether the standards are met as far
8 as the patient's bill of rights
9 which is health, safety, freedom
10 from abuse and neglect and violation
11 of rights.
12 Q.    Do I understand you
13 correctly when you say the bill of
14 rights you're talking about the bill
15 of rights in the 5100 regs?
16 A.    Uh-huh (yes).
17 Q.    As you mentioned a moment
18 ago. Any other standards?
19 A.    Depending on which
20 facility and what the case would be,
21 we would be looking at different
22 issues. But it would be depending
23 on the --- the purpose of the
24 visit. I cited several categories
25 of visits.

Multi-Page™

**Page 18**

1 Q. Do you ever use standards
2 that aren't written down in any
3 official place like a regulation or
4 Statute or something?
5 A. If it's not written down,
6 how could it be a standard?
7 Q. Well, I --- that's ---
8 that's for you to say.
9 A. I wouldn't call it a
10 standard if it wasn't written down.
11 Q. Okay.
12 A. We have our own
13 professional judgment as a result of
14 training and experience about ---
15 about issues. But as far as the
16 standard it would have to be
17 something written down.
18 Q. So then am I correct that
19 when you find a facility, whether
20 it's a nursing home or perhaps a
21 group home of some kind or any kind
22 of facility serving one of your
23 clients, to be in violation of some
24 applicable standard, you would be
25 using a written standard of the kind

**Page 19**

1 you referred to?
2 A. If it's a group home, of
3 course, it would be the 6400 regs.
4 Yes, FMRs have their own regs. Each
5 of those systems have their own
6 regs. It is possible for a facility
7 to be in technical compliance with
8 their own standards and yet for
9 human rights standards to be
10 violated that that can happen.
11 Q. Can you give me an
12 example?
13 A. Sure. I've been in a
14 facility where five people were
15 domiciled in the same bedroom. The
16 --- that is permissible under the
17 regulations for that facility but in
18 this case it effectively prevented
19 them from getting any sleep and as a
20 result they weren't able to
21 participate in daytime activities or
22 programming and the sleep
23 deprivation was leading to emotional
24 disturbance. Now, that's a human

**Page 20**

1 permissible in the regulations that
2 govern that facility.
3 Q. What regulations did
4 govern that facility, do you recall?
5 A. In this case, it was a
6 state mental hospital, Harrisburg
7 State Hospital. And the regulations
8 allow for five people to be put in
9 one bedroom. But this mix of people
10 prevented them from effectively
11 getting sleep and I'm sure you'd
12 agree sleep is a human right. So in
13 addition to knowledge of the
14 regulations, we --- we are also ---
15 look at a broad range of human
16 rights issues.
17 Q. You have visited South
18 Mountain Restoration Center?
19 A. Uh-huh (yes). That's
20 right.
21 Q. Do you recall the first
22 time or the year at least was the
23 first time?
24 A. The first time I visited
25 South Mountain was 1995.

**Page 21**

1 Q. Do you recall the reason
2 for that visit?
3 A. Yes, one of my clients was
4 being proposed for transfer to South
5 Mountain.
6 Q. And was that person
7 ultimately transferred to South
8 Mountain or not?
9 A. No. That individual
10 client I successfully was able to
11 advocate against the transfer at
12 South Mountain, because I did not
13 feel South Mountain could adequately
14 preserve --- let me back up. At
15 that time, that person was not
16 transferred to South Mountain. I
17 was successfully able to prevent
18 that transfer because of my concerns
19 about South Mountain's ability to
20 meet her needs. I did learn that
21 four years later she was
22 transferred.
23 Q. Who was that, do you
24 recall?

Page 22

1  S▓▓▓▓ (phonetic).
2  Q.    All right. Do you know
3  whether she's there now?
4  A.    She recently died.
5  Q.    The reason you thought
6  South Mountain could not meet her
7  needs adequately at that time was
8  what?
9  A.    Staff on her unit at
10  Harrisburg State Hospital came to me
11  and told me that her --- she was
12  proposed for transfer and that they
13  were very alarmed in a visit there
14  that they had seen --- they felt
15  from what they observed that the
16  level of nursing care was not
17  sufficient to meet her needs. And
18  so I took a visit to South Mountain
19  to look at this myself. And my
20  independent observations verified
21  their concerns and so in treatment
22  team then I advocated against her
23  move.
24  Q.    You say level of nursing
25  care. Do you mean the number of

Page 23

1  nurses were not sufficient or
2  something else was ---?
3  A.    Staffing practices. What
4  had been brought up to me by the
5  staff at Harrisburg State Hospital
6  and what I confirmed was that it's
7  possible to walk onto a unit and
8  find no staff at all. And, in fact,
9  the unit that she was proposed to go
10  on when I walked on the unit I found
11  somebody crying for water and I
12  could find no staff on that unit.
13  And I had to go to a different unit
14  to get staff to get that individual
15  some water. So given this person's
16  medical needs, I felt that the fact
17  that staff were not within ear shot
18  or in attendance on the people, that
19  gave me very grave concern about the
20  future safety of my client.
21  Q.    From '95 up through let us
22  go up to 1999, how often did you
23  visit?
24  A.    Once until the end of '99.
25  Q.    All right.

Page 24

1  A.    Once in the intervening
2  years and I can't tell you if it was
3  '96 --- I don't think it was any
4  later than 1996.
5  Q.    All right. And that was
6  in connection with a different
7  individual?
8  A.    Yes, another individual
9  was transferred there. And I went
10  to visit her and met with the team
11  and discussed her plans to be
12  discharged to the community. So she
13  was ---.
14  Q.    And sometime in late '99
15  you started visiting more
16  frequently?
17  A.    When ---.
18  Q.    Is that correct?
19  A.    Yes. And I'm sorry I
20  don't have with me those dates, but
21  I'm sure you have them here.
22  Q.    Well, that's ---
23  approximately we're starting from
24  late '99. All right. Before I ---
25  the 1996 individual, do you recall

Page 25

1  the name of that individual?
2  A.    Teo R▓▓, which is T-E-O,
3  F▓▓▓▓▓
4  Q.    All right. Well, we're
5  not hearing a lot of people with
6  that first name so that's probably
7  sufficient to identify her.
8  A.    I can't remember the last
9  name. I'm blacking out.
10  Q.    That's all right. It's
11  sufficient to identify her. And was
12  discharged ultimately?
13  A.    To the community.
14  Q.    To the community meaning,
15  what, to a another nursing home or
16  do you recall?
17  A.    Her family lived in
18  Chambersburg so she was discharged
19  to a placement near her family. It
20  may have been a nursing home or a
21  personal care home. I don't recall.
22  Q.    Okay.
23  A.    It was at the wish of her
24  family then.
25  Q.    Okay.

Multi-Page™

Page 26

1  A.    She be discharged to that
2  center.
3  Q.    All right.  In late '99
4  your visits started to increase.  I
5  mean, then you started to visit with
6  some frequency and through 2000.
7  All right.  Now, at that point, is
8  that the case for PP&A generally or
9  just you personally?  In other
10 words, was PP&A visiting more
11 frequently, collectively?
12 A.    The visits I described in
13 '94 or '5 or '6 were in response to
14 specific client issues.
15 Q.    Right.
16 A.    I'm not at the policy
17 level of this agency so I can't give
18 you an overall view of individual
19 advocate visits to the facility.
20 But we were --- I would say probably
21 the visits to South Mountain
22 increased at that time overall.
23 Q.    Do you know why?
24 A.    I'm --- if I knew I can't
25 think of it right now.  It was

Page 27

1  determined that we would respond to
2  concerns and I accompanied a team
3  and looked at issues.
4  Q.    From the time you began in
5  late '99 through July of 2000, can
6  you recall approximately how many
7  days you were at South Mountain
8  approximately?
9  A.    Maybe three.  I'm not
10 perfectly accurate on that.
11 Q.    You have indicated that
12 you think you've been to roughly 20
13 nursing homes in Pennsylvania.  On
14 the basis of your visits to those
15 homes and visits to South Mountain,
16 do you have any reason to believe
17 that South Mountain provides a
18 quality of care which is above
19 average, average or below average
20 compared to the other nursing homes
21 that you have personally visited?
22 A.    You're asking me to rank
23 South Mountain?
24 Q.    Yes.

Page 2

1  home worse than South Mountain?
2  Yes, I have.  Have I seen many?
3  No.  Have I seen nursing homes that
4  are better than South Mountain?
5  When I say that would have --- that
6  would be cleaner, better staffing
7  ratios, more activities, yes, I've
8  seen --- I have seen that in
9  Pennsylvania.
10 Q.    Which ones?  Let's just
11 take cleaner.  Which ones are
12 cleaner?
13 A.    The --- the private-pay
14 units of, for instance, the county
15 home of Lebanon County which is
16 Cedar Haven is certainly cleaner.
17 Q.    And how recently have you
18 visited there?
19 A.    Well, that's ---.
20 Q.    Ball park by year?
21 A.    Two years since I've been
22 there.  This is so difficult to
23 rank.  Once again, I'm not a
24 surveyor.
25 Q.    When you refer to staff

Page 29

1  ratios, what facilities had better
2  staff ratios, do you recall?
3  A.    The Leader nursing homes,
4  I have been in a number of nursing
5  homes run by the Leader facilities
6  that appeared to be cleaner and have
7  better staff ratios.  I am unable to
8  comment on medical or treatment or
9  rehabilitative outcomes of those
10 facilities.  I'm not capable of
11 commenting on those aspects.
12 Q.    In your visits, in the
13 recent visits by which I mean the
14 '99-2000 visits?
15 A.    Uh-huh (yes).
16 Q.    I assume you spoke with at
17 least some residents while you were
18 there?
19 A.    Uh-huh (yes).
20 Q.    Which residents --- strike
21 that.
22    Let me rephrase that.  You
23 spoke with some residents and I
24 assume not all the residents since

Multi-Page™

Page 30

1 200 residents. On what basis did
2 you select individual residents to
3 talk to?
4 A.    Sure. I would be assigned
5 to a particular unit to monitor, and
6 walk up and down the hallway and
7 visit the day room. And I spoke to
8 everyone, greeted everyone. Some
9 people indicated that they wished to
10 converse. Other people were either
11 unable to converse or at that time
12 was not --- did not wish to
13 converse. So I greeted everyone on
14 the unit and then according to the
15 wishes of the patients whether or
16 not we entered into conversation.
17 Q.    Did you have any
18 conversation with any of the
19 residents concerning their wishes to
20 stay or to leave?
21 A.    Uh-huh (yes).
22 Q.    Did you have such
23 conversations with all the residents
24 you talked to or only some or ---?
25 A.    Only some.

Page 31

1 Q.    And the reason you'd have
2 such conversations with some and not
3 others was ---?
4 A.    Some people were willing
5 and able to enter into detailed
6 conversation of that sort. And
7 other people either didn't have the
8 time, perhaps they were on their way
9 to being toileted or in the middle
10 of another activity, feeding or
11 something like that and not everyone
12 was able to enter into such a
13 conversation.
14 Q.    When you did have a
15 conversation about this particular
16 issue, about whether they wanted to
17 stay or leave, was that particular
18 issue raised by you typically or
19 raised by the resident typically?
20 A.    Our conversation was very
21 general. Typically we would say to
22 folks, and this would be the same
23 for any institution, how are you,
24 how is your day going, do you feel
25 like talking, if they indicate yes

Page 32

1 then say, so how's your day going?
2 What are you doing today? Anything
3 fun to look forward to? How do you
4 like living here? Are there any
5 things you'd like to do that you're
6 not able to do? And then generally
7 I just let the folks respond to
8 whatever they'd like to respond to.
9 Q.    Do you recall
10 approximately how many residents
11 with whom you engaged in
12 conversation about this issue desire
13 to stay, desire to leave, do you
14 have any sense of that over the days
15 you were there in '99?
16 A.    How many folks do you want
17 to leave? I don't believe I asked
18 anyone, do you want to leave, but
19 there were folks who volunteered
20 that, yeah.
21 Q.    Well, in confer --- well,
22 you've had some conversation about
23 that issue, staying or leaving. And
24 how many do you recall expressed a
25 desire to leave?

Page 33

1 A.    In the sum total of my
2 visits there during this period.
3 Q.    From '99-2000?
4 A.    Can this be a wild guess?
5 Q.    Well, you can label it for
6 the record a wild guess.
7 A.    Yeah.
8 Q.    If that's what it is.
9 A.    I would say virtually
10 everyone that I had a detailed
11 conversation with expressed a desire
12 to live nearer to their family. And
13 some wanted to get out right away.
14 And others just said I wish I could
15 live near my family. How many
16 people that was?
17 Q.    Yes. Five or less ---?
18 A.    Five, seven --- let's say
19 more than five, maybe less than ten
20 or maybe closer to ten.
21 Q.    All right. Five to ten.
22 That you spoke with about the issue
23 of staying or leaving. Do I
24 understand you correctly that
25 however many it was, five to ten or

Multi-Page™

**Page 34**

1  whatever, of those individuals with
2  whom the subject was discussed, all
3  said they wanted to leave?
4  A.    No.  I spoke to one person
5  who said, who stated that they had
6  no other place to live and if it
7  wasn't for South Mountain they'd be
8  living on the street and they didn't
9  want to live on the street.
10 Q.    Did you make any --- any
11 effort with respect to any of these
12 individuals to determine whether
13 either the hospital records ---
14 pardon me.  Strike that.
15     Of South Mountain's
16 records determined or showed a
17 determination by a physician that
18 the person was competent or not?
19 A.    Could you restate the
20 question?
21 Q.    Yes, I'm sorry.  It was
22 phrased clumsy.  With respect to
23 these individuals, either the
24 majority you said expressed a desire
25 to leave or the one individual that

**Page 35**

1  expressed a desire to stay, did you
2  make any effort to determine whether
3  that person's competence had been
4  addressed either in the form of a
5  doctor's determination, hospital
6  record or in the form of a Court
7  order?
8  A.    Yes.  When we go into a
9  facility and assess individuals, if
10 people have a legal guardian, then
11 we certainly proceed through their
12 legal guardian.  If --- I am not
13 sure, but I believe in the case of
14 one of the folks we talked to, we
15 brought up their names to the
16 facility director and one of those
17 individuals was determined to have
18 had a legal guardian.  I cannot
19 remember the name of the person.  I
20 just remember that, that issue being
21 brought.
22 Q.    Do you recall the names of
23 any of these five to ten
24 individuals?

**Page 3[6]**

1  they wanted to leave?
2  Q.    Yes.
3  A.    The one that sticks most
4  clearly in my mind was Hilda G██████
5  because we had quite a lengthy
6  conversation.
7  Q.    Okay.  Do you recall the
8  names of any others?
9  A.    No.
10 Q.    Do you have any notes
11 which would have these names on
12 them?
13 A.    All of my notes have been
14 passed along.  I no longer have them
15 in my possession.
16 Q.    Passed along to Mr. Meek?
17 A.    You would have all those
18 notes?
19     ATTORNEY MEEK:
20     Well, passed along to
21 me.  They were passed
22 along through me.
23     ATTORNEY ULAN:
24     Well, we'll go
25 through some cases.

**Page 37**

1     ATTORNEY MEEK:
2     You have everything
3 that everyone wrote.
4     ATTORNEY ULAN:
5     All right.  Well,
6 let's start with some of
7 these notes.
8 BY ATTORNEY ULAN:
9 Q.    Let's call this H-1.
10 We'll call this H-1.
11     (Haugh Exhibit Number
12     One marked for
13     identification.)
14 A.    Thank you.
15 BY ATTORNEY ULAN:
16 Q.    We'll get another one
17 here.  It might be easier for you to
18 hold onto those now, whatever.  Ms.
19 Haugh, do you recognize this
20 document?
21 A.    Yes, I do.
22 Q.    Is this a form that you
23 completed about a South Mountain
24 resident?

Multi-Page™

1 Q.    This is about Madeline
2 K█████?
3 A.    Yes.
4 Q.    Now, earlier today, Ms.
5 Beilharz described briefly this
6 form.  This appears to be the same
7 form that Ms. Beilharz used.  When
8 you interviewed any resident, did
9 you complete this form or only some
10 residents?
11 A.    No, not everyone.
12 Q.    What would cause you to
13 complete the form as opposed to not
14 complete it?
15 A.    We greeted everyone on the
16 unit.  Some folks did not wish to
17 --- there were people who did not
18 wish to interact.  Either they
19 wanted to be left alone to sleep or
20 just was not responsive and in such
21 cases we don't force interaction on
22 them.
23 Q.    All right.  In this
24 instance of the record of Ms.
25 K█████'s, most of the boxes are

1 blank.  In fact, all except the last
2 which is other.
3 A.    Uh-huh (yes).
4 Q.    Now, why would most or all
5 of the boxes except the last be left
6 blank?
7 A.    When I interview or speak
8 to a client, I let the client direct
9 the course of the interview.  And in
10 this case, she didn't want to talk
11 about those other things.  This is
12 --- she wanted to talk about her
13 issue so that was the only issue she
14 wanted to talk about.  So I
15 documented it.
16 Q.    And that's on the last
17 page?
18 A.    Yes.
19 Q.    And what was her issue?
20 A.    She wanted to walk and she
21 wanted magazines and that's all she
22 wanted to talk about.
23 Q.    In your opinion, was South
24 Mountain failing to do something for
25 her that should be done?

1 A.    Since she had requested
2 reading materials and she could
3 read, it's very difficult to
4 understand why South Mountain did
5 not make those available to her.
6 Q.    Did you talk to any South
7 Mountain staff about this?
8 A.    Yes.  Actually it's very
9 hard to find staff at South
10 Mountain, but I did go in search of
11 reading materials and ultimately
12 found a nurse who was able to go in
13 search to find a magazine and bring
14 it back.
15 Q.    All right.  Let's go on to
16 H-2.
17         (Haugh Exhibit Number
18         Two marked for
19         identification.)
20 BY ATTORNEY ULAN:
21 Q.    Now, could you --- have I
22 given you ---?
23 A.    Uh-huh (yes).  I have two
24 documents here.
25 Q.    I gave you --- that I

1 think should be done separately or
2 discussed separately.  Ms. Haugh,
3 this does not have your name filled
4 in here, but is this your
5 handwriting?
6 A.    Yes, it is.
7 Q.    Do you recognize this?
8 A.    Yes.
9 Q.    All right.  And what is
10 this kind of form used for, what do
11 you use it for?
12 A.    The beginning pages are
13 forms --- this is a guideline used
14 to interview a patient with
15 suggestions for things to talk
16 about.
17 Q.    When would this be used as
18 opposed to the interview form that
19 has been marked H-1?
20 A.    I believe that was a ---
21 that was a document used in July and
22 this is a document used in May, but
23 I could be wrong.  I --- I recognize
24 these as being employed on two
25 different dates.

Multi-Page™

Page 42

1      ATTORNEY MEEK:
2         Two different years.
3 A.   Oh, yeah, two different
4 years.  Okay.
5      ATTORNEY ULAN:
6         Do ---?
7 A.   Thank you.
8 BY ATTORNEY ULAN:
9 Q.   Do you know why the form
10 was changed?
11 A.   No.  It may have been ---
12 one may have been too cumbersome or
13 --- no, I don't know.  That's only
14 guessing and that's pointless to
15 guess.
16 Q.   From this form it appears
17 you interviewed the resident named
18 ---?
19 A.   Epifanio Z████.
20 Q.   Thank you.  And it
21 indicates the unit he was on at the
22 time.
23 A.   Uh-huh (yes).
24 Q.   Now, on the top, I assume
25 that's your handwriting at the top,

Page 43

1 2:00, reported to nurse he
2 complained of what?
3 A.   Stomach pain.
4 Q.   Oh, I see.  And reported
5 to nurse means you reported to the
6 nurse?
7 A.   I reported it to the
8 nurse.
9 Q.   I see.  There does not
10 appear to be any other information
11 filled out.
12 A.   Sure.
13 Q.   In this form.
14 A.   Uh-huh (yes).
15 Q.   Except after a release of
16 records consent form and there is a
17 page which has handwriting.  Is that
18 your handwriting across that?
19 A.   Uh-huh (yes).  Uh-huh
20 (yes).  Uh-huh (yes).
21 Q.   Do you know why this
22 resident came to your attention?
23 A.   Yes.  He speaks Spanish.
24 Q.   And you do?

Page 44

1 Q.   I see.
2 A.   Bilingual and bicultural.
3 Q.   I see.  Okay.
4 A.   If I'm not mistaken, maybe
5 I shouldn't take a guess here
6 because it's been so long, but I
7 believe his name was also on a list
8 provided to us by staff folks who
9 believed he may also have mental
10 retardation.
11 Q.   I see.
12 A.   But once again, this is
13 two years ago, I mean, I could be
14 wrong.
15 Q.   Is there anything you can
16 recall from this record or from your
17 recollection?
18 A.   Yes.  The interview was
19 very difficult.  Mr. Z████ was
20 elderly and had difficult
21 articulation and did not respond to
22 questions and did not wish to
23 participate in the interview.  The
24 only thing he wanted to talk about
25 was that his stomach hurt and I

Page 45

1 promised that I would summon the
2 nurse.  I asked permission to read
3 his records and requested his
4 signature.  He gave it.
5 Q.   Okay.  Did you make any
6 determination at the time that South
7 Mountain was failing to do something
8 for him that it should have been
9 doing?
10 A.   Did I make a determination
11 of abuse or neglect?  Is that what
12 you're asking?
13 Q.   No.  Well, anything.  I'm
14 not limiting it to rather extreme
15 situations of abuse or neglect.  I'm
16 obviously including that if that was
17 your opinion, but was there anything
18 that South Mountain should have been
19 doing for him that it wasn't doing?
20 A.   Before I read the record
21 or after I read the record?
22 Q.   Well, after.
23 A.   The only issue that I
24 determined was that the family was

Page 46

1  and that they wanted him closer.
2  They were not able to visit him at
3  that distance.  That was the only
4  issue I was able to determine.  It
5  doesn't mean there weren't other
6  issues.
7  Q.    No, I understand.  H-3.
8        (Haugh Exhibit Three
9        marked for
10       identification.)
11 BY ATTORNEY ULAN:
12 Q.    This is a form that you
13 completed?
14 A.    Uh-huh (yes).  Yes, it
15 is.
16 Q.    All right.  And the date
17 is July of 2000?
18 A.    Uh-huh (yes).
19 Q.    The first page at meal
20 time I assume NA means not
21 applicable?
22 A.    Yes.
23 Q.    You were not observing him
24 at meal time, that's why not
25 applicable?

Page 47

1  A.    It wasn't at meal time.
2  Uh-huh (yes).
3  Q.    The next page, Madeline
4  K████ sleeping in recliner and so
5  forth.  Does your recording of this
6  means there's a problem?
7  A.    Uh-huh (yes).
8  Q.    And what was the problem?
9  A.    Her positioning in that
10 recliner to me, she looked
11 uncomfortable and, yeah, I was
12 concerned about the position.
13 Q.    All right.  Next page on
14 page --- let me see.  What is the
15 --- I believe the fifth page that
16 has something in the bottom box?
17 A.    Uh-huh (yes).
18 Q.    Harold M████?
19 A.    Uh-huh (yes).
20 Q.    This is also a seating
21 situation described here.
22 A.    I was uncomfortable about
23 his feet.  His feet looked
24 alarmingly at risk.  They were
25 purple and swollen and ulcerated.

Page 48

1  And the floor was very dirty.  I was
2  concerned that he had open sores on
3  his feet and that with them dangling
4  unsupported and touching the floor
5  that he was at risk.
6  Q.    Did you talk to staff
7  about that?
8  A.    We did.  Yes, we did.
9  There should be somewhere documents
10 about the report made to the
11 facility director.
12 Q.    What did he do about it,
13 do you know?
14 A.    I believe he directed
15 nursing to address that issue.
16 Q.    Okay.  Do you know what
17 the outcome was, whether the problem
18 was addressed or not, do you know?
19 A.    No, I reported it and I
20 believe I was informed that he would
21 or had addressed it as I remember.
22 Q.    Okay.  The next page has a
23 good deal of writing in the second
24 box.
25 A.    Uh-huh (yes).

Page 49

1  Q.    Can you summarize what
2  that's about?
3  A.    Yes, this was a gentleman
4  named Blaine L████ in the day
5  room by himself and he caught my
6  attention and gestured to the window
7  and kept motioning that he wanted to
8  go outside.  It was a beautiful day
9  and the woods were very beautiful
10 out there.  And he kept making this
11 motion that he wanted to go out.  So
12 I sat with him and waited till staff
13 came and then explained to staff
14 that he had the wish to go outside.
15 And the staff explained that he had
16 aggressive behavior and so that he
17 doesn't go out --- he never gets to
18 go outside.  He's not appropriate
19 for organized community trips.  And
20 staff aren't available, not enough
21 staffing to take him out on a one on
22 one basis.  I was really pleased
23 with her, because at least she spoke
24 kindly to him.  And I tried to
25 advocate for Blaine's desire to go

Multi-Page™

Page 50

1 outside with the staff, was
2 unsuccessful in getting him to go
3 outside.
4 Q.    You raised that matter
5 with a higher up in management?
6 A.    Uh-huh (yes).
7          ATTORNEY MEEK:
8          Yes.
9 A.    Oh, I'm sorry, I believe
10 --- I believe all of these issues
11 were reviewed with the facility
12 director.
13 BY ATTORNEY ULAN:
14 Q.    All right.  And do you
15 know the outcome of that?
16 A.    No, I do not.
17 Q.    Let's go to H-4.
18          (Haugh Exhibit Number
19          Four marked for
20          identification.)
21 BY ATTORNEY ULAN:
22 Q.    Exhibit H-4, this is a
23 form you completed July 25, 2000;
24 correct?
25 A.    That's correct.

Page 51

1 Q.    Does this entire form
2 refer to observations made in the
3 day room?  The first line says day
4 room.
5 A.    I think that page is the
6 day room.  Is that correct?  No,
7 each of these pages lists where the
8 activity would be.
9 Q.    So on the first page day
10 room is roughly the top third and
11 the next third it says day room door
12 open?
13 A.    Yes.
14 Q.    No air conditioning, that
15 whole bottom, so forth?
16 A.    That's correct.
17 Q.    5A and so forth.
18 A.    Uh-huh (yes).
19 Q.    The observations for
20 example, middle of the first page,
21 it says 5A 2:29 and so forth and
22 then the writing, to the right, it
23 says 11, 11 is time or number of
24 people or what is 11?

Page 52

1 I was trying to get a handle on how
2 many folks are there.  Yes, there's
3 a breakdown between the 11.
4 Q.    Then at the time and
5 there's description of no staff and
6 the time they were sitting and how
7 many seats they were sitting in; is
8 that correct?
9 A.    Yes.
10 Q.    Bottom is a reference to
11 Harold M███?
12 A.    Yes.
13 Q.    Can you describe?
14 A.    I looked him up, because I
15 had reported my concerns earlier on
16 an earlier visit.
17 Q.    Right.
18 A.    And I see that.  At least
19 he has new gloves.  The other ones
20 had been soiled with BM.  His feet
21 are still bare dangling swollen.  At
22 least one ulcer is now closed.  But
23 the --- the feet are still pretty
24 bad shape.
25 Q.    The time that's indicated

Page 53

1 on the first page in the form at the
2 top it says 10/17.  Is that then the
3 time that you arrived in the day
4 room?
5 A.    That would have been the
6 time I began my reporting, my
7 observations.
8 Q.    All right.  And then you
9 moved on at about, well, 10:31 to
10 K███ (phonetic); is that correct?
11 A.    That's correct.
12 Q.    So the day room would have
13 been between approximately ---?
14 A.    That's correct.
15 Q.    Okay.  And the next page
16 describes your observations of a
17 particular individual in particular
18 places?
19 A.    Yes.
20 Q.    So at the column on the
21 left side if you go to the second
22 half where it says walk through
23 10:40 and so on?
24 A.    Yes.

Page 54

1  A.    Yes.
2  Q.    BR empty, I assume means
3  bedroom empty?
4  A.    Bedroom empty.
5  Q.    So they were not in their
6  bedroom at that time?
7  A.    That's correct.
8  Q.    Is that good or bad?
9  A.    They could have been among
10 the 11 who were sleeping in the day
11 room. It's not good or bad. It's
12 just an observation.
13 Q.    All right. And the term
14 empty is used in this box for
15 several individuals, it means
16 bedroom empty, is that ---?
17 A.    The bedroom is empty.
18 Q.    Then the remainder of this
19 form is not completed, because you
20 didn't see these kinds of issues
21 when you were there?
22 A.    Correct. Virtually
23 everyone was asleep on the unit, so
24 there was no activities going on to
25 observe. They were either sleeping

Page 55

1  in the day room or sleeping in the
2  bedrooms. This was midmorning.
3         ATTORNEY ULAN:
4         This would be H-5.
5         ATTORNEY MEEK:
6         H-5.
7         (Haugh Exhibit Number
8         Five marked for
9         identification.)
10 BY ATTORNEY ULAN:
11 Q.    Exhibit H-5, this is a
12 form you filled out on July 27th,
13 2000; correct?
14 A.    That's correct.
15 Q.    At 5:55 p.m. On that
16 first page which has to do with meal
17 time, what, if anything, that you've
18 written here refers to what you
19 would characterize as a problem?
20 A.    On the first page?
21 Q.    Yes.
22 A.    It's not pleasant to eat
23 in a noisy unpleasant setting. We'd
24 like people to have dignity and
25 quality of life. I'm also concerned

Page 56

1  watching these observations about
2  positioning issues. So that's
3  briefly alluded to on this page and
4  addressed in more detailed on the
5  following pages.
6  Q.    The next two pages relate
7  also to the dining room; is that
8  right?
9  A.    Uh-huh (yes). That's
10 correct. Yes.
11 Q.    So page --- let's see
12 page four of the form that deals
13 with temperature at the top and it
14 says is a temperature between 71 and
15 81 degrees. Do you see that?
16 A.    Yes.
17 Q.    Do you know why those
18 particular temperatures were chosen
19 as the relevant temperatures? Is
20 that by regulation or from anything
21 you know of?
22 A.    I don't know that.
23 Q.    On the --- let's see, if
24 you go to, count from the back, it's
25 three pages from the back?

Page 57

1  A.    Yes.
2  Q.    If I understand this, the
3  writing on that page all refers to
4  the heading of neglect. Is that
5  correct? I mean, you crossed out
6  the caption of the first box and
7  they appear to be all related to the
8  second caption. Is that ---?
9  A.    That's correct.
10 Q.    Is it possible for you to
11 summarize the problem that you think
12 you've described?
13 A.    What I saw of them?
14 Q.    Yes.
15 A.    You want me to summarize
16 what I'm writing about?
17 Q.    Yes.
18 A.    In the dining room scene a
19 person who I first took to be a man
20 but later learned was Ms. W███████
21 in the very busy, very noisy dining
22 room, she was holding up her cups
23 and gesturing every time the staff
24 walked by in a gesture for water and
25 staff completely ignored her and

Multi-Page™

1 walked back and forth and back and
2 forth. And with each staff that
3 would walk by, she would gesture and
4 motion for water. And the meal came
5 to its completion. She began to
6 yell. She still didn't get water.
7 They wheeled her out. She began to
8 strike herself. In fact, she began
9 to strike herself even before they
10 wheeled her out. I followed her and
11 --- and at this point, it goes
12 beyond neglect. At this point, it's
13 abuse, because she continued to
14 strike herself. And the --- the
15 staff did not attend to her or stop
16 or intervene or meet her needs.
17 Q.    Did you or any other PP&A
18 staff report this to anyone?
19 A.    I did. I did, indeed.
20 Q.    To who?
21 A.    And an investigation was
22 made. To the facility director.
23 They did. They investigated the
24 incident.
25 Q.    And do you know what the

1 outcome of the investigation was?
2 A.    Yes, it was a travesty.
3 They acknowledged that she struck
4 herself. They acknowledged that
5 they didn't meet her needs. They
6 said that they believed that this
7 was a behavior and an attention
8 seeking device, that she had a brain
9 tumor. There was no denial that she
10 didn't --- that she asked for water
11 and that she didn't get it and that
12 she struck herself a great many
13 times. I believe I counted at ---
14 and it's in the report that I
15 submitted, I counted 1500 times that
16 she struck herself. I do not
17 believe that she they sanctioned the
18 staff or in any way addressed the
19 situation.
20 Q.    Is this W██████?
21 A.    Nettie, uh-huh (yes).
22 Q.    Nettie.
23 A.    1200 times is the number.
24       ATTORNEY MEEK:

1 A.    Yes, it's on the next
2       page.
3 BY ATTORNEY ULAN:
4 Q.    When you say strike
5 herself, could you ---?
6 A.    Could I demonstrate?
7 Q.    Sure.
8 A.    In the dining room, she's
9 holding up two cups, up to staff.
10 When it's apparent after sometime
11 she's not going to get any water and
12 they're taking people out, she
13 begins to yell and she puts her cups
14 down. And she begins to hit herself
15 in roughly one every second in a
16 manner like this and she continues
17 to hit herself.
18 Q.    For the record, she's
19 holding her cup like this ---?
20 A.    Her fist.
21 Q.    Or fist?
22 A.    Yes, she put her cup down
23 and with her fist begins to strike
24 herself with some force on her head.
25       ATTORNEY MEEK:

1       Forehead?
2 A.    Forehead.
3       ATTORNEY MEEK:
4       Temporal area, crown,
5       where?
6 A.    Forehead, like this, yes.
7 BY ATTORNEY ULAN:
8 Q.    Now, did the staff do
9 anything about this?
10 A.    Uh-uh (no).
11 Q.    Or tell you anything about
12 her?
13 A.    I sat with her for
14 sometime hoping that staff would
15 intervene. And I was trying to make
16 an observation, so I sat with her
17 until I realized that staff were not
18 going to intervene. At which time,
19 I went and got a nurse and explained
20 that she was striking herself. And
21 I believed that she wanted water and
22 that she seemed to be in distress
23 and that staff were not attending to
24 her. And the nurse I believe said

Multi-Page™

Page 62

1 familiar. I advised her to consult
2 a chart. There might be something
3 in there about a behavior support
4 plan that would prevent self
5 injury. She did. The nurse did
6 intervene appropriately. She got
7 her --- offered her juice and a
8 cookie and then the self abuse
9 stopped at that time.
10 Q.    While you were there, did
11 you see any actual injury to her
12 forehead during the time you were
13 there?
14 A.    Did I observe injury and
15 in what form?
16 Q.    Well, a bruise, broken
17 skin, any kind of physically
18 observable injury?
19 A.    No. No, I didn't observe
20 any injury.
21 Q.    And you kept some actual
22 tally apparently?
23 A.    Uh-huh (yes).
24 Q.    Of the number of times?
25 A.    Uh-huh (yes).

Page 63

1 Q.    This happened.
2 A.    Ms. W██████'s chair was
3 up against the wall and there was a
4 clock right behind her, so I began
5 to tally the times that she was
6 hitting herself. And I realized
7 that she was doing it at
8 approximately once a second. So I
9 just kept watching her and watching
10 the clock. And when I reached this
11 point, I said nobody's coming, I'm
12 going to go get help.
13 Q.    Okay. H-6.
14        (Haugh Exhibit Number
15        Six marked for
16        identification.)
17 A.    Thank you.
18 BY ATTORNEY ULAN:
19 Q.    This is an observation
20 form completed July 27th, 2000, by
21 you; correct?
22 A.    That's correct.
23 Q.    On that date, the July
24 27th, how long were you there?
25 Roughly when did you arrive and when

Page 64

1 did you leave?
2 A.    I can't recall, but that
3 was a very long day.
4 Q.    Looks like it.
5 A.    Yes. Yes, it was.
6 Q.    Well, I mean, were you
7 there 12 hours, more than 12 hours?
8 A.    Probably. It was probably
9 close to that time. I think it was
10 quite late when we left. We wanted
11 to get a good across the shift ---
12 across several shifts comparison.
13 So I think we were there for three
14 different shifts if I'm not
15 mistaken.
16 Q.    And this form has no
17 writing other than N/A till page
18 three; correct?
19 A.    Yes, it was nighttime.
20 Q.    All right.
21 A.    So that meals were not
22 going on.
23 Q.    At page three in the
24 bottom box it talks about residents
25 returning from concert in the park;

Page 65

1 is that correct?
2 A.    That's correct.
3 Q.    By park, does this mean
4 the area around South Mountain or
5 off somewhere, do you ---?
6 A.    I should have been more
7 specific. I --- I don't recall.
8 Q.    Do you know whether they
9 refer to the grounds immediately
10 around South Mountain as the park?
11 A.    I don't believe so. It's
12 probably off grounds. I would say
13 that it would be more than likely
14 off grounds.
15 Q.    Off grounds?
16 A.    Uh-huh (yes).
17 Q.    All right. Am I correct
18 that except for the last line about
19 strong urine odor, this does not
20 reflect what you would consider
21 problems?
22 A.    No. I recorded this
23 because I was very pleased. I think
24 this was housekeeping staff, because
25 they were mopping the floor and I

Page 66

1  was very pleased. I thought it was
2  a model for staff interaction.
3  There's eye contact and friendly
4  normalized conversation. And we
5  just didn't see too much of that, so
6  I thought it was worth recording.
7  Oh, there is something there. You
8  --- we were always concerned that
9  the bathroom doors were left open
10  and that people didn't have
11  privacy.
12  Q.    Right.
13  A.    So that's recorded there.
14  Q.    I see. In terms of the
15  time we're talking about, this form
16  says 9:40 which is the time you
17  began the form, I assume?
18  A.    Uh-huh (yes).
19  Q.    And the observations that
20  followed were in the next, what,
21  half hour or less than that?
22  A.    No, I would say it's much
23  less than this. This was a very
24  brief walk-through. And I kept my
25  interactions at a minimum, because

Page 67

1  some folks were attempting to
2  sleep.
3  Q.    What are we at, seven?
4         ATTORNEY FELLIN:
5         Seven.
6         ATTORNEY ULAN:
7         Seven.
8         ATTORNEY ULAN:
9         H-7.
10        (Haugh Exhibit Number
11        Seven marked for
12        identification.)
13  BY ATTORNEY ULAN:
14  Q.    This is a form from the
15  18th of July. I assume it's 2000.
16  Is that correct? That's not
17  indicated, but I assume this is
18  2000?
19  A.    That's correct.
20  Q.    This is only about
21  activities, so you've got to go to
22  the last two pages to find anything;
23  right?
24  A.    That's correct.

Page 68

1  the last two pages?
2  A.    Well, I --- I was
3  dismayed. I was all prepared to be
4  pleased with an activity, because
5  this is an important part of
6  people's lives. They --- the folks
7  were looking forward to this movie.
8  One gentleman in particular, Richard
9  S███, was telling me how much he
10  wanted to see this movie. And he
11  asked for his glasses and there was
12  a little commotion, they couldn't
13  find his glasses. And then the
14  staff told him that he was going to
15  get glasses. They didn't know where
16  his glasses were now. And then at
17  that time they pulled him out of the
18  movie, told him he had to go to
19  Hebrew services. And he wasn't real
20  happy about that. He wanted to see
21  the movie. And ten minutes later I
22  came out in the hall and just found
23  him, his wheelchair parked in the
24  hall. He didn't get to see the
25  movie and I couldn't find any Hebrew

Page 69

1  services going on anywhere. That's
2  a shame. It could have been a
3  pleasant experience for him.
4  Q.    Is this what he related to
5  you or what you saw and heard
6  directly?
7  A.    I observed this.
8  Q.    Okay.
9  A.    I went to see him in his
10  room a little later. They wheeled
11  him to his room and I asked him if
12  he wanted to talk. And he was
13  rather upset. He didn't want to
14  talk, so this is the full extent of
15  my report.
16  Q.    H-8.
17  A.    Thank you.
18        (Haugh Exhibit Number
19        Eight marked for
20        identification.)
21        ATTORNEY MEEK:
22        I think I've got two
23  of them.
24        ATTORNEY ULAN:

Multi-Page™

Page 70

1  BY ATTORNEY ULAN:
2  Q.    This is an observation
3  form from July 18th, I assume, 2000?
4  A.    Yes, that's correct.
5  Q.    It appears that at least
6  as far as we go three pages into
7  this, the majority of issues raised
8  relate to positioning.  I think
9  there's a couple of other issues.
10  A.    There are some varied
11  issues here.  There are positioning
12  issues raised.  There's an issue of
13  Mr. M[ ] feet again.  This must
14  have been a different time on the
15  same day or another day as I
16  mentioned it before.
17  Q.    Are these position issues
18  raised in this, in this observation
19  form, essentially the same nature as
20  the ones that were raised earlier?
21  A.    No, I believe these are
22  different issues.  We're looking at
23  the whole --- the whole issue of
24  meal times.  Meal times is a real
25  important part of your life and if

Page 71

1  you live in a facility, it's about
2  the only pleasurable time of your
3  life and are folks getting good
4  community interaction, is it
5  pleasant, is it safe?  And some
6  folks apparently had to wait to eat
7  dinner and some were fed in the
8  room.  We were just trying to get an
9  accurate picture of what it's like
10  at meal times.  And ---.
11  Q.    Being fed in a room is not
12  itself a rights violation or is it?
13  A.    It could be.  It depends
14  on what the issue is.  If you want
15  to eat in your room, it's not a
16  human rights violation.  But if
17  you're kept in your room, because
18  you're considered inappropriate in
19  your behavior and you're excluded
20  and segregated from the population,
21  that could be a rights violation to
22  you.
23  Q.    Well, you've mentioned
24  here on the first page Helen B[ ]
25  fed in room disrobing, considered

Page 72

1  inappropriate for dining room.  Now,
2  this statement considered
3  inappropriate for dining room, are
4  you referring to the staff
5  considered her that way or you
6  considered her that way or both?
7  A.    No.  You know, that
8  certainly should have been better
9  recorded.  Since these were my notes
10  for my own use, I knew that I didn't
11  consider her inappropriate.  The
12  staff said that she was
13  inappropriate for dining room.  That
14  raised flags for me, because it
15  meant that typically she didn't get
16  to go to the dining room.  She had
17  that kind of categorization.
18  Q.    And what do you think
19  should have been done?
20  A.    I'd certainly want to ---
21  I would expect a team meeting to
22  convene and discuss what are the
23  issues that are affecting her that
24  are causing whatever behavior that
25  the staff feel is disruptive to the

Page 73

1  dining room and what can be done to
2  address it.  And with staff support,
3  most issues can be resolved.
4  Q.    Do you know whether there,
5  in fact, were or were not team
6  meetings in which that was
7  addressed?
8  A.    I do not know whether that
9  was addressed or not.  I simply know
10  from staff comment that they didn't
11  feel that she could eat in the
12  dining room.  And I would have hoped
13  to have seen better support.
14  Q.    I'm going to suggest in
15  the future you now put a page number
16  to these forms.
17  A.    It would have been great
18  if they came numbered; wouldn't it?
19  Post thought.
20  Q.    In the middle of the page?
21  A.    Yes.
22  Q.    Where there are two boxes
23  that say yes, yes, and then right in
24  the middle is anyone being
25  physically restrained, that's the

Multi-Page™

1 page I have.
2 A.    Okay.
3 Q.    Are these the usual
4 positioning geri chair issues or is
5 this something different to you?
6 A.    It's always a concern for
7 people to spend a significant
8 portion of their life in a geri
9 chair.  A geri chair in itself is a
10 form of restraint because of the
11 trays prevent the person from
12 getting out.  I observed one woman
13 in a geri chair, Edna, who kept
14 attempting to move the geri chair
15 with her feet to go into another
16 room and staff kept stopping her.
17 So clearly these chairs were being
18 used as a restraint.  If a person's
19 unable to walk safely, walk or walk
20 safely, we would hope to find a
21 wheelchair with whatever the proper
22 things come that keep their
23 positioning supportive, but a geri
24 chair does not provide support
25 either for the back or the

1 buttocks.  It's --- it doesn't do
2 anything except restrain a person.
3 You --- you'll see real quick loss
4 of ambulation and functioning when a
5 person's kept a long time in a geri
6 chair.
7 Q.    Next page is a reference
8 to Harold M███ and I really am not
9 certain whether we have all the
10 references to Harold M███ in
11 chronological order.
12        ATTORNEY MEEK:
13        Doubt it.
14 BY ATTORNEY ULAN:
15 Q.    So I'm not certain whether
16 this is an earlier, middle or later
17 reference.
18 A.    I would say that this ---
19 Q.    This one was ---
20 A.    --- we made later
21 references and references on a later
22 date.
23 Q.    --- the same day?
24 A.    But this may be an earlier

1 Q.    Exhibit H-3 which is the
2 same date?
3 A.    But a later time.
4        ATTORNEY MEEK:
5        Yes.
6 BY ATTORNEY ULAN:
7 Q.    Yes.  A later time but the
8 same day.
9 A.    If ---.
10 Q.    And then we have --- then
11 we have a reference on the 25th ---
12 Exhibit H-4 refers to Mr. M███ on
13 the 25th of July.  And H-3 and H-8
14 both on the 18th of July.  With H-8,
15 the earlier time of 12-something and
16 I believe H-3 is 2:30 or something
17 like that.
18 A.    Yes, typically if I would
19 see someone with an issue that
20 concerned me, on later
21 walk-throughs, I would make sure I
22 would check on them again so that's
23 why you'll find him quoted more than
24 one time.
25 Q.    The top of the next page

1 refers to a staff member whose name
2 is --- appears to be penny bunch?
3 A.    Penny bunch, right, that's
4 correct.
5 Q.    Who's an RN apparently?
6 A.    Uh-huh (yes).
7 Q.    She disregarded the
8 patient?
9 A.    She disregarded my report
10 made of the patient's request.
11 Q.    And your report to her was
12 what, do you recall?
13 A.    Mr. M███ reports to us
14 that his feet hurt, that he's in
15 pain.
16 Q.    And this quotation, he's
17 always complaining, is ---?
18 A.    From penny bunch.  She
19 said that's just the behavior or
20 it's a behavior.  He's always
21 complaining.
22 Q.    H-9, right?  H-9.
23        (Haugh Exhibit Number
24        Nine marked for

Multi-Page™

Page 78

1  A.    Thank you.
2  BY ATTORNEY ULAN:
3  Q.    H-9, a report by you dated
4  July 18th, 2000, about 5:00, which I
5  suppose is dinner time there; is
6  that right?
7  A.    Yes, it would be the early
8  dinner.  They fed in two shifts.
9  Well, I think the A unit ate first
10  and then the B unit or I might have
11  that backwards.
12  Q.    All right.  On the first
13  page in the reference to Blaine
14  ▆▆▆▆?
15  A.    Uh-huh (yes).
16  Q.    Can you explain briefly
17  what happened, and what you thought
18  should happen?
19  A.    Blaine and four other
20  people were being secluded in the
21  day room while the other folks that
22  they shared a unit with were
23  eating.  And I asked the RN on duty
24  why that was so.  And she said that
25  Blaine's noisy behaviors disturbed

Page 79

1  other people.  He has to wait till
2  the other ones get done being fed.
3  And why I thought this was
4  significant to record was Blaine
5  obviously wanted to be with the
6  other people on his unit.  He kept
7  walking with his heels, walking his
8  geri chair towards the dining room
9  where his peers were or maybe he was
10  just hungry and didn't want to wait
11  to eat.  And every time the staff
12  would grab his chair from the bar on
13  the back and then yank it back out.
14  And he was pretty determined.  He
15  kept trying to get into the dining
16  room with his peers again and again,
17  didn't get to, had to wait till
18  everyone else ate.
19  Q.    And what do you think
20  should have been done in that
21  situation?
22  A.    This is a problem with
23  congregate care living when you have
24  this many people.  It's difficult.
25  They get stuck into situations like

Page 80

1  this, the staff does where they are
2  forced to do seclusion-inclusion
3  area activities that violate human
4  rights.  If Blaine lived in a
5  smaller group of people you might
6  not have these issues.  If meals and
7  activities were designed for the
8  patient's comfort and convenience
9  instead of staff convenience in
10  feeding large numbers of people at
11  one time, I don't think you'd have
12  this issue.  I think in a quieter
13  environment you wouldn't have any of
14  these problems.
15  Q.    When you say --- you made
16  reference to Blaine being secluded,
17  I believe?
18  A.    Uh-huh (yes).
19  Q.    This says he was with four
20  others.
21  A.    Yes, he was secluded ---
22  he was excluded from his peer group.
23  Q.    Right.  But he was not
24  alone?
25  A.    He was not alone.

Page 81

1  Q.    He was with himself and
2  four others?
3  A.    Excluded would be a better
4  choice of words.
5        ATTORNEY ULAN:
6        H-10.  Right, that's
7        where we are.
8        ATTORNEY FELLIN:
9        Yes.
10        (Haugh Exhibit Number
11        Ten marked for
12        identification.)
13  BY ATTORNEY ULAN:
14  Q.    H-10.  This is a review
15  form back from May of '99 in a
16  format that we've seen at least once
17  before.  The patient's name is Edna
18  H▆▆▆.  Do you recall how she came
19  to your attention?
20  A.    I regret to say I do not.
21  Q.    By reviewing this
22  document, can you identify any
23  problems with respect to South
24  Mountain's care of her?
25  A.    I believe this is a person

Page 82

1  who is unhappy that she is far
2  removed from her family. She
3  brought that up several times in the
4  interview and did not want to come
5  to South Mountain and was unhappy
6  that she was so far away. I see
7  that it's Washington County.
8  Q.    Do you know what
9  ultimately happened to her?
10  A.    No, I do not. My
11  supervisor did the document review,
12  so I just did the interview.
13  Q.    Your supervisor being ---?
14  A.    Jackie Beilharz.
15  Q.    Jackie Beilharz. The
16  reference at the bottom St. Albans
17  what's that about? Do you know?
18  A.    She would like to live in
19  her own house and, I'm sorry, I'm
20  not familiar with St. Albans. I'm
21  not at all familiar with Washington
22  County. Perhaps that's a
23  neighborhood.
24  Q.    I'm going to tentatively
25  mark this H-11, although I may

Page 83

1  strike that depending on whether the
2  witness can identify it or not.
3          ATTORNEY MEEK:
4          Okay. Are you done
5          with Ten?
6          ATTORNEY ULAN:
7          Yes, I'm done with
8          Ten.
9          (Haugh Exhibit Number
10          11 marked for
11          identification.)
12  BY ATTORNEY ULAN:
13  Q.    This is a package of
14  handwritten notes and I do not know
15  in whose handwriting, but these came
16  from Mr. Meek.
17          ATTORNEY MEEK:
18          Can you identify
19          this?
20          ATTORNEY ULAN:
21          Along with the other
22          documents and if this
23          witness could identify the
24          handwriting either as her

Page 8[4]

1          someone else's.
2  BY ATTORNEY ULAN:
3  Q.    Do you recognize these as
4  PP&A records, first of all?
5  A.    Truthfully, I do not.
6  It's not a form that I've used. And
7  it's not my handwriting. My
8  handwriting's a great deal worse
9  than this. Do you want me to take a
10  guess? Is there any value in that?
11          ATTORNEY MEEK:
12          I wouldn't do that.
13  A.    Okay. Could you compare
14  it with the writing of Marg Leed?
15          ATTORNEY ULAN:
16          It's not Marg's.
17  A.    It's not Marg's
18  handwriting.
19          ATTORNEY MEEK:
20          Compare it to Jackie
21          Beilharz.
22          ATTORNEY ULAN:
23          I think not.
24  A.    Jackie's, yeah.
25          ATTORNEY MEEK:

Page 8[5]

1          Is there anything
2          written --- it doesn't
3          look like hearsay either.
4  A.    No.
5  BY ATTORNEY ULAN:
6  Q.    And they're from March of
7  2000 --- well, some of this ---
8  there's some June but most of them
9  are March or February of 2000, so it
10  was somebody who was there?
11  A.    I apologize. I really
12  can't help you.
13          ATTORNEY MEEK:
14          Don't apologize.
15  BY ATTORNEY ULAN:
16  Q.    And does it not appear to
17  be Jackie's?
18  A.    No, that's --- I'm sure
19  that's not Jackie's writing. Does
20  it look like Jackie's to you? It
21  doesn't to me.
22          ATTORNEY ULAN:
23          And ---.
24          ATTORNEY MEEK:

1  would say, Margaret Leed.
2  Only because, one, it
3  looks like her writing,
4  two, she's the one that
5  had the most contact with
6  the facility.
7 A.  That's true.
8 BY ATTORNEY ULAN:
9 Q.  Okay.
10    ATTORNEY ULAN:
11    No, I don't ---.
12    ATTORNEY MEEK:
13    It's your deposition,
14  do whatever you want with
15  it.
16    ATTORNEY ULAN:
17    Well, might as well
18  leave it as call it H-11.
19  So it's officially
20  something. That's fine.
21    I have a few brief
22  questions and then we can
23  take a break and then we
24  can get to the major last
25  issue which is the

1    Complaint.
2 BY ATTORNEY ULAN:
3 Q.  Ms. Haugh, do you believe
4  that many South Mountain residents'
5  health would improve if they were
6  transferred somewhere else?
7 A.  Just somewhere else or
8  would you define transferred to
9  where?
10 Q.  Either other nursing homes
11  or possibly group homes of two,
12  three, four beds?
13 A.  I believe that their
14  health would improve if they were
15  transferred to quality community
16  programs, because I've seen it
17  happen so often when people have
18  left institutions. And I believe
19  there are good studies out that
20  document that.
21 Q.  Studies concerning what
22  populations specifically, do you
23  know?
24 A.  Folks who have been
25  institutionalized and many of those

1  medically fragile people who have
2  come out into quality community
3  programs. There's less introduction
4  to infection which is a problem in
5  congregate care facilities, less
6  chance of medication error, because
7  you're dealing with so few people,
8  so much fewer people, better
9  staffing ratios, better community
10  integration, better quality of
11  life. In my own professional
12  experience, I've seen it and I've
13  read studies to that effect.
14 Q.  Have you read any such
15  studies that deal with a nursing
16  home population placed in group
17  homes as opposed to, say, a mental
18  retardation state center population
19  or state mental hospital population?
20 A.  I don't believe that I've
21  personally read one that dealt with
22  nursing home, but the age and the
23  medical needs of the folks that I
24  worked with in --- in state centers
25  were comparable to this group,

1  elderly and medically fragile
2  people. The majority of the folks
3  in our state centers now are elderly
4  and medically fragile.
5 Q.  But you have no medical
6  training; is that right?
7 A.  That's correct. I'm only
8  speaking from my personal
9  observation and my knowledge derived
10  from reading published reports.
11 Q.  And you've said the
12  published reports do not include
13  transferring people from nursing
14  homes to group homes?
15 A.  Yes.
16 Q.  Is that correct?
17 A.  That's correct.
18 Q.  I understand from Ms.
19  Beilharz's testimony earlier that
20  you have visited some group homes in
21  Pennsylvania, which provide services
22  to disabled people, mentally
23  disabled, mentally ill or mentally
24  retarded and that have 24-hour,
25  seven-day-a-week licensed nursing

Multi-Page™

Page 90

1 staff either LPN or RN; is that
2 correct?
3 A.    Yes, that's correct.
4 Q.    How many such have you
5 visited approximately?
6 A.    Certainly 50. I can't
7 tell you how many more than that. I
8 have visited group homes and
9 probably nearly every county in
10 central Pennsylvania and a wide
11 variety of group homes.  You
12 couldn't stop at 50, yeah.
13 Q.    No, no, I'm not asking you
14 how many group homes have you
15 visited?
16 A.    I'm sorry. I wasn't
17 attentive.
18 Q.    I'm asking you only about
19 group homes that have 24-hour,
20 seven-day-a-week, on-site licensed
21 nursing care that is either LPN or
22 an RN. I don't mean 24-hour-a-day
23 attendants or aides, I mean,
24 licensed ---?
25 A.    Medical care.

Page 92

1 Q.    In central region?
2 A.    Yes, central region,
3 Allegheny Valley is really expanding
4 in central region. If I'm not
5 mistaken, I've also seen a home that
6 fits that model by northwestern
7 human services.
8 Q.    Okay. Have you had any
9 formal training that directly
10 relates to your advocacy activities
11 and by formal training, I mean
12 classes or lectures and the like?
13 A.    Yes. In all the years
14 that I have been here, the seven and
15 a half years I've been here, I have
16 attended regular trainings offered
17 by the Department of Public Welfare,
18 both their trainings for
19 professional staff and their
20 trainings for non-professional
21 staff. And these would be trainings
22 on positioning, safe feeding, abuse
23 and neglect, rights, reporting of
24 incidents, medications, a whole
25 gamut of care training sessions that

Page 91

1 Q.    Well, nursing care.
2 A.    Sure.
3 Q.    Either LPN or RN.
4 A.    Thank you for clarifying
5 the question. I have probably seen
6 no more than five or six of those.
7 That doesn't mean that that's all
8 there is but ---.
9 Q.    No, I understand
10 personally visited.
11 A.    Sure.
12 Q.    And these are the ones in
13 central Pennsylvania that you've
14 personally visited?
15 A.    Uh-huh (yes).
16 Q.    Do you provide the names
17 of the providers?
18 A.    The ARC in Centre County
19 opened up as a result of a closure
20 opened up a double or duplex ---
21 it's a duplex for better optimum use
22 of resources, so they are --- that's
23 an excellent facility. Allegheny
24 Valley Homes also operates some

Page 93

1 are offered. And I've attended
2 trainings offered by other entities,
3 too.
4 Q.    All right. Are these in
5 most cases one day in length?
6 A.    Some of the clinical
7 institutes run to two or three
8 days. Everyday lives is a series of
9 workshops that generally runs two to
10 three days. Our training, the
11 Pennsylvania --- the National
12 Association of Protection and
13 Advocacy Systems.
14 Q.    Yes.
15 A.    Generally lasts for a
16 week, but that's also a series of
17 workshops that some run two days.
18 These vary the trainings from one
19 day to two.
20 Q.    In any of these trainings,
21 do you take an exam afterwards?
22 A.    That would be unusual.
23        ATTORNEY ULAN:
24        All right. We could

Multi-Page™

Page 94

1    point.
2         ATTORNEY MEEK:
3         Okay.
4         ATTORNEY ULAN:
5         Then the major
6    remaining issue is the
7    Complaint in the same
8    fashion as Ms. Beilharz.
9         ATTORNEY MEEK:
10        Yes.
11        ATTORNEY FELLIN:
12        Beilharz Eight I
13   think is the Complaint.
14        ATTORNEY MEEK:
15        Oh, it's here.
16        ATTORNEY ULAN:
17        Yes, we can use the
18   ---.
19        ATTORNEY MEEK:
20        I've got it.
21   (SHORT BREAK TAKEN).
22        ATTORNEY ULAN:
23        Before we get to the
24   Complaint, there's one
25   small thing that I want to

Page 95

1         clarify about your
2    testimony just before the
3    break.
4    BY ATTORNEY ULAN:
5    Q.    And the group homes that
6    you talked about that had 24-hour,
7    seven-day-a-week licensed nursing
8    staff, is it your understanding that
9    these homes were four individuals
10   who were coming out of state mental
11   retardation centers?
12   A.    I do not believe that all
13   the folks in there came out of state
14   mental retardation centers.  I think
15   that was the impetus to build them
16   but some were for folks who lived in
17   the community and became medically
18   fragile or ---.
19   Q.    But to your knowledge,
20   were any of the people in these
21   particular facilities that you
22   personally visited come from nursing
23   homes?
24   A.    Can I confer with you?
25        ATTORNEY MEEK:

Page 96

1         Well, I mean, if you
2    don't know, you don't
3    know.  Say you don't know.
4         ATTORNEY ULAN:
5         If you don't know
6    ---.
7    A.    There was a client we
8    worked with that came out of a
9    nursing home and you assisted him to
10   get out of the nursing home.  And he
11   went into a group home.  Was Cedar
12   Haven involved in county mental
13   health?
14        ATTORNEY MEEK:
15        Yes, I remember but
16   ---.
17        ATTORNEY ULAN:
18        You were the witness
19   but Mr. Meek --- some day
20   I may get to take
21   Mr. Meek's deposition.
22        ATTORNEY MEEK:
23        I can look forward to
24   attorney's fees?
25   A.    I'm sorry.

Page 97

1    BY ATTORNEY ULAN:
2    Q.    If you recall at that
3    time.
4    A.    I believe one of the
5    gentlemen came out of a home and ---
6    and shared a home with two other
7    residents that came out of a state
8    mental retardation center.  He had
9    never been in a state mental
10   retardation center.  He had been in
11   a state nursing home.
12   Q.    With that exception that
13   you just mentioned?
14   A.    Or a few others from the
15   community.
16   Q.    From the community or who
17   were mentally retarded?
18   A.    Uh-huh (yes).
19   Q.    Now, to turn to Exhibit
20   B-8, we might as well still call it
21   B-8.
22        ATTORNEY MEEK:
23        Okay.
24   BY ATTORNEY ULAN:
25   Q.    The Amended Complaint in

Multi-Page™

1 this matter. What I asked you to do
2 was --- what I will ask you to do is
3 to turn to paragraph 25 and for each
4 paragraph from there up through
5 number 117, to identify paragraphs
6 that recite claims or allegations of
7 which you have personal knowledge,
8 that is you saw that, you heard it
9 happen, you smelled it, in those
10 cases that involves smells.
11 A.    Uh-huh (yes).
12 Q.    And skip over those of
13 which you have no personal
14 knowledge.
15 A.    Yes.
16 Q.    Okay. So starting with
17 25.
18 A.    I will not address 25.
19 26, I have personally observed and
20 experienced.
21 Q.    How often?
22 A.    I would say that on every
23 visit from my very first visit in
24 '95 I walked through areas of South
25 Mountain that reeked and observed

1 smeared feces on the floor or on the
2 elevator or something of that
3 nature. There are also areas of
4 South Mountain that do not reek, but
5 there are areas that are pretty,
6 pretty hard to tolerate.
7 Q.    As compared with your
8 experience with other nursing homes,
9 same, better, worse?
10 A.    I don't know the use of
11 the comparison, but there's parts of
12 South Mountain that smell almost as
13 bad as any place else I've seen.
14 Q.    27?
15 A.    No, I'm not going to speak
16 to that. 28, I've observed the
17 privacy interests of South Mountain
18 residents violated particularly in
19 bathrooms. Staff --- I have
20 observed folks using the toilet that
21 are in full view of anyone walking
22 down the hall and that would be it.
23 Q.    You say --- wait a
24 minute. I want to ask you, say, a

1 view, don't they have stalls in the
2 bathrooms?
3 A.    But there's no door on the
4 stall.
5 Q.    Oh, the stall --- the
6 stall has no door?
7 A.    Yeah.
8 Q.    Is that true of all the
9 bathrooms there?
10 A.    I don't know that.
11 Q.    Okay. Go ahead to the
12 next.
13 A.    I have 29 marked. I have
14 observed that I have done
15 walk-throughs while folks are
16 sleeping. I have observed that the
17 bedroom doors are uniformly kept
18 open. And on 30, I have observed
19 that the dining rooms are very
20 noisy, intolerably and uncomfortably
21 noisy. Skipping down to 33, I was a
22 PP&A staff that observed this
23 resident dirty and unshaven
24 complaining about pain.
25 Q.    Excuse me. Which

1 paragraph is this?
2 A.    I'm on 33 now.
3 Q.    Okay.
4 A.    And I was the PP&A staff
5 who brought this to the attention of
6 SMRC staff.
7 Q.    HM initials mean?
8 A.    Harold M▬▬ And on
9 paragraph 34, it was I that observed
10 the staff who spent the entire meal
11 with his pants down around his
12 knees. And I observed that staff
13 did not respond to that. And
14 nothing else on that page. Nothing
15 on the next page.
16 Q.    Excuse me. Number 34, do
17 you know who the resident was?
18 A.    I could find it. It would
19 be in one of those ---.
20 Q.    One of the exhibits?
21 A.    It would be in one of the
22 exhibits.
23        ATTORNEY MEEK:
24        That we went through,

Multi-Page™

1      ATTORNEY ULAN:
2          All right. We can
3      look later.
4  A.    Yeah, you would find the
5  mention of that. The next paragraph
6  that I can speak to is number 48.
7  (OFF RECORD DISCUSSION)
8  A.    I observed this. I
9  observed this and documented it in
10 the Exhibit, this feeding of
11 resident MJ.
12 BY ATTORNEY ULAN:
13 Q.    Do you recall the name of
14 MJ?
15 A.    I'd have to go back and
16 look at that Exhibit. And I
17 observed MS coughing so severely
18 that she was shaking and coughing.
19 Q.    Do you recall her name?
20 A.    Once again, it would be
21 recorded in the Exhibit.
22 Q.    Okay.
23 A.    And skipping down to ---
24 maybe I don't have any more here. I
25 don't know, let me see. Oh, 66.

1  This is the incident about Nettie
2  Wildstein that I discussed.
3  Q.    And that is described in
4  one of the exhibits that we covered
5  earlier?
6  A.    Yes. Yes, we did. And
7  I'm --- let me go to the end to make
8  sure there's nothing else.
9      ATTORNEY MEEK:
10         Oh, back up a
11     second.
12 A.    Sorry. Oh, 87.
13     ATTORNEY ULAN:
14         Okay. Please wait a
15     moment till I get there.
16 A.    Yeah. I had personal
17 knowledge to this. I have visited
18 in community settings either in
19 their own apartments with supportive
20 staff or in group homes many elderly
21 folks who are with serious mental
22 disabilities who are receiving one
23 to three integrative supports and
24 living and functioning well in the
25 community. And some of them are

1  receiving those supports through
2  waivers who are specially designed
3  for folks who would otherwise
4  qualify for nursing facility. And
5  also --- where am I at?
6      ATTORNEY MEEK:
7          This is 78 ---.
8      ATTORNEY ULAN:
9          Let's stay with ---
10     let me stop you for a
11     moment on 87.
12 A.    Okay.
13 BY ATTORNEY ULAN:
14 Q.    Is it your claim that the
15 people you're describing in number
16 87 are medically similar or
17 comparable to South Mountain
18 residents?
19 A.    I would say identical and
20 I got to know a group of elderly
21 folks in Harrisburg State Hospital
22 who lived on the geriatric unit. I
23 believe nine were taken out under a
24 CHIPS funding and lived in community
25 settings and their health and

1  functioning all improved. And I
2  visited them for some time after
3  they moved. Their other peers went
4  to South Mountain and are some of
5  the folks that we talked about. I
6  knew them before they went to South
7  Mountain. The ones who went to the
8  community under the CHIPS program
9  who had the same level of care need
10 and the same age group did very,
11 very well. So, yes, they are
12 comparable.
13 Q.    When you say they are
14 comparable, you were making that
15 judgment wholly as a lay person in
16 the sense that you have no medical
17 training and no nursing training?
18 A.    I would challenge that,
19 because I am basing my estimate of
20 comparable ability on the Department
21 of Public Welfare's estimate. They
22 were all grouped in one specific
23 unit called Hilltop II which was for
24 people with a higher than average
25 nursing care need. Hilltop I ---

Page 106

1 now I've got that vice-versa.
2 Hilltop I was the higher need.
3 Hilltop II was a lesser need. This
4 group of folks that I'm talking
5 about all lived in Hilltop II and
6 were all assessed to have that same
7 level of need. Nine went to the
8 community under ---.
9 Q.  Same level of, excuse me?
10 A.    Sure.
11 Q.    All assessed as having the
12 same level of need as what?
13 A.    Care need. They were
14 grouped together.
15 Q.    But my question ---?
16 A.    By determinations ---.
17 Q.    I understand that.
18 A.    Yeah, okay.
19 Q.    My question is, on what
20 basis do you say those individuals
21 were comparable in the medical and
22 nursing needs to South Mountain
23 residents?
24 A.    That grouping of people
25 were split based not on need but

Page 107

1 just on funding. Nine went to the
2 community with funding offered by
3 CHIPS program. The rest went to
4 South Mountain. They were --- had
5 all been assessed at the same care
6 level need by the State hospital.
7 They all lived in the same unit
8 designed for folks for that same
9 need.
10 Q.    And when did that happen?
11 A.    The folks that came out of
12 Hilltop I, I believe, left in '95
13 and '96.
14        ATTORNEY MEEK:
15        Hilltop II?
16 A. Hilltop II. Hilltop ---
17 well, both units experienced a
18 downsizing but the CHIPS, that CHIPS
19 move I think was '95-'96.
20 BY ATTORNEY ULAN:
21 Q.    And how do you know what
22 the outcomes were of those
23 individuals who went to South
24 Mountain and those who went to the

Page 108

1 A.    Sure. The nine who went
2 to the community, I spent some time
3 visiting. I visited all of them,
4 numerous times in their community
5 settings. And the folks that went
6 to South Mountain I got to see
7 during this '99-2000 period and many
8 of them are the folks that we
9 discussed. And ---.
10 Q.    Are they all at South
11 Mountain still? They weren't
12 transferred out and didn't die?
13 A.    Some died. At least ---
14 at least two or three died.
15 Q.    At South Mountain?
16 A.    Some died before they went
17 to South Mountain. Some of them
18 died at South Mountain.
19 Q.    Did any of them die in
20 community?
21 A.    Not that I know of. The
22 last time that I visited those folks
23 which is admittedly a couple years
24 ago, they were all doing quite well.
25 Q.    And when you say doing

Page 109

1 quite well that was your personal
2 assessment of how they were doing?
3 A.    Not necessarily. I can
4 think of one person who went to a
5 locked unit, in a locked unit in a
6 personal care home and she was
7 incontinent and she had so many
8 falls. And after she was in the
9 community for about six months, she
10 was able to transfer to a less
11 restrictive setting. She had
12 improved so much in her ability to
13 ambulate and she became continent
14 and began speaking again, so that
15 wasn't my determination that moved
16 her to a less restrictive setting.
17 That was the system, the medical
18 professionals' assessment.
19 Q.    And this occurred --- the
20 move you're talking about, the move
21 from Hilltop to South Mountain and
22 some to the community you believe
23 occurred in '96?
24 A.    I would say that the CHIPS

Page 110

1 of the population the Hilltop
2 population was gradual and probably
3 took three years.
4 Q.    So '95 to '98 is roughly
5 the period of time?
6 A.    Uh-huh (yes).
7 Q.    All right.  And there were
8 how many in each group you think?
9 A.    I know that nine went to
10 the community.
11 Q.    Okay.  And you think the
12 same number at South Mountain?
13 A.    I would say seven to nine
14 went to South Mountain.
15 Q.    All right.  Okay.
16 A.    And did I get on to 88 yet
17 or had I not yet discussed that.
18      ATTORNEY MEEK:
19        You hadn't.
20 A.    Okay.  Number 88, there
21 are many programs administered
22 through many counties that offer
23 community services to folks with
24 disabilities.  There are --- there's
25 a whole gamut of waivers that are

Page 111

1 being operated through the county,
2 home health services, Department the
3 Aging, the attendant care waiver,
4 the independence waiver, that brings
5 folks out of nursing homes and they
6 live in communities.  And I know a
7 good number of folk living in the
8 community and doing well.  And
9 that's not mine.
10      ATTORNEY MEEK:
11        Okay.
12 A.    That isn't mine.
13      ATTORNEY MEEK:
14        Okay.
15 A.    Okay.  That's it.
16 BY ATTORNEY ULAN:
17 Q.    Just one moment and I'll
18 be done very soon, I believe.
19      ATTORNEY ULAN:
20        I have no further
21      questions.
22      ATTORNEY MEEK:
23        Neither do I.  Thank
24      you.
25      * * * * *

Page 112

1 DEPOSITION CONCLUDED AT 4:25 P.M.
2      * * * * *
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Multi-Page™

1

*10*

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT

OF PENNSYLVANIA

\* \* \* \* \* \* \*

PENNSYLVANIA          \*

PROTECTION AND        \*

ADVOCACY, INC.,       \* No.

    Plaintiff      \* 1:00-CV-01582

    vs.            \*

DEPARTMENT OF         \*

PUBLIC WELFARE OF \*

THE COMMONWEALTH  \*

OF PENNSYLVANIA;  \*

FEATHER O.        \*

HOUSTOUN, IN HER  \*

OFFICIAL CAPACITY \*

AS SECRETARY OF   \*

PUBLIC WELFARE FOR\*

THE COMMONWEALTH  \*

DEPOSITION OF

JACQUELINE BEILHARZ

JUNE 28, 2001

Any reproduction of this document

is prohibited without authorization

by the certifying agency



Multi-Page™

Page 2

1  OF PENNSYLVANIA;  *
2  CHARLES G. CURIE,  *
3  IN HIS OFFICIAL  *
4  CAPACITY AS DEPUTY*
5  SECRETARY FOR   *
6  MENTAL HEALTH AND *
7  SUBSTANCE ABUSE  *
8  SERVICES; AND S.  *
9  REEVES POWER,   *
10 PH.D., IN HIS   *
11 OFFICIAL CAPACITY *
12 AS SUPERINTENDENT *
13 OF SOUTH MOUNTAIN *
14 RESTORATION CENTER*
15    Defendants   *
16     * * * * * * *
17      DEPOSITION OF
18     JACQUELINE BEILHARZ
19      JUNE 28, 2001
20
21
22
23
24
25

Page

1      A P P E A R A N C E S
2
3  ROBERT MEEK, ESQUIRE
4  Disabilities Law Project
5  1315 Walnut Street, Suite 400
6  Philadelphia, PA  19107-4798
7     COUNSEL FOR PLAINTIFF
8
9  HOWARD ULAN, ESQUIRE
10 DANIEL M. FELLIN, ESQUIRE
11 Commonwealth of Pennsylvania
12 Department of Public Welfare
13 Third Floor West, H & W Building
14 7th and Forster Streets
15 Harrisburg, PA  17120
16    COUNSELS FOR DEFENDANTS
17
18
19
20
21
22
23
24
25

Page 3

1        DEPOSITION
2          OF
3
4  JACQUELINE BEILHARZ was taken on
5  behalf of the Defendants herein,
6  pursuant to the Rules of Civil
7  Procedure, taken before me, the
8  undersigned, Denise J.
9  Khorey-Barriman, a Registered Merit
10 Reporter and Notary Public in and
11 for the Commonwealth of
12 Pennsylvania, at the offices of the
13 Pennsylvania Protection and
14 Advocacy, Inc., 1414 North Cameron
15 Street, Harrisburg, Pennsylvania, on
16 Thursday, June 28, 2001, at 10:31
17 a.m.
18
19
20
21
22
23
24
25

Page

1        I N D E X
2  WITNESS: JACQUELINE BEILHARZ
3  EXAMINATION
4    By Attorney Ulan    8 - 155
5    By Attorney Meek      155
6  CERTIFICATE           157
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Multi-Page™

Page 6

EXHIBIT PAGE

PAGE

NUMBER   IDENTIFICATION   IDENTIFIED

1   Observation packet
    pertaining to Unit 2A,
    dated 7-27-00                66

2   Record review packet
    relating to Carolyn
    G██████              75

3   Record review packet
    relating to Gustav██
    ██████               83

4   Resident interview of
    Betty ███) K█         93

5   Record review packet
    relating to Robert
    L██████             104

6   Record review packet
    relating to Richard
    R█████              108

7   Record review packet
    relating to Charlotte
    L██████             115

8   Complaint               137

Page 7

OBJECTION PAGE

ATTORNEY                    PAGE

Meek                        31

Meek                        64

Meek                        110

Meek                        111

Meek                        153

Page 8

1       P R O C E E D I N G S
2   - - - - - - - - - - - - - - - - - -
3   JACQUELINE BEILHARZ, HAVING FIRST
4   BEEN DULY SWORN, TESTIFIED AS
5   FOLLOWS:
6   - - - - - - - - - - - - - - - - - -
7       ATTORNEY ULAN:
8       The usual
9   stipulations.
10      ATTORNEY MEEK:
11      Usual stipulations,
12  read and sign.
13      ATTORNEY ULAN:
14      And reserving
15  objections except as to
16  form.
17  EXAMINATION
18  BY ATTORNEY ULAN:
19  Q.   Ms. Beilharz, will you
20  state your name for the record,
21  please?
22  A.   Sure.  Jacqueline
23  Beilharz.
24  Q.   And where are you
25  currently employed?

Page 9

1   A.   Pennsylvania Protection
2   and Advocacy.
3   Q.   And is that out of the
4   Harrisburg office?
5   A.   Yes, it is.
6   Q.   How long have you been
7   employed with them?
8   A.   Since 1988.
9   Q.   Have you had the same
10  position all that time or has that
11  position in the organization
12  changed?
13  A.   It's changed.
14  Q.   What was it originally or
15  what it changed to?
16  A.   Originally?  Originally, I
17  was hired as an advocate to work
18  with the agency's committees.  And
19  then I was promoted to central team
20  manager.
21  Q.   And that's your position
22  today?
23  A.   Yes, it is.
24  Q.   I omitted the usual
25  introductory remarks, so I assume

Multi-Page™

**Page 10**

1  you've been deposed before?
2  A.    Yes.
3  Q.    You know I'm Howard Ulan.
4  I'm counsel for the Defendants in
5  the PP&A versus Houstoun case. And
6  I'll try and make my questions
7  clear, but if you're not sure
8  whether you understand them, please
9  let me know and I will try and
10  clarify.
11       And, of course, the Court
12  Reporter needs to have oratory
13  responses.
14  A.    Okay.
15  Q.    Is that okay? Okay.
16  Prior to working for PP&A, where did
17  you work?
18  A.    How far back do you want
19  me to go?
20  Q.    Graduation from college or
21  graduate school, if any?
22  A.    Okay. Immediately upon
23  graduation from college, I went to
24  work for the Northern Maryland
25  Association for Retarded Citizens.

**Page 11**

1  Then later was employed by the
2  Maryland School for the Blind.
3       From there, I moved to
4  Massachusetts and was employed by
5  the State in their Dorchester area
6  office.
7  Q.    To do what?
8  A.    Oh, I'm sorry. I forgot
9  one in between. At --- immediately
10  upon moving to Massachusetts, I was
11  employed by the Brockton
12  Multi-Service System to ---.
13  Q.    Which was what kind of
14  agency?
15  A.    It was an agency that
16  serves people with all types of
17  disabilities in the Brockton,
18  Massachusetts, area.
19  Q.    Okay.
20  A.    Then was employed by the
21  State of Massachusetts for first to
22  be a service coordinator, then was
23  promoted service coordinator
24  supervisor. And then went to work
25  for Seaside Education Associates as

**Page 12**

1  an independent professional review
2  staff.
3  Q.    In what field was that?
4  A.    MR.
5  Q.    Then here in 1988?
6  A.    Pennsylvania Protection
7  and Advocacy.
8  Q.    Your highest academic
9  degree is what?
10  A.    Bachelor's in psychology.
11  Q.    From where, please?
12  A.    Eastern Nazarene College,
13  Wollaston, Massachusetts.
14  Q.    Are you licensed in any
15  health care or social service field
16  in any state?
17  A.    No, I'm not.
18  Q.    Have you received any
19  formal education beyond the
20  Bachelor's Degree? And by formal
21  education, I mean any courses or
22  training in which you had to pass an
23  exam at the end?
24  A.    If an oral exam is
25  included.

**Page 13**

1  Q.    Yes.
2  A.    I was trained by the
3  University of Maryland through the
4  Maryland School for the Blind on
5  medications and medication
6  administration.
7  Q.    And how long was that
8  course? About a day, a week, a
9  month, a year ---?
10  A.    No, it was --- oh, gee, it
11  was so many years ago, let me
12  think. If I'm remembering
13  correctly, it was a week long course
14  with monthly supervision by the
15  medical staff at the school for the
16  entire five years that I was there.
17  Q.    And this oral exam that
18  you passed was at what point in this
19  program?
20  A.    It was after the one
21  week.
22  Q.    Okay. Other than in
23  connection with medications that
24  there may have been included in the
25  course you've just described, have

Multi-Page™

1 you received any formal training in
2 reading medical records?
3 A.    No.
4 Q.    Have you ever visited any
5 nursing home other than South
6 Mountain ever?
7 A.    Yes.
8 Q.    Do you have a rough idea
9 of how many nursing homes you've
10 visited for any purpose at any time,
11 whether just to visit family or
12 professional basis?
13 A.    Yeah.
14 Q.    Or ---?
15 A.    That's --- that's really
16 hard to say.  I would --- I would
17 estimate somewhere between 35 and
18 50.
19 Q.    I assume that includes
20 both in Pennsylvania and out of
21 Pennsylvania?
22 A.    Yes, it does.
23 Q.    If I limit the question to
24 in Pennsylvania during the 19, well,
25 90s and 2000-2001, beginning 1990

1 forward in Pennsylvania only, do you
2 have an estimate?
3 A.    My guess, best guess, is
4 about two dozen.
5 Q.    Okay.  And were all those
6 visits in your professional capacity
7 to do something in connection with
8 your employment?
9 A.    Yes, I believe they were.
10 Q.    And during that period,
11 you were employed by PP&A?
12 A.    Yes.
13 Q.    That period of time you
14 were employed by PP&A?
15 A.    Uh-huh (yes).
16 Q.    So all these visits in
17 Pennsylvania during the 1990s were
18 made in your capacity as an employee
19 of PP&A?
20 A.    Yes.
21 Q.    Okay.  Can you classify
22 the kinds of visits or were they all
23 the same in terms of duration in
24 nature or were there some, for
25 example, just to give you an example

1 of the kind of classification I
2 mean, were some of the visits to see
3 a particular client and so you saw
4 the client and talked to staff and
5 whatever, related to that client,
6 and were there other visits in which
7 there was some sort of survey of the
8 whole facility or a big part of the
9 facility?  Were there visits of both
10 kinds among them?
11 A.    Yes, there were.
12 Q.    More of one than the
13 other, about even or do you have any
14 sense of that?
15 A.    Probably more to visit
16 individuals.
17 Q.    Okay.  And when you
18 visited the nursing home to see
19 individual clients, I assume you
20 focused on that client and the staff
21 who dealt with that client in those
22 cases?
23 A.    What do you mean by
24 focused on?
25 Q.    Well, did you combine

1 those kinds of visits with surveys
2 of the whole facility or did you ---
3 in other words, did you do what you
4 thought needed to be done on behalf
5 of the particular client on those
6 visits that the --- what I would
7 call client-specific visits as
8 opposed to surveys, if those terms
9 ---?
10 A.    Well, most certainly, my
11 primary purpose there was to visit
12 the individual and determine what
13 their needs were and address those
14 needs.  However, as a routine when
15 we go to a facility, we very
16 typically, in fact, I can't think
17 offhand of any time we have not done
18 this, we very typically will do at
19 least a walk-through of the
20 facility, talk with a variety of the
21 patients, residents there who are
22 willing to talk with us and then
23 talk in --- at least informally with
24 staff.  So I would have done all of
25 those things on my visits.

1 Q.    Out of the roughly two
2 dozen nursing homes in Pennsylvania
3 you have visited in the 1990s, which
4 out of --- say three would be the
5 three best in your recollection?
6 A.    That would be difficult to
7 say.
8 Q.    Would it be easier if I
9 asked you the one best? Could you
10 pick that out more easily than the
11 top three?
12 A.    I think it would be --- I
13 would need to know what you mean by
14 best, because I would assume that
15 your definition of best and my
16 definition of best might well be
17 different.
18 Q.    Well, what would be
19 relevant to your definition of best?
20 A.    My definition of best
21 would include first and foremost do
22 the people need to be there? Is
23 there a reasonable alternative for
24 them? My definition of best would
25 include the individual's level of

1 be better served elsewhere.
2 A.    Right.
3 Q.    Did you encounter any
4 people that in your opinion would,
5 in fact, be best served in a nursing
6 home?
7 A.    There were some people
8 that --- who appeared to have such
9 extreme medical needs that from a
10 very cursory review, and I mean sort
11 of an eye ball look at them, they
12 appeared to be people that needed an
13 extreme level of nursing care, so
14 those individuals perhaps.
15 Q.    Using the criteria for
16 bestness that you have just
17 articulated, can you now identify
18 the best three nursing homes on your
19 criteria, whether or not they are
20 anybody else's criteria?
21 A.    Best three. I --- I
22 honestly can't. That's such a long
23 period of time, and it would be very
24 difficult for me to --- to make that
25 determination with any kind of

1 satisfaction with their care there.
2 It would include the general
3 condition of the facility, and would
4 include staff attitude. It would
5 include what I saw as far as the
6 activities going on there at the
7 time that I visited. And to be
8 honest with you, best would only be
9 a relative term. I cannot say that
10 I have visited to the best of my
11 recollection any nursing home where
12 I didn't encounter some people that
13 could not be served better in the
14 community in my opinion, did not
15 encounter some people who were
16 unhappy. Now, I've heard other
17 people going to nursing homes and
18 visit individuals where individuals
19 were happy, but I --- it would be
20 difficult for me to say what's best.
21 Q.    When you say other people,
22 you mean other PP&A staff?
23 A.    Uh-huh (yes).
24 Q.    You mentioned as one of
25 your criteria whether people could

1 accuracy.
2 Q.    If I limited it to the
3 second half of the decade, 1995 to
4 the present day, would that make it
5 easier?
6 A.    No. Again it wouldn't,
7 there again for me that's a
8 long period of time. I mean, I'm in
9 and out of so many places, but I
10 personally --- let me put it this
11 way, I personally have not been to a
12 nursing home where I would feel 100
13 percent comfortable in sending a
14 family member of mine. And I have
15 had family members in nursing
16 homes. I'm not saying they don't
17 exist. I'm just saying I personally
18 have not been there.
19 Q.    According to your criteria
20 for quality or bestness, could you
21 identify the three worst nursing
22 homes you have visited going back to
23 1990 or if that's impossible because
24 of how long ago it was, beginning in
25 1995, whichever's easier for you to

Page 22

1 do?
2 A.    I can think of --- I can
3 think of one that stands out in my
4 mind most especially.  And that was
5 a nursing home in York,
6 Pennsylvania.  I can't --- I
7 honestly can't remember the name.
8 Q.    Do you know approximately
9 when it is and where it is ---?
10 A.    It was in Dallastown ---
11 Dallastown, Pennsylvania, I
12 believe.  And we visited in 19 ---
13 it was either '9 --- I think it was
14 either '98 or '99.
15 Q.    Okay.  And the reason for
16 that visit, was that to see a
17 specific client or ---?
18 A.    No, that was because of
19 complaints that we received about
20 the nursing home.
21 Q.    I see.  To your knowledge,
22 is the nursing home still in
23 operation?
24 A.    I don't know to be honest
25 with you.

Page 23

1 Q.    Do you have any
2 recollection of the size, I mean, in
3 terms of beds, was it 20 people or
4 200 people?
5 A.    No, it was a large nursing
6 home.
7 Q.    Probably over a hundred?
8 A.    Probably over a hundred.
9 Q.    Okay.  All right.  Thank
10 you.  You have visited South
11 Mountain Restoration Center?
12 A.    Yes, I have.
13 Q.    All right.  Do you recall
14 when the first visit occurred as to
15 what year the first visit occurred,
16 I mean yours personally, your first
17 visit?
18 A.    My personally first
19 visit.  I think if I'm remembering
20 correctly, it was 1994.  I think I'm
21 not one hundred percent sure.
22 Q.    Do you recall the reason
23 for that visit?
24 A.    I think it was in response
25 --- I think there was an individual

Page 24

1 that had been in another institution
2 and had transferred there and wanted
3 to see how she was doing.
4 Q.    Okay.
5 A.    I believe if I'm
6 remembering correctly.
7 Q.    Thereafter how frequently
8 did you visit South Mountain?
9 A.    I visited --- I believe I
10 visited again in '96 and then again
11 in --- I think my more frequent
12 visits began '98, '99 and then, of
13 course, 2000.  Up to just recently,
14 I was there not long ago.
15 Q.    In all of these visits,
16 were you accompanied by someone else
17 from PP&A?
18 A.    Yes, I believe so.
19 Q.    I believe you identified
20 the first visit as specific to a
21 client you wished to see.
22 A.    I think it was, if I
23 remember.
24 Q.    Were the subsequent visits
25 for the same reason or were they for

Page 25

1 different reasons?
2 A.    They were for different
3 reasons.
4 Q.    And what were the
5 different reasons?
6 A.    I believe it was '96, it
7 could have been later, but I believe
8 it was in '96, the agency started
9 looking more closely at the issue of
10 all of the mental health programs in
11 Pennsylvania.  And, of course, South
12 Mountain is one of those managed by
13 OMH at that time, it's us now.  And
14 it was just one of those facilities
15 that we wanted to take a look at.
16 Q.    Is that because PP&A had a
17 heightened interest in nursing homes
18 in general at that time?
19 A.    Well, it was more --- I
20 would attribute our visit more to
21 the fact that the agency in general
22 was focussing more on the programs
23 run by the Office of Mental Health.
24 Q.    I see.
25 A.    I wouldn't equate that

Multi-Page™

Page 26

1 with nursing homes necessarily.
2 Q.    During the period of time
3 from your first visit in '94
4 approximately to visits up to this
5 year, you said you have visited this
6 year, did you notice any trend of
7 any kind in the overall quality of
8 care there, getting better, getting
9 worse, staying the same?
10 A.    There have been some
11 changes at South Mountain.
12 Q.    Changes you regard as good
13 or bad or neutral?
14 A.    Well, I don't know that
15 you can classify them as good or
16 bad.  Changes in --- we've seen some
17 effort being made by Doctor Power to
18 make some changes.
19 Q.    Can you be specific about
20 the kind you have in mind?
21 A.    After Doctor Power
22 arrived, we --- we had been to South
23 Mountain a number of times prior to
24 his arrival and had identified a
25 number of concerns at that program,

Page 27

1 I'm sure I assume you've seen that,
2 those reports, had identified
3 concerns with nursing or staff
4 ratios, staff-to-client ratios,
5 activity, client activity levels,
6 general condition of clients,
7 general condition of facility, those
8 sorts of things.
9        We saw some changes once
10 Doctor Power got there that looked
11 like the facility might be moving in
12 the direction of trying to correct
13 some of those concerns.
14 Q.    Well, can I ask you one
15 other question about your
16 background?
17 A.    Uh-huh (yes).
18 Q.    Have you ever been
19 qualified as an expert witness in
20 any hearing or trial, Federal or
21 State?
22 A.    No.
23 Q.    What do you believe is the
24 proper standard for evaluating the
25 quality of care in South Mountain

Page 28

1 Restoration Center?
2 A.    Well, I believe there are
3 a couple of standards.
4 Q.    I'm sorry?
5 A.    I'm sorry.
6 Q.    I'm sorry.
7 A.    I believe there are a
8 couple of standards.
9 Q.    Go ahead.
10 A.    One, there's a minimum
11 standard which is licensing, but I
12 want to stress that is a very
13 minimum standard.  From there, the
14 standard, what I believe is an
15 appropriate standard to use to
16 identify the quality of services is
17 again looking at what I would want
18 if I were someone who receives
19 services there, what a family member
20 --- what I would want for a family
21 member, and also comparing it to
22 what I know that people living in
23 the community receive, people having
24 very similar needs, what their
25 quality of life is.

Page 29

1 Q.    These standards that you
2 just referred to as distinct from,
3 and I think in your view, above in
4 some sense the minimum licensing
5 standards, are they written down
6 anywhere?
7 A.    Written, no, not that I'm
8 aware of, no.
9 Q.    To go back to the
10 licensing issue and particularly the
11 Department of Health which as you
12 know licenses nursing homes in
13 Pennsylvania, Ms. Leed who was
14 deposed I guess a couple months ago
15 here and who I think works for you,
16 is that correct?
17 A.    Yes, she does.
18 Q.    She expressed the view
19 that when the Department of Health
20 came out to do their inspection or
21 survey for the licensure, that South
22 Mountain had some sort of advance
23 notice that they were coming?
24 A.    Yes.
25 Q.    And, therefore, they could

1 specially prepare or some such thing
2 as that. Now, do you similarly
3 believe South Mountain had some
4 advance notice that the Department
5 of Health inspectors were coming on
6 a particular date or whatever?
7 A. I believe they are
8 notified ahead of time.
9 Q. And why do you believe
10 that? Did somebody tell you that or
11 did you read that somewhere?
12 A. I --- if I recall
13 properly, let me think, I believe we
14 talked to someone in the Department
15 of Health that does nursing home
16 inspections. I could be wrong. I
17 could be wrong, but I think we
18 talked to someone there and they did
19 say ---.
20 Q. Okay. You don't recall
21 the name of that person?
22 A. No, no, I don't recall the
23 name and I believe they said they
24 were --- they were announced.
25 However, even if they are not

1 announced, they happen --- they have
2 to happen within a certain time
3 period. So if they've not happened
4 and we know the time period's
5 getting close, we know that
6 inspectors will be there, you know,
7 in a certain month. Some programs,
8 not necessarily South Mountain, but
9 some programs I know can anticipate
10 almost the week that inspectors are
11 coming.
12 Q. Ms. Beilharz, do you have
13 any reason to believe that the
14 quality of care at South Mountain
15 generally is below that of the
16 average nursing home in
17 Pennsylvania?
18    ATTORNEY MEEK:
19     I'm going to object,
20    because there's nothing
21    established that she would
22    know the quality of care
23    of the average nursing
24    home. She has only seen
25    in her best guess 24 in

1 the last 12 years. And I
2 would suggest there are a
3 lot more than 24 nursing
4 homes in Pennsylvania. So
5 I don't think that's an
6 appropriate question.
7    ATTORNEY ULAN:
8     If the witness ---
9    well, if the witness
10    cannot answer, the witness
11    cannot answer. That's up
12    to the witness.
13 A. I need to be advised. I
14 don't know what I can and can't
15 answer then.
16    ATTORNEY MEEK:
17     You need to answer.
18    If you don't know the
19    answer, say you don't know
20    the answer.
21 A. Well, I think Mr. Meek is
22 exactly right. I haven't seen that
23 many nursing homes, but certainly
24 there are elements of South Mountain
25 that are worse.

1 BY ATTORNEY ULAN:
2 Q. Than what?
3 A. Than some of the nursing
4 homes I've seen.
5 Q. Of the 24 that you have
6 visited from 1990 forward, in
7 Pennsylvania for any of the reasons
8 you have described, just using that
9 comparison, the ones you have
10 actually visited in Pennsylvania, do
11 you have any reason to believe the
12 quality of care at South Mountain is
13 below the average of those
14 facilities?
15 A. Yes, I do.
16 Q. And what is the reason?
17 A. One is the location of
18 South Mountain. It is far more
19 isolated than any community nursing
20 home I've --- I've ever seen, which
21 in turn does not give people who
22 even have the ability to, if
23 necessary, walk out of the facility
24 on their own access to reasonable
25 community experiences.

Page 34

1 Q.    May I just stop you there:
2 A.    Sure.
3 Q.    On that issue, at the
4 other nursing homes you have
5 visited, the 24 or so, was the
6 typical nursing home in walking
7 distance of downtown or a shopping
8 mall or did people typically if they
9 wished to go shopping be taken in a
10 van or a car, something like that,
11 do you know?
12 A.    Yes, a number of them were
13 within reasonable walking distance.
14 We also in the community nursing
15 homes that we visited routinely run
16 into family members who are there
17 and taking their loved ones out for
18 visiting. So, yes.
19 Q.    Now, I think you may have
20 mentioned, and I know Ms. Leeds
21 testified, that the intensity of
22 visits of PP&A staff to South
23 Mountain went up in the last roughly
24 two years or something like that,
25 and you talked about that already.

Page 35

1 A.    Yes.
2 Q.    And am I correct that it
3 became most intense last year in
4 2000 in terms of ---
5 A.    Yes.
6 Q.    --- number --- in terms of
7 number of days of visits and number
8 of staff involved?
9 A.    Yes. Uh-huh (yes).
10 Q.    Okay. And how many staff
11 were involved in the visits last
12 year of PP&A and by staff I'm
13 including volunteers if there were
14 already volunteers?
15 A.    Uh-huh (yes).
16 Q.    Are there any volunteers?
17        ATTORNEY MEEK:
18        Just one moment. Are
19    you saying calendar ---?
20        ATTORNEY ULAN:
21        Calendar 2000.
22        ATTORNEY MEEK:
23        Okay.
24 BY ATTORNEY ULAN:
25 Q.    Calendar 2000.

Page 36

1 A.    We had --- there were ---
2 I hope I have the right year. We in
3 May I believe we did a visit to
4 South Mountain with a group of
5 individuals, staff from here. And I
6 want to say it was --- no. No. I
7 wouldn't --- without looking at my
8 records, I'd have a hard time
9 saying, but we've had this ---.
10 Q.    Well ---?
11 A.    This past year most of the
12 visits to South Mountain have been
13 conducted by Marg, myself ---.
14 Q.    Just to interrupt, this
15 past year you mean 2000?
16 A.    Yes.
17 Q.    Okay. The visits have
18 been conducted by what?
19 A.    Most of them have been
20 conducted by Marg, Margaret Leed,
21 myself, upon occasion Diana Haugh
22 has visited.
23 Q.    Yes.
24 A.    And Pat Madigan. I don't
25 honestly recall. We've had other

Page 37

1 staff go with us, but I don't
2 honestly recall the dates.
3 Q.    Are all of the individuals
4 you've just mentioned people who at
5 least in the year, we're talking
6 about the year 2000, work under your
7 supervision?
8 A.    Yes, they do.
9 Q.    Does Judy Banks work under
10 your supervision?
11 A.    No, she doesn't.
12 Q.    Did she go to South
13 Mountain?
14 A.    She did, but honestly
15 right now I can't recall if it was
16 2000 or '99 off the top of my head.
17 Q.    Which --- but she does not
18 work for you?
19 A.    No.
20 Q.    Did she go for some reason
21 other than the reasons you and your
22 team that was under your supervision
23 went?
24 A.    No.
25 Q.    Whatever --- the reason

Page 38

1 you were all going included the
2 reason that Judy Banks was going?
3 She was another PP&A staff?
4 A.   Yes.
5 Q.   She just doesn't happen
6 normally to work under your
7 supervision?
8 A.   Yes, that's correct.
9 Q.   Under whose supervision
10 does she work, do you know?
11 A.   She works --- her direct
12 supervisor is Sharon Potter and
13 ultimately her supervisor is Kevin
14 Casey.
15 Q.   For any of the people who
16 work under your supervision and went
17 on these visits in 2000, to your
18 knowledge, do any of them have a
19 license from either Pennsylvania or
20 any other state in any health care
21 or social service profession?
22 A.   No.
23 Q.   To your knowledge, the
24 answer is no?
25 A.   Right.

Page 39

1 Q.   Is that true also for
2 Ms. Banks?
3 A.   I very honestly couldn't
4 answer that.  I don't know.
5 Q.   The visits in the year
6 2000, do you know roughly how many
7 PP&A visits occurred during the
8 course of that year?
9 A.   No.  I know for a period
10 of time Margaret was going almost
11 weekly.
12 Q.   And that was in the summer
13 or late spring or something like
14 that?
15 A.   No, I think that started
16 --- actually I think it started
17 around February of 2000.
18 Q.   Did most of those times
19 she went herself or --- or were you
20 there with her or was someone else
21 with her?
22 A.   Many of those times she
23 went by herself.
24 Q.   I see.  She testified
25 about, and there are some exhibits

Page 40

1 in connection with the deposition,
2 about forms she used at some point I
3 think for the first time in 2000,
4 that she filled out in connection
5 with some of the residents there.
6      Do you know where the
7 forms came from, who created them?
8 A.   It depends on which form
9 you're talking about.  If you have
10 an example of it, I could --- I
11 could answer that.
12 Q.   Okay.  Did she report to
13 you each time she came back from
14 South Mountain?
15 A.   Yes.
16 Q.   And when she reported to
17 you, did she speak only of
18 particular residents or did she ever
19 talk about general conditions at
20 ---?
21 A.   She --- go ahead.  I'm
22 sorry.
23 Q.   General conditions at
24 South Mountain?
25 A.   To the best of my

Page 41

1 recollection, it was both.
2 Q.   And with respect to
3 general conditions, what I call
4 sights, sounds and smells, what did
5 she tell you?
6 A.   Well, I obviously can't
7 tell you each and every visit but in
8 general ---
9 Q.   To the best of your
10 recollection.
11 A.   --- she often expressed a
12 concern about the physical condition
13 of the plan.
14 Q.   Can you be more specific
15 about the ---?
16 A.   Yes, smelling --- smelling
17 strong odors, urine odors, odors
18 associated with fecal material.  She
19 expressed concern about the --- I'm
20 not sure how to put this --- sort of
21 the general atmosphere there that
22 oftentimes it was very loud.  The
23 --- not any individual in
24 particular was necessarily being
25 loud but that the building itself

Multi-Page™

Page 42

1 echoes and makes things louder
2 sometimes than what they are.
3 Expressed concern about the
4 condition she saw a number of the
5 individuals in.
6 Q.   Can you recall with any
7 specificity what you mean by
8 condition?
9 A.   Individuals being in dirty
10 clothing.  Individuals looking as if
11 they were dirty, their skin.
12 Individuals who perhaps complained
13 to her about conditions there, lack
14 of activities, those sorts of things
15 she talked about pretty regularly.
16 Q.   You personally visited
17 South Mountain approximately how
18 many times in the year 2000, best
19 estimate?  Would it be at least four
20 or five times?
21 A.   Oh, definitely,
22 definitely.
23 Q.   And perhaps as many as ten
24 or 15 times?
25 A.   Yes, yeah.  That's very

Page 44

1 visited, that is, noisier, less
2 noisy, smellier, less smellier,
3 same?
4 A.   My general impression of
5 South Mountain is that it's noisier
6 than almost any other nursing home
7 that I've been in.  Smells to be
8 honest with you I'm not a very good
9 person to ask about that, my nose
10 doesn't work extremely well.
11 Q.   Okay.
12 A.   There have been occasions
13 where I've been at South Mountain
14 and I've definitely smelled things
15 which in my estimation makes those
16 odors very prominent because if I
17 smell them, they --- it's got to be
18 pretty bad for me to smell them.
19 Q.   I see.  Do you know
20 whether PP&A staff or yourself,
21 either or both, have asked residents
22 whether they wish to leave South
23 Mountain?
24 A.   Yes.  Uh-huh (yes).
25 Q.   Have you personally asked

Page 43

1 possible.
2 Q.   Okay.  So we'll say at
3 least five times and perhaps as many
4 as 15 times in the calendar year
5 2000?
6 A.   Fifteen (15) might be a
7 little high but ---.
8 Q.   Close ---?
9 A.   Yeah.
10 Q.   In between somewhere?
11 A.   In between --- somewhere
12 in between.
13 Q.   Ten plus or minus five,
14 how about that?
15 A.   Sounds good.
16 Q.   That gets us in the right
17 ball park.  With respect to general
18 conditions, for example, noise that
19 Ms. Leed mentioned, smells that
20 Ms. Leed mentioned, smells that
21 Ms. Leed mentioned, are you able to
22 compare the noisiness of South
23 Mountain or the smells of South
24 Mountain with the other 24 nursing
25 homes in Pennsylvania that you

Page 45

1 residents, any residents?
2 A.   I ---.
3 Q.   Whether they wished to
4 leave South Mountain?
5 A.   I don't --- I don't know
6 --- I can't say that I've walked up
7 to someone and said, do you want to
8 leave here?
9     What I've said to people
10 is, how do you like living here?  Is
11 there some place else you think you
12 might like to be?
13     To the best of my
14 knowledge, that's typically the way
15 I ask people those things.
16 Q.   And do you have any
17 recollection of how many people you
18 asked that in calendar year 2000?
19 A.   That would be impossible
20 to say.  I mean, I would be there
21 and talk to 25 or 30 people and
22 another time I'd be there and only
23 talk to maybe a half a dozen.  So I
24 couldn't with any accuracy say.
25 Q.   Do you have any

Page 46

1  recollection of how many of those
2  individuals that you had this
3  conversation with that you just
4  described, however many it was, not
5  absolute numbers, in proportions,
6  what percentage did in your view
7  express a desire to leave?
8  A.    I --- boy, that's a tough
9  one to say.  I would say
10  approximately --- this is really
11  approximate.  I would say somewhere
12  between 50 to 75 percent of the
13  people I talked to, talked about
14  being interested in leaving.
15  Q.    Okay.  Do you have any
16  records of each of these
17  conversations?
18  A.    Each specific
19  conversation?
20  Q.    Right.
21  A.    No, I don't.  No.  I know
22  Marg has talked to some people about
23  it.
24  Q.    Of your own?
25  A.    Of mine ---.

Page 47

1  Q.    Not speaking about other
2  staff speaking to you, about your
3  own conversations personally?
4  A.    Right, right.
5  Q.    So what you told me now
6  about the proportions and so forth
7  is about your own conversations;
8  correct?
9  A.    Right, right.
10  Q.    And as a general rule when
11  you had these conversations, you did
12  not produce a piece of paper or fill
13  out a piece of paper that would
14  record what conversation as ---?
15  A.    That said today so and so
16  told me they wanted to leave South
17  Mountain?
18  Q.    Or something like that,
19  right.
20  A.    No, no.  Many of the
21  people were people --- we didn't
22  talk --- I didn't talk to a distinct
23  group of different people each time
24  I went, so they were people who
25  maybe had told someone else who had

Page 48

1  been there that they wanted to
2  leave, that they were interested in
3  leaving or they didn't like it there
4  or whatever.
5  Q.    How did you select the ---
6  which residents to talk to?  Did you
7  go to a particular unit or did you
8  go to all the units or ---?
9  A.    During our visits there,
10  we visited --- I visited every
11  single unit.  And what typically I
12  do is I'll walk down the hall, I see
13  someone in the hall, I'll say hello
14  and introduce myself, ask them if
15  they're willing to talk to me.  If
16  they are, I talk with them.  If
17  they're not, I don't.  If people are
18  sitting in their rooms, do the same
19  thing.  If they're open to talking
20  with me, go to the day rooms.
21  Q.    When you have these
22  conversations with these residents,
23  do you make any systematic
24  assessment of their competence?
25  A.    What do you mean by

Page 49

1  systematic assessment?
2  Q.    Well, I'll rephrase to
3  start with.  Do you make any
4  assessment of their competence,
5  whether systematic or not?
6  A.    The ---.
7        ATTORNEY MEEK:
8        I'm going to ask you
9  also --- I'm not sure.  By
10  competence, do you mean
11  general competence to do
12  what?
13        ATTORNEY ULAN:
14        Well, competence ---.
15        ATTORNEY MEEK:
16        What do you mean by
17  competence?
18        ATTORNEY ULAN:
19        Competence as defined
20  in Pennsylvania Statute or
21  as the witness would
22  define it.  I'll allow the
23  witness to define it.
24        ATTORNEY MEEK:
25        Okay.

Multi-Page™

Page 50

1     ATTORNEY ULAN:
2         As long as she states
3   what she thinks the
4   definition of competence
5   is.
6     ATTORNEY MEEK:
7         Well, either you do
8   or she does.
9     ATTORNEY ULAN:
10        And that's all right.
11    ATTORNEY MEEK:
12        Right.
13    ATTORNEY ULAN:
14        That's all right.
15 A.    For my purpose if I'm
16 there visiting with people, if
17 people are able to talk with me, if
18 they're able to hold any semblance
19 of a conversation, if they're not
20 clearly some place else when I'm
21 talking to them, that's --- that's
22 enough for me. If someone says, you
23 know, they have a choice between
24 milk and juice and they choose
25 juice, well, if that's what they

Page 51

1 want then they're competent to make
2 that choice. It's enough for me if
3 someone says, I would like to live
4 closer to my family and they have
5 some idea of where that is, then,
6 you know, that's competent enough
7 for me.
8 BY ATTORNEY ULAN:
9 Q.    In any of these cases
10 you're talking about, did you ever
11 verify the factual premises of the
12 wish to live next to family so that
13 --- I'll explain what I mean if I'm
14 not clear.
15      Suppose a resident said I
16 want to live near my family.
17 Suppose he said --- let me be more
18 specific, he wants to live with his
19 parents. Okay? His parents are
20 deceased. Is that a competent wish
21 or not a competent wish?
22 A.    I personally don't recall
23 anyone saying to me I want to live
24 with my parents whose parents were
25 deceased. We did, in fact, at one

Page 52

1 point during our visits there review
2 the records of a number of
3 individuals. And in those records
4 very often the South Mountain staff
5 would indicate that this individual
6 wants to live closer to their family
7 and/or their family wants them to
8 live closer to them.
9 Q.    In those charts that
10 you've looked at that you just
11 mentioned, did you look to determine
12 whether there had ever been an
13 adjudication of incompetence on that
14 individual?
15 A.    We saw in many of the
16 charts an indication from the
17 physician that the person was either
18 competent or incompetent. I do not
19 recall off the top of my head seeing
20 any adjudication of incompetence.
21 Q.    Do you recall any cases in
22 which you disagreed with the
23 determination of the physician
24 regarding a person's competence in
25 either direction, the physician said

Page 53

1 he's competent and you thought he
2 wasn't, or the physician said he
3 wasn't and you said he was?
4 A.    I don't honestly recall to
5 tell you the truth. Most of those
6 --- I should add, most of those
7 notations around incompetence had to
8 do with, from what I saw, making DNR
9 orders. DNR, do not resuscitate.
10 Q.    Do you have any reason to
11 believe that the health of South
12 Mountain residents would be improved
13 if they were transferred somewhere
14 else as to any or all?
15 A.    In --- in general?
16 Q.    Yes.
17 A.    Yes, I do.
18 Q.    And where do you think
19 they should be transferred to
20 improve their health?
21 A.    I think that from my
22 experience in knowing what kind of
23 community programs can and have been
24 established in the Commonwealth of
25 Pennsylvania, that there are an

Multi-Page™

**Page 54**

1 enormous number of people at South
2 Mountain who could move into small
3 community living situations.
4 Q.    When you say small, do you
5 mean something like two-, three-,
6 four-bed?
7 A.    Yes.
8 Q.    Is that what you have in
9 mind by small?
10 A.    Yes.
11 Q.    When you said --- I think
12 you said an enormous number can ---?
13 A.    A large number.
14 Q.    Well, is it fair to say
15 that means more than half or ---?
16 A.    Yes. Yes, I think more
17 than half could.
18 Q.    And how --- how would
19 their health be improved if that
20 happened?
21 A.    Well, I can give you an
22 example of people, of one person in
23 particular from Harrisburg State
24 Hospital who we saw this exact thing
25 happen. It's a person who was ---

**Page 55**

1 actually it was a couple of people,
2 but one person really stood out in
3 my mind, stands out in my mind.
4      A woman who at Harrisburg
5 State Hospital was on their
6 geriatric unit. She was considered
7 to have dementia, extreme dementia.
8 She was incontinent, was eating
9 pureed food. Half the time couldn't
10 feed herself. Was given the
11 opportunity to move into a community
12 setting and our staff did a
13 follow-up. It was within six months
14 I believe of her moving there. And
15 very literally when they walked into
16 the program did not recognize her.
17      She was eating food that
18 was not pureed, wasn't ground. She
19 was no longer incontinent. She was
20 speaking. She was clean. She was
21 dressed in a way that was similar to
22 the way other people in the
23 community dress. And that's just
24 one example. I mean, there are
25 numerous examples.

**Page 56**

1 Q.    Let me stop you about that
2 one. Do you recall what year this
3 happened?
4 A.    It was sometime after
5 1994. I want to say rough
6 recollection, probably 1996.
7 Q.    She moved into a group
8 home that was located where do you
9 know?
10 A.    It was in I want to say
11 Hershey. I think it's in Hershey.
12 Q.    She was approximately how
13 old, do you recall?
14 A.    She was senior age, but I
15 couldn't tell you. She was
16 somewhere over 60 and under about
17 80, I think. But that's only one
18 example. I mean, we've seen this
19 happen time and time and time again
20 to people who have lived in isolated
21 settings, institutional settings.
22 Q.    Am I correct that when you
23 say you have seen this time and time
24 and time again, that most of the
25 cases you are referring to such as

**Page 57**

1 the particular one that you
2 mentioned a moment ago are people
3 moving out of either state mental
4 hospitals or state mental
5 retardation centers?
6 A.    Yes, most of them.
7 Q.    Most of your experience
8 with this sort of thing involved
9 those two populations; is that
10 correct?
11 A.    Right.
12 Q.    Do you have any similar
13 examples you can relate involving
14 individuals in nursing homes,
15 whether it's South Mountain or any
16 of the other 24 nursing homes that
17 you visited and had a similar
18 result?
19 A.    I personally? No, I
20 cannot. I know other people on our
21 team --- the only personal
22 experience I have ---.
23 Q.    Excuse me. Before you go
24 on, other people on your team?
25 A.    Uh-huh (yes).

Page 58

1 Q.     What?
2 A.     Have been aware of people
3 leaving community nursing homes and
4 moving into community programs and
5 have made significant gains.
6 Q.     And who are these other
7 people on your team that ---?
8 A.     Well, I know that Diana
9 Haugh was involved with a nursing
10 home in I want to say Lebanon County
11 and was successful in getting a
12 number of people out of there into
13 community settings.
14 Q.     Have ---?
15 A.     And I've had a personal
16 experience with this in my own
17 family.
18 Q. .   Do you know of any
19 published literature on the subject
20 of relocating nursing home residents
21 to group homes such as you've
22 described, two- to four-bed?  Again,
23 I'm speaking of nursing home
24 residents?
25 A.     Right.

Page 59

1 Q.     Not state mental hospital
2 residents and not ---
3 A.     Right.
4 Q.     --- retardation centers,
5 do you know of any ---?
6 A.     Nothing I could quote you
7 off the top of my head.
8 Q.     Do you recall ever seeing
9 any literature that you don't recall
10 specifically the author or date but
11 that you can summarize the substance
12 even if you can't recall a specific
13 author or date?
14 A.     To be honest with you,
15 what I recall about what is written
16 about this phenomenon of people
17 leaving large congregate
18 institutional settings and moving to
19 the community ---
20 Q.     Yes.
21 A.     --- is something that has
22 been --- I've been part of
23 discussions about that, and I ---
24 but I can't honestly tell you if the
25 information I have about written

Page 60

1 literature is literature that I've
2 --- I've read myself or literature
3 that other people have read and they
4 have shared that with me.  So I
5 can't answer that.
6 Q.     And the literature that
7 other people shared with you with
8 respect to moving from large
9 congregate settings to group homes
10 or institutions to group homes, may
11 have included literature relating to
12 state mental hospitals and state
13 mental retardation centers; is that
14 correct?
15 A.     It may have, maybe.
16 Q.     If I understand you
17 correctly, you do believe that for
18 some individuals nursing homes in
19 general are necessary leaving aside
20 any particular nursing home; is that
21 correct?
22 A.     There --- there may be
23 some individuals who are so
24 medically involved that they could
25 potentially need the services of a

Page 61

1 nursing home, but my personal belief
2 is that those people are few and far
3 between.  I've --- let me put it
4 this way.  I've not seen services,
5 any services delivered to anyone
6 that I visited at South Mountain
7 that I've not seen delivered in a
8 community setting.
9 Q.     The group homes that
10 you're describing as apparently
11 being the appropriate placement for,
12 I think you've said most South
13 Mountain residents, these would be
14 group homes, two or three residents,
15 maybe four?  I don't know what ---
16 is that right?  I mean ---?
17 A.     Yes, generally.
18 Q.     All right.
19 A.     Three maybe four.
20 Q.     Three, occasionally four.
21 Do you envision these places as
22 having 24-hour, on-site, licensed
23 nursing staff?
24 A.     Yes.
25 Q.     Or not?

Page 62

1 A.    Yes. That already exists
2 in the community.
3 Q.    Do you have an opinion as
4 to whether most South Mountain
5 residents need 24-hour, on-site
6 licensed nursing care?
7 A.    It appears from our visits
8 there, we've not read the --- I want
9 to be very clear about this. I've
10 not read the records of every single
11 person there, but it appears that
12 many, many do not.
13 Q.    What is your standard for
14 determining whether an individual
15 does or does not need 24-hour,
16 on-site licensed nursing care?
17 A.    If the level of care they
18 need is not something that would
19 require a nurse to administer it,
20 there are some --- if I'm not
21 mistaken, there's some people at
22 South Mountain who receive daily
23 medication only. That is something
24 that very typically in the community
25 is given by trained staff, not

Page 63

1 necessarily night --- nurses. There
2 are other people who obviously need
3 injections or they need other ---
4 other services that would need to be
5 given perhaps by a nurse, but there
6 appear to be many who do not.
7 Q.    Do you know of any nursing
8 home in the United States that has
9 either been closed or had some
10 substantial reduction in census so
11 that half or more of the residents
12 have moved to group homes?
13 A.    I can't answer that. I
14 mean, my experience --- now you're
15 going outside Pennsylvania, just to
16 nationwide, I'm not ---.
17 Q.    I'm asking if you know.
18 If you don't know, you don't know
19 and I'm not ---?
20 A.    No, I don't know.
21 Q.    Do you believe that PP&A
22 staff know the residents at South
23 Mountain that they have visited with
24 as well as South Mountain staff do?
25 A.    In ---.

Page 64

1    ATTORNEY MEEK:
2    I'm going to object.
3 That clearly calls for
4 complete speculation on
5 her part.
6    ATTORNEY ULAN:
7    Well, the witness can
8 determine that.
9    ATTORNEY MEEK:
10    It's speculative.
11 It's objectionable. It's
12 speculative. The form of
13 the question is requiring
14 speculation. Therefore,
15 it's objectionable at a
16 deposition.
17    ATTORNEY ULAN:
18    Well, the witness can
19 answer after the objection
20 is made and the witness
21 can answer if the witness
22 believes she can answer.
23 If not, she can say she
24 can't.
25 A.    I --- I can't honestly say

Page 65

1 how well the staff at South Mountain
2 know the individuals. I know that
3 there are things about the residents
4 at South Mountain that we've become
5 aware of that staff seem not to be
6 aware of.
7 BY ATTORNEY ULAN:
8 Q.    Such as?
9 A.    Requests, personal,
10 requests, things people want. Some
11 of their desires, things people
12 would like to have for themselves in
13 their lives.
14 Q.    Such as?
15 A.    People wanting to take
16 trips out, out into the community,
17 people wanting to live closer to
18 their family, things as basic as
19 people --- people who want better
20 fitting clothing.
21 Q.    And what causes you to
22 believe that South Mountain staff
23 are not aware of these desires?
24 A.    Well, what --- what would
25 be the reason for keeping someone in

Page 66

1 ill fitting clothing if they want
2 clothing that fits well and staff
3 are aware of that? I've got to
4 assume that they're not aware of
5 it.
6 Q.    Okay. I now have some
7 documents and I'll ask that they be
8 marked if you could mark that one
9 and give it to the witness, this
10 will be Beilharz One.
11        ATTORNEY MEEK:
12        You can look at this
13 one.
14 A.    Okay.
15        ATTORNEY MEEK:
16        Yes. That's the same
17 thing.
18 A.    The same thing.
19        ATTORNEY MEEK:
20        Yes.
21        (Beilharz Exhibit
22        Number One marked for
23        identification.)
24 BY ATTORNEY ULAN:
25 Q.    Do you recognize this

Page 6

1 A.    The purpose of this form
2 is to keep in front of staff who are
3 using it when they're on the unit,
4 observing what's going on, an idea
5 of things that they should be
6 looking for, that might go to
7 quality of life issues, that might
8 go to health and safety issues, that
9 might go to some licensing issues.
10 Q.    When was this form first
11 used at South Mountain? Was it
12 calendar year 2000 or sometime
13 earlier?
14 A.    No. I believe it was
15 either '98 or '99.
16 Q.    On the first page ---?
17 A.    Excuse me.
18 Q.    Go ahead.
19 A.    A version of this form.
20 It's modified periodically.
21 Q.    I see. Now, this
22 indicates that this was 4:50 p.m. to
23 6:00 p.m. on July 27th, 2000, unit
24 2A, I assume that is around dinner
25 time.

Page 67

1 document?
2 A.    Yes.
3 Q.    And are you the person who
4 completed this form?
5 A.    Yes, I am.
6 Q.    Did you create this form
7 or did you take it from somewhere
8 else?
9 A.    This form is a --- I --- I
10 physically put this form together,
11 but it's very, very loosely based on
12 a similar form that another team
13 used at another facility.
14 Q.    Okay. And when is this
15 form for? When does PP&A use this
16 form?
17 A.    Well, I put this form
18 together to be used specifically at
19 South Mountain.
20 Q.    Okay. And the
21 circumstance at South Mountain when
22 you would use this or perhaps I
23 should ask it the other way. What
24 is the purpose of this particular
25 form?

Page 6

1 A.    Roughly.
2 Q.    Okay. And your notation,
3 no, on the first page means that all
4 the residents were having dinner in
5 the dining room. Is that what that
6 means?
7 A.    When I was on the unit,
8 the part of the unit I was on, I
9 didn't observe anyone at that time
10 having a meal outside of the dining
11 room.
12 Q.    The dining room --- that's
13 my understanding. Is that right?
14 A.    I'm not saying everyone on
15 the unit was in the dining room. I
16 didn't know that. But I didn't
17 observe anyone sitting in the day
18 room eating or whatever.
19 Q.    Okay. And then the next
20 page says none related to
21 positioning issues. So that's ---
22 A.    I didn't observe ---
23 Q.    --- relating ---?
24 A.    --- any dinner meal when I
25 was on the unit.

Multi-Page™

Page 70

1 Q.    I'm sorry.  You did or did
2 not?
3 A.    I did not observe the
4 dinner meal at this time when I was
5 on the unit.
6 Q.    Oh, I thought this was
7 dinner time.
8 A.    Well, it was, but I was
9 doing something else on the unit.
10 Q.    Oh, I see.  Well, the next
11 page, the next page has issues on
12 the column, left column there?
13 A.    Uh-huh (yes).
14 Q.    Of various kinds.  And
15 then your notation in the first one
16 is none, the second one is unknown
17 and the third one is okay.  Now,
18 what do these three different
19 notations, none versus unknown
20 versus okay mean?
21 A.    For the --- the
22 individuals I was interacting with
23 at the time, they were not
24 individuals who at that time were
25 having issues with choking or

Page 71

1 swallowing.
2 Q.    Okay.  So unknown in the
3 next box means what?
4 A.    Does that individual have
5 issues with eating too fast?  It was
6 unknown to me whether or not they
7 did.
8 Q.    And okay I suppose means
9 okay?
10 A.    From what --- from what I
11 observed at the time, it was okay.
12 Q.    The next page is
13 self-explanatory I think.
14 A.    Uh-huh (yes).
15 Q.    Does okay and yes mean
16 anything different in your --- I'm
17 on the third page?
18 A.    Right, right.
19 Q.    Oh, excuse me, fourth.
20 I'm on the fourth page.  The first
21 boxes okay and then three yeses.
22 A.    Well, yes, it does.  There
23 is a difference.  I could say
24 definitively that the bathroom
25 curtains, privacy curtains were

Page 72

1 pulled.  I saw those.  The same with
2 the other two yeses.  The
3 temperature I did not have a
4 thermometer with me at the time.
5 The temperature felt okay with me.
6 I could not definitively say that
7 the temperature at that point was
8 between 71 and 81 degrees.  So
9 that's the difference between those
10 answers.
11 Q.    Okay.    Turning to --- let
12 me see, page --- I think it's page
13 seven, it's the first boxes, do
14 staff appear to speak with the
15 residents, do you see?
16 A.    Uh-huh (yes).
17 Q.    Sorry.
18        ATTORNEY FELLIN:
19        That's all right.
20 BY ATTORNEY ULAN:
21 Q.    The next boxes, personal
22 possessions, are residents wearing
23 their own clothes?  Not for the most
24 part means they were wearing what
25 sort of stuff?

Page 73

1 A.    They were wearing for the
2 people that I observed, they seemed
3 to be wearing clothing that was ill
4 fitting.  I made ---.
5 Q.    And from the fact they're
6 ill fitting, you infer that they're
7 not their clothes?
8 A.    Right.
9 Q.    All right.  I'm just
10 trying to understand what this
11 means, that's all.
12 A.    Right.
13 Q.    The last page of this
14 document, the first section about
15 residents engaged in scheduled
16 recreational activities --- no one I
17 spoke to was aware of the 6:30
18 activity.  Do you recall what the
19 activity was?
20 A.    I believe it was a concert
21 or an out --- yeah, it was an outing
22 for a concert.
23 Q.    Oh, a concert off
24 grounds?  Is that what you mean?
25 A.    I --- it didn't say if it

Page 70 - Page 73

Page 74

1  was off grounds or on grounds. It
2  was unclear.
3  Q.    In any event, no one you
4  spoke with was aware of it?
5  A.    Uh-huh (yes).
6  Q.    And the people you spoke
7  with are the residents you're
8  talking about, not the staff?
9  A.    Uh-huh (yes). The
10  residents.
11  Q.    The residents. Do you
12  recall how many residents you spoke
13  with about this?
14  A.    I honestly don't.
15  Typically what I'll do I'll go down
16  the hall and see anyone I see in the
17  hallway or in the day room I'll say,
18  hi, chat with them, ask them what
19  are you doing this evening and no
20  one indicated at that time that they
21  knew about the 6:30 concert.
22      ATTORNEY ULAN:
23      Will you mark this
24  B-2?
25      (Beilharz Exhibit

Page 75

1      Number Two marked for
2      identification.)
3  BY ATTORNEY ULAN:
4  Q.    Take just a few moments to
5  look at it and then when you're
6  ready, we'll proceed. We're going
7  to --- sort of for scheduling, we're
8  going to take a lunch break before
9  one; correct? That's --- if you
10  want to take a break in between,
11  before now and one, that's up to
12  you. We can.
13      ATTORNEY MEEK:
14      How long do you think
15  we're going to be here
16  with her?
17      ATTORNEY ULAN:
18      Well, depending on
19  how long this stuff takes.
20      ATTORNEY MEEK:
21      It's only ---.
22      ATTORNEY ULAN:
23      This is not as bad as
24  it looks.
25      ATTORNEY MEEK:

Page 76

1      It's only 20 of 12
2  now.
3      ATTORNEY ULAN:
4      I understand. Most
5  of the remaining documents
6  consist of the most part
7  of hospital records.
8  There's just a few pages
9  that the deponent created,
10  so I think that's going to
11  be not as much as it looks
12  here.
13      ATTORNEY MEEK:
14      Okay. I'm just
15  trying to figure out ---.
16      ATTORNEY ULAN:
17      And then go through
18  the Complaints. Go
19  through the Complaints,
20  see what knowledge she has
21  of the Complaint and
22  that. So I mean, I think
23  we'll still be with
24  Ms. Beilharz after lunch
25  at one for a while.

Page 77

1      ATTORNEY MEEK:
2      Okay.
3  BY ATTORNEY ULAN:
4  Q.    Okay. The document marked
5  B-2, this is a document you created,
6  is that correct, or a form you
7  filled out?
8  A.    Yes, uh-huh (yes). I
9  completed this form.
10  Q.    Is this a form that you
11  created? Leaving aside the
12  particular content, I mean the form
13  itself, was that something you
14  created or you got from somewhere
15  else or ---?
16  A.    Well, I created but it's
17  again based very roughly on a form
18  that another team used at another
19  facility.
20  Q.    And can you describe the
21  circumstances under which PP&A would
22  use this form?
23  A.    It was to gather
24  information about individuals in the
25  facility, what was contained in

Multi-Page™

1 their record and compare it to the
2 individual that we met on the unit.
3 Q.    All right. Am I correct
4 that a form like this does not exist
5 for every South Mountain resident?
6 A.    Oh, no.
7 Q.    So there are only some?
8 A.    Yes.
9 Q.    All right. And on what
10 basis would the some be selected out
11 of the total population?
12 A.    It could be based on the
13 fact that we were on the unit
14 talking to the individual and they
15 may have had some concerns or they
16 may have appeared to us to need some
17 maybe a piece of assistive
18 technology that they didn't seem to
19 have or perhaps we knew that this
20 person had come from, not in this
21 case, but had come from another
22 facility, another state hospital and
23 we had concerns about how they got
24 there.
25 Q.    Do you know what the

1 particular reason that this resident
2 --- whose name is Carolyn G▇▇▇▇
3 is that correct?
4 A.    I believe that is, yes.
5 Q.    All right. Why this
6 particular resident came to the
7 attention of PP&A?
8 A.    No. I honestly can't
9 say. I don't recall.
10 Q.    From the form itself, I
11 mean, does that refresh your
12 recollection as to why the first
13 instance this individual came to
14 PP&A's attention?
15 A.    Well, I --- I'm not 100
16 percent positive, but this may have
17 been an individual who may have
18 indicated some interest in leaving
19 South Mountain. I don't know.
20 Q.    The first page, the last
21 thing filled out on the first page
22 is the medication. It says, patient
23 receives Mellaril. Do you know what
24 Mellaril is used for?
25 A.    I know it's used quite

1 often to control behavior.
2 Q.    Any particular kind of
3 behavior?
4 A.    Acting out behaviors.
5 Q.    Do you know what a
6 standard dose or dose range of
7 Mellaril is?
8 A.    No, I don't.
9 Q.    The other medication, do
10 you ---?
11 A.    Nortriptyline.
12 Q.    Yes. What's that?
13 A.    No, I'm not. I'm not
14 terribly familiar with that.
15 Q.    The notations on the
16 second page of this document,
17 there's maybe ten or so lines with
18 your writing; right?
19 A.    Uh-huh (yes).
20 Q.    Now, does --- does this
21 represent a verbatim or close
22 paraphrase of the content of the
23 records, or does it include your
24 comments on the records or both? Or
25 what does this represent?

1 A.    It's --- it's pretty much
2 a paraphrase of what I found in the
3 record. I found a notation on
4 7/27/98 from Doctor Reed saying she
5 was alert, oriented, thought content
6 normal, did have auditory
7 hallucinations. She could give
8 informed consent. I found a
9 notation in her social assessment,
10 7/28/98 she wants to be discharged
11 to her city of origin. Her brother
12 wants her to return to the area. So
13 it's not necessarily verbatim but it
14 is ---.
15 Q.    So in other words, whether
16 you think can it's good, bad or
17 otherwise, this is simply a summary
18 of what's there in the records. Is
19 that accurate or not?
20 A.    Pretty much, yeah. Uh-huh
21 (yes).
22 Q.    Okay. Do you think South
23 Mountain should be doing anything
24 for this resident that it isn't
25 doing or at least wasn't when you

Page 82

1  filled this out which was in 1999?
2  A.    Well, yeah. Someone who
3  obviously there's a lot of concern
4  about getting this individual back
5  to her home community. You know,
6  not only does she want to or not
7  only does her family want to return
8  her to return to home, she has
9  expressed an interest in returning
10  to her home county. The family
11  isn't able to visit because of the
12  distance. So, yeah.
13  Q.    So the main issue with her
14  in your view is that she should be
15  discharged or should have been
16  discharged?
17  A.    Well, it's discharge. I
18  see also here there's a note about
19  she apparently had a number of falls
20  and I'm, to be very honest with you,
21  I'm not sure if this is my note or a
22  note there that it could possibly be
23  linked to psychotropic drugs.
24  Q.    Okay.
25        (Beilharz Exhibit

Page 83

1        Number Three marked
2        for identification.)
3  BY ATTORNEY ULAN:
4  Q.    I'll give you B-3.
5        ATTORNEY MEEK:
6        Here you can look at
7        this.
8  A.    Oh, I'm sorry.
9  BY ATTORNEY ULAN:
10  Q.    I believe this consists of
11  a form you filled out on top with a
12  release from the resident.
13  A.    Right.
14  Q.    And the remainder of this
15  document is extracts from the
16  clinical record at South Mountain?
17  A.    Uh-huh (yes).
18  Q.    That's what it is?
19  A.    Uh-huh (yes). Oh, I'm
20  sorry, yes, it is. Excuse me. I'm
21  sorry.
22  Q.    Am I correct that you did
23  complete the first part of this
24  document or record review?
25  A.    Yes, I did.

Page 84

1  Q.    And if you wish more time,
2  go ahead. Just let me know.
3        ATTORNEY MEEK:
4        You want her to look
5        at the entire document?
6        ATTORNEY ULAN:
7        No, not the chart
8        yet.
9        ATTORNEY MEEK:
10        All right.
11  BY ATTORNEY ULAN:
12  Q.    Do you know why this
13  resident came to PP&A's attention?
14  A.    No, I honestly don't. It
15  was another advocate who apparently
16  talked to this individual.
17  Q.    I'm sorry. It was
18  another?
19  A.    Another advocate.
20  Q.    Oh, I see. Okay.
21  A.    That spoke to the
22  individual and spoke to him about
23  signing the release, so, no, I
24  couldn't tell you.
25  Q.    All right. But the

Page 85

1  handwriting on this form is yours?
2  A.    Yes, it is.
3  Q.    Did you speak with him
4  personally or do you recall?
5  A.    I --- I don't recall. I
6  honestly can't tell you.
7  Q.    The first box at the top,
8  discharge issues, you wrote yes, but
9  he needs nursing facility because he
10  needs total care for ADL as a rehab
11  potential poor. Right?
12  A.    Uh-huh (yes). That came
13  from the records. That's not my
14  assessment.
15  Q.    Oh, well, that's --- yes,
16  that's what I'm trying to understand
17  this.
18  A.    That's not my assessment
19  of him. That came from the
20  records. It says over here has
21  professional staff team ready for
22  discharge and that's what they said
23  about him being ready for
24  discharge.
25  Q.    So do you understand this

Multi-Page™

Page 86

1  to mean that he can be discharged
2  but has to be another nursing
3  facility he goes to?
4  A.     That's what the staff
5  there are saying.
6  Q.     And what is filled in in
7  these other boxes on page one and
8  the subsequent pages of the document
9  captioned record review, they simply
10  represent what the records say.  Is
11  that fair, or do they represent your
12  conclusions based on the records?
13  A.     These look like they're
14  all what I took out of the record.
15  Q.     Is there any way for
16  someone other than yourself to look
17  at this document or any of the
18  similar documents and tell whether
19  the handwriting is simply a summary
20  of what the record at South Mountain
21  says as opposed to your views as to
22  it?
23  A.     Is there a way for someone
24  else?  Is that your question?
25  Q.     Yes.

Page 87

1  A.     To determine?
2  Q.     Yes.  In other words, if I
3  --- if I looked at this, I didn't
4  have you here to tell --- to walk me
5  through this and explain what this
6  means and that means and so forth,
7  is there a way someone --- for
8  example, let me be as specific as I
9  can.  I mean, you were already
10  through the first box about
11  discharge?
12  A.     Uh-huh (yes).
13  Q.     You say this reflects not
14  your opinion necessarily but this is
15  what's in the record.  On the second
16  page, on the second page four boxes
17  down, has family friend expressed a
18  desire for --- a sister hesitant for
19  discharge?
20  A.     Right.
21  Q.     Am I correct that that's
22  what the South Mountain record says,
23  it's not your independent
24  determination about what a sister
25  ---?

Page 88

1  A.     Right.  That's --- that's
2  --- I'm not saying those are the
3  words verbatim, but that's a
4  paraphrase.
5  Q.     But that is a record
6  summary or a paraphrase of what the
7  record has ---?
8  A.     Yes.  The only thing that
9  doesn't come completely from the
10  records from what I'm looking at
11  here the best that I can see ---
12  Q.     Yes.
13  A.     --- would be this notation
14  here.  Some of this is from
15  records.  That's why it's outside of
16  the box.  Some of it's from records
17  but some of it is not.  It --- the
18  first notation is my --- my
19  assessment of what's occurring that
20  they're not aggressively pursuing
21  discharge for him.  There is this 92
22  PA --- PA SID, that, of course, is a
23  notation that says --- that comes
24  from what that says.  The same with
25  the 1996.  But would someone just

Page 89

1  off the street be able to pick this
2  up and ---.
3  Q.     Right.
4  A.     No, because this was never
5  meant for someone off the street to
6  just pick up and use.  This was an
7  internal document for our use.
8  Q.     Do you know whether some
9  of the forms that you personally
10  filled out, this particular form
11  captioned record review, have a
12  mixture of your opinion or findings
13  along with the record mixed in the
14  boxed part so that your own opinion
15  is not necessarily limited to what's
16  written outside the box as in this
17  case?
18  A.     Without looking at each
19  and every one, I can't tell you.  I
20  would tell you for the most part, I
21  was trying to be as consistent as
22  possible about keeping what's inside
23  the box here, what I was reading in
24  the individual's record.
25  Q.     Am I correct that other

Multi-Page™

Page 90

1  PP&A staff use this same form,
2  you're not the only staff person who
3  uses this form?
4  A.    Correct.
5  Q.    Do you know whether other
6  staff followed the same rule?
7  A.    I believe that for the
8  most part people were putting into
9  the actual boxes what they were
10  finding in the record.
11  Q.    You personally distributed
12  this form to staff; is that correct?
13  A.    Yes, I did.
14  Q.    Did you provide specific
15  instruction about it?
16  A.    I provided general
17  instructions about it, yes.
18  Q.    But the general
19  instructions included that
20  particular issue that is what's in
21  the box is to be an accurate
22  reflection as opposed to ---?
23  A.    I don't believe I said
24  the staff you can only write in the
25  boxes exactly what you take out of

Page 91

1  the record. The assumption was that
2  if it was in the boxes it would be
3  based on something that they found
4  on the record. Now, could someone
5  have written a personal note in one
6  of those boxes to jog their own
7  memory when they got back to the
8  office, perhaps. I don't know.
9  Q.    This particular record
10  review is accompanied by excerpts
11  from a hospital record of what
12  appears to be maybe 50 pages or so,
13  an approximation. Now, apparently
14  not all these record reviews are
15  accompanied by copies of the
16  record. Some are, some aren't. Do
17  you know why some were and some
18  weren't?
19  A.    From the best that I can
20  recall, we chose to copy records
21  that demonstrated some of what we
22  were identifying here, or
23  demonstrated concerns perhaps that
24  we had about the individual. I
25  can't really be any more detailed

Page 92

1  than that.
2  Q.    Well, do I understand you
3  to say that if a record review form
4  is accompanied by substantial
5  excerpts from the --- from South
6  Mountain's records, that that means
7  it is more likely that PP&A find
8  something wrong with what South
9  Mountain is doing for that resident
10  than if it's not accompanied by the
11  excerpts?
12  A.    I don't know that that's
13  --- that's a correct assumption.
14  Some of it was a time issue, how
15  much we could get copied in the time
16  we were there. We --- if there's
17  some that don't have any records it
18  may have been our intention to go
19  back at a later date and copy them.
20  Q.    Okay. Thank you.
21      ATTORNEY ULAN:
22      Why don't we mark the
23      --- mark these --- wait a
24      minute. I've got one
25      that's not yours. Here.

Page 93

1      Let's save this for the
2      afternoon.
3      ATTORNEY FELLIN:
4      The ---.
5      ATTORNEY ULAN:
6      We have three copies
7      they just got mixed. This
8      will be B-4.
9      (Beilharz Exhibit
10      Number Four marked
11      for identification.)
12  BY ATTORNEY ULAN:
13  Q.    Pass that one down. When
14  you're done, just let me know.
15  A.    Okay.
16  Q.    Okay. This form you
17  filled out; correct?
18  A.    Yes, I did.
19  Q.    Do you know why this
20  resident came to PP&A's attention?
21  A.    Yes. Betty is an
22  individual that when we go on the
23  unit she very often is sitting in a
24  day room. She's the kind of
25  individual that's very open to

Page 94

1 people approaching her, saying hi,
2 how are you doing, would you like to
3 talk. We see Betty almost every
4 time we go down there, at least
5 enough to say hi, how are you
6 doing.
7 Q.    So initially at least, am
8 I correct, the connection between
9 PP&A and her arose out of the fact
10 that she was relatively gregarious
11 and talked to you and seemed to want
12 to talk and say ---?
13 A.    I don't know that I'd call
14 her gregarious, but when we
15 approached her, she was open to
16 speaking with us.
17 Q.    And is that enough to
18 trigger this document which is a
19 resident interview unlike the
20 earlier ones which were record
21 reviews?
22 A.    At this time when we were
23 doing this, yes.
24 Q.    Okay. So that you would
25 create a record or to your knowledge

Page 95

1 your staff, the people who worked
2 for you, would create a record like
3 this of any resident who would be
4 interviewed at least ---?
5 A.    When we were down there to
6 do formal interviews, yes.
7 Q.    All right. To do formal
8 interviews is when?
9 A.    Uh-huh (yes).
10 Q.    This was July 2000?
11 A.    Uh-huh (yes).
12 Q.    Is that when you're
13 talking about?
14 A.    Uh-huh (yes). I believe
15 we were there for two or three days
16 in July maybe. At least two days,
17 I'm pretty sure we were there.
18 Q.    And was that the first
19 time you were there to do formal
20 interviews?
21 A.    No. I think we --- oh,
22 boy. The dates are really running
23 together. If I'm not mistaken, we
24 had done something similar, maybe
25 the year before. To actually sit

Page 96

1 down and formally interview someone
2 and ask them specific questions
3 rather than just sharing with them,
4 you know, how are you doing, how are
5 things going, is there anything you
6 need help with, that sort of thing.
7 Q.    Do you know which of your
8 staff conducted most of these
9 interviews, at least in 2000?
10 A.    No, I --- I don't know.
11 Q.    Of all the resident
12 interviews conducted by PP&A staff,
13 do you have any sense of what
14 proportion you did yourself
15 personally?
16 A.    No, I don't. I believe I
17 did not do as many as other
18 individuals.
19 Q.    With respect to this
20 individual resident in B-4, do you
21 find anything inappropriate being
22 done by South Mountain for her or
23 any omissions, things they should do
24 that are not?
25 A.    Well, that's difficult to

Page 97

1 say based on this document alone.
2 This document indicates that at a
3 minimum the individual is not aware
4 of their being an aggressive effort
5 made to getting her back to
6 Allentown where she wants to go.
7 According to the individual, this is
8 someone who likes outings and that
9 sort of thing. She's not going out
10 to purchase her own clothing. It
11 comes from the South Mountain
12 supply. She likes cooking class and
13 we know that cooking class does not
14 occur on a or didn't occur on a very
15 frequent basis and it wasn't open to
16 allowing everyone who was interested
17 in going, going. So those things
18 appear to be a problem based on this
19 interview. In addition, if you look
20 at the last page ---
21 Q.    Yes.
22 A.    --- you'll see that
23 there's someone in the day room
24 who's making a lot of noise and it
25 is upsetting other people who are in

Page 98

1 the day room, but that's, you know,
2 there doesn't appear to be anything
3 going on to either assist the person
4 who's yelling or assist the other
5 people there.
6 Q.    Do you know whether you
7 personally or any other PP&A staff
8 said anything to South Mountain
9 staff about her care and about the
10 issues you've just raised following
11 this interview?
12 A.    Following this interview?
13 Q.    Yes.
14 A.    I --- I honestly don't
15 recall. I know that these general
16 concerns came up time and time again
17 and they were, in fact, shared with
18 the director of South Mountain, both
19 Mr. Buckus and Doctor Power.
20 Q.    But you don't recall
21 specifically about this interview or
22 ---?
23 A.    I ---.
24 Q.    Or as a result of this
25 interview?

Page 99

1 A.    I honestly don't.
2 Q.    With respect to your
3 earlier evaluations of residents,
4 B-1 through B-3, do you recall
5 whether you personally or other PP&A
6 staff approached any South Mountain
7 staff about any of the concerns
8 reflected in those evaluations?
9 A.    I --- I --- when you say
10 South Mountain staff, you're talking
11 about staff on each unit?
12 Q.    Any?
13 A.    Okay.
14 Q.    Whether it's from the ---?
15 A.    Well, as I said ---.
16 Q.    From the unit staff up to
17 the administrator, anybody.
18 A.    Okay. As I said, these
19 issues were fairly typical of issues
20 that we found there, both expressed
21 by residents and what we observed.
22 We did share those regularly with
23 the director. It would not --- I
24 can't say to you that I left this
25 room and went and got staff. I

Page 100

1 don't recall that I did that. It
2 would not have been atypical for us
3 to leave the room, go into the hall
4 and find a staff person and say this
5 person seems to be in distress.
6 Q.    Okay. And what you just
7 said refers back to B-1 through B-3?
8 A.    It ---.
9 Q.    And generally what you've
10 described?
11 A.    Generally it would not be
12 unusual. If we saw someone who was
13 in a lot of distress, who seemed to
14 be in a situation that needed
15 intervention and if it looked like,
16 given enough time, staff were not
17 going to intervene on their own, it
18 would not have been atypical for us
19 to grab a staff member going by, to
20 say this person seems to need some
21 help.
22 Q.    Okay. For all these four
23 cases, B-1 through B-4, you do not
24 have any specific recollection of
25 doing anything of that kind?

Page 101

1 A.    No, I don't, no.
2 Q.    Fine. Do you recall
3 whether Betty C█████ (phonetic) had
4 ever either been adjudicated
5 incompetent or had been determined
6 incompetent by the doctor?
7 A.    I don't recall off the top
8 of my head, no.
9 Q.    And there is no place on
10 this form to record that
11 specifically; is that right?
12 A.    No. This is an interview
13 form. I would not have asked an
14 individual if they had been
15 adjudicated incompetent.
16 Q.    Do you consider it to be
17 of no particular consequence whether
18 a person's adjudicated incompetent
19 or not or determined by the doctor
20 to be incompetent or not?
21 A.    Not simply for me to talk
22 to them, no.
23 Q.    But to find out their
24 circumstances and some issues
25 related to mental health or any of

Page 102

1  the things in here, you don't need
2  to know whether they're competent or
3  incompetent?
4  A.    For someone to share with
5  me how they're feeling about where
6  they might want to live or what
7  staff are telling them about what
8  they're doing to find a place for
9  them to live.
10  Q.    Right.
11  A.    I don't see as
12  particularly important based on
13  during an interview process to
14  determine whether or not they're
15  competent or incompetent.  If
16  they're clearly hallucinating when
17  they're talking to me, I'm going to
18  understand that their answers may
19  not be reliable.  That's not the
20  case with Betty.  Betty was clear
21  and Betty from --- I can remember
22  from the times I've talked to her,
23  Betty's pretty consistent about what
24  she wants.
25  Q.    Do you understand the

Page 103

1  difference between delusions and
2  hallucinations?
3  A.    Yeah --- well, I believe
4  in a gross sense I do, yes.
5  Q.    And in a gross sense, the
6  difference is what?
7  A.    Well, a hallucination is
8  something that usually is to my
9  understanding a sensory --- it
10  involves the senses where something
11  is not --- you can have an olfactory
12  hallucination where you smell
13  something it's not really there.
14  You think you see something it's not
15  really there.  You think you hear
16  something, it's not really there.
17  Q.    And a delusion is what?
18  A.    A delusion?  You're
19  deluded.  You have a misperception
20  about something.
21  Q.    But smelling something
22  that's not there is a misperception,
23  is it not?
24  A.    It is, but it --- I guess
25  I'm having problems defining it more

Page 104

1  closely.  And I said I have a gross
2  understanding of the difference.
3  Q.    All right.  This one's
4  B-5.
5        (Beilharz Exhibit
6        Number Five marked
7        for identification.)
8  BY ATTORNEY ULAN:
9  Q.    Okay.  B-5, you completed
10  this form, record review?
11  A.    Yes, I did.
12  Q.    All right.  Do you know
13  why this resident came to PP&A's
14  attention?
15  A.    Yes.  We were on the unit
16  and observed him and observed that
17  he had significant scratching on his
18  face.  And if I remember correctly
19  when we asked staff about it, they
20  told us it was a behavioral issue.
21  Q.    Most of these boxes on
22  this form are not filled out except
23  for the first that says no medical
24  fragile in the box marked discharge
25  issues.

Page 105

1  A.    Right.
2  Q.    So first of all, no
3  medically fragile, am I correct this
4  represents what the record says, is
5  not necessarily PP&A's opinion?
6  A.    Yes, that's correct.
7  Q.    The reason that the first
8  box is the only one filled out and
9  there's lots and lots of other boxes
10  here is why?
11  A.    Because we looked at this
12  individual's chart specifically to
13  look at the behavioral issues that
14  we were told he had that led to the
15  scratching on his face.
16  Q.    All right.  Was anything
17  done in this case by way of advising
18  South Mountain staff of the problem
19  that you specifically can recall?  I
20  know the general answer you already
21  gave, but specifically with respect
22  to this case?
23  A.    Yes.  In this case, I
24  believe we spoke with Doctor Power
25  and shared our concern about the ---

Page 106

1 the lack of a behavioral plan,
2 behavioral treatment for this
3 individual and our concern about the
4 scratches on his face.
5 Q.    Okay.  And the --- when
6 you say we, you include yourself
7 personally?
8 A.    Yes.
9 Q.    Yes?
10 A.    Yes.
11 Q.    All right.  Do you recall
12 what Doctor Power said or did in
13 response to this concern?
14 A.    I honest --- I honestly
15 don't.  I'm trying to think.  And
16 thinking back on it, it may not have
17 been me personally and I'll tell you
18 why.  It was very late at night.  In
19 fact, I think it was one of these
20 nights we were there it was like
21 after midnight or 1:00 in the
22 morning.  It may have been at the
23 time of our next visit and it may
24 have been Marg.  So I'm --- I'm
25 thinking I spoke to him about it,

Page 107

1 but it may have been Marg.  I'm not
2 sure.
3 Q.    And Marg who ---?
4 A.    Margaret Leed on our
5 team.  When she went back she may
6 have addressed it with him.
7 Q.    Okay.  All right.  Any
8 particular reason, any medical
9 record or substantial extracts from
10 medical record are appended in the
11 case?
12 A.    Yes, because it --- it ---
13 in looking through the record, we
14 saw nothing that indicated that this
15 gentleman had a behavior management
16 plan and this simply supports that.
17 Q.    I see.  Okay.  Fine.
18       ATTORNEY ULAN:
19       Okay.  B-6.
20       ATTORNEY FELLIN:
21       Six.
22       ATTORNEY ULAN:
23       Right.
24       ATTORNEY MEEK:
25       Six.

Page 108

1       (Beilharz Exhibit
2       Number Six marked for
3       identification.)
4 BY ATTORNEY ULAN:
5 Q.    You completed this record
6 review form; correct?
7 A.    Yes, I did.
8 Q.    Do you recall the reason
9 that this resident came to your
10 attention?
11 A.    This man is someone that
12 prior to us going down for a few
13 days in July, Margaret had been
14 talking with him on and off and had
15 been concerned about, at least this
16 is to the best of my recollection,
17 she was concerned about the fact
18 that he was identified as someone
19 who had behavioral issues, but she
20 didn't see anything going on to
21 address those issues.  In addition
22 to the fact that in her estimation
23 it looked as if his wheelchair
24 didn't fit.  And he --- there were
25 concerns about his not getting his

Page 109

1 teeth.  He was having difficulty
2 speaking.  He apparently had
3 indicated in --- that he wanted to
4 live in the community so we took a
5 look at his record just to see what
6 we could find primarily about the
7 behavioral stuff which apparently
8 there wasn't much of anything there
9 or at least to the best of my
10 recollection there wasn't.
11 Q.    That's why the record is
12 appended to this?
13 A.    Yes.
14 Q.    To show the absence of a
15 behavioral plan?
16 A.    You know, I'm honestly not
17 sure with this one.  To be honest
18 with you, I'm not sure.
19 Q.    Am I correct that in this
20 case as in the earlier case, the
21 writing outside the boxes reflects
22 your own conclusions and so forth
23 and the writing in the boxes is a
24 summary of what ---?
25       ATTORNEY MEEK:

Page 110

```
 1        I'm going to object
 2   to that characterization,
 3   because the testimony
 4   earlier was that it was a
 5   mixture of both, a summary
 6   of the records as well as
 7   own --- her own notes in
 8   the prior document that
 9   had that kind of markings
10   which was B-3.
11        ATTORNEY ULAN:
12        I don't recall her
13
14        ATTORNEY MEEK:
15        That is the testimony
16   and if you want the
17   Reporter to read it back,
18   I'd be happy to ask that
19   ---.
20        ATTORNEY ULAN:
21        Well, the witness ---
22   the witness can respond to
23   the question and say that
24   it is or is not in general
25   ---.
```

Page 111

```
 1        ATTORNEY MEEK:
 2        Well, what I'm
 3   objecting to is the
 4   question, which I'm
 5   permitted to do because
 6   the question
 7   mischaracterizes the
 8   previous testimony,
 9   Howard.  That's what I
10   just said.
11   BY ATTORNEY ULAN:
12   Q.   Ms. Beilharz, in this
13   particular document, B-6, am I
14   correct that the handwriting in the
15   boxes which in this case is limited
16   to the top of the first page, the
17   bottom of the third page, the bottom
18   of the fourth page, is essentially a
19   paraphrase of what is in South
20   Mountain's record?
21   A.   Yes, that appears to be
22   what it is.
23   Q.   The writing outside the
24   box is?
25   A.   It's ---.
```

Page 112

```
 1   Q.   Apparently some commentary
 2   such as excessive amount of time to
 3   get teeth and the like?
 4   A.   Some of it's commentary.
 5   Some of it's a notation of an
 6   observation, no behavior management
 7   plan.  And some of it is actually I
 8   believe the last two, where we have
 9   the slashes wants to live in
10   community, whirlpool one time a
11   week, no bath, shower, I believe
12   that comes directly from the
13   record.  As does the information at
14   the top, the date of admission, from
15   Hornersville, date of birth and the
16   county.
17   Q.   Well, what --- all right.
18   So the notation outside the box,
19   wants to live in the community, now
20   is there a reason why that is
21   written there as opposed to on page
22   two where there is a specific box
23   for, has resident expressed a desire
24   to live in an NF home, community or
25   family?
```

Page 113

```
 1   A.   No, except that to be
 2   honest with you, as I was going
 3   through the file, I would find
 4   things and if I couldn't rapidly
 5   find a place, a box, an appropriate
 6   box, I might stick it out in the
 7   column, but that would be the only
 8   reason.
 9   Q.   And the reason most of the
10   boxes I would roughly eye ball this
11   as saying 80 percent of the boxes
12   are not filled in at all is what?
13   A.   You know, I honestly don't
14   know.  I'm not sure.  I don't know
15   if I was doing it quickly because I
16   needed to go off and do something
17   else.  I honestly don't know.
18   Q.   And I don't believe I've
19   asked you with respect to this
20   individual on this document, the ---
21   whether or not this was brought to
22   the attention of South Mountain
23   staff, the concerns you had.  Do you
24   have a specific recollection of
25   that?
```

Page 114

1 A.    I --- specifically to
2 Richard, I can't say. I know that
3 in general, after reviewing, talking
4 with a number of people, having
5 staff say to us on a number of
6 occasions where we would ask about a
7 certain issue, oh, that's a
8 behavioral issue, or they can't go
9 outside because of their behavior,
10 whatever, and seeing a lack of
11 behavior management plans in the
12 files, we did, in fact, address that
13 very specifically with Doctor Power
14 on more than one occasion.
15 Q.    Okay. But specific
16 recollection as to him, you don't
17 have at this time?
18 A.    I honestly don't.
19 Q.    Fine.
20 A.    I don't recall.
21 Q.    That's all right. Okay.
22 I think this is the last of these
23 documents. B-7.
24        (Beilharz Exhibit
25        Number Seven marked

Page 115

1        for identification.)
2        ATTORNEY MEEK:
3        There, thanks.
4 A.    Thanks. Okay.
5 BY ATTORNEY ULAN:
6 Q.    Okay. This individual on
7 B-7, any reason why --- do you
8 recall the reason why this
9 individual came to PP&A's attention?
10 A.    I believe Charlotte is
11 someone that from early on or for
12 quite awhile had been talking to us
13 about wanting to leave. And staff
14 were talking about she should be
15 leaving relatively soon. And then
16 she didn't leave and didn't leave
17 and didn't leave. So I think that's
18 what prompted taking a closer look
19 at her situation.
20 Q.    In this case, nearly every
21 --- well, not nearly every, but 80
22 percent of the boxes are filled
23 out. Do you know why in this case
24 nearly 80 percent of the boxes are
25 filled out?

Page 116

1 A.    No. Just that would ---
2 probably the things we were looking
3 at were pretty obvious in the
4 record, pretty easy to find.
5 Q.    And substantial excerpts
6 from the record are appended in this
7 case.
8 A.    Uh-huh (yes).
9 Q.    For what reason, do you
10 recall?
11 A.    Well, I believe that our
12 concern here was two fold. This is
13 a woman who appears rather capable;
14 she is someone that likes to be
15 active but was expressing concern
16 about not having access to or the
17 opportunity to be involved in
18 activities as often as she'd like,
19 in addition to the fact that she
20 clearly has a behavior where she's
21 picking at her arms when she was
22 bored or concerned about what was
23 going with that. And the fact that
24 she's someone that it appears
25 everyone's saying she has good

Page 117

1 potential for discharge, she's
2 interested in being discharged but
3 nothing is happening.
4 Q.    And do you have any
5 specific recollection of bringing
6 these issues to the attention of any
7 South Mountain staff?
8 A.    Yes, again, Doctor Power.
9 This --- I was there when on at
10 least one occasion when Charlotte's
11 situation was discussed with him. I
12 know also that either in --- either
13 in one of our reports that went to
14 South Mountain or in a separate
15 letter, and I --- I very honestly
16 don't remember at this time which it
17 was, we very specifically talked
18 about an experience that Charlotte
19 had had with looking at a placement
20 in the community that seemed
21 extremely inappropriate.
22 Q.    Inappropriate because?
23 A.    Because Charlotte uses a
24 wheelchair, is compensate dependent
25 on that as her primary means of

Page 118

1  mobility.  She is or was at that
2  time very excited about leaving
3  South Mountain and she was taken by
4  the social worker, I believe it was,
5  to visit either a personal care home
6  or a group home or some sort of
7  community setting where there were
8  steps involved.  She was very
9  excited about going, got there,
10  found out there were steps, was told
11  that she couldn't go there because
12  of the steps, she was devastated.
13  And it seemed like a very
14  inappropriate thing to do to
15  someone.  Why had that not been
16  explored prior to her visit at the
17  nursing --- at the community home?
18  Q.    Do you recall when that
19  happened, was that something that
20  happened in 2000 or the year before
21  or the year ---?
22  A.    I don't.  I don't recall.
23  It was not the very distant past
24  from what I remember.
25  Q.    Okay.

Page 119

1  A.    But I don't recall the
2  year.
3  Q.    All right.  Ms. Beilharz,
4  when all this relatively intensive
5  activity was going on during 19 ---
6  during 2000, in the summer roughly
7  or late spring or sometime in 2000,
8  these documents were generated ---
9  the last several documents were
10  generated I believe in July of 2000?
11  A.    Uh-huh (yes).  But we also
12  had intensive activity, activity as
13  early as February.
14  Q.    Earlier that year.  All
15  right.  Beginning in February and
16  going through July, there were some
17  going --- some things in August, I
18  believe, in any event, and there was
19  this concern about various residents
20  as you have just described as well
21  as general conditions there, did
22  you, and I mean either you
23  personally or anybody on PP&A's
24  staff or management, and so forth
25  --- you report directly to

Page 120

1  Mr. Casey; is that correct?
2  A.    Sharon Potter.
3  Q.    Or you report to Sharon
4  Potter?
5  A.    Yes, I do.
6  Q.    She reports to Mr. Casey?
7  A.    Yes.
8  Q.    To your knowledge, did
9  anyone consult with a licensed
10  health care or human services
11  professional about any of these
12  matters at that time?  I mean, not
13  at South Mountain.  I mean, somebody
14  you would retain or hire or consult
15  with or whatever, doctor, nurse,
16  social worker, but I'm talking about
17  a licensed health care or human
18  services professional to determine
19  how bad things really are or
20  whatever?
21  A.    We did.  We did I guess
22  you could say consult.  It was very
23  informal, with an individual sort of
24  on a very casual running basis but I
25  can't honestly tell you when it

Page 121

1  began.
2  Q.    What professional are you
3  talking about?
4  A.    This was a person who was
5  an OT.
6  Q.    Is this Mr. Hawk?
7  A.    Yes, it is.
8  Q.    All right.  My
9  understanding is that he ultimately
10  became an OTA which is --- I think
11  is an assistant?
12  A.    Right.
13  Q.    Is that ---?
14  A.    But he is licensed, I
15  believe.
16  Q.    As an occupational therapy
17  assistant?
18  A.    Yes.
19  Q.    Do you know when he became
20  licensed?
21  A.    I honestly don't.
22  Q.    All right.  Apart from
23  Mr. Hawk, then to your knowledge
24  there was no consultation during
25  this time ---

Multi-Page™

1 A.    I'm trying ---.
2 Q.    --- from February through
3 July at least or perhaps after
4 August?
5 A.    From what I can recollect
6 at this point in time, nothing,
7 nothing formal.
8 Q.    Something informal?
9 A.    I --- well, I don't know.
10 I'm --- I'm trying to remember
11 conversations we've had with
12 people. I don't recall anything
13 now.
14 Q.    Do you know of any reason
15 why such consultation was not
16 sought? You just didn't have the
17 money to do it or some other reason?
18 A.    Well, we were in the
19 process of looking at what was going
20 on at South Mountain.
21 Q.    Right.
22 A.    Gathering information to
23 try and come up in our own minds
24 with what we thought might be going
25 on. It wasn't at that time

1 something we were ready to take to a
2 professional.
3 Q.    Well, what --- what would
4 make you ready?
5 A.    I guess if we were going
6 to do something more substantial
7 than just take a look at what was
8 going on and try and work with
9 Doctor Power around correcting some
10 of the issues. You know, during the
11 course of our conversations over
12 months with Doctor Power, to bring
13 many of these things to his
14 attention, he did not disagree that
15 there were problems.
16 Q.    Did he generally respond
17 in a way that you thought was
18 appropriate when it was brought to
19 his attention?
20 A.    He would promise to look
21 into it. He would on some occasions
22 indicate that he knew something we
23 had brought to his attention was a
24 problem.
25 Q.    And do you know whether he

1 did or did not fix the problems?
2 A.    I know that he looked into
3 them. To say which problems he
4 fixed or didn't fix, I can't tell
5 you off the top of my head.
6 Q.    Do you have any records
7 which would reveal that?
8 A.    Only his correspondence to
9 us about things he would or would
10 not have done.
11        ATTORNEY ULAN:
12        Okay. We can break
13 for lunch if that's
14 acceptable to everybody.
15        ATTORNEY MEEK:
16        Yeah, do you know
17 what --- if we ---
18 assuming we take an hour
19 ---.
20        ATTORNEY ULAN:
21        Yeah.
22        ATTORNEY MEEK:
23        Do you know what time
24 you're going to wrap up
25 today with ---.

1        ATTORNEY ULAN:
2        Well, the major thing
3 left is the stuff in the
4 Complaint. And the
5 question is whether she
6 has personal knowledge of
7 the stuff in there and if
8 it's not as much as
9 Margaret Leed had then
10 it's going to be less than
11 Margaret Leed.
12        ATTORNEY MEEK:
13        Okay, okay.
14        ATTORNEY ULAN:
15        And that's what you
16 know and I don't really,
17 how lengthy that's going
18 to be. I mean, I'm only
19 interested in what she
20 knows.
21        ATTORNEY MEEK:
22        You can ask her now.
23 I mean, you can find out.
24        ATTORNEY ULAN:
25        Well, let's go off

Multi-Page™

Page 126

1 the record for this.
2       ATTORNEY MEEK:
3       Okay.
4 (LUNCH BREAK TAKEN FROM 12:36 P.M.
5 TO 1:36 P.M.)
6       ATTORNEY ULAN:
7       Before we get to the
8   Complaint, I just want to
9   clarify a couple things
10   you said before lunch.
11 A.   Okay.
12 BY ATTORNEY ULAN:
13 Q.   I believe you said that
14 you judge the quality of life at
15 nursing homes or the quality of
16 nursing homes if I recall by
17 comparing it to life in the
18 community. Is that ---?
19 A.   The quality of life in the
20 community.
21 Q.   Right. In this context
22 does --- for someone who is in a
23 nursing home, is community other
24 nursing homes for South Mountain
25 residents? Does community include

Page 127

1 other nursing homes?
2 A.   I think I said before that
3 for the most part it seems that most
4 people at South Mountain could live
5 in a community home not community
6 nursing home, a community home.
7 Q.   By which you mean a group
8 home; is that right?
9 A.   Well ---.
10 Q.   Of what you described
11 earlier?
12 A.   I wouldn't necessarily
13 call it a ---.
14 Q.   Two or three or four
15 people?
16 A.   Yeah, yeah.
17 Q.   But for those --- for
18 those whatever percentage it is who
19 cannot live in group homes, do you
20 consider transfer from South
21 Mountain to another nursing home, a
22 transfer to, quote, the community,
23 unquote?
24 A.   I don't know. I haven't
25 really thought about it.

Page 128

1 Q.   What factor --- leaving
2 aside your decision which you
3 haven't thought about, what factors
4 would affect your conclusion when
5 --- if you do think about it, what
6 do you think about?
7 A.   I would think about, one,
8 first what level of care would they
9 need that only a nursing home could
10 give them that a community
11 arrangement, a community residential
12 arrangement could not. And I would
13 also have to consider the location
14 of South Mountain in comparison to
15 if it was someone that absolutely
16 could live no place else, to a
17 community nursing home, connection
18 with family, connection with former
19 friends, that's important for
20 people.
21 Q.   You also mentioned that of
22 the roughly two dozen nursing homes
23 in Pennsylvania that you have
24 visited during the period from 1990
25 to present, that there were some

Page 129

1 that were I believe your phrase was
2 within walking distance of shopping
3 areas, either like a downtown area
4 or maybe a mall or something like
5 that. Is that correct?
6 A.   Yes.
7 Q.   Do you have any sense of
8 how many that was, whether it's one
9 or two or ---?
10 A.   No.
11 Q.   More ---?
12 A.   No.
13 Q.   All right.
14 A.   I honestly couldn't say.
15 Q.   When you say that there
16 were whatever the number was and you
17 use the term walking distance of the
18 nursing home, what do you consider
19 to be walking distance for nursing
20 home resident?
21 A.   Well ---.
22 Q.   One block, ten blocks?
23 A.   It obviously depends on
24 the person's abilities, but
25 typically for someone that has ---

Page 126 - Page 129

Multi-Page™

Page 130

1 has mobility walking or uses a power
2 chair and has safety skills, half a
3 mile.
4 Q.    During any of these visits
5 did you actually see someone walking
6 or using a power chair to go from
7 the nursing home to the shopping
8 area?
9 A.    I have seen people using
10 the local transportation system.
11 Q.    By which you mean what,
12 buses or cabs or what?
13 A.    Using either county
14 transportation, specialized
15 transportation or what was the other
16 situation, I believe if I'm not
17 mistaken, I saw someone using ---
18 may have been county
19 transportation.
20 Q.    By this you mean like a
21 van that can take wheel chairs and
22 so forth?  Is that what you mean by
23 county transportation?
24 A.    It's the transportation
25 that the county --- many counties

Page 131

1 offer to senior-aged individuals.
2 Q.    But it is a van of some
3 kind, is it not?
4 A.    Yeah, it's like an
5 adaptive van.
6 Q.    Right.
7 A.    But it's part of the
8 county transportation system.
9 Q.    I understand.
10 A.    And families.  We also
11 have seen a lot of families coming
12 in to get their loved ones and
13 taking them out.
14 Q.    Do you know how often
15 South Mountain provides a similar
16 service to take ---?
17 A.    What similar service.
18 Q.    Advance or some kind of
19 motor transportation to take people
20 off to a shopping area?
21 A.    We know that the
22 recreation staff attempt to do that
23 on at least a monthly basis, but
24 that's only for a very few people
25 there, because they can only

Page 132

1 transport so many people at a time.
2 Q.    You mentioned that there
3 exists already Pennsylvania group
4 homes two, three, four, residents
5 that do have 24-hour nursing
6 service, licensed nursing staff.  Is
7 that correct?
8 A.    Yes.
9 Q.    Do you know how many such
10 facilities exist in Pennsylvania?
11 A.    Well, off the top of my
12 head, no, I don't.  But I know it's
13 a relatively large number.  We're
14 not talking five or ten.  We're
15 talking hundreds.
16 Q.    Do you know whether these
17 are for individuals who are mentally
18 retarded as opposed to mentally ill
19 or both or ---?
20 A.    Some.  Some of the
21 individuals there have mental
22 retardation, but there are a large
23 number of individuals that have
24 mental retardation and mental
25 illness, they're dualy diagnosed.

Page 133

1 Q.    These hundreds of
2 facilities that you believe have
3 licensed 24-hour nursing staff on
4 site, to your knowledge are they
5 scattered throughout the State or
6 located in any particular place?
7 A.    As far as I know they're
8 scattered across the State.  And I
9 --- I need to back up.  I'm really
10 not sure on the number, but I know
11 it's a relatively large number, but
12 I don't want to --- it's more than
13 five or ten, let's put it that way.
14 Q.    Okay.
15 A.    And they are scattered
16 across the State.
17 Q.    Do you know the names of
18 any providers of this particular
19 service there?
20 A.    Sure.  I know RedCo is a
21 provider.  Skills is a provider.
22 I'm trying to think of some of the
23 others.  Allegheny Valley, those are
24 the ones that come to the --- to
25 mind off the top of my head.

Multi-Page™

---

Page 134

1  Q.    And the reason you are
2  aware of these particular facilities
3  is what?  Have you visited them or
4  what?
5  A.    Yes.  Oh, yes.  We know
6  people who have moved from
7  institutional settings into those
8  types of facilities.
9  Q.    Which ones have you
10 personally visited that have 24-hour
11 on-site nursing staff?
12 A.    Well, just Tuesday I was
13 at a program in Montandon with ---.
14 Q.    I'm sorry.  Where?
15 A.    Montandon, Pennsylvania,
16 with 24-hour on-site nursing staff.
17 Q.    Just so that this is
18 clear, by nursing staff, I mean
19 either licensed practical nurse or
20 RN?
21 A.    Yes.  And director of
22 nursing.  I mean, not just --- they
23 have someone who supervises the
24 nurses as well as nursing staff.
25 Q.    Is the supervisor on-site

---

Page 135

1  also?
2  A.    Yes.
3  Q.    Is the supervisor around
4  24 hours?
5  A.    There --- yes, I believe
6  in this facility there is.
7  Q.    How big is this facility?
8  A.    It serves five people.
9  Q.    So it has two nurses round
10 the clock?
11 A.    It --- it may not have two
12 nurses on the overnight shift but on
13 the other shifts, yes, it's my
14 understanding.
15 Q.    Can you describe the
16 residents at this facility?
17 A.    Sure.  All five
18 individuals have some level of
19 mobility impairment.  Two --- I
20 think it's two individuals use
21 motorized wheel chairs.  Two
22 individuals use non-motorized wheel
23 chairs, manual chairs.  At least one
24 person uses a feeding tube.  At
25 least one person gets injections.

---

Page 136

1  Everyone received routine
2  medications.
3  Q.    When you say feeding tube?
4  A.    Uh-huh (yes).
5  Q.    Is the feeding tube
6  through the stomach or ---?
7  A.    Yes, it is.  Yes, it is.
8  Q.    And the provider agency,
9  I'm sorry?
10 A.    That provider agency
11 happens to be RedCo.
12 Q.    RedCo.  Okay.  Any others
13 that you visited?
14 A.    Geez, it's been a while.
15 I think it's probably been a couple
16 years since I've been in one then.
17 I'm foggy.
18 Q.    Do you know whether any of
19 the other PP&A staff have visited
20 any other facilities of this kind?
21 A.    Yes.
22 Q.    Recently?
23 A.    Yes.
24 Q.    Who?
25 A.    Diana Haugh on our team.

---

Page 137

1  I hear other individuals in the
2  agency talk about going to them and
3  I couldn't tell you where they are
4  or when they've been, but I mean
5  it's not uncommon for us to be going
6  to these types of programs.
7  Q.    Okay.  Let us turn then to
8  the Amended Complaint in this
9  matter, which we'll mark as B-8.
10            (Beilharz Exhibit
11            Number Eight marked
12            for identification.)
13 A.    This is the one we marked
14 up so ---.
15            ATTORNEY FELLIN:
16            Why don't we mark
17            this one officially.
18            ATTORNEY ULAN:
19            Here.
20 OFF RECORD DISCUSSION
21 BY ATTORNEY ULAN:
22 Q.    Ms. Beilharz, we discussed
23 before breaking for lunch
24 identification of those factual
25 claims that are made in the

---

Page 134 - Page 137

Multi-Page™

Page 138

1 Complaint concerning which you might
2 have personal knowledge, that is,
3 you saw it or you heard it or you
4 smelled it. And I believe the ---
5 you decided that this should begin
6 at paragraph 25 of the Complaint.
7 And if you could begin with the
8 first paragraph beginning at 25, and
9 going forward, about which you have
10 personal knowledge.
11 A.    Okay.
12 Q.    Please let me know.
13 A.    Paragraph 25, talks about
14 the fact that the majority of
15 residents are not discharged from
16 South Mountain.
17 Q.    Right.
18 A.    But leave when they die.
19 Q.    Yes.
20 A.    I reviewed the death
21 reports.
22 Q.    Yes.
23 A.    And for the year that we
24 began down there, I think it was
25 '99.

Page 139

1 Q.    Yes.
2 A.    It was something like ---
3 I'll say off the top of my head, 20
4 percent of their population died
5 that year, and it was only a matter
6 of a few people, maybe a handful
7 that were actually discharged but
8 clearly the vast majority of people,
9 the decrease in census was coming
10 from death. And if you look at the
11 census in the next years, you'll see
12 that still most of the people remain
13 there. A lot of people, a number of
14 people die, but there are very few
15 people --- I mean, it's a factual
16 thing. If you look at the census
17 and how people are leaving.
18 Q.    Do you have any statistics
19 on how that would compare to other
20 nursing homes or nursing homes in
21 general?
22 A.    No. No, I don't.
23 Q.    All right. 26?
24 A.    Yes. As I stated earlier,
25 my nose is not the best nose for

Page 140

1 this, but I do recall on one
2 occasion being on the dementia unit
3 and there being an overwhelming odor
4 of feces.
5 Q.    About what time of day was
6 it, do you recall roughly, morning,
7 afternoon, evening?
8 A.    It was before lunch.
9 That's --- that's about all that I
10 can remember.
11 Q.    Did you say anything to
12 staff about it at that point?
13 A.    Yes, we did. We mentioned
14 the fact that there was ---.
15 Q.    Unit staff? That was unit
16 staff?
17 A.    Yes. That the odor was
18 pretty strong and they mentioned,
19 yeah, well, they were changing
20 people and that sort of thing.
21 Q.    All right. 27?
22 A.    No.
23 Q.    All right. 28?
24 A.    No.
25 Q.    All right. Why don't you

Page 141

1 just pick up the next one where the
2 answer's yes?
3 A.    Okay. 28A, yeah, the
4 staff failed to assure that bathroom
5 doors are closed on every occasion
6 except for occasions when they've
7 either known ahead of time that
8 we're coming or when we've been
9 there a series of days in a row, we
10 have --- I've observed personally
11 bathroom doors being left open.
12 Q.    All right. Now, just when
13 you say bathroom door, is this the
14 door to a toilet stall or the door
15 to the bathroom which ---?
16 A.    Door to the bathroom. B,
17 I don't have any information about
18 that.
19 Q.    All right.
20 A.    29, I, in fact, have been
21 on different units during my visits
22 there when people have been lying in
23 bed asleep with the doors open. And
24 it's all hours of the day.
25 Q.    All right. And --- and

Multi-Page™

Page 142

1 this is objectionable, because the
2 resident is asleep or because the
3 door is open while asleep? What's
4 the concern about this?
5 A.    Well, the objection here
6 is the fact that they're trying to
7 rest and the doors are wide open.
8 It's a very noisy environment.
9 There's no privacy.
10    30, the information I have
11 about that is, every time I'm there,
12 the --- especially in the hallways,
13 the environment is noisy. If anyone
14 is having difficulty, if they're
15 having any sort of behavioral
16 episode, it's --- the noise is very,
17 very loud.
18 Q.    31?
19 A.    No.
20 Q.    All right.
21 A.    32, no. 33, no.
22 Q.    Okay.
23 A.    34, 35, 36, 37, down to
24 37.
25 Q.    Okay.

Page 143

1 A.    I personally observed from
2 what I can remember just about every
3 visit there seeing someone that
4 either has soiled clothing, their
5 hair seems to be mussed or
6 ill-fitting shoes. That's pretty
7 common. Number 38, in reviewing the
8 records, their records establish
9 that they get a bath or shower only
10 once a week.
11 Q.    Do you know what other
12 kind of hygiene is done in between?
13 A.    No.
14 Q.    All right.
15 A.    I just know that their
16 records reflect they get a bath or
17 shower only once a week.
18 Q.    Okay. 39?
19 A.    Again, this is an issue of
20 the record. Residents having DNR
21 orders.
22 Q.    Okay. So your knowledge
23 of 39 is from the record; is that
24 right?
25 A.    Right, uh-huh (yes).

Page 144

1 Q.    All right.
2 A.    Again, 41, the records
3 reflect that staff or relatives ---.
4    ATTORNEY MEEK:
5    You skipped 40.
6 A.    Yeah, I --- nothing about
7 39 or --- or nothing about 40,
8 sorry. 41, the records reflect that
9 relatives or staff are signing off
10 on DNR orders. Nothing on the next
11 page.
12 BY ATTORNEY ULAN:
13 Q.    Okay.
14 A.    Number 45, I have been
15 there when we've talked to Doctor
16 Power about the fact that placing
17 people in reclined positions after
18 eating places them at risk, and I
19 have seen the report that was
20 completed by their consultant in
21 November of '99. The next item
22 would ---.
23 Q.    All right. Stop ---?
24 A.    Uh-huh (yes).
25 Q.    We're stopping at 45?

Page 145

1 A.    Uh-huh (yes).
2 Q.    And then going to the next
3 ---?
4 A.    Going to 49.
5 Q.    Okay.
6 A.    And that's an observation.
7 Q.    All right.
8 A.    That a number of people
9 are in wheel chairs or that a number
10 of people cannot independently
11 ambulate.
12 Q.    All right.
13 A.    What I know about 50 is
14 the fact that a large number of
15 people I've observed there in wheel
16 chairs without the foot rests with
17 their legs dangling. Again 51, when
18 I'm there I observe people in their
19 geri chairs. And people are put in
20 positions where they can't maneuver
21 themselves and need assistance from
22 aides to maneuver them from one
23 place to another. Personally
24 witnessed people sitting in one
25 position for hours at a time. That

Page 146

1 goes to 52 as well.
2 Q.    In the case of 51 or 52,
3 are these matters about which you
4 spoke to either the unit staff or to
5 management?
6 A.    Yes.
7 Q.    And what was the reaction
8 of unit staff to management?
9 A.    Management said they would
10 look into it.
11 Q.    And do you know whether
12 they had done so or not?
13 A.    I believe they've looked
14 into it. I don't know what their
15 remedy has been.
16 Q.    What's the next item?
17 A.    53, the use of sling wheel
18 chairs. Again, it's an
19 observation. Every time I'm there.
20 From there, I go to number 62.
21        ATTORNEY MEEK:
22        56.
23 A.    Did I skip one? Oh,
24 okay. I --- I've never personally
25 witnessed anyone at South Mountain

Page 147

1 using a motorized wheelchair.
2 Sorry.
3 BY ATTORNEY ULAN:
4 Q.    Okay.
5 A.    62, this is when we
6 brought the issue of psychiatric
7 services and behavioral services to
8 the lack of what we thought was a
9 lack of those services being
10 provided to Doctor Power's
11 attention. This is information that
12 he gave us about not having a
13 psychologist on staff.
14 Q.    And approximately when are
15 you talking about, is that 2000 or
16 back in '99, do you recall?
17 A.    I believe it was in 2000
18 sometime.
19 Q.    Okay.
20 A.    I couldn't tell you
21 exactly when. 65, again, this is a
22 combination of having staff tell us
23 that a particular thing that's going
24 on with an individual is a
25 behavioral issue, reviewing records

Page 148

1 and not seeing a behavioral
2 management plan, and then again
3 discussing it with Doctor Power and
4 him confirming that, no, they did
5 not have behavioral management
6 capabilities. Skipping over to 73.
7 Q.    All right. By skipping
8 over, you mean that's the next one?
9 A.    Right.
10 Q.    That you have personal
11 knowledge about?
12 A.    Right.
13 Q.    Okay.
14 A.    Right. With the exception
15 of the two announced visits that we
16 made, we have on every other
17 occasion observed people sitting for
18 extended periods of time and that
19 means more than an hour, oftentimes
20 two or more hours with absolutely
21 nothing to do.
22 Q.    By absolutely nothing to
23 do, if the television is on do you
24 count that as absolutely nothing to
25 do or what?

Page 149

1 A.    Yes, if the person's
2 sleeping.
3 Q.    So nothing to do may be
4 taking a nap?
5 A.    All day?
6 Q.    Well, no, whatever period
7 of time you're talking about, you
8 say an hour or longer?
9 A.    I'm talking about people
10 who are --- I'm talking about people
11 who are wheeled into a room who may
12 be asleep at the time they're
13 wheeled in.
14 Q.    All right.
15 A.    Who are plunked in front
16 of a TV. No one's changed the
17 channel. No one's asked them what
18 they want to watch. And they are
19 put there and they're left there.
20 74, similar, this is ongoing except
21 for the two days that were
22 prearranged. This is an observation
23 that we make when we're there.
24 Skipping down to number 78, I
25 personally have been on the patio

Page 150

1 behind the building trying to speak
2 with what I recall was two gentlemen
3 and was having great difficulty
4 talking to them because of the
5 machinery that's located right next
6 to the patio was running, ran the
7 whole time I was out there which was
8 at least an hour, made it very
9 difficult to have any conversation.
10 Q.    This machinery, is this
11 permanent?  Is this like air
12 conditioning machinery or what?
13 A.    It's permanent.  I don't
14 know what it is.  It's large ---.
15 Q.    It's a permanent thing,
16 whatever?
17 A.    It's a permanent thing.
18 Q.    Okay.
19 A.    Number 79, is what we have
20 --- I have personally heard staff
21 say that when we've asked why can't
22 this person go outside, this person
23 wants to go on a trip, their
24 response has been we don't have
25 enough nursing staff to accompany

Page 151

1 them.
2        Number 92, the personal
3 knowledge I have of that is that at
4 Harrisburg State Hospital when they
5 were decreasing the census on
6 Hilltop I a number of years ago, we
7 intervened with a number of
8 individuals and attempted to prevent
9 their transfer to South Mountain
10 Restoration Center, requesting that
11 instead there be more intensive
12 activity around looking for a
13 nursing home in their community.
14 Q.    Here where you say
15 community services are appropriate,
16 page 92 --- back at 92?
17 A.    I'm sorry.
18 Q.    Paragraph 92 that you have
19 just spoken about?
20 A.    Uh-huh (yes).
21 Q.    The statement for who
22 community services are appropriate?
23 A.    Uh-huh (yes).
24 Q.    Here, does the phrase
25 community services include nursing

Page 152

1 homes other than South Mountain or
2 ---?
3 A.    No, no.
4 Q.    So at least you understand
5 in paragraph 92 the community
6 services means group home?
7 A.    Yes.
8 Q.    Okay.  Thank you.  Go
9 ahead to whatever is the next
10 paragraph.
11 A.    If I'm reading that
12 correctly.  And that's it.
13 Q.    That's it up through
14 paragraph ---.
15        ATTORNEY MEEK:
16        That's it.
17 BY ATTORNEY ULAN:
18 Q.    Paragraph 117 which I
19 believe is the last factual claim?
20 A.    Yes, I believe that's
21 everything.
22        ATTORNEY ULAN:
23        If you'll just give
24        me one moment, we're
25        almost done.

Page 153

1 BY ATTORNEY ULAN:
2 Q.    Ms. Beilharz, apart from
3 the matters addressed in the
4 Complaint that we've just gone
5 through and the matters you spoke
6 about this morning, are the --- are
7 there any other conditions or facts
8 at South Mountain to your knowledge,
9 whether your personal knowledge or
10 by reports from your staff, that in
11 your opinion violate the rights of
12 South Mountain residents?
13        ATTORNEY MEEK:
14        I'm going to object
15        to the question.  She's
16        not an encyclopedia.
17        There's a Complaint.
18        Those are all the
19        allegations that are made
20        in the Complaint.  They
21        are set out very clearly
22        in the Complaint and there
23        is no reason to expect
24        that this witness or any
25        other witness will be able

Multi-Page™

Page 154

1    to give you a catalog of
2    every possible violation
3    of the person's rights,
4    any person's rights.
5 BY ATTORNEY ULAN:
6 Q.    All right.  The objection
7 is noted for the record, but I'm
8 asking the witness to answer the
9 question to the extent that she can
10 and I ---?
11 A.    I honestly was just
12 getting ready to say I couldn't give
13 you that off the top of my head.  I
14 mean, I'd have to reread this.  I'd
15 have to go back through all the
16 information you have to give you an
17 answer on that.  I --- I can't give
18 you an answer on that off the top of
19 my head.
20        ATTORNEY ULAN:
21        Very well.  And I
22    have nothing further.
23        ATTORNEY MEEK:
24        I have one question.
25 EXAMINATION

Page 155

1 BY ATTORNEY MEEK:
2 Q.    Looking at the Complaint
3 in paragraph 40, did you --- go
4 ahead, I'm sorry.  You indicated
5 that you understood as to 41 that
6 you had seen in records that DNR
7 orders were authorized either by DPW
8 staff or family members who are not
9 guardians.
10 A.    Right.
11 Q.    From what source was
12 that?
13 A.    That's from individuals'
14 records.
15 Q.    So would that also be a
16 response to paragraph 40?
17 A.    Yes, it would be,
18 absolutely.
19        ATTORNEY MEEK:
20        Okay.  No further
21    questions.
22        ATTORNEY ULAN:
23        Nothing further.
24 A.    Okay.
25        * * * * *

Page 156

1 DEPOSITION CONCLUDED AT 2:05 P.M.
2        * * * * *
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

# PENNSYLVANIA PROTECTION & ADVOCACY, INC.

1414 N. Cameron Street, Suite C
Harrisburg, PA 17103

717-236-8110
800-692-7443

Fax: 717-236-0192
E-mail:ppa@ppainc.org

June 15, 2000

Reeves S. Power, Ph.D., Administrator
South Mountain Restoration Center
South Mountain, PA 17261-9999

Dear Dr. Power;

In May, Margaret Leed and I met with you to review our on-going concerns regarding South Mountain Restoration Center. We have attached a report of the issues we discussed.

I am very troubled that so many of the issues we raised in our May 1999 review continue to exist. There is no question that access to assistive devices is a critical need for most, if not all, residents of SMRC. It is evident that there is a desperate need for increased numbers of staff to be available during the critical hours when meals are served and when activities should be occurring. Residents do not have access to the variety or frequency of activity that they desire or require. Placing people in a room with a TV or radio does not constitute acceptable activity, especially when the acoustics of the room are such that the noise is so excessive as to cause problems hearing. During our visit on May 3rd, a beautiful, warm, sunny day we observed only a handful of residents outside. However, staff were out in large numbers walking, socializing and seemingly enjoying the beautiful Spring day. Why is that opportunity not available to all residents of SMRC? Unfortunately, there are residents of SMRC who reportedly don't leave the building for a year or more at a time. I could continue with numerous examples of poor quality of life for the SMRC residents, but as I stated before, our report is attached.

Additionally, it would be very helpful if OMHSAS would begin to aggressively plan to develop community programs for residents of SMRC. I am not speaking of nursing homes, but small community-based, home-like settings. Your experience in the MR system should be invaluable in this process as you are well aware of what can be developed for people, especially those with significant medical needs.

Please provide me with a response by July 3, 2000 including a timeline for correction of the identified issues. If you have any questions, please call me.

Sincerely,

*Jacqueline A. Beilharz*

Jacqueline A. Beilharz
Central Team Leader

Kevin T. Casey, Executive Director   ■   Hikmah Gardiner, President


# SOUTH MOUNTAIN RESTORATION CENTER MONITORING REPORT
June 15, 2000

Pennsylvania Protection and Advocacy, Inc. began routine and frequent monitoring visits to South Mountain Restoration Center (SMRC) the end of February, 2000. The purpose of the visits was to determine progress being made toward improving the adequacy of treatment and care of the residents, the availability of activities for residents and the environmental conditions of the facility. This report will serve as a summary of our findings to date.

## CONDITIONS AND TREATMENT:

There continue to be problems associated with meal times and feeding residents. A large number of residents, many of whom use geri-chairs and/or have tremors, have been observed struggling to feed themselves. The residents who remain in the geri-chairs for meals are in a semi-reclined position and have to reach an arm's length to access their food. Combine that with a shaking hand and the result is a less than desirable dining experience. Frequently, food will fall off the eating utensil onto clothing, bibs or the floor. Drinking glasses are filled to the top so that when residents attempt to take a drink, the liquid spills all over them. There is little evidence of use of adaptive cups or other eating utensils that would aide individuals while eating. Several residents were observed choking on food and/or stuffing food into their mouths. Staff looked at them, but offered no assistance. Often we observe staff standing to feed residents. Frequently they are talking to other residents or staff and pay little attention to the person they are feeding.

We continue to see very large numbers of people in geri-chairs. Often residents who use geri-chairs are placed in the day rooms or TV rooms and are left unattended for long periods of time. There is no way for them to call for help and we have observed residents who, after being left alone for a period of time, ended up in awkward, non-therapeutic positions (e.g. residents slide down in their seats, some residents will maneuver in to positions where their upper bodies hang over the edge of the chair or legs dangle off the sides). These all represent potentially very dangerous situations for the residents. A large number of the residents use standardized wheelchairs. The sling seats in these chairs can be problematic for long-term use, especially when foot rests are not attached to the chairs and when the chairs do not properly position the individuals.

Residents' ability to communicate continues to be a very serious concern. Individuals who are non-verbal and whose ability to significantly improve their use of oral language is poor, need an alternate means of communication. This does not exist at SMRC. When reviewing records residents have been described as not being interested in communicating, but when we approach some of these same individuals, they try desperately to communicate with us but are usually unsuccessful. Our observations indicate that staff often <u>assume</u> they know what the individual wants.

Some residents have indicated they received eye exams, but never received the glasses that were prescribed. Several residents said their glasses had been broken quite some time ago and

were supposed to be repaired, but never were.

Only <u>one</u> resident in the facility was observed to be using a hearing aid. Conversing with many residents is very difficult, because they appear not to hear well. It is unclear how often residents have an auditory evaluation. However, adding to the problem is the fact that the noise level in the building is so excessive because of the very poor acoustics, it may be difficult for individuals who need hearing aids to be able to tolerate them.

Some residents appear to have excessive plaque or tartar on their teeth, while others have no teeth. Clearly some residents may not wish to wear dentures, however, some do and those individuals need to have access to such appliances.

A number of residents report that their shoes are ill fitting. They complain that their shoes are ordered from a catalog by staff who <u>estimate</u> their shoe size. Some residents refuse to wear the shoes because they don't fit and opt to wear their bedroom slippers or socks instead. One female resident can be heard as she moves from one place to another because her shoes "flop" on her feet.

In March of this year, a clothing sale was held in the auditorium. PP&A observed SMRC staff as they purchased clothing for residents with no involvement from the individual. In one case, staff brought a resident into the room, placed the resident (in their wheelchair) in the middle of the aisle and proceeded to do all the shopping without consulting the resident even once on their size, preference, etc. The resident was given absolutely no choice in the purchase of their clothing even though PP&A staff could clearly hear the resident talking about what she wanted. Additionally, the staff purchased a number of pants, tops and nightgowns for the individual in a matter of minutes. The team had decided the clothing the person should have, not the individual. PP&A staff recorded how long it took SMRC staff to shop for 5 residents. In each case it took less than 5 minutes, from the time the resident was brought into the room until the time the purchase was completed. Clearly, residents did not have time to look at the options available or make a choice of which clothing should be purchased, not to mention the fact that obviously, no one took the time to ensure a proper fit.

The lack of activities for residents is inexcusable. The vast majority of the time residents are left to do nothing all day. Occasionally, there will be an activity planned but it does not include all residents, and we have observed that not all residents on a unit are even asked if they would like to participate. Residents have been very clear with us that they want more opportunities to participate in activities and a greater variety of activities from which to chose. PP&A staff observed a current events activity, unfortunately the events were not current. The material was uninteresting and residents were not encouraged to participate. Those residents who tried to speak were interrupted or their sentences were completed for them. When a resident tried to discuss an event, not included in the set agenda, the subject was ignored and the resident was not permitted to finish his thoughts. On several occasions the activity was not being held in the room where it was scheduled and no one knew where the activity had been moved. Residents frequently complain they are very bored. They want to get off the grounds to go shopping, out to eat, go to a park, the zoo, the library or a movie. They have

also requested that Bingo be offered on a more frequent basis. Other possibilities include board games, dance classes, Tai Chi, walks outside, etc.

Staff have been observed walking outside the building during the day, but never accompanied by residents. There are a few residents who sit in the lobby and a few more who venture out to the patio behind the building. For those few, the patio/gazebo area doesn't even offer much diversity in their day and worse yet, noise from the machinery located next to this area, makes conversation very difficult. Some residents report that they have not been outside since last fall.

The volunteer program at SMRC seems to offer the majority of the residents little in the way of frequent and varied activities. With the local schools, colleges, churches etc. there should be little difficulty in finding some volunteers who could frequently and regularly offer the residents a break in their routine and mundane existence. A wide variety of activities need to be offered to residents. Consider painting, ceramics, gardening, photography, story telling, recording family stories, rubber-stamping, sewing, embroidery, knitting, making note cards, reading to other residents, a radio club that could use the public address system to make daily, weekly announcements or offer a weekly music, news or talk show program, etc. The possibilities are only as limited as the imagination of the staff or volunteers.

Exercise classes are the same routine each session. We observed little enthusiasm by staff in their efforts to encourage residents to attend or to participate in the exercises. A few residents were asked to attend the class and the remaining residents were ignored. When PP&A staff demonstrated a little enthusiasm for participation, all but two or three residents on the unit joined in.

The residents on the Dementia unit seem to do little but wander the halls all day. There is little activity and not much staff interaction. Residents stand at the door and pound on the glass to get the attention of the residents on the unlocked unit. There have been two incidents in the last two months where residents have been injured by another resident. These incidents may have been avoided had staff been more actively involved with the residents.

The noise level throughout the facility continues to be very high. This is particularly troublesome for the individuals on the Demential unit. A noisy environment is not only very unpleasant, but can increase agitation for persons with dementia and mental illness.

There are residents at SMRC whose native language is not English. Although some individuals can speak limited English, that is not sufficient for therapies, medical examinations and when issues of importance need to be discussed with the individual. .

During our visit on May 10, 2000 we recorded air temperatures that ranged between 84° and 88°. The highest temperatures were recorded on the sixth floor where the most medically involved residents are housed. The interim dining area on 3-A was 88°. Reportedly, the thermometers on the radiators were not working and the heat could not be turned off. High temperatures can present a very dangerous situation for people on certain medications and

some senior-aged individuals. Residents were very vocal about the heat and their discomfort.

## COMMUNITY RESIDENTIAL OPPORTUNITIES:

A number of residents have expressed a desire to leave South Mountain Restoration Center, but there is little evidence of formalized discharge planning activities for these individuals. No one from the regional OMHSAS offices seems to have responsibility for assisting the staff at SMRC in finding appropriate community alternatives for residents. It appears that SMRC's social service staff do not explore all suitable community options when looking for available placements for residents. One resident was taken to the northern part of the state to look at a potential housing opportunity. The resident is occasionally ambulatory, but routinely uses a wheelchair. The house the resident visited had several steps and the resident was told, by the social worker she could not move there because she could not go up and down the steps quickly enough. That was a cruel, disappointing and unnecessary ordeal to put the resident through. Knowing that the resident frequently used a wheelchair, SMRC staff should have been clear about the physical layout of the house prior to making arrangements for the resident to visit. This particular resident has been at SMRC for eight years and desperately wants to leave. The trip involved a great distance, but only one housing possibility was offered.

It is important that SMRC staff have greater access to what is available in the community and information about innovative programs being developed to serve senior-aged people. Where communities do not have readily available appropriate options to which SMRC residents can return, it is important that OMHSAS **create** those opportunities.

## RECOMMENDATIONS:

Every resident be evaluated for any assistive device that may make mealtime more productive, safe and pleasant.

*All* staff should immediately receive training on dysphagia by qualified personnel.

Every resident who uses a wheelchair or a geri-chair immediately be evaluated for properly fitting and supportive equipment.

Recommendations made during auditory evaluations need to be followed by SMRC staff and the prescribed hearing devices need to be purchased in a timely fashion and used by those who need them.

Increased access to regional OMHSAS staff to assist SMRC staff in identifying and securing appropriate community placements for SMRC residents.

All social service staff should have access to the Internet, as one tool to enhance their search for community placement options and state-of-the-art residential services for senior-aged

people. Additionally, the Internet could be used as a tool for residents to keep in touch with their family members who live many miles away.

_ALL_ staff who work on the Dementia unit, as well as social work staff, be sent to observe community based services for persons with dementia to determine current best practices for treatment, activities and the possibilities for discharge.

Significantly reduce the noise level immediately, starting with the Dementia unit.

Evaluate all patients to determine if English is their native language. Residents having a different native language should be assessed by a qualified professional to determine their ability to communicate in English. If it is determined that the patient can communicate more effectively in their native language, then arrangements must be made for qualified interpreters to assist these individuals especially at treatment team meetings, medical evaluations, therapies, etc.



Kevin T. Casey *Executive Director*
Hikmah Gardiner *President*

**PENNSYLVANIA PROTECTION AND ADVOCACY, INC.**

February 28, 2000

Reeves S. Power, Ph.D., Administrator
South Mountain Restoration Center
South Mountain, PA 17261-9999

Dear Dr. Power, Reeves

This letter serves as a follow up to our meeting on Thursday, February 10. As you know, my colleague, Margaret Leed, toured the facility while we were there and reported back to you on her findings including:

- the strong urine odor that we had smelled in May was no longer evident;
- it appeared that greater numbers of residents were out of bed during this visit;
- staff seemed more involved with residents;
- lack of communication devices;
- Sophia T. speaks little English, her native language is German, but no staff speak German. Also, Risa G. speaks Hebrew, but no staff at SMRC can interpret for her instead they try to guess what she wants;
- lack of behavior programming;
- staff walked by an open bathroom door, but did not intervene when they heard a woman screaming for a male patient to leave the women's rest room;
- many residents continue to be placed in geri-chairs with no means to call for assistance;
- residents left unsupervised in day rooms;
- during lunch, a resident on the 5th floor choked on her food. Staff did not appear to know what to do to assist her.

Additionally, I reviewed the record of Ms. Joyce W██ an SMRC resident who died in July 1999 and am very concerned by what I found. According to her record Joyce had type I diabetes, she had a well-established pattern of refusing food, meds, and/or her blood sugar tests. There is no evidence that a behavior management plan was ever written to address these issues. According to her progress notes on:

- 7/9/99 - Joyce was awake all night;
- 7/10/99 - 0900 - Joyce refused all meds;
    - 1300 - refused all meds;
    - 1815 - refused meds;
- 7/11/99 - 0900 - refused breakfast, meds and sugar check;

- 1240 - she was found non-responsive with mottled face and arms.  She had no pulse or respiration (no indication that CPR was started);
- 1245 - RN supervisor was notified.  Dr. Marwak was called;
- 1330 - Dr. checked her and pronounced her dead at 1310;

However the medication chart has medication signed as if given on that day.  In fact, some were signed that they were given after she died (Lorazopan, Docusate).

A note by the doctor says that the exact cause of death was unknown, but it was natural.

The Death certificate has no identifying information, simply the cause of death.

Would you please advise me of the results of your investigation into the circumstances around Ms. W████'s death and any action taken to remedy the issues brought to your attention the day of our visit.

If you have any questions, please contact me.

Sincerely,


Jacqueline A.  Beilharz
Central Team Leader

*13*



Kevin T. Casey *Executive Director*
Hikmah Gardiner *President*

PENNSYLVANIA PROTECTION AND ADVOCACY, INC.

December 10, 1999

Thomas Buckus, Administrator
South Mountain Restoration Center
South Mountain, PA 17261-9999

Dear Mr. Buckus;

We have received your letter responding to the findings resulting from our review of South Mountain Restoration Center (SMRC), completed in May of this year. I was pleased to see that you invited Ms. Donna DiCasimirro to review feeding routines for some of the residents. I deliberately waited to reply to your letter until her assessment had been completed and I had a chance to review it.

In many ways I found your response to the findings of our report disturbing. Additionally, a number of the issues we raised were never addressed in your response, including:

- residents who were not changed promptly after urinating or defecating, or who needed assistance to get out of their wheelchair/geri-chair to use the bathroom, had to wait an extended period of time for staff to help them. This seemed to be due to the fact that there were inadequate numbers of direct care staff available;

- one woman, who was edentulous, was eating whole cherries and choking the entire time. Staff did not intervene;

- some residents were admitted to SMRC with a "stable medical condition", an Options assessment that stated nursing home care was needed due to "chronic persistent mental illness", a PASARR that indicated a resident needed nursing home care because she had chronic mental illness and she needed to be monitored for decompensation as well as a need to monitor her psychotropic medications, and another woman (who had mental retardation) was admitted to gain control of her diabetes and when her diabetes was under control her home county refused to allow her to return to her home program;

- the need to develop a protocol that ensures that every resident who can call staff for assistance is always within reach of some sort of calling device when it is needed, to which staff will respond within a predetermined period of time. For individuals who cannot call for assistance, ensure that they are never unsupervised; and

- the need to clearly mark the accessible routes allowing residents to easily find their way from their ward to the accessible exits.

In addition, I find that where you did respond to the issues raised, often your response was insufficient. Most disturbing was your assertion that the staffing pattern at SMRC is sufficient to ensure resident safety and quality care. Nothing could be further from the truth. To make the claim that your staffing patterns meet regulatory requirement, is no defense as regulations are **minimum** standards. It is abundantly clear that there are insufficient numbers of staff at SMRC to adequately care for the residents. Evidence to support that position is plentiful beginning with the issue of mandatory overtime. As we discussed at the July 20th meeting, mandatory overtime is a very serious problem with SMRC staff. It is unreasonable to believe that even the best staff can work many hours of overtime and maintain an energy level that allows them to deliver quality care. It is clear that SMRC is not planning to remedy the problem, but is preparing for it to worsen. This is evidenced by the fact that in the 2000/2001 budget you have almost doubled the amount of money requested for overtime. In 1999/2000, you requested $557,000 and in 2000/2001 you have requested $1,021,000. Overtime aside, resident care demonstrates a significantly undersized staff. If this were not the case it would be unnecessary for some residents to wait until other residents have been fed before they can eat; residents would not need to wait to have their soiled underclothing changed; large numbers of residents would not need to be left alone in a room while staff are busy toileting, changing and otherwise caring for other residents; and there would be activities available to all residents regardless of whether or not the activity specialist was off grounds with a small group of patients. It is also evident that residents are not getting the level of supervision needed. One glaring example is the woman who died after falling three times. The first fall may have been an accident, you give no details as to how she fell the second time, but surely after two falls and a broken hip which required surgery, she should not have been in a position where she could attempt to get up without staff knowing that she was doing so, resulting in a third fall and ultimately her death. In April of 1998 during a DOH review, SMRC was cited for not providing adequate levels of supervision. Additionally, during meetings of the Resident Council, residents addressed the issue of wanting/needing to have the opportunity to bathe more than once a week. In the minutes provided to us, there is no indication that this issue was ever remedied. Obviously, this concern exists due to a lack of adequate numbers of staff to allow for more frequent bathing.

You stated in your response that of course there are different staffing ratios on each unit because the needs are different on each unit. On the surface that is a logical response, however at the time of our visit you informed us that the individuals living on the second floor needed the least amount of care and the most medically involved individuals, with the most care-intensive needs, resided on the sixth floor. When we reviewed the staffing ratios on each floor we found that during the evening shift on May 19 unit 2A had a 1 to 10.25 staff to resident ratio, 3B had a 1 to 10 ratio, 5B had a 1 to 6.6 ratio, 6A had a 1 to 5 ratio and 6B had a 1 to 9 ratio. Considering the fact that many of the residents on the 5th and 6th floors need almost total care these ratios are woefully inadequate to provide appropriate care and a safe level of supervision, not to mention access to leisure activities, etc.

Your claim, that Assistive Technology is fully implemented at SMRC, is incorrect. According to

the information you provided to us, the only augmentive communication devices currently being used at SMRC are hearing aides. It is difficult to understand why NO ONE is using a communication board or other expressive communication device. To report that each nurses' station has a set of talking pictures in various languages is of no value. Communication assists are absolutely useless to people who cannot get to the nurses' station to ask for help. Communication assists should be individualized, portable and accessible at all times. Resident Council minutes reflect a concern over the lack of AT available, with no indication this was ever resolved. You provided information that indicated that 55 residents use wheelchairs. Of those 55 people, over 30% (19) use a standard wheelchair with no adaptations. Additionally, upon review of Ms. DiCasimirro's report, it is clear that not even basic feeding assistive devices were being used for many of the residents.

At the time of our meeting to discuss PP&A's findings, you mentioned that the deaths we questioned had all been reviewed by OMHSAS. You included the summary of that review in your response. It is important to note that the examination of these deaths did not include the review of a single resident's chart nor did it consider the common practice at SMRC of reclining people, in some cases immediately and in almost every other case, shortly after they have eaten. You mention that it clearly would not be appropriate to involve the coroner in every death at SMRC. I must submit to you that SMRC's decision not to involve the corner in any death at SMRC is just as inappropriate.

I am relieved to see that some of our concerns will be addressed, but my hope is that we can have a more forthright discussion of the remaining issues/remedies. Would you please contact me to set up a time when we can discuss your progress in addressing these concerns? If you have any questions, please do not hesitate to call me.

Sincerely,

Jacqueline A. Beilharz
Central Team Leader

cc:    Kevin Casey
       Charles Curie





NOV 0 1 1999

COMMONWEALTH OF PENNSYLVANIA
**DEPARTMENT OF PUBLIC WELFARE**
P.O. BOX 2675
HARRISBURG, PENNSYLVANIA 17105-2675

CHARLES G. CURIE
DEPUTY SECRETARY FOR MENTAL HEALTH

OCT 2 9 1999

TELEPHONE NUMBER
AREA CODE (717) 787-6443

RECEIVED
NOV 1 0 1999
By

Kevin T. Casey
Executive Director
Pennsylvania Protection and Advocacy, Inc.
116 Pine St.
Harrisburg, PA 17101

Dear Mr. Casey:

I am writing in response to your letter of October 7 regarding the findings of your review of services at South Mountain Restoration Center (SMRC). Mr. Thomas Buckus, Superintendent of SMRC was able to respond to the majority of issues identified as a result of your visit. I would like to take this opportunity to respond to areas outside of his realm of authority.

As we have discussed during our meetings with you, the Office of Mental Health and Substance Abuse Services (OMHSAS) is beginning a statewide planning initiative for downsizing the state-run psychiatric hospital program. The first phase has already been implemented with the appointment of the Southeast Region County/State Hospital Integration Coalition. This coalition of state, county and stakeholder representatives is charged with recommending a regional plan for community-based care, including the role of Norristown State Hospital. The Coalition has identified the needs of the older adult with mental illness as one of several specific areas to be addressed. We will be initiating a similar effort for the remainder of the state who will likewise be charged with considering recommendations for this population as part of their comprehensive effort.

OMHSAS has demonstrated its commitment to providing community options for all persons in the state hospitals, through its ambitious CHIPP initiatives and its ongoing efforts to downsize the hospital census overall. Since 1991, the overall census in the state hospitals has gone from approximately 6,600 patients to 3,360. Since 1976, we have closed seven (7) hospitals and transferred the operation of one. Since 1991, we have closed five (5) long-term care units. SMRC has continued to show a steady decline in census from 426 in June 1990 to 242 as of October 1999.

We continue to work with all stakeholders to address the specialized needs of the older adult with mental illness and look forward to implementing some creative initiatives to better identify and address their needs. We remain active participants in the Joint Committee

for the Mental Health of Older Persons with the Department of Aging and have issued a joint policy statement highlighting our mutual interests and goals.

We welcome your input and look forward to your continued advocacy on behalf of this constituency group.

Sincerely,

Charles G. Curie

Cc:    George Kopchick

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

2000 WL 433976
18 NDLR P 52
(Cite as: 2000 WL 433976 (E.D.Pa.))

United States District Court, E.D. Pennsylvania.

**ADAPT OF PHILADELPHIA, et al.**
v.
**PHILADELPHIA HOUSING AUTHORITY, et al.**

No. Civ.A. 98-4609.

April 14, 2000.

Stephen F. Gold, Philadelphia, PA, David A. Kahne, Houston, TX, for Adapt of Philadelphia, Plaintiff.

Stephen F. Gold, David A. Kahne, (See above), for Liberty Resources, Inc., Plaintiff.

Stephen F. Gold, (See above), for Marie Watson, Plaintiff.

Stephen F. Gold, (See above), for Marshall Watson, Plaintiff.

Stephen F. Gold, (See above), for Diane. Hughes, Plaintiff.

Carl Oxholm, III, Carl Oxholm, III, (See above), Fox, Rothschild, O'Brien & Frankel, Phila., PA, Alan C. Kessler, Wolf, Block, Schorr and Solis-Cohen LLP, Philadelphia, PA, Joel M. Sweet, Wolf, Block, Schorr and Solis-Cohen LLP, Philadelphia, PA, for Philadelphia Housing Authority, Defendant.

Carl Oxholm, III, Carl Oxholm, III, Alan C. Kessler, Joel M. Sweet, (See above), for Carl Greene, in his Official Capacity as the Executive Director of the Philadelphia Housing Authority, Defendant.

### PARTIAL FINDINGS OF FACT AND CONCLUSIONS OF LAW

BARTLE, J.

*1 Plaintiffs have brought this action against the Philadelphia Housing Authority ("PHA") and Carl Greene, in his official capacity as the executive director of the PHA, pursuant to § 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, and certain regulations which implement § 504, including 24 C.F.R. §§ 8.23, 8.24, and 8.26. Plaintiffs seek a declaration that the defendants, who are recipients of federal funds to assist with the oversight of "scattered site" public housing units throughout the City of Philadelphia, have violated § 504 because they failed to make a sufficient number of scattered site units accessible to people with mobility impairments. They also seek injunctive relief.

A nine day non-jury trial was held. At the request of the parties, and in an effort to encourage an amicable resolution of this matter, the court makes the following partial findings of fact and conclusions of law.

I.

Defendant PHA is the largest provider of public housing in Pennsylvania. It receives the majority of its funding from the federal government through the United States Department of Housing and Urban Development ("HUD"). Defendant Carl Greene has been executive director of PHA since March, 1998. PHA's housing program consists of two parts: (1) public housing, which PHA provides and for which it serves as landlord; and (2) a Section 8 voucher program, which allows eligible tenants to live in low-rent private housing.

PHA oversees a public housing stock of approximately 20,000 dwelling units, or apartments, located throughout the City of Philadelphia. [FN1] There are two basic types of dwelling units: (1) approximately 13,000 "conventional" units; and (2) approximately 7,000 "scattered site" units. Conventional dwelling units, generally, are those located in one or more buildings in a contiguous area. They include not only apartments in highrise buildings but also units in "garden style" buildings, which look much like townhouses. Scattered site dwelling units are usually located in individual row houses scattered among or surrounded by private homes, although some scattered site units are in houses that are adjacent to other PHA scattered site

buildings. Most of PHA's scattered site houses have only one dwelling unit, while others are divided into two or more different apartments.

> FN1. We will use the terms "dwelling unit," "unit," and "apartment" interchangeably throughout the remainder of these partial findings of fact and conclusions of law. For our purposes, a "building" is not the same thing. A building is the entire single physical structure that encapsulates anywhere from one to over one hundred apartments.

## II.

The plaintiffs in this action include two advocacy organizations, ADAPT of Philadelphia ("ADAPT") and Liberty Resources, Inc. ("LRI"). Neither ADAPT nor LRI is a membership organization. ADAPT defines its mission as "help[ing] individuals with disabilities achieve equal opportunity and, addressing institutional problems, ... eradicat[ing] discrimination against persons with disabilities." Stip. Testimony of Dr. Erik von Schmetterling ¶ 4. Its advocates not only address the housing needs of its clients, who are individuals with disabilities, but also its clients' attendant care and transportation needs. The parties stipulated:

**\*2** ADAPT does not have sufficient resources to meet all the critical needs of persons with disabilities in Philadelphia. A crisis in one area requires diversion of resources from other areas.... Given the housing crisis faced by persons with disabilities, ADAPT has diverted substantial resources for individual and systems advocacy in response to PHA's refusal to make scattered site housing accessible.... Individual advocacy means providing counseling and referral services to help people find places to live.... Systems advocacy includes efforts to persuade PHA to make its scattered site housing accessible.... While ADAPT has not calculated the amount of time, money, and energy diverted because of PHA's refusal to make scattered site housing accessible, by any measure the amount is substantial....

ADAPT also has devoted substantial effort to counseling and referrals [for clients who have urgent housing needs] ... including telephone calls, letters, meetings (with the client and with potential housing providers), and helping persons with disabilities complete application[s] for other places to live.... It is very difficult, and time consuming, to counsel a person where their options are so

limited....

In addition to individual advocacy, ADAPT has done extensive systems advocacy, trying to persuade PHA to make scattered site units accessible. These efforts go back at least 5 years....

Had PHA made five percent of its scattered site units accessible, ... ADAPT would have had substantial additional resources freed to do other work, vitally important.

Plaintiff LRI is chartered pursuant to federal law, which requires that it promote "equal access ... to society and to all services, programs, activities, resources, and facilities" for people with disabilities. 29 U.S.C. § 796f- 4(b)(1)(D). In addition, LRI "shall work to increase the availability and improve the quality of community options for independent living in order to facilitate the development and achievement of independent living goals by individuals with ... disabilities." 29 U.S.C. § 796f-4(b)(4). Like ADAPT, LRI also addresses the transportation and attendant care needs of people with disabilities and does not have the resources to meet all of the critical needs of the population it serves. It does both individual and systems advocacy. LRI hired Elizabeth Albert to work on its community services program and not to do advocacy on housing issues. Nonetheless, she has been doing housing advocacy work for the past two to three years in an effort to create more accessible, affordable housing for people with disabilities because of the overwhelming need for such services. Within the past few years, the number of hours that she and others like her at LRI have diverted away from other activities and to LRI's efforts to increase the affordable housing options for people with disabilities is in the hundreds. If she and others at LRI did not have to do housing advocacy, they would have time to do the jobs for which they were hired.

**\*3** Three years ago, the City of Philadelphia formed a Housing Crisis Coordinating Committee to address the housing needs of low-income individuals with disabilities. PHA's § 504 accessibility coordinator participated in those meetings on behalf of PHA, and LRI and ADAPT participated, too. At those monthly meetings, ADAPT and LRI presented case studies of low-income clients who were in great need of accessible housing. They also attempted to persuade PHA to make more of its scattered site public housing accessible. According to PHA's accessibility coordinator, ADAPT and LRI have been very active advocates on behalf of disabled people at the

Committee meetings. PHA's interim executive director from October, 1997 to March, 1998 met with representatives from ADAPT and LRI to discuss the need for more accessible public housing for persons with disabilities. In addition to the meetings with PHA's accessibility coordinator and executive director, advocates from ADAPT and LRI have made phone calls, written letters, and created and reviewed proposals, all in an effort to persuade PHA to make more of its scattered site housing accessible to people with disabilities.

Plaintiffs Marie and Marshall Watson, mother and son, have lived together in a non-accessible PHA scattered site unit for the past seven years. Marshall has cerebral palsy and cannot move about without assistance. He typically uses a walker, but when that is not possible, he must crawl. Beginning several years ago, and on more than one occasion, Marie Watson asked the manager for her unit to move her to an accessible unit. Although she concedes that she did not formally submit the proper documents for such a request, she maintains that no one informed her that she had to submit any forms.

Diane Hughes, also a plaintiff in this action, is a resident of a first floor PHA scattered site unit that is not accessible to a person with a mobility impairment. She has lived in the unit for five years. She has severe arthritis and cannot walk unassisted. There are five steps from the sidewalk to her front door and no ramp. She requested that PHA transfer her to an accessible scattered site unit in or near her neighborhood, but she was offered a unit in another part of the City. She declined the unit because she desired to remain close to the medical and other support systems that she already had in place. At the time of trial, PHA had offered her a different accessible unit, she had accepted, and she was waiting for the move to take place.

III.

HUD assigns a "project number," also called a "PA number" because "PA" precedes each number, to groups of PHA's housing units. HUD designated PA numbers for PHA's conventional units when they were constructed. As HUD deeded scattered site buildings to PHA, HUD grouped together those buildings that were transferred at or around the same time and designated a PA number for each group. The scattered site units that are covered by any one PA number are not always in the same contiguous area or even in the same neighborhood. Those units

assigned to a particular PA number are often dispersed throughout the City. None of the PA numbers, however, is assigned to a group of units that includes both scattered site *and* conventional units. After PA numbers are assigned by HUD, PHA may not transfer units from one number to another. Currently, there are separate PA numbers assigned to fifteen groups of scattered site units and approximately 50 groups of conventional units. The numbers assigned to the scattered site housing, and the number of units in each project as of September 30, 1998, were as follows:

| Project number | Total project units |
| -------------- | ------------------- |
| 1.  PA002004 | 1,954 |
| 2.  PA002005 | 21 |
| 3.  PA002012 | 1,012 |
| 4.  PA002025 | 43 |
| 5.  PA002060 | 173 |
| 6.  PA002067 | 423 |
| 7.  PA002069 | 967 |
| 8.  PA002078 | 14 |
| 9.  PA002080 | 646 |
| 10. PA002081 | 525 |
| 11. PA002085 | 449 |
| 12. PA002087 | 14 |
| 13. PA002088 | 381 |
| 14. PA002091 | 250 |
| 15. PA002092 | 96 |

TOTAL NO. OF UNITS: 6,968

**\*4** PHA uses PA numbers for both scattered site and conventional housing for identification purposes in its communications with HUD. Furthermore, HUD maintains by PA number its records of PHA's housing stock, including scattered site and conventional housing. HUD keeps track of the number of units within each PA number and the configuration of units within each PA number (the number of efficiencies, and the number of units with one, two, three, or four or more bedrooms).

Each year, PHA and HUD enter into a "Consolidated Annual Contributions Contract" in which PHA agrees to certain terms in exchange for its subsidy from HUD. The contract "covers all project(s) listed" and requires PHA to "develop and operate each project solely for the purpose of providing decent, safe, and sanitary housing for eligible families in a manner that promotes serviceability, economy, efficiency, and stability of the projects, and the economic and social well-being of tenants." In these contracts, PHA and HUD use PA numbers to identify the "project(s) listed." PHA was permitted to use the money received pursuant to the Consolidated Annual Contributions Contract for maintenance, repair, day-to-day needs, or alterations.

From 1992 to 1997, PHA participated in HUD's "Comprehensive Grant Program," which provided funds for capital improvements to its housing stock.

PHA annually submitted a proposal to HUD which specified the type of work it wished to perform on each unit and the estimated cost. This information was broken down by PA number. The proposals also specified the amount PHA wished to spend on "504 Compliance" for units in each PA number. After it had received the proposal, HUD determined the amount of money that it would provide to PHA. Prior to the implementation of the Comprehensive Grant Program, PHA applied for and received money for capital improvements from HUD through the Comprehensive Improvement Assistance Program. PHA's applications for Comprehensive Improvement Assistance Program funds were similarly broken down by PA number.

PHA has managed its scattered site housing separately from its conventional housing. From at least 1993 to 1997, PHA administered its scattered site housing in three groups. Each of the three groups of scattered site units, as well as each group of conventional units, had its own manager, manager's office, and maintenance crew. Since 1998, PHA has managed its scattered site housing in ten different groups, which are still separate from conventional housing.

PHA undertook a number of alteration programs that affected only its scattered site housing and that were completed primarily between 1993 and 1997:(1) the Apartment Renovation Team program

("ART"); (2) the Job Order Contracts program ("JOC"); (3) the Philadelphia Housing & Development Corporation program ("PHDC"); (4) the Miscellaneous Contracts program; and (5) the Haddington program. Most or all of the funds for each of these modernization efforts was derived from the HUD Comprehensive Grant Program or Comprehensive Improvement Assistance Program.

*5 For each PHA dwelling unit, HUD assigned a sum that it estimated to be the "Total Development Cost" ("TDC"). TDC varied according to the city in which units are located, the type of building in which the units were located (elevator, walk-up, etc.), and the number of bedrooms in the unit. Where two or more dwelling units were located in one building, the TDC for each unit could be different. HUD strongly encouraged PHA to spend no more than 90% of TDC when it renovated units using HUD funds.

Both the ART and JOC programs were "gut renovation" programs. The work performed included replacement of the entire electrical and plumbing systems, installation of new roofs, new front steps, new windows, new floor joists, and entirely new fronts of buildings, although all of these were not performed in every unit. In the ART program, PHA spent 75% or more of TDC on all of the 225 scattered site units renovated. For a number of the units, costs exceeded 100% of TDC. In the first phase of ART, over $21 million was spent on 179 units, for an average expenditure of over $117,318.44 per unit. Average TDC for those 179 units was only $79,522. PHA renovated 262 scattered site units in the JOC program. For 207 of those units, the expenditures were 75% or more of TDC, and as in ART, for many of the renovated units, costs exceeded 100% of TDC.

The other three modernization programs were of a smaller scale. PHA renovated 102 scattered site units in the PHDC program. It spent 75% or more of TDC on 36 of those units. In the Miscellaneous Contracts program, PHA did work on 89 total scattered site units. Expenditures were at or exceeded 75% of TDC for four of those units. The Haddington program involved renovations of at least 133 scattered site units. Although PHA's data on TDC was incomplete, for at least 13 of the 133 units, the cost of modernization was at or above 75% of TDC. In total, in all five modernization programs, PHA altered at least 485 scattered site units for which expenditures were equal to or exceeded 75% of TDC.

When the above-mentioned modernization programs began, PHA had no accessible scattered site units. PHA made fully wheelchair accessible only 22 of the scattered site units renovated in the five modernization programs. This represents merely 2.7% of the 811 units that were part of the five modernization programs and 4.5% of the 485 for which rehabilitation costs were 75% or more of TDC. Of the 22, there were ten each in the ART and JOC programs, two in the PHDC program, and none in the Miscellaneous Contracts and Haddington programs.

IV.

Defendants challenge plaintiffs' standing. In our February 10, 1999 order denying defendants' motion to dismiss the amended complaint, we concluded that because the language of the Rehabilitation Act's enforcement provision is so broad, the prudential standing requirements are not applicable. *See ADAPT v. Philadelphia Housing Auth.,* Civ. A. No. 98-4609 (E.D.Pa. Feb. 10, 1999); *see also* 29 U.S.C. § 794a(a)(2); *Innovative Health Systems, Inc. v. City of White Plains,* 117 F.3d 37, 47 (2d Cir.1997). Defendants do not dispute that conclusion. Their position is that plaintiffs have not satisfied the standing requirements of Article III of the United States Constitution.

*6 Article III requires a plaintiff to prove: (1) "injury in fact," that is, "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical;" (2) a causal connection between the injury and the conduct of which the plaintiff complains; and (3) that it is likely that the injury will be redressed by a decision in plaintiff's favor. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560-61 (1992) (citations, internal quotation marks, and footnote omitted). These three elements "each ... must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation." *Id.* at 561.

Defendants contend that the very missions of the organizational plaintiffs, ADAPT and LRI, are to advocate on behalf of persons with disabilities, so they have not sustained an injury by having to advocate for more accessible housing. The Supreme Court has determined that "where discriminatory 'practices have perceptibly impaired [an

organization's ability to carry out its mission], there can be no question that the organization has suffered injury in fact ." ' *Fair Housing Council of Suburban Phila. v. Montgomery Newspapers,* 141 F.3d 71, 76 (3d Cir.1998) (quoting *Havens Realty Corp. v. Coleman,* 455 U.S. 363, 379 (1982)). The organization may prove such an impairment by coming forward with evidence that it has diverted resources to one area of its effort in order to combat the alleged discrimination. *See id.* at 78. Our Court of Appeals has held that a diversion of resources in order to pursue litigation, alone, is not sufficient proof of injury in fact. *See id.* at 79.

Neither ADAPT nor LRI exists only to advocate for more widely available accessible housing. Because of PHA's alleged violation of its duties to make more scattered site housing accessible to persons with mobility impairments, ADAPT and LRI have had to divert their time and the organizations' resources away from services like transportation and attendant care advocacy in order to address the pressing housing needs of their low-income clientele. ADAPT and LRI representatives have spent a substantial amount of time in meetings in an effort to convince PHA to make more of its scattered site housing accessible to people with disabilities. PHA's own accessibility coordinator testified that ADAPT and LRI were active advocates on behalf of their clientele in the Housing Crisis Coordination Committee meetings. The time spent trying to persuade PHA to make more accessible scattered site housing was time the advocates could have spent in individual client consultations, working to find housing that met the needs of specific clients. We conclude that ADAPT and PHA have proven that they diverted resources away from other of their day-to-day services in order to try to resolve amicably PHA's alleged failure to make more of its scattered site housing accessible to people with mobility impairments, and that this is sufficient injury in fact. *See id.* at 78-80.

*\*7* Defendants argue that plaintiff Hughes has accepted an accessible unit and will be transferred imminently, so she cannot prove any injury or her claims are moot. They also argue that any waiting period that she had to endure before being transferred to an accessible unit was not caused by PHA because Ms. Hughes chose to decline the first accessible unit PHA offered to her. Ms. Hughes wanted to move to an accessible scattered site unit in or near her own neighborhood where her doctors were located. This was not an unreasonable request.

We do not know when she was offered the first accessible unit, how long she waited before it was offered, or how far it was from her neighborhood. If PHA had made more of its scattered site units accessible, it is a reasonable inference that Ms. Hughes would not have had to wait as long as she did before she was offered a scattered site unit near her support systems. Her wait, during which she remained in an inaccessible unit, was her injury. Although she presently may be scheduled to move to an accessible unit, the controversy is not moot. She had not yet moved at the time of trial. We conclude that she has proven all three elements of Article III standing.

Finally, defendants aver that the Watsons do not have standing because they failed to submit the proper documents to PHA to request a transfer to an accessible unit. The Watsons have proven that they have been waiting for years for an accessible scattered site unit. However, because they failed to prove that they properly requested such a unit, they failed to prove by a preponderance of the evidence a causal connection between their injury and PHA's alleged violation of § 504 of the Rehabilitation Act. *See Lujan,* 504 U.S. at 560. Accordingly, the Watsons do not have standing to pursue this action.

## V.

Section 504 of the Rehabilitation Act provides:
No otherwise qualified individual with a disability in the United States, as defined in section 706(20) of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service.
29 U.S.C. § 794(a) (footnote omitted). HUD has promulgated regulations that seek to implement § 504. It is plaintiffs' primary contention that PHA violated one of those regulations, 24 C.F.R. § 8 .23(a). That regulation reads:
Alterations of existing housing facilities.
(a) Substantial alteration. If alterations are undertaken to a project ... that has 15 or more units and the cost of the alterations is 75 percent or more of the replacement cost of the completed facility, then the provisions of § 8.22 shall apply.
24 C.F.R. § 8.23(a). Section 8.22 provides that "a minimum of five percent of the total dwelling units or at least one unit in a multifamily housing project,

whichever is greater, shall be made accessible for persons with mobility impairments." 24 C.F.R. § 8.22(b).

*8 Under the HUD regulations, "alteration" means "any change in a facility or its permanent fixtures or equipment. It includes, but is not limited to, remodeling, renovation, rehabilitation, reconstruction, changes or rearrangements in structural parts and extraordinary repairs. It does not include normal maintenance or repairs, reroofing, interior decoration, or changes to mechanical systems." 24 C.F.R. § 8.3.

A "project" is defined as "the whole of one or more residential structures and appurtenant structures, equipment, roads, walks, and parking lots which are covered by a single contract for Federal financial assistance or application for assistance, or are treated as a whole for processing purposes, whether or not located on a common site." *Id.* A "facility" is defined as "all or any portion of buildings, structures, equipment, roads, walks, parking lots, rolling stock or other real or personal property or interest in the property." *Id.*

Plaintiffs and defendants sharply disagree about the definition of "project" as used in 24 C.F.R. § 8.23(a). According to plaintiffs, a "project" is a set of units that is grouped under one "PA number," and since HUD has assigned fifteen PA numbers to groups of scattered site units, PHA has fifteen scattered site projects. Under this definition, plaintiffs argue that once PHA made substantial alterations to any units classified under one PA number, it had a duty to make accessible all of the substantially altered units until 5% of the total units within that PA number were accessible. For example, if there were 100 units included within one PA number, and PHA substantially altered five units in that group, all five would have to be made accessible. If PHA subsequently substantially altered ten additional units in that PA number, none of those units would have to be made accessible because 5% of the units in the PA number would already be accessible.

The defendants take the position that a "project" is a modernization program, so that the ART, JOC, PHDC, Miscellaneous Contracts, and Haddington programs are five distinct projects. They contend that PHA had a duty to make accessible 5% of the total number of altered units in each modernization program, apparently not merely 5% of those units

substantially altered. [FN2] According to the defendants, PHA was obliged to make accessible 5% of the 225 units in ART (12 units), 5% of the 262 units in JOC (14 units), 5% of the 102 units in PHDC (6 units), 5% of the 89 units in Miscellaneous Contracts (5 units), and 5% of the 133 units in Haddington (7 units). Thus by its own analysis, PHA should have made 44 units accessible and has fallen short by 22 units.

> FN2. In their post-trial brief, defendants wrote, "This is how PHA has interpreted the word 'project' when renovating its scattered sites. It has similarly applied the accessibility requirements to its several 'single undertakings'--the ART Program, JOCS, PHDC, and the like--and while the buildings were not contiguous PHA's goal was to make accessible *5% of all of the units modernized.*" Defs' Post-Trial Br. at 20-21 (emphasis added).

In support of their proffered meaning of "project," defendants cite to 42 U.S.C. § 1437a(b)(1), which provides in relevant part, "When used in this chapter .... [and w]hen used in reference to public housing, the term 'low- income housing project' or 'project' means (A) housing developed, acquired, or assisted by a public housing agency under this chapter, and (B) the improvement of any such housing." 42 U.S.C. § 1437a(b)(1). Under the definition in § 1437a(b)(1), they contend, PHA reasonably concluded that it only had an obligation to make accessible 5% of the total number of altered units. Defendants' analysis is flawed. We agree that both the Rehabilitation Act and the implementing HUD regulations utilize the term "project." Nonetheless, for purposes of the obligations set·froth in the regulations to make 5% of units accessible, we look to the definition of project as set forth in the regulations.

*9 The evidence at trial was clear that HUD assigns the project numbers, or PA numbers, when the units are acquired by PHA, that HUD keeps track of PHA's housing stock by PA number, and that PHA has acquiesced in the use of those numbers by citing them whenever it wished to identify its housing in its communications with HUD. PA numbers are also used in contracts between PHA and HUD which provide PHA with its federal subsidies. Although there was no evidence that PHA uses the PA numbers internally for operational purposes, we conclude that "treated as a whole for processing

purposes" under 24 C.F.R. § 8.3 means the way HUD and PHA have treated the units in their contracts and in their communications and dealings with each other. In this regard, there can be no doubt that each group of scattered site units as organized by PA numbers is treated as a whole for processing purposes. In contrast, the modernization programs which defendants seek to fit within the definition of "project" were never denominated as such by HUD.

The defendants admit that it makes sense to equate "project" and PA number for *conventional* housing. They contend, however, that HUD did not have in mind scattered site housing when it defined "project." The definition of "project" found in § 8.3 of the regulations specifically provides that it applies to those structures that are "treated as a whole for processing purposes, *whether or not located on a common site.*" 24 C.F.R. § 8.3 (emphasis added). The emphasized language refutes defendants' argument. The conventional units which are assigned to the same PA number are located in a contiguous area, or common site. If HUD had in mind only conventional units, it would have had no reason to include the last clause. The language "whether or not located on a common site" demonstrates to us that HUD did indeed anticipate that the definition would apply to more than conventional housing located in a contiguous area.

While the definition of "project" found in 24 C.F.R. § 8.3 is not a model of clarity, we agree with the plaintiffs that a project means the traditional PA number groupings assigned by HUD. We concede that the way scattered site units are grouped within a particular project number is more historical than logical. Once a unit is so assigned, its assignment is permanent. PHA may not shift a unit to another project number. Regardless of how we might like to rewrite the regulations, we are not free to do so.

Section 8.23 only applies if there have been substantial alterations to units within a project. A substantial alteration occurs when "the cost of the alterations is 75 percent or more of the replacement cost of the completed facility." 24 C.F.R. § 8.23. PHA recognizes that where alteration expenses for a unit are at or above 75% of TDC, there has been a substantial alteration.

Under defendants' own interpretation of the relevant regulations and according to their own expert, PHA made accessible only half the number of scattered

site units it should have. They contend that this shortfall is excused because it was not feasible to make more than 22 of the altered scattered site units accessible. Defendants interpret 24 C.F.R. § 8.23(a) as imposing an obligation to make 5% of units accessible only to the maximum extent feasible.

**\*10** There is nothing in the language of 24 C.F.R. § 8.23(a), however, which provides a feasibility defense to the 5% requirement. There is language in subsection (b) of § 8.23 which speaks about feasibility, but subsection (b) covers "Other alterations," alterations that are other than "substantial." That is a subject matter different from the substantial alterations covered in subsection (a), and the language of § 8.23 does not indicate in any way that the content of (b) also applies to (a).

Even if a feasibility defense were available, plaintiffs demonstrated at trial that it was certainly feasible to make more than 22 units accessible. Indeed, PHA's accessibility coordinator, the individual whose role it has been for the past seven years to make sure PHA is in compliance with § 504 of the Rehabilitation Act, admitted that more units could have been made accessible in the ART and JOC modernization programs. PHA did not consider accessibility potential when it selected the scattered site units which would be substantially altered. It was only *after* the units were selected for modernization that PHA's accessibility coordinator reviewed the units to see which ones might be made accessible.

Most or all of PHA's scattered site units have steps from the sidewalk to the front door. In order to make the units accessible, either a ramp or an exterior mechanical lift had to be installed, both of which require a certain amount of space. PHA's accessibility coordinator looked only for those buildings for which a ramp could be constructed. Even assuming PHA was justified to exclude the possibility of using exterior lifts, the factors considered by the accessibility coordinator and her team were too restrictive. They looked for units that were on corner lots or had alleys running along the side or in back. Although they also looked for scattered site units that were next to vacant lots owned by PHA, they determined that building ramps that ran onto the vacant lots would make the lots too difficult to sell at some later, undetermined time. They did not consider using the available space in front of two or more adjacent PHA scattered site buildings in order to construct a ramp that would

create wheelchair accessibility to all of the units. They did not consider reconfiguring the steps that led to front doors in order to create space for ramps. In sum, PHA could have been more flexible in its approaches to identifying potentially accessible units. Although some units clearly could not be made accessible, architectural and special considerations did not defeat the feasibility of making more than 22 accessible units.

The cost of making more units accessible also was not prohibitive. In the ART and JOC programs, PHA frequently spent more than 60% of TDC to renovate units, and it sometimes spent well over 100% of TDC. In some instances, PHA was spending the princely sum of $125,000 to $150,000 per unit. These "gut rehabilitation" programs essentially stripped the buildings of their interiors and rebuilt those interiors anew. Consequently, the added cost of constructing a ramp, creating wider hallways and lower counter tops, and making other such adjustments in order to make units accessible to those with mobility impairments was not significant. The executive director of PHA during the time most of the relevant modernization took place admitted that compared to the amount of money spent in the ART and JOC programs, in particular, the cost of adding accessibility features to more units was not substantial.

*11 In summary, we agree with the plaintiffs that, as it is used in 24 C.F.R. § 8.23(a), a "project" is a group of units to which HUD has assigned a particular PA project number. Any units PHA substantially altered within one PA number had to be made accessible until 5% of the total units within that PA number were accessible.

## VI.

As requested, we will now extend to the parties an opportunity amicably to resolve this action based upon the court's partial findings of fact and conclusions of law. Should the parties fail to do so expeditiously, the court is prepared to make additional findings of fact and conclusions of law and to enter an order granting appropriate relief.

END OF DOCUMENT

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

2002 WL 186008
--- F.3d ---
**(Cite as: 2002 WL 186008 (3rd Cir.(Pa.)))**

Only the Westlaw citation is currently available.

United States Court of Appeals,
Third Circuit.

**PENNSYLVANIA PSYCHIATRIC SOCIETY,**
**Appellant,**
v.
**GREEN SPRING HEALTH SERVICES, INC.;**
**Magellan Health Services, Inc.; Highmark,**
**Inc.; Keystone Health Plan West, Inc.; Keystone**
**Health Plan Central, Inc.;**
**Keystone Health Plan East, Inc.**

**No. 00-3403.**

Argued Oct. 31, 2000.
Feb. 6, 2002.

On Appeal from the United States District Court for
the Western District of Pennsylvania, D.C. Civil
Action No. 99-cv-00937, (Honorable Gary L.
Lancaster).

Philip H. Lebowitz, (Argued), Pepper Hamilton,
Philadelphia, PA, Attorney for Appellant.

John R. Leathers, (Argued), Buchanan Ingersoll,
Pittsburgh, PA, Attorney for Appellees, Green
Spring Health Services, Inc. and Magellan Health
Services, Inc.

Gerri L. Sperling, Springer Bush & Perry,
Pittsburgh, PA, Attorney for Appellees Highmark,
Inc. and Keystone Health Plan West, Inc.

Carleton O. Strouss, Kirkpatrick & Lockhart,
Harrisburg, PA, Attorney for Appellee, Keystone
Health Plan Central, Inc.

Thomas S. Biemer, John J. Higson, Dilworth
Paxson, Philadelphia, PA, Attorneys for Appellee,
Keystone Health Plan East, Inc.

Richard D. Raskin, Sidley Austin Brown & Wood,
Chicago, IL, Attorney for Amici Curiae Appellant,
The American Medical Association and Pennsylvania
Medical Society.

Before SCIRICA, NYGAARD and BARRY,
Circuit Judges.

OPINION OF THE COURT

SCIRICA, Circuit Judge.

*1 The Pennsylvania Psychiatric Society sued
several managed health care organizations on behalf
of its member psychiatrists and their patients. The
gravamen of its complaint was that the managed
health care organizations impaired the quality of
health care provided by psychiatrists to their patients
by refusing to authorize necessary psychiatric
treatment, excessively burdening the reimbursement
process and impeding other vital care.

The principal issue on appeal is whether the
Pennsylvania Psychiatric Society has properly
pleaded associational and third-party standing.
Finding the Society would require significant
individual participation to establish its member
psychiatrists' claims, the District Court dismissed its
complaint for lack of associational standing. [FN1]
The District Court also found the Society's member
psychiatrists lacked third-party standing to pursue
their patients' claims. As an alternative ground for
dismissal, the District Court held the mandatory
arbitration provision in the psychiatrists' contracts
barred the Society from advancing their members'
claims in court.

> FN1. The District Court adopted the
> Magistrate Judge's Report and
> Recommendation in full.

We believe the District Court's dismissal under
Fed.R.Civ.P. 12(b)(6) was premature. For this
reason, we will vacate and remand for further
proceedings.

I.

The District Court had subject matter jurisdiction
under 28 U.S.C. S 1331 because certain claims
asserted by the Pennsylvania Psychiatric Society
arose under the Employee Retirement Income
Security Act of 1974 ("ERISA"), 29 U.S.C. SS

1001-1461. [FN2] We have jurisdiction under 28 U.S.C. S 1291.

> FN2. The case was removed from state court under ERISA's civil enforcement provision, S 502(a)(1)(b), which preempts state court jurisdiction for claims by a plan participant "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. S 1132(a)(1)(B); Metropolitan Life Ins. Co. v. Taylor, 481 U.S. 58, 66 (1987); Pilot Life Ins. Co. v. Dedeaux, 481 U.S. 41, 56 (1987).

To discern which claims are preempted, "we embraced a distinction between claims pertaining to the quality of the medical benefits provided to a plan participant [that is, not preempted] and claims that the plan participant was entitled to, but did not receive, a certain quantum of benefits under his or her plan [that is, preempted]." In re U.S. Healthcare, Inc., 193 F.3d 151, 162 (3d Cir.1999) (citing Dukes v. U.S. Healthcare, Inc., 57 F.3d 350, 357-58 (3d Cir.1995)), cert. denied sub nom., U.S. Healthcare, Inc. v. Bauman, 530 U.S. 1242 (2000). Explaining this distinction in the Supreme Court's lexicon, we recently restated our position that "challenges [to] the administration of or eligibility for benefits [i.e., quantity] ... fall[ ] within the scope of S 502(a) and [are] completely preempted...." Pryzbowski v. U.S. Healthcare, Inc., 245 F.3d 266, 273 (3d Cir.2001). To this end, claims against HMO policies that purportedly delay care "fall within the realm of the administration of benefits." Id.

On behalf of its members' patients, the Pennsylvania Psychiatric Society alleges the MCOs implemented policies to discourage or prevent subscribers from using mental health services. Under S 502(a), "[r]elief may take the form of accrued benefits due, a declaratory judgment on entitlement to benefits, or an injunction against a plan administrator's improper refusal to pay benefits." Dedeaux, 481 U.S. at 53. In this case, the relief sought involves the administration of benefits, because it would change the quantum of mental health

services provided. These allegations fall within the scope of ERISA's civil enforcement provision, and, therefore, removal was proper as ERISA completely preempts at least some of the claims alleged by the Pennsylvania Psychiatric Society on behalf of its members' patients.

II.

The Pennsylvania Psychiatric Society, a nonprofit corporation representing licensed psychiatrists in Pennsylvania, filed suit on behalf of its member psychiatrists and their patients who subscribe to managed health care plans administered by Green Spring Health Services.

There are several defendants. Green Spring Health Services, Inc. provides a network of psychiatrists as well as administrative services for managed health care plans; Magellan Health Services, Inc. is its corporate parent. Keystone Health Plan West, Inc., Keystone Health Plan Central, Inc., and Keystone Health Plan East, Inc. are health maintenance organizations that contract with Green Spring Health Services to provide mental health and substance abuse services to their subscribers. Highmark, Inc. is the parent company of Keystone Health Plan West (these managed care organizations collectively are referred to as "the MCOs"). Green Spring Health Services, Magellan Health Services and Highmark choose which psychiatrists to credential to provide these services.

Green Spring Health Services administers the psychiatric and substance abuse services for the employee benefit plans provided by the health management organizations. For this purpose, it enters into contracts with psychiatrists (the "Provider Agreement") to form a provider network to service the plans. In particular, the Provider Agreement assures that Green Spring Health Services will not undermine the psychiatrists' responsibility to provide patients with the mental health services they require. For most disputes arising between credentialed psychiatrists and Green Spring Health Services, the Provider Agreement also contains a mandatory arbitration clause that requires exhaustion of internal review procedures before seeking binding arbitration.

*2 Alleging the MCOs unfairly profit at the expense of the psychiatrists and their patients, the Pennsylvania Psychiatric Society asserts several tort

and breach of contract claims for impeding necessary psychiatric treatment. The Pennsylvania Psychiatric Society contends the MCOs refused to authorize and provide reimbursement for medically necessary mental health treatment; interfered with patients' care by permitting non-psychiatrists to make psychiatric treatment decisions; violated Provider Agreements by improperly terminating relationships with certain psychiatrists; and breached the contractual duties of good faith and fair dealing by failing to timely pay psychiatrists and by referring patients to inconvenient treatment locations, thereby depriving some patients access to treatment.

On the basis of these allegations, the Pennsylvania Psychiatric Society claims the MCOs tortiously interfered with the psychiatrists' livelihood as well as the psychiatrist-patient relationship. In addition, the Society asserts the MCOs fraudulently misrepresented the quality of care their plans would provide to subscribers and the benefits psychiatrists would receive for providing their services. Finally, on behalf of its members' patients, the Society alleges the MCOs made false representations to their subscribers in violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 Pa. Const. Stat. Ann. S 201-1 et seq. (West 2001).

The complaint sought declaratory relief, injunctive relief, and damages. The Pennsylvania Psychiatric Society does not appeal the dismissal of its damages claims.

The suit commenced in state court but was removed to federal court on grounds that ERISA preempted all or, at least, some of the Society's claims. Recommending dismissal, the Magistrate Judge issued a Report and Recommendation finding the Society lacked standing to assert the claims of its members and their patients. As an alternative ground for dismissal, the Magistrate Judge found the mandatory arbitration clause in the psychiatrists' contracts foreclosed advancing the claims in court. The District Court adopted the Magistrate Judge's Report. The Pennsylvania Psychiatric Society timely appealed.

III.

The Pennsylvania Psychiatric Society's ability to press the claims of its members and their patients initially hinges on whether it meets the constitutional requirements for associational standing. For its part, the Society seeks only to pursue claims on behalf of

its members and their patients; it does not allege direct injury to itself.

Our review of a dismissal under Fed.R.Civ.P. 12(b)(6) for lack of standing is plenary. ACLU-NJ v. Township of Wall, 246 F.3d 258, 261 (3d Cir.2001); Gen. Instrument Corp. v. Nu-Tek Elecs. & Mfg., Inc., 197 F.3d 83, 86 (3d Cir.1999). On appeal, we must accept as true all material allegations of the complaint and draw all reasonable inferences in a light most favorable to plaintiff. Maio v. Aetna, Inc., 221 F.3d 472, 481-82 (3d Cir.2000). " 'The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims.' " In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1420 (3d Cir.1997) (quoting Scheuer v. Rhodes, 416 U.S. 232, 236 (1974)). Therefore, we may affirm the district court only if we believe that the association would be entitled to no relief under any set of facts consistent with its allegations. Allegheny Gen. Hosp. v. Philip Morris, Inc., 228 F.3d 429, 434- 35 (3d Cir.2000); City of Pittsburgh v. West Penn Power Co., 147 F.3d 256, 262 n. 12 (3d Cir.1998).

A.

*3 To satisfy the "case or controversy" standing requirement under  Article III, S 2 of the United States Constitution, a plaintiff must establish that it has suffered a cognizable injury that is causally related to the alleged conduct of the defendant and is redressable by judicial action. Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 180-81 (2000) (discussing Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992)); The Pitt News v. Fisher, 215 F.3d 354, 359 (3d Cir.2000). Associations may satisfy these elements by asserting claims that arise from injuries they directly sustain. See, e.g., Babbitt v. United Farm Workers Nat'l Union, 442 U.S. 289, 299 n. 11 (1979). Absent injury to itself, an association may pursue claims solely as a representative of its members. See, e.g., New York State Club Ass'n, Inc. v. City of New York, 487 U.S. 1 (1988); Pub. Interest Research Group of N.J., Inc. v. Magnesium Elektron, Inc., 123 F.3d 111 (3d Cir.1997). By permitting associational standing, we "recognize[ ] that the primary reason people join an organization is often to create an effective vehicle for vindicating interests that they share with others." Int'l Union, United Auto., Aerospace & Agric. Implement Workers v. Brock, 477 U.S. 274, 290 (1986); see also Joint Anti-Fascist Refugee Comm. v. McGrath, 341 U.S.

123, 187 (1951) (Jackson, J., concurring) (noting purpose of joining an association "often is to permit the association ... to vindicate the interests of all").

The Supreme Court has enunciated a three-prong test for associational standing. An association must demonstrate that "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." Hunt v. Wash. State Apple Adver. Comm'n, 432 U.S. 333, 343 (1977) (permitting state agency that represented apple industry to challenge North Carolina statute); see also Laidlaw Envtl. Servs., 528 U.S. at 181; Hosp. Council v. City of Pittsburgh, 949 F.2d 83, 86 (3d Cir.1991). The need for some individual participation, however, does not necessarily bar associational standing under this third criterion. Hospital Council, 949 F.2d at 89-90.

In this case, the MCOs concede the Pennsylvania Psychiatric Society satisfies Hunt's first and second prongs. But echoing defendants' objections, the District Court found the psychiatrists' claims would require a level of individual participation that precludes associational standing. As noted, the Society has not appealed the dismissal of its damages claims. This is noteworthy because damages claims usually require significant individual participation, which fatally undercuts a request for associational standing. On this point, the Supreme Court has explained that
"[w]hether an association has standing to invoke the court's remedial powers on behalf of its members depends in substantial measure on the nature of the relief sought. If in a proper case the association seeks a declaration, injunction, or some other form of prospective relief, it can reasonably be supposed that the remedy, if granted, will inure to the benefit of those members of the association actually injured. Indeed, in all cases in which we have expressly recognized standing in associations to represent their members, the relief sought has been of this kind."
**\*4**  Hunt, 432 U.S. at 343 (quoting Warth v. Seldin, 422 U.S. 490, 515 (1975)). Because claims for monetary relief usually require individual participation, courts have held associations cannot generally raise these claims on behalf of their members. E.g., Air Transp. Ass'n v. Reno, 80 F.3d 477, 484-85 (D.C.Cir.1996) (collecting cases); Sanner v. Bd. of Trade, 62 F.3d 918, 923 (7th

Cir.1995) (same). Specifically, the Supreme Court has counseled that "an association's action for damages running solely to its members would be barred for want of the association's standing to sue." United Food & Commercial Workers Union Local 751 v. Brown Group, Inc., 517 U.S. 544, 546 (1996) (relying on Hunt, 432 U.S. at 343). Had the Society continued to press its claims for damages on appeal, dismissal under Rule 12(b)(6) would be entirely appropriate.

The sole associational standing question remains whether, taking the allegations as true, the Pennsylvania Psychiatric Society's requests for declaratory and injunctive relief will require an inappropriate level of individual participation. [FN3] We first addressed this question in Hospital Council of Western Pennsylvania v. City of Pittsburgh, where an association alleged that certain city and counties threatened to discriminate against nonprofit hospitals on taxation, zoning, and contract matters if the hospitals refused to make voluntary payments in lieu of taxes. 949 F.2d 83. Interpreting Hunt's third prong through the prism of earlier Supreme Court jurisprudence, we rejected the city's argument that some individual participation violated this requirement. [FN4] Id. at 89. Explaining the circumstances on which this conclusion rested, we concluded:

> FN3.  Individual participation by an association's membership may be unnecessary when the relief sought is prospective (i.e., an injunction or declaratory judgment). See Brock, 477 U.S. at 287-88; Ark. Med. Soc'y, Inc. v. Reynolds, 6 F.3d 519, 528 (8th Cir.1993); Action Alliance of Senior Citizens v. Snider, Civ. A. No. 93-4827, 1994 WL 384990, at \*3 (E.D.Pa. July 18, 1994) ("[P]articipation of individual members is rarely necessary when injunctive relief rather than individual damages is sought. Hospital Council, 949 F.2d at 89. This particularly true where ... a broad based change in procedure rather than individualized injunctive relief is sought.").

> FN4.  In its brief, Keystone suggests reasons why individual participation would be required.

[T]he claims asserted by the Council would require some participation by some Council

members. This case, unlike many prior associational standing cases, does not involve a challenge to a statute, regulation, or ordinance, but instead involves a challenge to alleged practices that would probably have to be proved by evidence regarding the manner in which the defendants treated individual member hospitals. Adjudication of such claims would likely require that member hospitals provide discovery, and trial testimony by officers and employees of member hospitals might be needed as well. Nevertheless, since participation by "each [allegedly] injured party" would not be necessary, we see no ground for denying associational standing.
Id. at 89-90.

The Court of Appeals for the Seventh Circuit subsequently adopted our interpretation of Hunt's third prong in Retired Chicago Police Association v. City of Chicago, where the Retired Chicago Police Association sued the city to bar implementation of increased health care premiums. 7 F.3d 584 (7th Cir.1993). In this drawn-out litigation, the Retired Chicago Police Association represented city employees who allegedly had been guaranteed subsidized health coverage. When the city attempted to raise the coverage price because of escalating costs, the employees claimed the city reneged on its promise and sued. Believing the allegations would require individual participation, the district court concluded the association lacked standing. Id. at 600-01. Relying on Hospital Council, the court of appeals reversed and remanded, holding the association could attempt to establish its allegations with limited membership participation. [FN5] Id. at 602-03.

> FN5. The Court of Appeals for the Seventh Circuit stated: We believe that the approach of the Third Circuit is a sound one. We can discern no indication in Warth, Hunt, or Brock that the Supreme Court intended to limit representational standing to cases in which it would not be necessary to take any evidence from individual members of an association.... Rather, the third prong of Hunt is more plausibly read as dealing with situations in which it is necessary to establish "individualized proof," 432 U.S. at 344, for litigants not before the court in order to support the cause of action.
> 7 F.3d at 601-02.

**\*5** The MCOs argue the medical coverage decisions

on psychiatric care and substance abuse services, which form the basis of the organization's allegations, are fact-intensive inquiries. For this reason, they assert the examination of medical care determinations will demand significant individual participation. To buttress this point, defendants note they offer subscribers various health care plans that in turn provide varying benefits. Consequently, they argue, demonstrating any single coverage decision violated their obligations will entail a case-by-case examination of a patient's condition along with the corresponding available benefits. In support, defendants rely on Rent Stabilization Association v. Dinkins, where an association of landowners alleged rent regulations constituted an unconstitutional taking of their property. 5 F.3d 591 (2d Cir.1993). There, the Court of Appeals for the Second Circuit held that the extensive individual testimony required to adjudicate the claims would violate Hunt. Id. at 596; see also Reid v. Dep't of Commerce, 793 F.2d 277, 279-80 (Fed.Cir.1986) (holding union lacked standing to assert back pay claims for its members because each claim depended on member's individual circumstances). The court reasoned the claims foreclosed standing because it

> would have to engage in an ad hoc factual inquiry for each landlord who alleges that he has suffered a taking. [The court] would have to determine the landlord's particular return based on a host of individualized financial data, and [the court] would have to investigate the reasons for any failure to obtain an adequate return, because the Constitution certainly cannot be read to guarantee a profit to an inefficient or incompetent landlord.

Rent Stabilization, 5 F.3d at 596. But the Court of Appeals for the Second Circuit has not rejected associational standing where only limited individual participation by some members would be required. See N.Y. State Nat'l Org. for Women v. Terry, 886 F.2d 1339, 1349 (2d Cir.1989) (association warranted standing although evidence from some individual members necessary); see also Nat'l Ass'n of Coll. Bookstores, Inc. v. Cambridge Univ. Press, 990 F.Supp. 245, 249-50 (S.D.N.Y.1997). We agree that conferring associational standing would be improper for claims requiring a fact-intensive-individual inquiry.

The District Court reviewed the Pennsylvania Psychiatric Society's allegations--overly restrictive treatment authorizations; care determinations based on criteria besides medical necessity; creation of improper obstacles to physician credentialing; imposition of overly--burdensome administrative



requirements; failure to pay psychiatrists for rendered services; direct interference with psychiatrist-patient relations--and found each assertion would necessitate significant individual participation. If this were true, the organization would not satisfy the associational standing requirements. [FN6]

> FN6. Likewise, if the Pennsylvania Psychiatric Society continued to press claims on behalf of its members, it would not meet the requirements for associational standing. See supra p. 8.

But the Pennsylvania Psychiatric Society maintains the heart of its complaint involves systemic policy violations that will make extensive individual participation unnecessary. In effect, the Society contends the methods the MCOs employ for making decisions--e .g., authorizing or denying mental health services, credentialing physicians, and reimbursement--represent breaches of contract as well as tortious conduct. Therefore, insofar as its allegations concern how the MCOs render these decisions, the Society's complaint "involve [s][ ] challenge[s] to established practices," Hospital Council, 949 F.2d at 89, that may be established with sample testimony, which may not involve specific, factually intensive, individual medical care determinations. See Virginia Hosp. Ass'n v. Baliles, 868 F.2d 653, 663 (4th Cir.1989), aff 'd on other grounds sub nom. Wilder v. Virginia Hosp. Ass'n, 496 U.S. 498 (1990).

*6 If the Pennsylvania Psychiatric Society can establish these claims with limited individual participation, it would satisfy the requirements for associational standing. While we question whether the Society can accomplish this, at this stage of the proceedings on a motion to dismiss for lack of standing, we review the sufficiency of the pleadings and "must accept as true all material allegations of the complaint and must construe the complaint in favor of the plaintiff." Trump Hotels & Casino Resorts, Inc. v. Mirage Resorts Inc., 140 F.3d 478, 483 (3d Cir.1998) (citing Warth, 422 U.S. at 501). For this reason, we believe the Society's suit should not be dismissed before it is given the opportunity to establish the alleged violations without significant individual participation (as noted, if the damages claims remained, we would affirm the dismissal under Fed.R.Civ.P. 12(b)(6)). Moreover, as the organization concedes, if it cannot adequately demonstrate the MCOs' breaches with limited

individual participation, its suit should be dismissed. Because this appeal arises on a motion to dismiss, the Pennsylvania Psychiatric Society should be allowed to move forward with its claims within the boundaries of associational standing. Therefore, we conclude that the District Court erred in dismissing the matter on this basis under Fed.R.Civ.P. 12(b)(6). Nevertheless, the District Court is free to revisit this issue.

B.

In addition to advancing the rights of its member psychiatrists, the Pennsylvania Psychiatric Society seeks to assert the claims of its members' patients who are also allegedly injured by defendants' practices. Because the patients are not members of, or otherwise directly associated with, the Pennsylvania Psychiatric Society, the Society does not have associational standing to assert their claims. Nonetheless, the Society maintains it may bring the patients' claims under the doctrine of third-party standing. [FN7] In particular, the Society contends its member psychiatrists have third-party standing to assert the claims of their patients, and the Society has standing to bring the claims of its members, including their third-party claims. Defendants have challenged both of these steps. Therefore, we must decide, first, whether the member psychiatrists have third-party standing to bring the claims of their patients, and second, whether the Pennsylvania Psychiatric Society has associational standing to assert these members' third-party claims.

> FN7. Third-party standing is also commonly known as jus tertii standing. City of Chicago v. Morales, 527 U.S. 41, 56 n. 22 (1999); The Pitt News, 215 F.3d at 362 n. 6; see also Henry Monaghan, Third Party Standing, 84 Colum. L.Rev. 277, 278 n. 6 (1984) (explaining jus tertii standing).

1.

Apart from the constitutional requirements for standing, [FN8] courts have imposed a set of prudential limitations on the exercise of federal jurisdiction over third-party claims. Bennett v. Spear, 520 U.S. 154, 162 (1997) ("[T]he federal judiciary has also adhered to a set of prudential principles that bear on the question of standing.") (quotation and citation omitted); Warth, 422 U.S. at 498; Powell v. Ridge, 189 F.3d 387, 404 (3d Cir.1999). The restrictions against third-party

standing do not stem from the Article III "case or controversy" requirement, but rather from prudential concerns, [FN9] Amato v. Wilentz, 952 F.2d 742, 748 (3d Cir.1991), which prevent courts from "deciding questions of broad social import where no individual rights would be vindicated and ... limit access to the federal courts to those litigants best suited to assert a particular claim." Gladstone, Realtors v. Vill. of Bellwood, 441 U.S. 91, 99-100 (1979); see also Sec'y of State v. Joseph H. Munson Co., 467 U.S. 947, 955 (1984).

> FN8. Under standing doctrine, a plaintiff must satisfy three constitutional preconditions: (1) a cognizable injury that is (2) causally connected to the alleged conduct and is (3) capable of being redressed by a favorable judicial decision. Lujan, 504 U.S. at 560-61; see also supra pp. 6-7.

> FN9. The Supreme Court has consistently held that standing to assert third-party rights is a prudential matter:
> [O]ur decisions have settled that limitations on a litigant's assertion of jus tertii are not constitutionally mandated, but rather stem from a salutary "rule of self-restraint" designed to minimize unwarranted intervention into controversies where the applicable constitutional questions are ill-defined and speculative.
> Craig v. Boren, 429 U.S. 190, 193-95 (1976); see also Brown Group, 517 U.S. at 557; Allen v. Wright, 468 U.S. 737, 751 (1984); Singleton v. Wulff, 428 U.S. 106, 123-24 (1976) (plurality opinion); Warth 422 U.S. at 499; Barrows v. Jackson, 346 U.S. 249, 255, 257 (1953).

*7 It is a well-established tenet of standing that a "litigant must assert his or her own legal rights and interests, and cannot rest a claim to relief on the legal rights or interests of third parties." Powers v. Ohio, 499 U.S. 400, 410 (1991); see also Valley Forge Christian Coll. v. Ams. United for Separation of Church and State, Inc., 454 U.S. 464, 474-75 (1982); Wheeler v. Travelers Ins. Co., 22 F.3d 534, 538 (3d Cir.1994). This principle is based on the assumption that "third parties themselves usually will be the best proponents of their own rights," Singleton v. Wulff, 428 U.S. 106, 114 (1976) (plurality opinion), which serves to foster judicial restraint and ensure the clear presentation of issues.

See Munson, 467 U.S. at 955.

Yet the prohibition is not invariable and our jurisprudence recognizes third- party standing under certain circumstances. [FN10] Campbell v. Louisiana, 523 U.S. 392, 397-98 (1998); see also Hodel v. Irving, 481 U.S. 704, 711 (1987) (acknowledging general rule that party must assert own interests is "subject to exceptions"). In particular, if a course of conduct "prevents a third-party from entering into a relationship with the litigant (typically a contractual relationship), to which relationship the third party has a legal entitlement," third-party standing may be appropriate. United States Dep't of Labor v. Triplett, 494 U.S. 715, 720 (1990); see also Munson, 467 U.S. at 954-58 (fundraiser had third-party standing to challenge statute limiting fees charitable organizations could pay because law infringed on organizations' right to hire fundraiser for a higher fee).

> FN10. For instance, doctors may be able to assert the rights of patients; lawyers may be able to assert the rights of clients; vendors may be able to assert the rights of customers; and candidates for public office may be able to assert the rights of voters. See, e.g., Caplin & Drysdale, Chartered v. United States, 491 U.S. 617 (1989) (holding lawyer could bring Sixth Amendment lawsuit on behalf of criminal defendant); Singleton, 428 U.S. 106 (conferring standing on physicians on behalf of patients to challenge a statute that excluded funding for abortions from Medicaid benefits); Craig, 429 U.S. 190 (allowing vendor to challenge statute that prohibited males under age of twenty-one from buying beer); Mancuso v. Taft, 476 F.2d 187 (1st Cir.1973) (permitting candidate for public office to raise voters' rights).

The Supreme Court has found that the principles animating these prudential concerns are not subverted if the third party is hindered from asserting its own rights and shares an identity of interests with the plaintiff. See Craig, 429 U.S. at 193-94; Singleton, 428 U.S. at 114-15; Eisenstadt v. Baird, 405 U.S. 438, 443-46 (1972). More specifically, third-party standing requires the satisfaction of three preconditions: 1) the plaintiff must suffer injury; 2) the plaintiff and the third party must have a "close relationship"; and 3) the third

party must face some obstacles that prevent it from pursuing its own claims. Campbell, 523 U.S. at 397; Powers, 499 U.S. at 411; The Pitt News, 215 F.3d at 362. It remains for courts to balance these factors to determine if third-party standing is warranted. Amato, 952 F.2d at 750.

a.

Although the Pennsylvania Psychiatric Society itself has not suffered direct injury, it is uncontested that it properly pleaded that defendants' policies and procedures have economically injured its member psychiatrists and undermined their ability to provide quality health care. Thus, while the Society does not itself stand in an appropriate relationship to the patients' claims to directly assert them, its members may have third-party standing to do so. [FN11] And because plaintiff seeks to establish standing on the basis of its members' standing to bring these claims, the members are the appropriate focus of inquiry for these purposes.

> FN11. The District Court held--and the dissent argues--that the Pennsylvania Psychiatric Society could not raise these claims because it did not itself suffer injury. Injury to the Society, however, is not relevant to the issue of the psychiatrists' standing to bring the patients' claims. Because of the Society's posture, that is the initial question to be resolved. Only after it is determined that the member psychiatrists would have third-party standing over these claims do we assess whether the Society can bring its members' third-party claims. It is in the latter context that injury to appellant itself is a potential requirement, which we discuss below.

b.

**\*8** We next turn to whether the psychiatrists and their patients have a sufficiently "close relationship" which will permit the physicians to effectively advance their patients' claims. To meet this standard, this relationship must permit the psychiatrists to operate " 'fully, or very nearly, as effective a proponent' " of their patients' rights as the patients themselves. [FN12] Powers, 499 U.S. at 413 (quoting Singleton, 428 U.S. at 115).

> FN12. Courts have generally recognized physicians' authority to pursue the claims of

their patients. Am. Coll. of Obstetricians & Gynecologists v. Thornburgh, 737 F.2d 283, 290 & n. 6 (3d Cir.1984) (collecting cases where physicians allowed to assert patients' claims); see also Planned Parenthood v. Farmer, 220 F.3d 127, 147 & n. 10 (3d Cir.2000).

The patients' relationships with their psychiatrists fulfills this requirement. See supra note 12. In Singleton v. Wulff, the Supreme Court granted physicians third-party standing on behalf of their patients to challenge a statute prohibiting Medicaid funding for certain abortions. 428 U.S. 106. Because of the inherent closeness of the doctor-patient relationship, the plurality found the physicians could efficaciously advocate their patients' interests. Id. at 117 (noting "abortion decision is one in which the physician is intimately involved"). The relationship forged between psychiatrists and their patients is equally compelling.

Psychiatrists clearly have the kind of relationship with their patients which lends itself to advancing claims on their behalf. This intimate relationship and the resulting mental health treatment ensures psychiatrists can effectively assert their patients' rights. Because the Pennsylvania Psychiatric Society alleges the MCOs prevent patients from receiving necessary mental health services and psychiatrists from providing them, its member psychiatrists would be well-suited to litigate these claims for both parties, as their interests are clearly aligned. See Amato, 952 F.2d at 751 (noting doctor-patient relationship provides strong likelihood of effective advocacy by a physician on behalf of his patients). Accordingly, we believe the psychiatrist-patient relationship would satisfy the second criterion for third-party standing. [FN13]

> FN13. The importance of the psychiatrist-patient relationship has been recognized in other settings too. In Jaffee v. Redmond, the Supreme Court upheld the evidentiary privilege for psychotherapist-patient communications. 518 U.S. 1, 10-15 (1996).

c.

Finally, we examine whether the mental health patients face obstacles to pursuing litigation themselves. This criterion does not require an absolute bar from suit, but "some hindrance to the third party's ability to protect his or her own

interests," Powers, 499 U.S. at 411. In other words, a party need not face insurmountable hurdles to warrant third-party standing. [FN14] Id. at 415 (holding excluded juror's limited incentive to bring discrimination suit satisfied obstacle requirement for criminal defendant to merit third-party standing); Singleton, 428 U.S. at 117 (recognizing lawsuit's invasion of patient's privacy and "imminent mootness" of pregnancy sufficiently impeded patient from bringing suit herself). The District Court found the patients' mental health problems did not significantly hinder them from suing. We disagree.

> FN14. One treatise insists that "cases do not demand an absolute impossibility of suit in order to fall within the[impediment] exception. At the other end of the spectrum, a practical disincentive to sue may suffice, although a mere disincentive is less persuasive than a concrete impediment." 15 James Wm. Moore et al., Moore's Federal Practice S 101.51 [3][c].

The stigma associated with receiving mental health services presents a considerable deterrent to litigation. Cf. Parham v. J.R., 442 U.S. 584, 622 (1979) (Stewart, J., concurring) ("There can be no doubt that commitment to a mental institution results in massive curtailment of liberty. In addition to the physical confinement involved, a person's liberty is also substantially affected by the stigma attached to treatment in a mental hospital.") (quotations and citations omitted); Humphreys v. Drug Enforcement Admin., 96 F.3d 658, 662 (3d Cir.1996) (noting "psychiatric patients suffer a stigma in society") (quotation and citation omitted). For example, the Supreme Court recognized in Singleton that the obstacles confronted by women in opposing an abortion statute were not overwhelming. In fact, the Court acknowledged the suit could have been brought pseudonymously or as a class. Singleton, 428 U.S. at 117. The Court still concluded that a woman's desire to protect her privacy could discourage her from bringing suit and constituted a sufficient impediment. Id. at 117-18. These concerns apply with equal, if not greater, force to mental health patients. See Bd. of Trustees of Univ. of Ala. v. Garrett, 531 U.S. 356, 375 (2001) ("There can be little doubt, then, that persons with mental or physical impairments are confronted with prejudice which can stem from indifference or insecurity as well as from malicious ill will.") (Kennedy, J., concurring). Besides the stigmatization that may blunt mental health patients' incentive to pursue

litigation, their impaired condition may prevent them from being able to assert their claims. Therefore, we believe the patients' fear of stigmatization, coupled with their potential incapacity to pursue legal remedies, operates as a powerful deterrent to bringing suit.

**\*9** Because the third-party claims asserted by the Pennsylvania Psychiatric Society do not implicate any constitutional rights of the psychiatrists' patients, the MCOs contend that granting third-party standing is unwarranted. While successful third-party standing claims have involved alleged violations of third parties' constitutional rights, Singleton and its progeny have not stipulated that constitutional claims are a prerequisite. [FN15] It is true that the rule against third-party standing "normally bars litigants from asserting the rights or legal interests of others in order to obtain relief from injury to themselves."

> FN15. Simply raising a third party's constitutional claims will not in and of itself satisfy the requirements for third-party standing. For instance, a litigant may not assert a third party's Fourth Amendment rights against unreasonable search and seizure to prevent the admission of damaging evidence. E.g., United States v. Payner, 447 U.S. 727 (1980); see also Monaghan, supra note 7, at 305 n. 149.

Warth, 422 U.S. at 509. Furthermore, the Supreme Court has noted that courts must consider "the relationship of the litigant to the person whose rights are being asserted; the ability of the person to advance his own rights; and the impact of the litigation on third-party interests." Caplin & Drysdale, 491 U.S. at 623 n. 3. But the Court has not held that a constitutional claim must also be alleged, see, e.g., Powers, 499 U.S. at 410-11, and absent further guidance, we will not impose this requirement. For these reasons, we hold the Pennsylvania Psychiatric Society's member psychiatrists would have third-party standing to assert the claims of their patients.

2.

The Pennsylvania Psychiatric Society contends it has standing to bring these third-party claims just as it has standing to bring its members' other claims under the doctrine of associational standing. Defendants maintain the patients' claims are too attenuated from the Society to permit derivative

standing.

We decline to adopt a per se rule barring such derivative claims. The Supreme Court did not delineate in Hunt which types of claims associations could bring on behalf of their members, but rather simply held that "an association has standing to bring suit on behalf of its members" when the requisite elements are established. Hunt, 432 U.S. at 343.

The limitations on derivative standing, therefore, are to be determined by applying the test for associational standing specified in Hunt. Our holding that the Pennsylvania Psychiatric Society has alleged facts sufficient to establish the third-party standing of its members to bring their patients' claims implies the satisfaction of only the first requirement of the Hunt test--that "its members would otherwise have standing" to bring these claims. A third-party claim must also meet the requirements that "the interests it seeks to protect are germane to the organization's purpose" and that "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." Id. These factors inform the analysis whether an association stands in the correct relationship to a claim to allow it to assert that claim on behalf of others.

Other courts of appeals have adopted this approach in finding standing in similar cases. In Fraternal Order of Police v. United States, the Court of Appeals for the District of Columbia granted an organization derivative authority to assert the third-party claims of its members. 152 F.3d 998, 1002 (D.C.Cir.1998) ("[T]he presence of[the chief law enforcement officers] as members gives the FOP standing to make these [third-party] claims as well."). [FN16] The Fraternal Order of Police sued to contest the constitutionality of federal legislation that prohibited supplying firearms to police officers convicted of domestic violence. Id. at 1000-01. Because a chief law enforcement officer would be liable for supplying a firearm to a subordinate convicted of domestic violence and because the failure to supply a weapon could also violate the subordinate officer's rights, the court of appeals found the chiefs had third-party standing to advance the claims of their officers. Id. at 1002. Since the chiefs were members of the Fraternal Order of Police, the association had standing to advance the chiefs' claims as well as the claims of their subordinates. Similar to this case, none of the members were themselves party to the suit. [FN17]

FN16. The opinion containing the discussion of standing in Fraternal Order of Police was reversed on rehearing. Fraternal Order of Police v. United States, 173 F.3d 898 (D.C.Cir.1999). In the second opinion, however, the court stated, "The analysis of standing on this issue is unchanged from our prior opinion." Id. at 903.

FN17. Contrary to the dissent, we believe Fraternal Order of Police supports recognition of the combination of associational standing and third-party standing, since the standing "bridge" in that case--the chief law enforcement officers-- were not parties to the litigation.

*10 The Court of Appeals for the Sixth Circuit also granted an organization derivative authority to enjoin the enforcement of a statute requiring private schools to administer proficiency tests in Ohio Association of Independent Schools v. Goff. 92 F.3d 419, 421-22 (6th Cir.1996). As parties to the litigation, the association's member schools had standing because failure to comply with the statute would result in the loss of their school charters. Id. at 422. The private schools also had third-party standing to assert the constitutional right of their students' parents to direct their children's education. Because its member schools could be injured by the statute, the Ohio Association of Independent Schools also had standing to assert their claims. Since its member schools had standing to assert the rights of the parents, the court held the Ohio Association of Independent Schools also had standing to sue on behalf of the parents whose children attended its members' schools. Id. ("The member schools ... have standing ... on behalf of parents of students who are threatened with the nonreceipt of diplomas. Consequently, the OAIS itself, as an organization dedicated exclusively to advancing the interests of the member schools, has associational standing to challenge the statutes at issue."). Thus, while some member schools--the intermediate parties--were parties to the dispute, the Sixth Circuit's standing analysis did not rely on that fact. We see a compelling analogy between these cases and the claims before us, and believe the Pennsylvania Psychiatric Society may have standing to assert its members' third-party claims.

The District Court found the Pennsylvania Psychiatric Society lacked derivative authority to pursue the claims of its members' patients because it had not suffered direct injury itself. On this point,

defendants contend Goff is inapt because the Court of Appeals for the Sixth Circuit did not require that the association suffer injury in fact. See Amato, 952 F.2d at 749. This criticism is misplaced. It is generally true that third-party standing requires the party who advances the interests of another party to also suffer discrete injury. As noted previously, this prudential requirement sharpens presentation of claims and avoids litigation of general grievances. But when an association, which has not sustained direct injury, obtains standing to pursue the claims of its members, the association may rely on the injuries sustained by its members to satisfy the injury-in-fact requirement. Consequently, once an organization's members establish third-party standing, the prudential concerns are alleviated if the association also has authority to assert its members' claims.

It is a well-recognized anomaly of representational standing that the individuals who have sustained the requisite injury to satisfy the constitutional and prudential standing criteria are not in fact responsible for bringing suit. So long as the association's members have or will suffer sufficient injury to merit standing and their members possess standing to represent the interests of third-parties, then associations can advance the third-party claims of their members without suffering injuries themselves. [FN18] If on remand the Pennsylvania Psychiatric Society warrants associational standing to represent its members, we conclude it also may have derivative authority to raise the claims of its members' patients. [FN19]

> FN18. In Public Citizen v. FTC, the Court of Appeals for the District of Columbia held Public Citizen and other organizations had standing to challenge an FTC regulation exempting certain promotional items from a statutory requirement that all advertisements for smokeless tobacco products carry certain health warnings. 869 F.2d 1541 (D.C.Cir.1989). The court held the organizations had associational standing to assert the claims of their members. Id. at 1550. Additionally, the court held that members who were also parents had standing to advance claims for their children. The organizations thus had the derivative authority to assert the claims of their members' children as well. Id.

> FN19. Because the District Court held the Pennsylvania Psychiatric Society did not

have standing to assert the claims of its members' patients, it found the organization itself did not fall within the "zone of interests" of the common law fraud or statutory fraud claims asserted on behalf of the psychiatrists' patients. Because we reverse and remand the District Court's judgment on associational and third-party standing, it will have to reconsider this issue.

## IV.

*11 We now consider the arbitration provision in the Provider Agreement between the MCOs and the psychiatrists. [FN20] The Pennsylvania Psychiatric Society argues that the District Court erred in holding all its claims were subject to mandatory arbitration. The Society contends the arbitration provision should not apply to its member psychiatrists for several reasons: (1) the arbitration provision is an unconscionable contract of adhesion; (2) the organization's broad-based claims are beyond the scope of the arbitration provision; (3) claims regarding the process of determining medical necessity fall outside the purview of arbitration and pursuing these claims through the available internal review procedures would be futile; and (4) the psychiatrists with initial credentialing or re-credentialing claims do not have contracts with the MCOs requiring arbitration. [FN21]

> FN20. The Provider Agreement provides in part:
> Section 10.1 Resolution of Disputes. In the event that a dispute between Green Spring and Provider arises out of or is related to this Agreement, the parties to the dispute agree to negotiate in good faith to attempt to resolve the dispute. In the event the dispute is not resolved within 30 days of the date one party sent written notice of the dispute to the other party, and if any party wishes to pursue the dispute, it shall be submitted to binding arbitration in accordance with the rules of the American Arbitration Association.... If the dispute pertains to a matter which is generally administered in accordance with Green Spring's procedures involving, for example, credentialing or quality assurance, the procedures set forth by Green Spring must be fully exhausted by Provider before Provider may invoke its right to arbitration under this Section.

Provider acknowledges that the recommendation and determination of whether Health Services are Medically Necessary shall be made in accordance with Green Spring's policies and procedures and shall not be subject to this Section 10.

The Provider Agreement defines Medically Necessary Health Services as:

Health Services including professional services and supplies rendered by a Provider to identify or treat an illness that has been diagnosed or is suspected, and which are: (a) consistent with (i) the efficient diagnosis and treatment of a condition; and (ii) standards of good medical practice; (b) required for other than convenience; (c) the most appropriate supply or level of service; (d) unable to be provided in a more cost-effective and efficient manner; and (e) unable to be provided at a facility providing a less intensive level of care. When applied to inpatient care, the term means: The needed care cannot be safely given on other than an inpatient basis.

FN21. The District Court believed that these claims had all been settled, but the Pennsylvania Psychiatric Society maintains in its brief that these claims have not been addressed completely. Keystone also argues the association should be prohibited from asserting claims on behalf of psychiatrists that Green Spring Health Services has never credentialed because their claims are not present in the Pennsylvania Psychiatric Society's Amended Complaint. See Pa. ex. rel. Zimmerman v. PepsiCo, Inc., 836 F.2d 173, 181 (3d Cir.1988). In addition, defendants contend that the Pennsylvania Psychiatric Society has not asserted a single claim in its complaint on behalf of psychiatrists who have been denied credentialing by defendants. However, several of the allegations in the organization's amended complaint could arguably be read as asserting claims on behalf of this class of psychiatrists. Although the Amended Complaint is somewhat ambiguous, all these claims may be found woven throughout the allegations.

Because it denied the Society associational and third-party standing to advance the claims of its

members' patients, the District Court did not did not examine whether the patients' claims would be subject to mandatory arbitration. The District Court only reviewed the effect of the arbitration provision on the credentialed psychiatrists who are Society members. It strikes us that, assuming the Society has standing to assert the claims of each party, the District Court will have to re-examine the scope as well as the effect of the arbitration provision on all the parties involved. Because we find the Pennsylvania Psychiatric Society survives a motion to dismiss for lack of standing, the District Court must sort through, in the first instance, the impact of the psychiatrists' arbitration clause on the alleged claims.

V.

We will reverse and remand the dismissal of the Pennsylvania Psychiatric Society's complaint for lack of standing. Depending on the level of individual participation necessary to demonstrate its claims, the Society may have standing to press the claims of its member psychiatrists and their patients. Of course, we express no opinion as to the merits of any of the claims or defenses.

We will reverse the order of the District Court and remand for proceedings consistent with this opinion.

NYGAARD, Circuit Judge, dissenting:

I agree with much of what the majority has said. I part company, however, with its conclusion that grants PPS a hybrid-type of third-party derivative standing. PPS argues that it has standing to litigate, not the interests of its member-psychiatrists, but rather the issues and interests of its member-psychiatrists' patients--who are three steps removed from PPS. PPS's argument has three premises. Its first two premises are exceptions to the standing rule: 1) that PPS has associational standing to litigate on behalf of its member- psychiatrists; and, 2) that its member-psychiatrists have third-party standing to litigate on behalf of their patients. Its third premise is that these exceptions can be "stacked" to concoct a new exception to the standing rule. PPS thus concludes that it should have standing to litigate on behalf if its members' patients.

*12 The first two premises are sound, but I disagree with the majority on the third. PPS cannot piggy-back two discrete exceptions, to swallow up the long-standing rule that litigants must assert their own

rights and interests. I cannot find, nor does PPS cite, any authority for stacking or piggy-backing these relationships into an attenuated concatenation of exceptions to the standing rule so as to confer standing on PPS. I would hold that PPS cannot seek relief based upon the rights and interests of remote third parties. I must therefore respectfully dissent on this point.

Central to my conclusion is that PPS's third premise runs afoul of Amato v. Wilentz, 952 F.2d 742 (3d Cir.1991), wherein we discussed the objectives and standards for third-party standing. Although third-party standing typically proves to be a nebulous prudential doctrine, sensitive to the particularities and peculiarities of the relationship between the parties and their claims, we distilled a basic test for third-party standing in Amato. Id. at 748-49. We require that the party seeking standing must first have suffered an injury in fact. If the party seeking standing has suffered an injury in fact, the court must then examine further, considering: a) the intimacy of the relationship between the parties; b) any impediment the party might have to advancing its own rights; and c) the identity of the interests between the parties. Id. at 749.

Applying the Amato standards, the District Court first found that PPS did not itself suffer an injury. No one disputes this fact. I agree with the District Court that because PPS has not even alleged a concrete injury to itself, it cannot satisfy Amato's most elementary standard. Standing should be denied to PPS on this test alone.

The District Court, however, continued and found that even if PPS had alleged an injury in fact to itself, Amato's subsequent elements, or balancing tests, would not favor PPS third-party standing for its members' patients. The District Court found that the "relationship between PPS and the patient subscribers is so attenuated as to weigh against PPS to bring suit on behalf of persons with which it has no direct relationship." The District Court next found that "there appears to be no impediment to the patients seeking to enforce their legal claims themselves" and the patients face "no affirmative obstacle to sue[ ]." I agree with the District Court that even had PPS shown an injury-in-fact, the subsequent balancing test would not confer standing on PPS. The argument that psychiatric patients may face some impediment to bringing these claims themselves, because of the stigma attached to mental illness and psychiatric care, is mere speculation, and

moreover, this factor is counterbalanced by the remoteness of the relationship between PPS and its members' patients. The relationship between PPS and the patients is nothing like the doctor/patient intimacy that supports that exception to the standing rule.

**\*13** Thus the District Court held that PPS should be denied third-party standing for its member' patients for three distinct reasons: 1) PPS suffered no injury in fact and therefore the Court did not need to entertain the secondary balancing factors set forth in Amato; 2) even if PPS did merit consideration under the balancing test, the balancing test would not weigh in favor of granting standing since PPS's relationship with its members' patients is too attenuated; and 3) the patients have no substantial obstacle to bringing their claims independently. I agree with all three reasons, and with the District Court's conclusion.

PPS argues to us that the District Court "ignored significant case law recognizing derivative third-party standing." Nonsense. None of the cases PPS cites are directly on point. PPS and its amici cite cases that confer standing to doctors to litigate on behalf of their patients. But this does nothing to advance PPS' argument on the "stacking" issue presented here. PPS cites both American College of Obstetricans v. Thornburgh, 737 F.2d 283 (3d Cir .1983) and Ohio Association of Independent Schools v. Goff, 92 F.3d 419 (6th Cir.1996), to support the notion that "an association may assert third-party claims that could be brought by its members." Neither of these cases stand for such a notion.

In Ohio Association, the association, along with several of its member schools, sought standing for parents of children in the schools to challenge the requirement of state formulated testing in private schools. Ohio Association, 92 F.3d at 421. The Court found that the "OAIS member schools also have standing to assert the constitutional right of parents to direct their children's education ." Id. at 422 (emphasis added). Thus the Court did not find that the association had standing to assert parents' interests, but that individual schools had standing to do so. Thus the operative distinction between Ohio Association and PPS' argument is that in Ohio Association both the association and its individual members jointly brought the suit, but here, PPS attempts to bring its claims to court without the participation of any of its members.

American College presents the same problems for PPS. In American College, the challenge was brought by a team of an association, doctors, and medical providers. American College, 737 F.2d at 289. In a footnote the Court stated that the "district court concluded that plaintiff physicians, ACOG, and medical providers all had standing to raise their own interests (or the interests of members) and those of patients and customers in challenging the Act's constitutionality. We affirm this general conclusion." Id. at 290 n. 6. As in Ohio Association, the standing questions in American College turned on the doctors actually participating in the suit. The reason is obvious: The doctors provide the standing "bridge" between the association and the patients. All of the support cited in American College demonstrates the need for physicians to participate in the suit to establish standing. Id. (citing City of Akron v. Akron Ctr. for Reprod. Health, 462 U.S. 416 (1983) (challenge by abortion clinics and a physician); Planned Parenthood Ass'n v. Ashcroft, 462 U.S. 476 (1983) (challenge by Planned Parenthood, two physicians and an abortion clinic); Planned Parenthood v. Danforth, 428 U.S. 52, 62 (1976) (challenge by Planned Parenthood and two physicians); Singleton v. Wulff, 428 U.S. 106 (1976) (challenge by two physicians)).

**\*14** Other cases demonstrate this need for a caretaker, such as a parent or advising officer, to be a party to the suit to provide the bridge between the association and the harmed individual. See Fraternal Order of Police v. United States, 152 F.3d 998 (D.C.Cir.1998) (granting standing for an organization whose members included chief law enforcement officers based on the chief law enforcement officer's standing to advance the equal-protection rights of subordinate officers); Public Citizen v. FTC, 869 F.2d 1541 (D.C.Cir.1989) (organizations had standing to challenge an FTC regulation that exempted certain promotional items from the requirement that advertising for smokeless tobacco products carry health warnings, since the members of the organizations included parents of children who might be injured by the lack of warnings).

In summary, I agree with the manner in which the District Court applied the Amato standard. I am convinced that PPS has neither successfully met (nor circumnavigated, as the case may be) Amato's requirement that PPS must have itself suffered an injury. Hence I respectfully dissent and would affirm the District Court.

END OF DOCUMENT

17

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

2000 WL 1472749
**(Cite as: 2000 WL 1472749 (D.Kan.))**

Only the Westlaw citation is currently available.

United States District Court, D. Kansas.

**Luz UNZUETA, as Special Administrator of the
Estate of Alan Unzueta, Felicitas
Unzueta, Individually, Felicitas Unzueta, on
behalf of Alan Martinez, a minor
child; and Kansas Advocacy Protective Services,
Inc., a Kansas Corporation,
Plaintiffs,
v.
Janet SCHALANSKY; Connie Hubbell; Mani
Lee; Dennis Steele; Michael H. Tudor;
Philip A. Schreiber; Robert L. Janousek;
Bethany Smith; and Vanessa Paige,
Defendants.**

**No. 99-4162-RDR.**

July 6, 2000.

MEMORANDUM AND ORDER

ROGERS.

*1  This case is now before the court upon the
motion to dismiss and motion to sever of defendants
Schalansky, Goering and Lee.

Plaintiffs in this action are: Luz E. Unzueta, as
administrator of the estate of Alan Unzueta; Felicitas
Unzueta (mother of Alan) on behalf of Alan
Martinez, (a minor child of Alan Unzueta); James S.
Phillips, Jr. as limited conservator for Alan Jelinek,
(also a minor child of Alan Unzueta); and Kansas
Advocacy and Protective Services, Inc.("KAPS").
Defendants are Janet Schalansky, Connie Hubbell,
Lyn Goering, Mani Lee, Dennis Steele, Michael H.
Tudor, Philip A. Schreiber, Robert L. Janousek,
Bethany Smith, and Vanessa Paige. Hubbell was
originally sued in her official capacity. She has since
left the Department of Social and Rehabilitation
Services and been replaced by Lyn Goering. Goering
has been substituted as a defendant in her official
capacity. Hubbell remains a defendant in her
individual capacity.

KAPS is a federally funded non-profit corporation
under Kansas law which acts as an advocacy agency
for persons with disabilities. It is mandated by
Congress to advocate for appropriate services for
persons with disabilities and to see their rights are
protected. Under the Protection and Advocacy for
Mentally Ill Individuals Act of 1986 ("PAMII"), 42
U.S.C. § 10801 *et seq.,* KAPS is "authorized to ...
pursue legal remedies on behalf of institutionalized
individuals who suffer from mental illness and
provide legal representation to such individuals."

The Unzueta plaintiffs are related to Alan Unzueta,
a 16-year old who died at Larned State Hospital
allegedly because of the improper actions of staff
members and officials. These plaintiffs have brought
damages claims against Mani Lee, the
Superintendent of Larned State Hospital, Connie
Hubbell, the former Assistant Secretary for Health
Care of the Department of Social and Rehabilitation
Services, and six employees of the Larned State
Hospital (Dennis Steele, Michael H. Tudor, Philip
Schreiber, Robert Janousek, Bethany Smith and
Vanessa Paige) in their individual capacities.
Plaintiff KAPS is suing Schalansky, Goering (who
replaced Hubbell as Assistant Secretary) and Lee in
their official capacities for prospective injunctive and
declaratory relief.

*Motion to dismiss*

The court may not grant the motion to dismiss
unless it appears beyond doubt that plaintiffs can
prove no set of facts which would entitle them to
relief upon their claims. *Hall v. Bellmon,* 935 F.2d
1106, 1109 (10th Cir.1991) (citing    *Conley v.
Gibson,* 355 U.S. 41, 45-46 (1957)). We must
presume that plaintiffs' factual allegations are true
and construe them in the light most favorable to
plaintiffs. *Id.*

The amended complaint in this matter makes the
following claims and allegations. Alan Unzueta was
admitted to Larned State Hospital ("LSH") on
September 2, 1998 and diagnosed with intermittent
explosive disorder and possible depressive disorder.
When he was admitted he was placed on a suicide
warning and held in ambulatory restraints twenty-
four hours a day through September 24, 1998.
Unzueta was tall and weighed 234 pounds. Unzueta

was allowed more freedom until he was completely released from ambulatory restraints on October 9, 1998.

*2 On October 27, 1998, at a Halloween party/dance for the patients in the adolescent ward, Unzueta was reprimanded by staff. He walked to a corner of the auditorium and sat by himself. Concerned that Unzueta had become agitated, a staff member approached him at a drinking fountain and asked him if he was alright. Unzueta did not respond. The staff member then followed Unzueta back to where he was sitting and asked if he wanted to go back to his unit. Unzueta then stood up, grabbed the coat of the staff member and struck him on the jaw.

Other staff members saw this and rushed to provide assistance. The complaint alleges that one staff member persuaded Unzueta to sit down. The complaint further alleges that, although the situation was then under control, defendants Schreiber and Tudor took Unzueta's arms and defendant Steele placed Unzueta in a chokehold. Defendant Schreiber then kicked Unzueta's right leg out from under him, causing Unzueta to fall to his stomach. Defendant's Janousek, Smith and Paige then restrained Unzueta's legs.

After some minutes security officers arrived and placed Unzueta in hand cuffs. At that time, it was determined that Unzueta was not breathing and had no radial pulse. A code blue call was made and medical personnel arrived in five to seven minutes. They found Unzueta gasping for air and could detect a heart beat. They were told that Unzueta had fallen. After some time had passed oxygen was administered. It was then discovered that Unzueta was incontinent of bowel and bladder. An ambulance was dispatched. The emergency medical technician assessed Unzueta's condition as grave. His eyes were fixed and dilated, a sign of brain damage.

Unzueta died at a hospital in Great Bend, Kansas at approximately 2:05 a.m. on October 28, 1998. The coroner listed the official cause of death as positional asphyxia. His opinion was that Unzueta died from asphyxiation caused when he was restrained in a prone position. The Kansas Attorney General has concurred.

The complaint alleges that defendant Steele had previously been counseled for using inappropriate physical force upon two patients. It is further alleged

that Steele and other LSH employees had no training on the use of force, restraint and de-escalation techniques and that the hospital had no written policy on the subjects. Plaintiffs also assert that emergency medical equipment was not readily available to respond to Unzueta's medical crisis.

Perhaps more pertinent to the standing issues raised in the instant motion to dismiss, the complaint contains the following allegations:

88. Patients on the adolescent unit have expressed concerns to KAPS regarding the lack of active treatment to address their individual needs.

89. Patients on the adolescent unit of Larned State Hospital have expressed concerns to KAPS that physical restraint is the primary means of controlling patients.

90. Patients on the adolescent unit of Larned State Hospital have reported concerns to KAPS that the patients do not believe that the unit is adequately staffed to meet the individual needs of the patients.

*3 ....

180. The failure of Defendants Schalansky, [Goering] and Lee to develop and implement policies and procedures to increase the use of de-escalation techniques on the adolescent unit at Larned State Hospital; to prohibit the use of excessive and unnecessary physical or chemical restraints on the adolescent unit; and to require periodic training of staff members on the adolescent unit on appropriate de-escalation techniques and seclusion and restraint procedures constitute a violation of the current and future patients' liberty interests without due process of law under the Fifth and Fourteenth Amendments to the United States Constitution, 42 U.S.C. § 1981, 1983, Section 1 of the Bill of Rights, Kansas State Constitution.

181. The failure of Defendants Schalansky, [Goering] and Lee to maintain adequate staffing levels on the adolescent unit at Larned State Hospital to provide appropriate care and treatment to meet the needs of current and future patients on the adolescent unit of Larned State Hospital constitutes a violation of those patients' liberty interests without due process of law under the Fifth and Fourteenth Amendment to the United States Constitution, 42 U.S.C. § 1983, Section 1 of the Bill of Rights, Kansas State Constitution.

182. The failure of Defendants Schalansky, [Goering] and Lee to supervise and train direct care staff on the adolescent unit of Larned State Hospital in the appropriate use of de-escalation techniques and seclusion and restraints constitutes

a violation of those patients' liberty interests without due process of law under the Fifth and Fourteenth Amendment to the United States Constitution, 42 U.S.C. § 1983, Section 1 of the Bill of Rights, Kansas State Constitution.

183. As a result of Defendants Schalansky, [Goering] and Lees' failure to develop and implement policies and procedures for the Larned State Hospital adolescent unit to prohibit the excessive use of physical and chemical restraints, current and future patients will be injured and damaged.

184. As a result of Defendants Schalansky, [Goering] and Lees' failure to develop and implement policies and procedures requiring the maintenance of adequate staffing levels on the Larned State Hospital adolescent unit to provide active treatment to meet the individual patient's needs and to reduce the number of seclusion and restraint hours, current and future patients of Larned State Hospital will be injured and damaged.

185. As [a] result of Defendants Schalansky, [Goering] and Lees' failure to develop and implement policies and procedures to require the periodic training of direct care staff who provide care on the adolescent unit of Larned State Hospital in the appropriate use of de-escalation techniques and physical and chemical restraints, current and future patients of Larned State Hospital will be injured and damaged.

Very similar allegations predicting future injury and damage to current and future patients of LSH are contained in paragraphs 195 through 197 alleging a failure of training, supervision and policymaking on limiting the use of physical and chemical restraints. Paragraphs 207 through 209 of the amended complaint contain further claims of future injury and damage from alleged failures in policymaking and procedures for the provision of emergency medical care.

### Eleventh Amendment Immunity

*4 The first argument made in defendants' motion to dismiss is that recent developments in Eleventh Amendment jurisprudence require that this case be dismissed. We disagree. The *Ex Parte Young* exception to Eleventh Amendment immunity is still alive and well. See *Alden v. Maine,* 527 U.S. 706, 757 (1999). Consequently, actions for injunctive or declaratory relief which allege a violation of federal law may be heard in federal court. *Id.* The Tenth Circuit in *Elephant Butte Irrigation District v.*

*Department of Interior,* 160 F.3d 602 (10th Cir.1998), has stated that the following factors must be assessed in determining whether the *Ex Parte Young* doctrine applies:

First, we must determine whether this is an action against the state officials or against the State ... itself; second, whether the alleged conduct of the state officials constitutes a violation of federal law, or merely a tortious interference with Plaintiffs' property rights; third, whether the relief Plaintiffs seek is permissible prospective relief or is it analogous to a retroactive award of damages impacting the state treasury; [citation omitted] and finally whether the suit rises to the level of implicating "special sovereignty interests."

160 F.3d at 609 (quoting *ANR Pipeline v. LaFaver,* 150 F.3d 1178, 1193 (10th Cir.1998)).

This lawsuit satisfies each of these tests. It has been brought against state officials. It alleges a violation of federal law, 42 U.S.C. § 1983 and other provisions. It seeks prospective injunctive relief. Finally, the court is unaware of any special sovereignty interests which are implicated.

Accordingly, the court shall not dismiss this case on Eleventh Amendment immunity grounds.

### Standing

An examination of *Doe v. Stincer,* 175 F.3d 879 (11th Cir.1999) is helpful to deciding the standing issues raised in the instant motion to dismiss. In *Doe v. Stincer,* a protection and advocacy agency which, like KAPS, was established under PAMII brought suit alleging that a Florida law limiting the right of a patient to obtain his or her mental health care records was preempted by the ADA.

The Eleventh Circuit held that the protection and advocacy agency did have standing to sue if its members would otherwise have standing to sue in their own right and if the interests it seeks to protect are germane to the organization's purpose. Then the Eleventh Circuit examined the provisions of PAMII wherein Congress vested protection and advocacy agencies with the authority to pursue legal remedies on behalf of individuals with mental illness receiving care or treatment in a state system. The court concluded that the agency could sue on behalf of itself, (i.e., alleging an injury to the agency itself), or it could sue on behalf of specific individuals, or it could sue to " 'ensure protection of [unnamed] individuals with mental illness.' " Quoting 42

U.S.C. § 10805(a)(1)(B). The court further concluded that the protection and advocacy agency was the kind of organization which, under associational standing principles, could sue on behalf of the mentally disabled as if they were "members" of the agency.

**\*5** Ultimately, however, the Eleventh Circuit determined that the protection and advocacy agency had not established standing to sue because it failed to prove that one of its "members" would otherwise have standing to sue in his or her own right. More specifically, there was a failure to prove that any "member" had been or would likely be injured by the Florida statute being challenged. Accordingly, an injunction against the statute being challenged was vacated.

It is important to note that there was an evidentiary record before the Eleventh Circuit in *Doe v. Stincer*. The case had been decided in the district court on motions for summary judgment. In contrast, this case is before the court upon a motion to dismiss. Upon a motion to dismiss we presume "that general allegations embrace those specific facts that are necessary to support them." *Lujan v. National Wildlife Federation,* 497 U.S. 871, 889 (1990).

In the instant case, there are general allegations that patients at LSH will be injured and damaged because of alleged violations of 42 U.S.C. § 1983. At this stage, where we must presume there are specific facts necessary to support these general allegations, we believe the amended complaint is adequate to assert a claim which is properly before the court. We are open to reconsider the issue of standing upon a motion for summary judgment. But, the motion to dismiss shall be denied.

*Motion to sever*

The motion to sever asks that the court sever the claims of KAPS for injunctive relief from the claims of the Unzueta plaintiffs for damages. FED.R.CIV.P. 21 provides in part that "Any claim against a party may be severed and proceeded with separately." FED.R.CIV.P. 42(b) provides that a court may order separate trials in furtherance of convenience or to avoid prejudice.

This case is still in the discovery stage. At the present time, the court does not believe the KAPS claims should be separated from the rest of the case. But, if this case goes to trial, the court will seriously consider severing the KAPS claims for injunctive relief from the damages claims. The court shall deny the motion to sever without prejudice to its resubmission if and when a final pretrial order is entered.

*Conclusion*

The motion to dismiss and the motion to sever are denied consistent with the text of this order.

IT IS SO ORDERED.

END OF DOCUMENT

*18*

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

Slip Copy
21 NDLR P 224
**(Cite as: 2001 WL 1064810 (D.Del.))**

United States District Court, D. Delaware.

**Jane DOE, Plaintiff,**
v.
**Gregg SYLVESTER, Secretary, Delaware**
**Department of Health & Social Services, in**
**His Official Capacity, Renata Henry, Director,**
**Division of Alcoholism, Drug**
**Abuse and Mental Health, in Her Official**
**Capacity, and Jiro Shimono, Director,**
**Delaware Psychiatric Center, in His Official**
**Capacity, Defendants.**

**No. CIV. A. 99-891.**

Sept. 11, 2001.

Daniel G. Atkins, Esquire, Disabilities Law Program, Community Legal Aid Society, Inc., Wilmington, Delaware; Ira Burnim, Esquire, Jennifer Mathis, Esquire, and Mary Giliberti, Esquire, Bazelon Center for Mental Health Law, Washington, D.C.; counsel for plaintiff.

Marc P. Niedzielski, Esquire and Gregg E. Wilson, Esquire, State of Delaware Department of Justice, Wilmington, Delaware; counsel for defendants.

MEMORANDUM OPINION

MCKELVIE, District J.

*1 This is a civil rights case. Plaintiff, Jane Doe, is a resident of New Castle, Delaware, and receives inpatient services at the Delaware Psychiatric Center ("DPC"). Defendants are Gregg Sylvester, Secretary of the Delaware Department of Health and Social Services ("DHSS"), Renata Henry, Director of the Division of Alcoholism, Drug Abuse, and Mental Health ("DADAMH") within DHSS, and Jiro Shimono, Director of DPC. On December 15, 1999, plaintiff filed a complaint asserting claims under Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12131 et seq., and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794. On January 26, 2000, defendants moved to dismiss the complaint under Fed.R.Civ.P. 12(b)(1) and 12(b)(6). Specifically, the defendants contend

that the suit should be dismissed on the following grounds: (1) the suit is barred by the Eleventh Amendment; (2) plaintiff has failed to state a legal claim under either Title II of the ADA or Section 504 of the Rehabilitation Act; (3) plaintiff failed to exhaust her claims in state court; (4) plaintiff's claims are barred by the Rooker-Feldman doctrine; and (5) plaintiff's claims are barred under the doctrines of claim preclusion and issue preclusion. This is the court's decision on defendants' motion.

I. *FACTUAL BACKGROUND*

The court draws the following facts from Doe's complaint and from the defendants' amended opening brief. For the purposes of assessing defendants' motion to dismiss, the court accepts as true all of the allegations pled in the complaint and views the facts in the pleadings and all reasonable inferences therefrom in favor of Doe, the non-moving party. *Schrob v. Catterson,* 948 F.2d 1402, 1405 (3d Cir.1991).

Doe has been diagnosed with borderline personality disorder and profound congenital deafness. She has been educated at schools for the deaf, using American Sign Language ("ASL") as her primary language. ASL is currently plaintiff's primary mode of communication. Although English is her second language, she cannot read, write, or understand English well enough to communicate effectively. Plaintiff relies on a sign language interpreter for effective communication with non-signing individuals, because she is unable to understand more than 10-20% of what is said by reading lips. Because she is mentally ill, plaintiff meets the essential eligibility requirements for services offered by DADAMH which oversees both DPC and New Castle Community Mental Health ("CMH"). In August, 1998, Doe was involuntarily committed for treatment at the DPC by the Superior Court for the State of Delaware. *See Delaware Psychiatric Center v. [Jane Doe],* C.A. No. 981-06-056 (Del.Super.1998). She currently receives inpatient services at DPC.

Throughout the first year of plaintiff's stay at DPC, the hospital provided her with a sign language

interpreter from 9:00 a.m. to 9:00 p.m. on weekdays and from 11:00 a.m. to 9:00 p.m. on weekends. This service allowed her to communicate with therapists and other staff at the hospital, to participate in therapeutic and group activities, and to interact with her peers. In August of 1999, defendants reduced the number of hours that an interpreter would be provided to plaintiff to four and one-half hours on three days of the week, five and one-half hours on one day of the week, and between seven and nine and one-half hours on the remaining three days. During the three days on which she receives between seven and nine and one-half hours of interpreter service, plaintiff attends addiction groups and "treatment mall," a series of activities that are arranged for hospital patients. According to plaintiff, the interpreters often arrive late, leave early, or are absent. As a result, plaintiff has missed addiction group, women's group, and planned visits to her future community placement. She has also, at times, been required to participate in community meetings without the aid of an interpreter.

**\*2** Since the defendants have cut the number of hours that interpreter services are provided to Doe, she has been unable to communicate effectively with staff and other patients for a large part of the day. Her attendance at and ability to benefit from therapy sessions is now dependent on the availability of an interpreter. In addition, plaintiff is excluded from some group therapy sessions that she was previously able to attend with the aid of an interpreter. For instance, plaintiff can no longer attend a Relaxation Group that teaches patients techniques on how to cope with stress upon their departure from the hospital. For a period of time, plaintiff was also excluded from participation in her women's group and community meetings. Defendants have, however, rearranged plaintiff's interpreter schedule to allow her to participate in these meetings.

Doe is also forced to attend individual therapy sessions with her treating psychologist without an interpreter. She alleges that her therapy, therefore, must be primarily conducted using written English, typed on a computer in the psychologist's office. In her complaint, Doe alleges that because she cannot effectively communicate in written English, these sessions have been rather ineffective. Plaintiff further alleges that forcing her to communicate in written English causes her stress and aggravates the symptoms of her mental illness. Doe has repeatedly asked for the services of an interpreter during these therapy sessions. The hospital, however, has refused to provide an interpreter and has given Doe no explanation as to why this service is not being provided.

As of August of 1999, Doe's treatment team at DPC determined that she was ready to be discharged from the hospital and transferred to a community-based setting. Since May of 1999, an apartment in Horizon House, a CPH-contracted supervised community living facility for mentally ill individuals, has been set aside for Doe to occupy upon her discharge from DPC. However, due to her disability, Doe contends that before she can move into the apartment the defendants must equip the Horizon House apartment with certain auxiliary aids. For instance, the apartment must be equipped with a smoke detector with a flashing light, a Telecommunication Device for the Deaf, and flashing lights to signal when somebody is at the door or phoning plaintiff. Defendants must also assure that appropriate modifications are made, such as the hiring of interpreters or ASL proficient staff so that plaintiff can communicate with them. Despite knowing that such modifications were necessary since May of 1999, the defendants have failed to assure that Horizon House is equipped with appropriate auxiliary aids for plaintiff. Therefore, Doe has been forced to remain at DPC. Plaintiff's treatment team has acknowledged that she would have been released to a supervised community placement months ago if she were not deaf.

Furthermore, plaintiff must make transitional overnight stays at her designated apartment before she may be discharged from the hospital and permitted to permanently reside at Horizon House. She cannot begin this transitional period, however, until the appropriate modifications have been made to the facility. In addition, defendants have failed to assure that adequate interpreter services would be provided plaintiff during her transitional daytime visits to Horizon House. As a result, CMH has cancelled a number of these daytime visits. Plaintiff's release date has been delayed by months because these modifications have not been made at the Horizon House apartment.

**\*3** On December 8, 1999, the Superior Court of the State of Delaware conducted a hearing, pursuant to 16 *Del. C.* § 5010, to determine whether Doe was in need of continued involuntary treatment at a mental hospital. At the hearing, the Superior Court made findings that Doe was a mentally ill person and that she should remain as an inpatient at DPC for



observation and treatment for as long as medically indicated. On December 21, 1999, the Superior Court finalized those findings of fact by issuing its final order. *See Delaware Psychiatric Center v. [Jane Doe],* C.A. No. 98I-06-056 (Del.Super. December 21, 1999).

## II. *PROCEDURAL BACKGROUND*

On December 15, 1999, plaintiff, Jane Doe, filed a complaint alleging that the defendants, the Secretary of the DHSS, the director of the DADAMH, and the director of the DPC, violated Title II of the ADA, 42 U.S.C. § 12131 et seq., and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, by refusing to make reasonable modifications to her living arrangements and by denying her equal access to services at DPC such as discharge planning services, transitional services, and community-based planning services. Plaintiff seeks a declaratory judgment and injunctive relief to enjoin defendants to make reasonable modifications for the plaintiff's communication needs. Plaintiff also seeks attorneys' fees and costs.

On January 14, 2000, plaintiff moved for a preliminary injunction. On February 11, 2000, defendants filed their Answering Brief in opposition to the motion for preliminary injunction. On February 28, 2000, plaintiff replied in support of her motion for preliminary injunction. On March 7, 2000, plaintiff amended her opening brief in support of her motion for preliminary injunction. On April 28, 2000, the court held a preliminary injunction hearing on this matter.

On January 26, 2000, defendants moved to dismiss plaintiff's claim pursuant to 12(b)(1) and 12(b)(6). On February 14, 2000, defendants amended their opening brief in support of dismissal. On March 8, 2000, plaintiff filed her answering brief opposing the motion to dismiss. On March 21, 2000, the defendants filed their reply brief in support of their motion to dismiss. On April 5, 2000, plaintiff filed a surreply brief in opposition to defendants' motion to dismiss. On May 12, 2000, the United States moved for leave to participate as *amicus curiae* on behalf of Doe to support the constitutionality of applying Title II of the ADA to state entities.

Over the next months, the parties, at the urging of the court in a series of teleconferences, attempted to resolve the dispute amongst themselves. On December 21, 2000, however, the parties jointly

reported that they were unable to reach a settlement and requested the court to consider the parties' pending motions.

This is the court's decision on the defendants' motion to dismiss.

## III. *DISCUSSION*

### A. Are the defendants immune from suit under the Eleventh Amendment?

**\*4** Defendants contend that this court lacks subject matter jurisdiction to decide plaintiff's claims, because defendants, as officials of the state of Delaware, are immune to suit pursuant to their Eleventh Amendment sovereign immunity. [FN1] Defendants also contend that Congress unconstitutionally exceeded its authority to abrogate the State's Eleventh Amendment sovereign immunity and to subject the State to suit when it enacted the ADA and Section 504 of the Rehabilitation Act.

> FN1. The Eleventh Amendment to the United States Constitution provides: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. Amend. XI.

Plaintiff argues in opposition that the Eleventh Amendment only prohibits suits against the State for money damages. Therefore, she contends that her action against state officials seeking injunctive relief is not barred. Plaintiff bases her position on the seminal case of *Ex Parte Young,* [FN2] in which the Supreme Court carved out an exception to Eleventh Amendment immunity by permitting citizens to sue state officials when the plaintiff seeks only prospective injunctive relief to remedy continuing violations of federal law. *Id; see also Balgowan v. State of New Jersey,* 115 F .3d 214, 217 (3d Cir.1997). According to plaintiff, defendants in this case are not immune to suit because the plaintiff's suit is properly brought against state officials seeking prospective injunctive relief under the doctrine of *Ex Parte Young.* Moreover, plaintiff maintains that Congress validly enacted both the ADA and the Rehabilitation Act under the enforcement powers of § 5 of the Fourteenth Amendment, and thus had the power to abrogate the sovereign immunity of the

States.

FN2. 209 U.S. 123, 128 (1908).

While the Eleventh Amendment bars federal courts from hearing claims against the state for money damages, it does not prohibit a federal court from hearing claims to address alleged continuing violations of federal law that are brought against state officers for prospective injunctive relief. *Ex Parte Young,* 209 U.S. 123, 128 (1908). Moreover, a suit for prospective relief against state officials can be maintained under the *Ex Parte Young* doctrine even when the necessary result of compliance with the injunction will, as defendants assert here, cause the state to directly expend substantial amounts of money. *Edelman v. Jordan,* 415 U.S. 651(1974); *Graham v. Richardson,* 403 U.S. 365 (1971). As stated by the *Edelman* Court, this "ancillary effect on the state treasury is a permissible and often an inevitable consequence of the principle announced in *Ex Parte Young.*" *Edelman,* 415 U.S. at 667-68.

Defendants, however, rely on *Seminole Tribe of Florida v. Florida,* 517 U.S. 44, 74 (1996), for the proposition that the *Ex Parte Young* doctrine is inapplicable when either a plaintiff's claim arises under a specific remedial statute, or when the statute that the defendants allegedly violated is directed against State entities themselves, and not individuals. In *Seminole Tribe,* the Court held *Ex Parte Young* claims could not be brought to enforce a statute in which Congress has prescribed a limited and detailed remedial scheme. The Court reasoned that allowing *Ex Parte Young* claims in such circumstances would permit a broader range of remedies than Congress had intended under the statutory scheme. Defendants contend that the ADA and Rehabilitation Act contain comprehensive remedial provisions and, therefore, argue that under *Seminole Tribe, Ex Parte Young* claims are not permissible under either statute.

**\*5** Allowing *Ex Parte Young* suits under Title II of the ADA or Section 504 of the Rehabilitation Act does not raise the concerns of judicial over- reaching that were presented by the Supreme Court in *Seminole Tribe.* In contrast to the intricate remedial provisions of the statute at issue in *Seminole Tribe,* the Indian Gaming Regulatory Act, the statutes at issue in the instant case both have broad remedial schemes that were left unspecified by Congress. Section 504 of the Rehabilitation Act authorizes courts to award "any appropriate relief." *W.B. v. Matula,* 67 F.3d 484, 494 (3d Cir.1995). Similarly,

Title II of the ADA, which incorporates the enforcement provisions of Section 504, authorizes the same degree of broad relief. 42 U.S.C. § 12133; *Jeremy H. by Hunter v. Mount Lebanon School Dist.,* 95 F.3d 272, 279 (3d Cir.1996).

Moreover, the *Ex Parte Young* doctrine remains applicable even when the statute at issue is directed against the State entities themselves, rather than individuals. The Third Circuit has held that Section 504 of the Rehabilitation Act authorizes suits against government officials in their official capacity. *W.B. v. Matula,* 67 F.3d at 499. Congress has directed that Title II of the ADA be interpreted in a manner consistent with Section 504 of the Rehabilitation Act. 42 U.S.C. §§ 12134(b), 12201(a). Because Title II of the ADA incorporates the remedies and rights set forth in Section 504, Title II also authorizes suits against public officials in their official capacities. 42 U.S.C. § 121333, *Jeremy H.,* 95 F.3d at 279. Therefore, remedies under Section 504 of the Rehabilitation Act and Title II of the ADA may include prospective relief against state officials under *Ex Parte Young.*

The defendants' next argue that they should be immune from claims for money damages under Section 504 of the Rehabilitation Act and Title II of the ADA because Congress exceeded its authority under § 5 of the Fourteenth Amendment to abrogate a state's Eleventh Amendment sovereign immunity. *E.g. Bd. of Trustees of the University of Ala. v. Garrett,* 531 U.S. 356 (2001); *Florida Prepaid Postsecondary Educ. Expense Bd. v. College Sav. Bank,* 527 U.S. 627, 635 (1999); *City of Boerne v. Flores,* 521 U.S. 507, 520 (1997); *Seminole Tribe of Florida v. Florida,* 517 U.S. 44, 55-58 (1996).

While the Supreme Court has recently held, in *Bd. of Trustees of the University of Ala. v. Garrett et al.,* that Congress did exceed its constitutional authority to abrogate state sovereign immunity when it enacted Title I of the ADA, the Supreme Court has yet not addressed whether Congress also improperly abrogated state sovereign immunity when it enacted Title II of the ADA. *Garrett,* 531 U.S. at 356 n. 1. Nor has the Court of Appeals for the Third Circuit addressed the issue. *Doe v. Division of Youth Services,* 148 F.Supp.2d 462, 485 (D.N.J.2001). Because the court finds that the plaintiff seeks only prospective injunctive relief against state officials and does not seek money damages from the State, it is not necessary for the court to consider this argument.



*B. Should the court dismiss the plaintiff's complaint for failure to state a claim under Section 504 of the Rehabilitation Act or Title II of the ADA?*

**\*6** Defendants next argue, under Fed.R.Civ.P. 12(b)(6), that plaintiff fails to state a claim upon which relief may be granted. A court may dismiss a claim pursuant to Fed.R.Civ.P. 12(b)(6) only if, from the face of complaint, it appears that the plaintiff will be unable to prove any set of facts in support of her claim that would entitle her to relief. *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957). In deciding the defendants' motion to dismiss, court must construe the facts in the complaint in the light most favorable to the plaintiff and all of the allegations set forth in the complaint should be taken as true. *Scheuer v. Rhoades,* 416 U.S. 232, 236 (1974).

Section 504 of the Rehabilitation Act was the first federal statute to provide broad prohibitions against discrimination on the basis of disability. It applies only to programs and activities that receive federal financial assistance. Title II of the ADA, enacted in 1990, incorporates these prohibitions and protections and extends them to all state and local government programs and activities, regardless of whether they receive federal financial assistance. The substantive provisions of the two statutes are similar.

Section 504 of the Rehabilitation Act provides, "No otherwise qualified individual with a disability ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance ...." 29 U.S.C. § 794(a).

Title II of the ADA states that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

In support of their motion to dismiss, defendants argue that plaintiff has not alleged a violation under the ADA with regard to her community placement. Under Title II of the ADA, the placement of persons with mental disabilities into community settings is appropriate when (a) the State's treatment professionals have determined community placement to be appropriate, (b) the placement is not opposed by the affected individual, and (c) the placement can be reasonably accommodated in light of the State's available resources and the needs of other mentally disabled persons. *Olmstead v. L.C.,* 527 U.S. 581, 587 (1999).

From the face of the plaintiff's complaint, it is not clear to this court that she will be unable to put forth sufficient facts to entitle her to relief under the ADA. Plaintiff has alleged that, as of August of 1999, her treatment team at DPC determined that she was ready to be discharged from the hospital and transferred to a community-based setting, and that since May of 1999, an apartment in Horizon House, a CPH-contracted supervised community living facility for mentally ill individuals, has been set aside for her to occupy upon her discharge from DPC. Plaintiff has also alleged that she did not oppose transfer to the Horizon House apartment. Rather, she states that she could not be transferred there because of the defendants' failure to make the modifications to the apartment that due to her disability were necessary for her safety, health, and well-being. Last, plaintiff avers that such modifications were reasonable in light of the State's available resources and the needs of other mentally disabled persons. Ultimate factual determinations regarding the appropriateness of the community placement, the costs of the specific accommodations requested, and the reasonableness of these requests are not for the court to decide in the context of a motion to dismiss. Therefore, the Court finds that plaintiff has stated a claim under Title II of the ADA.

**\*7** Regarding the Rehabilitation Act, defendants argue that plaintiff has presented insufficient facts to prove that she is an "individual with a disability" within the meaning of Section 504, specifically under 29 U.S.C. § 705(20)(A). However, Section 705(20)(A) specifies that the definition in that section is to be used "[e]xcept as otherwise provided in subparagraph B." 29 U.S.C. § 705(20)(A). The appropriate definition of "individual with a disability" for use in Section 504 is thus found in 29 U.S.C. § 705(B), which defines the term as a person who "(i) has a physical or mental impairment which substantially limits one or more of such person's major life activities; (ii) has a record of such an impairment; or (iii) is regarded as having such an impairment." 29 U.S.C. § 705(B); *School Bd. of Nassau County, Fla., et al. v. Arline,* 480 U.S. 273, 279 (1987). Taking all of the well pled facts and allegations of the complaint as true, the court finds

that the plaintiff has provided sufficient basis to prove that she is an "individual with a disability" entitled to relief under the Rehabilitation Act.

### C. Should the court dismiss the plaintiff's complaint for failure to exhaust state remedies?

Defendants contend that the plaintiff's complaint should be dismissed for plaintiff's failure to exhaust state remedies under the federal habeas statute, 28 U.S.C. § 2254. While the specific enforcement schemes of Title II of the ADA and Section 504 of the Rehabilitation Act do not require individuals to exhaust available state remedies before filing claims, the federal habeas statute requires individuals to exhaust all available state remedies before petitioning a federal court for relief.

Defendants assert that plaintiff's complaint is merely a veiled petition for release from confinement and should therefore be treated as a habeas petition. In support of their argument, defendants rely on the Supreme Court's holding in *Preiser v. Rodriguez,* 411 U.S. 475 (1973), that a plaintiff cannot avoid the exhaustion requirements of the federal habeas statute by labeling her claims as civil rights claims arising under other federal laws.

According to the plaintiff, however, the *Preiser* doctrine is inapplicable to this case because her claims arise under more specific statutes (namely the ADA Title II and the Rehabilitation Act Section 504) that were enacted after the federal habeas statute. Alternatively, plaintiff contends that her claims cannot arise under the federal habeas statute because her claims do not challenge the fact or duration of her confinement, but challenge only the conditions of her confinement. *See Graham v. Broglin,* 922 F.2d 379, 381 (7th Cir.1991) (explaining distinction in *Preiser* between cases that challenge the "fact or duration" of confinement, which are only cognizable in habeas corpus, and those that challenge "conditions" of confinement, which are properly raised in civil rights actions); *see also Wright v. Cuyler,* 624 F.2d 455, 458 (3d Cir.1980).

**\*8** The court finds that plaintiff's claims do not challenge the fact or duration of her confinement or seek release from confinement; rather, the plaintiff seeks "reasonable" modifications, auxiliary aids, and the provision of services in the most integrated setting according to plaintiff's needs. Plaintiff's claims, therefore, are properly brought under the enforcement provisions of the ADA and Section 504 and not under the enforcement provisions of the federal habeas statute. The enforcement provisions of the ADA and Section 504 do not require the plaintiff to exhaust state remedies. *Jeremy H.,* 95 F.3d at 281-82 & n. 17.

To require individuals who properly allege federal claims under the ADA and Section 504 to first exhaust state remedies in accordance with the enforcement scheme of the federal habeas statute would frustrate Congress's intent to permit individuals to proceed with claims under those laws and their implementing regulations. Therefore the court finds that the exhaustion requirements of the federal habeas statute are not applicable to the plaintiff's ADA and Rehabilitation Act claims.

### D. Does the court lack subject matter jurisdiction to hear the plaintiff's claims under the Rooker-Feldman doctrine?

Defendants next contend that, under the *Rooker-Feldman* doctrine, the court lacks subject matter jurisdiction to hear the plaintiff's claims. *Rooker v. Fidelity Trust,* 263 U.S. 413 (1923); *District of Columbia Ct. of Appeals v. Feldman,* 460 U.S. 462 (1983); 28 U.S.C. 1257. The *Rooker-Feldman* doctrine provides that "a party losing in state court is barred from seeking what in substance would be appellate review of the state judgment in a United States District Court based on the losing party's claim that the state judgment itself violates the loser's rights." *Johnson v.. DeGrandy,* 512 U.S. 997, 1005-1006 (1994). According to the defendants, the relief that the plaintiff seeks is barred by the *Rooker-Feldman* doctrine because "the Superior Court has considered and ruled on the same issues regarding plaintiff's psychiatric treatment, personal safety, and the safety of the public ." Def. Amended Br. at 14.

A federal proceeding is barred by the *Rooker-Feldman* doctrine "only when entertaining the federal court claim would be the equivalent of an appellate review of [a state court] order." *Ernst v. Child and Youth Servs. of Chester County,* 108 F.3d 486, 149 (3d Cir.1997) (quoting *FOCUS v. Allegheny County Court of Common Pleas,* 75 F.3d 834, 840 (3d Cir.1996)). Thus, the doctrine "applies only when in order to grant the federal plaintiff the relief sought, the federal court must determine that the state court judgment was erroneously entered or must take action that would render that judgment ineffectual." *Id.*

The court finds that the plaintiff's claims under the ADA and the Rehabilitation Act do not challenge the original determination of the Delaware Superior Court ordering her involuntary commitment. Rather, plaintiff's claims allege that defendants are now violating the reasonable accommodation mandate of Title II of the ADA and of Section 504 of the Rehabilitation Act by refusing to provide the plaintiff with modifications that would enable her to benefit equally from defendants' hospital services, transitional services, and community services within the context of her involuntary commitment and by failing to administer its services to her in the most integrated setting appropriate to her needs. These claims are unrelated to the Superior Court's determination regarding the plaintiff's need for involuntary commitment. *See e.g. Kathleen S. v. Dep't. of Pub. Welfare,* 10 F.Supp.2d 460, 470 (E.D.Pa.1998) (rejecting application of *Rooker-Feldman* doctrine in ADA integration case brought by involuntarily committed residents of state mental hospital).

**\*9** Resolving the plaintiff's federal claims will not require this court to review the determination of the Superior Court with respect to the need for plaintiff's commitment, nor will it require this court to effectively overturn the Superior Court's involuntary treatment order. Therefore, the court finds that the *Rooker-Feldman* doctrine does not present a bar to its subject matter jurisdiction over the plaintiff's claims in this case.

E. *Are the plaintiff's claims precluded under the doctrines of claim or issue preclusion?*

Defendants' final argument is that plaintiff's claims are barred by the preclusive effect of the Delaware Superior Court's involuntary commitment order. Precluding litigants from contesting matters that they have already had a full and fair opportunity to litigate protects their adversaries from multiple lawsuits, conserves judicial resources, and fosters reliance on judicial action by minimizing the possibility of inconsistent decisions. *See* 18 Charles Allen Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 4402 (1981). Defendants raise two arguments regarding preclusion. First, defendants argue that plaintiff's claims are barred by the doctrine of claim preclusion. Second, defendants argue that plaintiff's claims are barred by the doctrine of issue preclusion.

Claim preclusion bars a party from litigating in a subsequent action an issue that was or could have been raised by the party in a finally adjudicated prior action. *Allen v. McCurry,* 449 U.S. 90, 94 (1990). Claim preclusion attaches when there has been "(1) a final judgment on the merits in a prior suit involving (2) the same parties or their privies and (3) a subsequent suit based on the same causes of action." *United States v. Athlone Indus., Inc.,* 746 F .2d 977, 983 (3d Cir.1984).

According to the defendants, plaintiff's claims should be precluded under the claim preclusion doctrine because she could have and should have raised her federal claims to the state court at her involuntary commitment hearing. Plaintiff argues that her ADA and Section 504 claims would not have been properly raised in such a forum. She contends that, because her federal claims require different determinations and involve different periods of time than the determinations made by the state court, she should not be barred from now raising her federal claims.

The court finds that the plaintiff is not precluded from raising her federal claims before this court. The involuntary commitment hearing was focused only on assessing the plaintiff's mental health and treatment options at the time of the hearing. It cannot be said that plaintiff's current civil rights suit is based on the same cause of action or that by participating in the state commitment proceedings, the plaintiff waived her rights to later assert federal claims.

Issue preclusion bars the relitigation of specific issues of fact or law in a subsequent action involving a party to the first action. *Allen v. McCurry,* 449 U.S. at 94. Issue preclusion applies when a question of fact essential to the judgment has been already been actually litigated and determined in a final judgment of a prior case. *Messick v. Star Enterprise,* 655 A.2d 1209, 1211 (Del.1995).

**\*10** The court finds that plaintiff's claims for reasonable accommodations for her disability under the ADA and the Rehabilitation Act and for integration under the ADA also cannot be barred by issue preclusion. Neither of those claims were litigated or addressed in the state court commitment proceedings. The only issues considered and adjudicated by the state court were whether the plaintiff was a mentally ill person at the time of the hearing and if so, what disposition would impose the least restraint upon her liberty and dignity at the time

of the hearing, given the available alternatives. Plaintiff's claims require separate determinations of whether, given her disability, the state met its obligations under *Olmstead v. L.C* to provide reasonable accommodations and whether defendants' failed to administer their services in the most integrated setting appropriate to plaintiff's needs. Because there is no identity of issue, the court finds that issue preclusion does not bar the plaintiff's claims.

The court will enter an order in accordance with this opinion. The court will address the plaintiff's motion for preliminary injunction in a separate opinion.

END OF DOCUMENT