IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

PENNSYLVANIA PROTECTION AND        :
ADVOCACY, INC.,
        Plaintiff                  :

                            :

        vs.                        CIVIL ACTION NO. 1:CV-00-1582

                            :

DEPARTMENT OF PUBLIC WELFARE OF :
THE COMMONWEALTH OF PENNSYLVANIA;
MARK S. SCHWEIKER, in his
official capacity as Governor of
the Commonwealth of Pennsylvania;:
FEATHER O. HOUSTOUN, in her
official capacity as Secretary  :
of Public Welfare for the
Commonwealth of Pennsylvania;   :
GERALD RADKE, in his official
capacity as Deputy Secretary    :
for Mental Health and
Substance Abuse Services; and   :
S. REEVES POWER, Ph.D., in his
official capacity as            :
Superintendent of South Mountain
Restoration Center,             :
        Defendants



*M E M O R A N D U M*

I.    *Introduction.*

        Plaintiff, Pennsylvania Protection and Advocacy, Inc.,

(PP&A), the entity charged with protecting the rights of

institutionalized Pennsylvanians, filed this lawsuit on behalf of

residents of South Mountain Restoration Center (SMRC), a state-run

nursing facility.  PP&A alleges violations of Title XIX of the

Social Security Act (the "Medicaid Act"), 42 U.S.C. §§ 1396a to

1396v; the Rehabilitation Act (RA), 29 U.S.C. § 794; and Title II

of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12131-12134.  The Pennsylvania Department of Public Welfare (DPW) is a defendant, along with certain individuals sued in their official capacities.  The individual defendants are: Mark S. Schweiker, the Governor of the Commonwealth of Pennsylvania; Feather O. Houstoun, the Secretary of DPW; Gerald Radke, the Deputy Secretary for Mental Health and Substance Abuse Services; and S. Reeves Power, the Superintendent at SMRC.  The complaint seeks only declaratory and injunctive relief.

Plaintiff bases its ADA and RA claims on Defendants' alleged failure to comply with the integration mandates of those acts by not providing community-based living programs for SMRC residents and instead limiting them to the institutional setting of SMRC.  As defenses to these claims in part, Defendants contend that the relief requested would create a fundamental alteration in the commonwealth's services for those with mental-health needs by shifting spending to SMRC residents and that SMRC is the appropriate setting for those residing there, given their physical and mental needs.

Plaintiff bases its Medicaid Act claims on alleged violations of the act's requirements: (1) that Defendants provide activities serving the residents' physical and mental well-being, (2) that Defendants review annually prescribed antipsychotic medications, (3) that Defendants provide the services the residents need to attain their highest mental and psychosocial

2

well-being, (4) that Defendants provide specialized rehabilitative services for residents, and (5) that Defendants provide specialized services for residents with mental retardation.

We are considering the parties' cross-motions for summary judgment. We will evaluate the motions under the well established standard. *See Showalter v. University of Pittsburgh Medical Center*, 190 F.3d 231, 234 (3d Cir. 1999).

II.   *Background*.

In connection with their motions, the parties have submitted detailed and well-organized statements of undisputed material facts (designated below either as "PSUF" or "DSUF"), and the following background will sometimes quote language without attribution from the uncontested statements of either side.

A.   *Background Primarily Relating to the ADA and RA Claims Based on the Integration Mandate*.

The Commonwealth of Pennsylvania has the following policies.  It provides services for individuals with severe and persistent mental illness in the most integrated setting appropriate to their needs, meaning that individuals are (or should be) serviced in a community setting rather than in an institutional one.  (PSUF 22; DSUF 6).  It provides services for persons with mental retardation in the community, if appropriate. (Plaintiff's exhibit 28 at p. 5; PSUF 24; DSUF 14).  It provides

3

community alternatives to nursing-facility care for Pennsylvanians who are elderly and/or medically fragile.  (PSUF 25).

Many persons with serious mental disabilities who are also elderly and/or have medical needs can live in their communities with appropriate residential and nonresidential services and support.  (PSUF 30).  Some individuals who meet the eligibility criteria for nursing-facility services may, with appropriate residential and nonresidential services and support, be able to live in other, more integrated settings.  (PSUF 36).

Plaintiff, PP&A, is a nonprofit Pennsylvania corporation.  Pennsylvania has designated PP&A as the advocate and protector of the rights of individuals with disabilities, including those who are institutionalized.

DPW is the state agency responsible for providing mental-health and mental-retardation services to Pennsylvania residents who have mental disabilities.  (DSUF 1).  It also administers Pennsylvania's Medical Assistance program.  (*Id.*)  DPW is comprised of various offices, including the Office of Mental Health and Substance Abuse Services (OMHSAS), the Office of Mental Retardation (OMR) and the Office of Medical Assistance Programs (OMAP).  (DSUF 3; PSUF 7).

In addition to SMRC, OMHSAS operates nine psychiatric hospitals and one juvenile forensic facility.  OMHSAS also funds community-based services for Pennsylvanians with severe and

4

persistent mental illness.  OMHSAS has authority to shift funding, as needed, from institutional to community-based programs.  (PSUF 7(a)).  In the Commonwealth's fiscal year 1998-99, some 200,000 persons, including impaired and chronically ill older persons, received community-based mental-health services designed to maintain them in the community and delay or avoid institutional care.  (DSUF 17 and Plaintiff's response).

OMR operates seven state centers for persons with mental retardation.  OMR also funds community-based services for Pennsylvanians with mental retardation.  (PSUF 7(b)).  OMAP operates the Medical Assistance Program, which funds physical and behavioral health services in nursing facilities and in the community.  (PSUF 7(c)).

SMRC is a "psychiatric transitional facility" located in South Mountain, Franklin County, Pennsylvania.  (PSUF 11; DSUF 5). It is the only nursing-type facility operated by the Commonwealth of Pennsylvania.  (PSUF 12; DSUF 5).

As of August 31, 2001, SMRC had 175 residents.  (PSUF 13).  This is a downward trend from 1,091 in 1969 and about 800 in 1985.  (DSUF 22).  The median age of a resident is 75.  (DSUF 23). Over 90% of them were admitted from state psychiatric facilities and the remainder from Pennhurst State School and Hospital, local or state prisons, community hospital psychiatric units or nursing facilities.  (PSUF 15).  Many SMRC residents had been institutionalized for decades in state-operated facilities,

5

including many years at SMRC.  Approximately forty SMRC residents
have been institutionalized for more than fifty years.  (PSUF 16).

The residents suffer from serious mental and physical
ills.  Virtually all have multiple, significant physical
impairments that require regular monitoring by physicians and
nursing staff.  (DSUF 28).  These ailments include cardiopulmonary
disease, epilepsy, and osteoporosis that significantly limit one
or more of the residents' major life activities.  (PSUF 20).  Over
90% of them have an active diagnosis of schizophrenia,
schizoaffective disorder, bipolar disorder, personality disorder,
or a history of such diagnoses.  (PSUF 18; DSUF 25).  Over 60% of
them have dementia.  (DSUF 27).  There were fourteen with mental
retardation.  (DSUF 26).

Each resident is supervised by a core interdisciplinary
treatment team, consisting of the attending physician (the team
leader), the nurse supervisor (the team coordinator), the charge
nurse and a social worker, which meets to discuss the needs of a
resident and develop a plan of care ("POC") for the resident
designed to address those needs.  The treatment team also
determines if the resident is appropriate for discharge.  (DSUF
31).  Using a standard of whether a resident "could handle and
benefit from a transfer", in March and April 2002, the treating
physicians and the treatment teams decided that only thirteen
residents could possibly benefit from a transfer.  (DSUF 89).

This position was buttressed by defense experts Marie Boltz and Susan Renz but was contradicted by Plaintiff's experts.

R. Gregory Kipper, a defense expert, prepared a cost comparison for Defendants of caring for SMRC residents at SMRC and in the community. He calculated that it cost the Commonwealth $239 per day to provide care at SMRC for each resident. Thus, if SMRC were closed, $239 would represent the cost savings to the Commonwealth per day per resident. If SMRC were not closed, and some residents remained while others left, the savings to the Commonwealth would be $139.02. For those placed in the community, the cost of community-based services would be between $257 per day per resident and $310 per day per resident, averaging to $283.50 per day per resident. Kipper also calculated that the average reimbursement rate for nursing facilities other than SMRC was about $125 per resident per day.

B.  *Background Primarily Relating to the Title XIX Activities Claim.*

SMRC has a Therapeutic Activities Service Department which has ten full-time staff members in addition to the Department's director and an additional supervisor. (DSUF 179). The ratio of activities staff to residents is approximately one to sixteen which is far above the average ratio of 1:52 or 1:66 for the average nursing facility with 120 to 150 beds. (DSUF 181).

The Joint Commission on the Accreditation of Hospitals (JCAHO) inspects and certifies hospitals and nursing facilities.

(DSUF 38).  The certification is voluntary on the part of the
health-care facility.  (DSUF 40).  In March 2000, JCAHO inspected
SMRC and gave it a score of 97 out of 100, finding a deficiency
only in activities for residents.  (DSUF 41, 43).

After the JCAHO report, SMRC personnel developed a plan
of correction which included identifying times of inactivity in
each living area, creating an activity schedule for every floor,
and hiring additional staff.  (DSUF 44).  Nursing staff were
assigned to all lounges to interact with nonambulatory residents
or engage them in an activity.  (DSUF 44).

SMRC provides a program of activities seven days per
week from 8:00 a.m. to 9:00 p.m.  (DSUF 186).  Defense expert,
Karla Dreisbach, a nursing facilities activities expert, noted the
number of activities, (Defendants' exhibit A-6 at pp. 11-15),
which includes an ongoing music therapy program and a "multi-
sensory environment program."  (DSUF 190).  The staff tracks
resident participation in activities by computer.  (DSUF 187).
Residents can also go on regular trips outside SMRC, about twenty-
four per month.  Additionally, there are over 200 volunteers and
142 groups who spend time with the residents.  (DSUF 197).

Periodic reports within SMRC from July 6, 2000, through
March 13, 2001, indicate that on particular days staff had not
observed residents participating in activities.  (Doc. 87,
Plaintiff's opposition brief at pp. 15).  "Facility Quality
Indicator Profiles" also show SMRC with a low percentile rank

8

averaging 75% compared to other commonwealth nursing facilities.
Additionally, SMRC "Performance Improvement/Risk Management
Committee Meeting Minutes," ranging from June 28, 2001, through
January 31, 2002, indicate problems with resident participation.
(Plaintiff's reply exhibit 7).  Plaintiff experts, Neal G. Ranen,
M.D., and G. David Smith, have both observed a lack of
participation by residents while they were inspecting SMRC.

     C.   *Background Primarily Relating to Mental-Health and*
          *Mental-Retardation Services.*

        Over 90% of SMRC residents have an active diagnosis of
serious and persistent mental illness or a history of such a
diagnosis.  (PSUF 18).  And 96% of the residents are taking one or
more psychoactive medications.  (Plaintiff's reply exhibit 4).

        In July 2000, SMRC contracted with Summit Behavior
Health for the following mental-health services.  James Hegarty,
M.D., a psychiatrist, visits SMRC about a half day twice per week,
and two behavioral-health consultants visit for a half day each
for a total of eight hours per week.  (Plaintiff's motion, Exhibit
17, Power deposition at pp. 285-86; exhibit 56, Christie
deposition at pp. 40, 49; exhibit 49, Newcomer deposition at p.
11).  Neither Dr. Hegarty nor the consultants are personally
involved in developing the plans of care for the residents, though
the treatment team may review information provided by the

consultants.  (Plaintiff's motion, Exhibit 30, Saweikis deposition
at p. 12; exhibit 49, Newcomer deposition at p. 37).[1]

The behavioral-health consultants examine residents who
have been referred for consultations, usually the same week.
However, if there are too many referrals, the reviews are delayed.
Thereafter, the consultants see the residents quarterly.
(Plaintiff's motion, Exhibit 46, Christie deposition at p. 50;
exhibit 49, Newcomer deposition at pp. 12, 24-25).  The
consultants review about eight residents a week and saw about
eighty residents in their first year of consulting.  (Plaintiff's
motion, Exhibit 49, Newcomer deposition at pp. 16-17, 23).

SMRC staff did not always follow the consultants'
recommendations.  In about September 2000, it was noted that the
consultants were "not seeing evidence that their recommendations
[were] being consistently followed."  (Plaintiff's reply brief,
exhibit 6, minutes of executive staff meeting).  On June 28, 2001,
Dr. S. Reeves Powers, SMRC superintendent, noted his concern that
behavioral-health consults were "not always reviewed by all of the
team members who should see them."  (Plaintiff's reply brief,
exhibit 7, "Performance Improvement/Risk Management Committee
Meeting Minutes," dated July 26, 2001).  The solution was to note

---

[1]  On August 11, 2000, S. Reeves Power, SMRC superintendent,
wrote a memo to John A. Saweikis, concerning behavior on July 27,
2000, involving a resident.  Reeves thought the behavior should
not have been considered "normal" by staff and recommended a
behavioral consult.  (Plaintiff's reply exhibit 7).

the recommendations in the resident's chart and have the treatment team review them for possible incorporation in the plan of care. (Plaintiff's motion, exhibit 56, Christie deposition at pp. 55-54).

Rebecca Newcomer, one of the behavioral consultants, stated that there was a short time lag in the process before their recommendations were placed in the plans of care, but that their recommendations were generally being followed. (Plaintiff's motion, exhibit 49, Newcomer deposition at p. 37-38.[2]

D.  *Background Primarily Related to the Administration of Psychotropic Medication*

SMRC residents are seen by the behavioral consultants who make recommendations concerning behavioral issues that might impact on use of drugs. Psychotropic medications are prescribed using the lowest effective doses of the safest and best-tolerated agents. They are tapered downward when appropriate. (DSUF 217). As Dr. Hegarty elaborates in his report, by September 2001 57% of the 76 residents on the older antipsychotic drugs had been switched from them to the newer, safer, so-called "atypical" agents, and 75% of residents on antipsychotic drugs are now receiving the newer drugs. (Defendants' exhibit A-9, Hegarty

---

[2] Also, Dr. Ranen, a plaintiff expert, noted that a resident displaying consistent, severe behavioral problems in April 2001 was not referred for psychiatric consultation. (Plaintiff's motion, exhibit 58, Ranen report).

11

report at p. 5).  Further, administration of some of these
medications in a dose greater than the recommended maximum dose
simply reflects the need of the individual patient, as determined
by his treating physicians, for a greater dose, and such use of
the medication is supported by the medical literature.  (DSUF 221,
citing Defendants' exhibit A-9, Hegarty report at pp. 11, 14-15).
Some patients require antipsychotic medication in doses higher
than the published norms to produce meaningful response.  (DSUF
298, citing Defendants' exhibit A-15, expert report of Dr. Stephen
Read at p. 38).

AIMS (Abnormal Involuntary Movement Scale) tests are
administered quarterly to discover evidence of tardive dyskinesia,
a possible side effect of traditional antipsychotic medications.
(DSUF 218, and Plaintiff's response).  On one occasion, an AIMS
test conducted by one of Plaintiff's experts, Dr. Read, indicated
prominent tardive dyskinesia, as opposed to an AIMS test conducted
by SMRC staff two weeks earlier.  (Plaintiff's exhibit 58,
attachment C).

III.  *Discussion.*

A.    *The ADA and RA Claims.*

Plaintiff contends that Defendants are violating the
integration mandates of the ADA and RA by not providing community-
based living programs for SMRC residents, allowing them instead
only the opportunity of living in the institutional setting of

12

SMRC.   PP&A maintains that the majority of SMRC residents can live in the community, with proper support, even with their mental and physical infirmities and advanced ages.

Both the ADA and the RA have been construed to include an integration mandate, a requirement that those disabled persons protected by the acts who are the recipients of state programs and services obtain those services in the most integrated setting possible.   The ADA, pursuant to 42 U.S.C. § 12132, provides that:

> Subject to the provisions of this subchapter [Title II of the ADA], no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

42 U.S.C. § 12132 (brackets added).

In implementing this section, the Department of Justice promulgated the following rule:

> A public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities.

28 C.F.R. § 35.130(d).

Similarly, the RA prohibits discrimination by entities receiving federal funds.   *See* 29 U.S.C. § 794 and 28 C.F.R. § 41.51(d).   Section 41.52(d), patterned after section 41.51(d), requires recipients of federal funds to "administer programs and

activities in the most integrated setting appropriate to the needs of qualified handicapped persons."

Thus, both the ADA and the RA require, when appropriate, some form of integration into the community for mentally disabled individuals. *See Frederick L. v. Department of Public Welfare*, 157 F. Supp. 2d 509, 534-36, 539 (E.D. Pa. 2001). The same standard applies to the integration mandates of the ADA and the RA. *See Frederick L. v. Department of Public Welfare*, 217 F. Supp. 2d 581, 591 (E.D. Pa. 2002).

That standard is set forth in *Olmstead v. L.C.*, 527 U.S. 581, 119 S.Ct. 2176, 144 L.Ed.2d 540 (1999), a case dealing with the ADA. In *Olmstead*, the Supreme Court held that the ADA's "proscription of discrimination . . . require[d] placement of persons with mental disabilities in community settings rather than in institutions." *Id.* at 587, 119 S.Ct. at 2181, 144 L.Ed.2d at 550. It further ruled that:

> Such action is in order when (1) the State's treatment professionals have determined that community placement is appropriate, (2) the transfer from institutional care to a less restrictive setting is not opposed by the affected individual, and (3) the placement can be reasonably accommodated, taking into account the resources available to the State and the needs of others with mental disabilities.

*Id.* at 587, 119 S.Ct. at 2181, 144 L.Ed.2d at 550 (numbering added).

14

Elaborating on these factors, the Court decided that a state could generally rely on the reasonable assessments of its treating professionals as to whether an individual could live in the community or remain in a more restrictive setting, commenting that "[c]ourts normally should defer to the reasonable medical judgments of public health officials." *Id.* at 602, 119 S.Ct. at 2188, 144 L.Ed.2d at 559 (quoted case omitted). It also reiterated that there was no "federal requirement that community-based treatment be imposed on patients who do not desire it." *Id.* at 602, 119 S.Ct. at 2188, 144 L.Ed.2d at 559.

In regard to the third factor, Justices Ginsburg, Souter, O'Connor and Breyer wrote:

> The State's responsibility, once it provides community-based treatment to qualified persons with disabilities, is not boundless. The reasonable-modifications regulation speaks of "reasonable modifications" to avoid discrimination, and allows States to resist modifications that entail a "fundamenta[l] alter[ation]" of the States' services and programs. 28 C.F.R. § § 35.130(b)(7)(1998).

*Id.* at 603, 119 S.Ct. at 2188, 144 L.Ed.2d at 559 (brackets in original).

That a state could defend its services and programs for disabled individuals by showing that the requested relief would fundamentally alter them meant the following. First, the "fundamental-alteration defense" could not be defeated by a mere comparison between the additional costs for eligible individuals

15

(two individuals in *Olmstead*) and the state's "entire mental health budget," no doubt because the additional costs would in most circumstances look minimal in comparison. *Id.*, 119 S.Ct. at 2188, 144 L.Ed.2d at 560. Instead, since a state could almost never show a fundamental alteration in those circumstances:

> Sensibly construed, the fundamental-alteration component of the reasonable-modifications regulation would allow the State to show that, in the allocation of available resources, immediate relief for the plaintiffs would be inequitable, given the responsibility the State has undertaken for the care and treatment of a large and diverse population of persons with mental disabilities.

*Id.* at 604, 119 S.Ct. at 2189, 144 L.Ed.2d at 560.

The defense also could not be defeated by a simple comparison between the cost of community placement and the cost of institutional confinement because it would "overlook costs the State cannot avoid," like the cost of keeping an institution open for residents who cannot be placed in the community. *Id.*, 119 S.Ct. at 2189, 144 L.Ed.2d at 560.[3]

---

[3]    The four Justices provided another example:

> If, for example, the State were to demonstrate that it had a comprehensive, effectively working plan for placing qualified persons with mental disabilities in less restrictive settings, and a waiting list that moved at a reasonable pace not controlled by the State's endeavors to keep its institutions fully populated, the reasonable-modifications standard would be met.

*Id.* at 605-06, 119 S.Ct. at 2189, 144 L.Ed.2d at 561.

16

In his concurrence, Justice Kennedy noted his general agreement with this fundamental-alteration analysis. *Id.* at 615, 119 S.Ct. at 2194, 144 L.Ed.2d at 567. We will use that analysis here as well. *See Frederick L. v. Department of Public Welfare*, 217 F. Supp. 2d 581, 591 (E.D. Pa. 2002); *Williams v. Wasserman*, 164 F. Supp. 2d 591, 632 (D. Md. 2001) (citing cases). We turn now to the merits of the ADA and RA claims.

Plaintiff filed this suit without any SMRC resident being named as a plaintiff or as a representative of a class. In a memorandum of March 27, 2002, we decided that it nonetheless had standing to pursue the case on behalf of the residents. On its ADA and RA claims, PP&A seeks injunctive relief as follows: (1) that Defendants agree with Plaintiff on an independent expert; (2) that the expert be given ninety days to evaluate all the SMRC residents to determine which residents can live in the community and the services and support such residents would need; (3) that Defendants develop appropriate community placements, at a rate of at least five per month, for residents the expert has determined can live in the community.

Both sides have provided extensive evidentiary material on these claims. Defendants rely on the following, in part. First, the treating physicians for the eighty-three residents identified by PP&A during the course of the litigation have submitted penalty-of-perjury declarations stating that each resident would not benefit from placement elsewhere and should

17

remain at SMRC because of their specific medical and mental-health needs or both.  Defendants buttress this evidence with expert reports that concur in the opinions of the treating physicians. Defendants thus argue Plaintiff cannot satisfy the first element under *Olmstead, supra,* that treatment professionals have determined community placement is appropriate, even if Plaintiff's experts disagree, since under *Olmstead* the opinions of the treating physicians are entitled to deference.  Second, they contend that Plaintiff's experts offer only conclusory opinions that omit vital medical facts and that rely on the wrong legal standard.[4]  Third, Defendants argue that only a few residents are not opposed to discharge and that opposition to discharge is best determined by the treating physicians.

Finally, Defendants maintain that the relief requested would fundamentally alter the program for two reasons.  First, the commonwealth has a comprehensive, effectively working plan for placing qualified persons with mental disabilities in less

---

[4]  Defendants maintain that the standard is whether the resident could not only handle but benefit from community placement as well, a standard that, as Plaintiff asserts, implies that if a resident could do just as well in the institution as in the community, then there is no ADA or RA violation.  Defendants rely on the Supreme Court's statement in *Olmstead* "emphasiz[ing] that nothing in the ADA or its implementing regulations condones termination of institutional settings for persons unable to handle or benefit from community settings."  527 U.S. at 601-02, 119 S.Ct. at 2187, 144 L.Ed.2d at 558-59.  We do not believe that this language means that, all other things being equal, the commonwealth can refuse to provide community-based living for SMRC residents.

restrictive settings.  Second, the finite financial resources available for the care and treatment of those with mental disabilities in the commonwealth does not allow relief for SMRC residents without affecting services for others.

Plaintiff counters with the following, among other things.  First, it relies on the statements of SMRC treatment professionals in June 2000 that 80% of the residents "could function in the community now if the necessary community support services were in place and operational" and that no SMRC resident was precluded from leaving "due to serious medical problems that cannot be met in the community."  PP&A argues that it is implausible that the treating physicians have now decided that the vast majority of the residents must remain at SMRC.[5]  Second, they proffer the opinions of their own experts that many residents appear able to live in the community with appropriate support.  Third, it attacks the declarations of the treating professionals because these declarations consider only community-health services that are "available" to the residents, but Defendants (as Plaintiff argues) have categorically refused to make community-based living available to SMRC residents.  Fourth, it argues that residents have not been adequately informed of the nature of community placement.

_____

[5]  Defendants maintain that the 80% figure was based on unlimited funding.

19

Finally, Plaintiff argues that the relief it seeks would not fundamentally alter the commonwealth's mental-health program. PP&A first contends that the commonwealth has no comprehensive program for moving individuals into the community.  It next argues that the commonwealth does have the financial resources to place SMRC residents in the community without adversely affecting the services for others in need of mental-health care.

We need not determine whether either side can prevail on summary judgment on their various contentions relating to the ability of SMRC residents to live in the community.  We conclude that Defendants are entitled to summary judgment on the ADA and RA claims on the basis of that part of its fundamental-alteration defense asserting that it does not have sufficient resources to move SMRC residents into the community and provide services for others with mental-health needs.

As noted above, R. Gregory Kipper, a defense expert, prepared a cost comparison for Defendants of caring for SMRC residents at SMRC and in the community.[6]  He calculated that it cost the commonwealth $239 per day to provide care at SMRC for each resident.  Thus, if SMRC were closed, the commonwealth would save $239 per day per resident.  If SMRC were not closed, and some residents remained while others left, the savings to the Commonwealth would instead be $139.02.  For those placed in the

---

[6]  Plaintiff contests the underlying methodology but accepts these figures for the purpose of summary judgment.

community, the cost of community-based services would be between $257 per day per resident and $310 per day per resident, averaging out to $283.50 per day per resident. Kipper also calculated that the average reimbursement rate for nursing facilities other than SMRC was about $125 per day per resident.

In moving for summary judgment, Plaintiff argues that these figures indicate that placement of SMRC residents in the community would be less expensive, if not cost-neutral. PP&A reasons as follows. First, based on a cost of $239 per day to maintain each resident at SMRC, the annual cost is about $15.27 million for SMRC's institutional setting, assuming a population of 175. Second, based on the maximum cost of $310 per day for community-based services for SMRC residents, the annual cost is about $19.8 million. The latter figure is greater, but if some of the residents can be cared for in the community, while others are placed in nursing facilities other than SMRC, the cost could be less than the cost of service for all residents at SMRC. PP&A posits a scenario where the commonwealth closes SMRC and 100 residents live in the community and seventy-five in other nursing facilities.[7] This results in a total annual cost of $14.737 million, about $1.5 million less than the $15.27 million for a population of 175 at SMRC. The $14.737 figure is calculated by

_____

[7] PP&A emphasizes, however, that it is not seeking an order closing SMRC. It is merely making a cost analysis. It defers any decision to close SMRC to Defendants.

21

multiplying 100 by $310, the maximum cost per day for caring for SMRC residents in the community, for a total of $11.315 million. This figure is then added to $3.422 million, reached by multiplying seventy-five by $125, the cost per day for other nursing facilities.[8]

In their own motion for summary judgment, Defendants counter that this analysis is flawed because it merely compares the cost of caring for the residents in various settings and ignores certain costs that the commonwealth cannot avoid, like the cost of keeping SMRC open for some residents. Defendants argue that under *Olmstead* such costs must be taken into account. We agree with this interpretation of *Olmstead,* as noted above. *See Frederick L., supra,* 217 F. Supp. 2d at 593; *Williams, supra,* 164 F. Supp. 2d at 636.

Under this approach, Defendants argue that Plaintiff's analysis is incorrect because it merely compares the costs of caring for SMRC residents in the community with the costs of caring for them at SMRC. As Defendants point out, this analysis omits Kipper's calculation that, if SMRC is not closed, the cost

---

[8]    Using $283.50 per day, the average cost of providing community services for SMRC residents, Plaintiff provides another example that is cost-neutral, also based on an assumption that SMRC is closed.  In this example, 125 SMRC residents are placed in the community and fifty are placed in other nursing facilities. This results in a total cost of $15.216 million as opposed to $15.27 million for 175 residents of SMRC.  The former cost figure is calculated by multiplying 125 by 365 by $283.5 for a total of $12.935 million added to $2.281 million reached by multiplying 50 by 365 by $125.  (Plaintiff's supporting brief at p. 33 n.21).

saving to the commonwealth is only $139 per day per resident.
Thus, if only one resident can live in the community, it would
cost $144.50 more per day than the amount saved, a figure reached
by subtracting the cost saving ($139) from the average cost of
care in a community setting ($283.50). The annual cost for one
resident placed in the community would be $52,742.50, and the cost
would increase to $4,377,627.50 per year for all eighty-three
residents Plaintiff discusses. Defendants add that even if all
eighty-three residents went to the least costly setting ($257 per
day), the additional cost to the commonwealth would be $3,574,810
annually. Since OMHSAS has only a finite amount of money to
devote to those with mental disabilities, (Defendants' exhibit I4,
Radke declaration at ¶¶ 25 and 26), the requested relief would
fundamentally alter the program by forcing Defendant to shift
funding from other eligible people to SMRC residents.

Plaintiff makes the following reply. First, even if
Defendants' figures are correct, the comparison is not to the
mental-health budget within DPW but to the budget for the entire
state (which is in the billions) or, at least, to DPW's budget.
PP&A asserts that "[t]here is nothing in *Olmstead* which restricts
review of the available resources to DPW's mental health budget.
To the contrary, the Court referred to "the resources available to
the State." (Plaintiff' brief in opposition to Defendants' brief
at p. 43)(quoting *Olmstead*, 527 U.S. at 597, 119 S.Ct. at 2185,
144 L.Ed.2d at 556). Viewed against the state's budget, the

additional $3,574,810 to $4,377,627.50 would not be a fundamental alteration, and Defendants cannot rely solely on whether placement in the community would increase costs.

Further, Plaintiff argues that the ADA and RA impose a duty on Defendants to allocate resources so that there is sufficient funding for those who are unnecessarily institutionalized, even the duty to seek legislative approval for changes in the budget if necessary. Reviewing DPW's budget, PP&A suggests, for example, that there was funding for items in the budget that could have been better spent on community placement, in its view.

We disagree with Plaintiff's position. First, as noted above, we believe the *Olmstead* plurality intended that resources available for mental-health services be the relevant figure. Justices Ginsburg, Souter, O'Connor and Breyer spoke about "available resources" in relation to the responsibility the state had undertaken for all person with mental disabilities, *id.* at 604, 119 S.Ct. at 2189, 144 L.Ed.2d at 560, not the entire state budget, or a departmental budget. This means the mental-health budget. *See Frederick L., supra*, 217 F. Supp. 2d at 592 ("The 'resources available to the State' refers to the state's mental health budget and nothing beyond that budget."). Plaintiff's argument to the contrary simply resurrects the one rejected in *Olmstead*, only on larger scale. Comparing costs to a state's entire budget, whether for two Plaintiffs as in *Olmstead* or 175

24

residents here, makes it unlikely for a state to prevail on a
fundamental-alteration defense.

We also believe that the ADA or RA does not allow us to
review how state officials have allocated resources within DPW's
budget to see if they have provided sufficient funding for those
disabled individuals qualified for community placement.  The state
budgetary process is beyond judicial scrutiny.  *See Frederick L.,
supra*, 217 F. Supp. 2d at 592-93.[9]

Based on the foregoing, we will enter summary judgment
in favor of Defendants and against Plaintiff on the ADA and RA
claims.  Based on Defendants' calculations, Plaintiff's requested
relief would fundamentally alter the commonwealth's program.
Judgment will also include the claim that Defendants violated the
ADA and RA by using discriminatory methods of administration.  *Id.*
at 591 n.11 (rejecting this type of claim on basis of failure to
establish a violation of the ADA and RA).

B.  *The Medicaid Claims.*

Title XIX of the Social Security Act (the "Medicaid
Act"), 42 U.S.C. §§ 1396a to 1396v, imposes certain requirements
on nursing facilities receiving federal funding.  The following
provisions are at issue in this case.  Under section 1396r(b)(2),
SMRC must provide the "services and activities to attain or

---

[9]  Plaintiff's reliance on *Helen L. v. DiDario*, 46 F.3d 325,
338-39 (3d Cir. 1995), on this point does not survive *Olmstead.*

maintain the highest practicable physical, mental, and psychosocial well-being of each resident in accordance with a written plan of care . . . ." Under section 1396r(b)(4)(A)(v), SMRC must also provide "an on-going program, directed by a qualified professional, of activities designed to meet the interests and the physical, mental, and psychosocial well-being of each resident." Next, "[t]o the extent needed to fulfill all plans of care . . . a nursing facility must provide . . . treatment and services required by mentally ill and mentally retarded residents." 42 U.S.C. § 1396r(b)(4)(A)(vii). Finally, section 1396r(c)(1)(D) permits the administration of psychopharmacologic drugs "only on the orders of a physician and only as part of" the written plan of care "designed to eliminate or modify the symptoms for which the drugs are prescribed and only if, at least annually an independent, external consultant reviews the appropriateness of the drug plan of each resident receiving such drugs."

Defendants have moved for summary judgment on Plaintiff's claims that SMRC is violating these provisions. In opposition, Plaintiff argues that there are issues of fact on these claims that require a trial.

1. *Activities Program.*

Plaintiff maintains that the commonwealth does not provide SMRC residents with the program of activities mandated by

26

section 1396r(b)(4)(A)(v).  Defendants argue this claim is meritless, presenting the following in their support.

SMRC has a Therapeutic Activities Service Department which has ten full-time staff members in addition to the Department's director and an additional supervisor.  (DSUF 179).  The ratio of activities staff to residents is approximately one to sixteen which is far above the average ratio of 1:52 or 1:66 for the average nursing facility with 120 to 150 beds.  (DSUF 181).

The Joint Commission on the Accreditation of Hospitals (JCAHO) inspects and certifies hospitals and nursing facilities.  (DSUF 38).  The certification is voluntary on the part of the health-care facility.  (DSUF 40).  In March 2000, JCAHO inspected SMRC and gave it a score of 97 out of 100, finding a deficiency only in activities for residents.  (DSUF 41, 43).

After the JCAHO report, SMRC personnel developed a plan of correction which included identifying times of inactivity in each living area, creating an activity schedule for every floor, and hiring additional staff.  (DSUF 44).  Nursing staff were assigned to all lounges to interact with nonambulatory residents or engage them in an activity.  (DSUF 44).

SMRC provides a program of activities seven days per week from 8:00 a.m. to 9:00 p.m.  (DSUF 186).  Defense expert, Karla Dreisbach, a nursing facilities activities expert, noted the number of activities, (Defendants' exhibit A-6 at pp. 11-15), which includes an ongoing music therapy program and a "multi-

27

sensory environment program." (DSUF 190). Residents can also go on regular trips outside SMRC, about twenty-four per month. There are over 200 volunteers and 142 groups who spend time with the residents. (DSUF 197). The staff tracks resident participation in activities by computer. (DSUF 187). Dreisbach opined that SMRC "provides a substantial program of activities that exceeds the state and federal requirements for a 'comprehensive program of activities.'" (Defendants' exhibit A-6 at p. 30).

In opposing, Plaintiff asserts that the evidence shows that, regardless of the number of activities, residents are not participating. First, PP&A relies on periodic reports within the institution from July 6, 2000, through March 13, 2001, indicating that on a particular day staff had not observed residents participating in activities. (Doc. 87, Plaintiff's opposition brief at pp. 15). Second, Plaintiff relies on "Facility Quality Indicator Profiles" showing that SMRC with a low percentile rank averaging 75% compared to other commonwealth nursing facilities. Third, Plaintiff relies on SMRC "Performance Improvement/Risk Management Committee Meeting Minutes," ranging from June 28, 2001, through January 31, 2002, indicating problems with resident participation. (*Id.* at p. 16; Plaintiff's reply exhibit 7). Fourth, Plaintiff's experts, Neal G. Ranen, M.D., and G. David Smith, both observed a lack of participation by residents while they were present at SMRC.

28

Finally, PP&A believes that the activities do not assist the residents to attain their highest practicable physical, mental, and psychosocial well-being because, as discussed by Dr. Ranen and Jane Ryan, R.N., another Plaintiff expert, they are not psychosocial rehabilitation (PSR), a type of program designed to teach new skills to those with serious mental illness, as opposed to the current activities at SMRC, which do not have a skills-building element. In the absence of PSR, Plaintiff maintains that Defendant are not meeting their statutory duty to the residents.

Ryan describes PSR. (Plaintiff's reply exhibit 5, Ryan expert report at pp. 8-12). Residents are assessed for the skills they need to develop. They are then assigned to a particular group to develop those skills. The group meetings should be held for three to four hours a day away from the wards so that the residents consider them like going to work each day. Examples "of the type of skills that can be developed through PSR groups are: (1) initiating positive comments; (2) listening emphatically; (3) having positive responses for actions; (4) expressing negative feelings directly; (5) coping with unexpected hostility and withdrawal; (6) acknowledging pleasing events; and (7) problem solving." (Ryan report at p. 11).

Ryan acknowledges that the PSR groups she has observed were designed for "particular sub-populations (e.g., persons with substance abuse problems; persons with forensic issues; and vocational PSR groups)," (*id.*), and that "the mental-health

29

literature" did not describe "implementation of PSR groups for the elderly in a psychiatric hospital," (*id.*), but she nonetheless opines that PSR would be beneficial for SMRC residents, and she has observed PSR programs that have "integrated groups for the elderly into their regular PSR curriculum." (*Id.*).

We take PP&A's last argument first. We reject its contention that the absence of PSR programs violates the statutory requirement for activities. As Defendants note in their reply brief, the closing unnumbered paragraph of section 1396r(4)(A) only requires that the "services meet professional standards of quality." SMRC does provide extensive activities for residents, and those activities do meet this statutory standard. They do not have to meet PP&A's standard.

As for the lack of resident participation in activities, it is true that SMRC records reflect, and two of Plaintiff's experts observed at some point, that some residents were not participating. However, the same records (Plaintiff's reply exhibit 7) show that SMRC personnel were acting to correct this. We therefore conclude that the SMRC activities program complies with Title XIX requirements.

2.  *Mental-Health and Mental-Retardation Service Requirements.*

In moving for summary judgment on the medicaid treatment claims under section 1396r(b)(4)(A)(vii), Defendants only discuss SMRC's administration of psychotropic drugs. In opposing summary

judgment, Plaintiff raises other issues and argues that the following raises triable issues of fact.

First, PP&A contends that neither the consulting psychiatrist, Dr. Hegarty, nor the behavioral-health consultants are actively involved in developing the plans of care to address behavioral issues and that the plans of care are inadequate to address the needs of residents with behavioral problems.  Second, SMRC staff do not always implement the recommendations of the behavioral-health consultants.  Third, SMRC does not provide psychosocial rehabilitation programs.

We essentially agree with Defendants' reply to these positions.  First, Defendants point out that the statute does not require a psychiatrist or behavioral-health professional to develop or be involved in a plan of care.  It only requires that the plan of care, in part: (1) be written; (2) "describe[ ] the medical, nursing, and psychosocial needs of the resident and how such needs will be met;" and (3) be "initially prepared, with the participation to the extent practicable of the resident or the resident's family or legal representative, by a team which includes the resident's attending physician and a registered professional nurse with responsibility for the resident."  42 U.S.C. § 1396r(b)(2)(A) and (B).  Second, the staff does not always have to implement the recommendations of the behavioral-health consultants.  The recommendations are, nonetheless, considered by the treatment team, and moreover, implemented

generally.  We agree with Defendants that isolated incidents where staff ignored troublesome behavior do not establish a violation, especially when supervisory memos instruct improvement in this area.  Third, as noted above, SMRC does not have to provide the psychosocial rehabilitation programs favored by Plaintiff.

    3.  *Administration of Psychotropic Medications.*

    42 U.S.C. § 1396r(c)(1)(D) requires that "[p]sychopharmacologic drugs" be administered only on the orders of a physician and only as part of the resident's written plan of care, be used only to treat the symptoms for which the drugs are prescribed, and that an independent, external consultant annually review the appropriateness of the drug for the resident.[10]

    In support of their position that SMRC is complying with federal law on the use and monitoring of psychotropic drugs, Defendants point to the following.  First, residents are seen by the behavioral consultants who make recommendations concerning behavioral issues.  Second, psychotropic medications are prescribed using the lowest effective doses of the safest and

---

    [10]  An implementing regulation, 42 C.F.R. § 483.25(1) in subsection (1) prohibits the unnecessary use of drugs, defined as an excessive dose, use for an excessive duration, or without adequate monitoring, or without adequate indications for its use, or in the presence of adverse effects indicating that the drug should be discontinued or reduced in dosage.  Subsection (2) provides that no antipsychotic drug be given unless necessary and that residents on antipsychotic drugs have their dosage reduced and be given behavioral interventions unless not clinically indicated.

best-tolerated agents.  They are tapered downward when
appropriate.  (DSUF 217).  As Dr. Hegarty elaborates in his
report, by September 2001 57% of the 76 residents on the older
antipsychotic drugs had been switched from them to the newer,
safer, so-called "atypical" agents, and 75% of residents on
antipsychotic drugs are now receiving the newer drugs.
(Defendants' exhibit A-9, Hegarty report at p. 5).  Further,
administration of some of these medications in a dose greater than
the recommended maximum dose simply reflects the need of the
individual patient, as determined by his treating physicians, for
a greater dose, and such use of the medication is supported by the
medical literature.  (DSUF 221, citing Defendants' exhibit A-9,
Hegarty report at pp. 11, 14-15).  Some patients require
antipsychotic medication in doses higher than the published norms
to produce meaningful response.  (DSUF 298, citing Defendants'
exhibit A-15, expert report of Dr. Stephen Read at p. 38).
Finally, AIMS (Abnormal Involuntary Movement Scale) tests are
administered quarterly to discover evidence of tardive dyskinesia,
a possible side effect of traditional antipsychotic medications.
(DSUF 218, and Plaintiff's response).

        In opposition, Plaintiff does not dispute that
monitoring of drug dosage and tapering of the dosage has taken
place, only that these practices were not in effect before PP&A
started this litigation.  It also asserts that AIMS testing is not
accurate since on one occasion, an AIMS test conducted by one of

Plaintiff's experts, Dr. Read, indicated prominent tardive dyskinesia, as opposed to an AIMS test conducted by SMRC staff two weeks earlier. (Plaintiff's exhibit 58, attachment C).

We will grant Defendants summary judgment on this claim. It is immaterial that drug monitoring did not begin until after this litigation was started, as long as it is in place. Our opinion is also not altered by one discrepancy in AIMS testing between Plaintiff's expert and SMRC staff.

C. *Specialized Services For R.Y.*

Under section 1396r(e)(7), residents with mental retardation are entitled to specialized services. In January 2000, OMR indicated that R.Y., a SMRC resident, needed specialized services, but Defendants have submitted documentation indicating that she was determined not to need them.

Based on the foregoing, Defendants concede that further discovery on this claim is probably appropriate. However, the court believes that the pursuit of R.Y.'s claim should not take place in this litigation. First, she is not a named plaintiff; PP&A filed this lawsuit solely on its own behalf. Second, PP&A sought broad injunctive relief against SMRC on an institutionwide basis; R.Y.'s claim is a discrete one for specialized services. Further, since we have decided that PP&A is not entitled to the relief it seeks, it serves judicial efficiency for us to terminate this litigation now because PP&A's claims have been adjudicated.

34

Since our order adjudicates only the claims of PP&A, it will be, of course, without prejudice to a suit by R.Y. for specialized services if she, or her representatives, decide to bring suit.

    D.  *Other Pending Motions.*

Other motions pending are: (1) Plaintiff's motion to strike certain exhibits to Defendants' motion for summary judgment; and (2) Plaintiff's motion to respond to newly-produced evidence relevant to pending summary judgment motions.

We will dismiss both motions as moot. As to the first motion, we did not rely on any of the challenged exhibits, so there is no need to determine their admissibility. As to the second, we considered the substance of Plaintiff's proposed response, which was set forth in the motion, so there is no need for Plaintiff to file a formal response to newly produced evidence.

IV.  *Conclusion.*

Based on the foregoing, we have decided to enter summary judgment on the ADA, RA and Title XIX claims in favor of Defendants and against Plaintiff. In doing so, we considered all points and arguments Plaintiff made even though some may not have been specifically discussed in this memorandum.

We will issue an appropriate order.


William W. Caldwell
United States District Judge

Date:  January 15, 2003