PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

————————————

No. 03-1461

————————————

PENNSYLVANIA PROTECTION
AND ADVOCACY, INC.,

Appellant

v.

PENNSYLVANIA DEPARTMENT OF PUBLIC
WELFARE;
FEATHER HOUSTOUN, in her official capacity
as Secretary of Public welfare for the
Commonwealth of Pennsylvania; CHARLES CURIE,
in his official capacity as Deputy Secretary
for Mental Health and Substance Abuse Services;
S. REEVES POWER, Ph.D., in his official capacity
as Superintendent of South Mountain Restoration
Center; MARK S. SCHWEIKER, in his official
capacity as Governor of the Commonwealth of
Pennsylvania; GERALD RADKE, in his official
capacity as Deputy Secretary for Mental Health
and Substance Abuse Services
Abuse Services

————————————

Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. Civil Action No. 00-cv-01582)
District Judge: Honorable William W. Caldwell

—————————

Argued October 26, 2004

Before: NYGAARD, AMBRO,
and VAN ANTWERPEN, <u>Circuit Judges</u>

(Opinion filed March 24, 2005)

Robert W. Meek, Esquire (Argued)
Mark J. Murphy, Esquire
Disabilities Law Project
1315 Walnut Street, Suite 400
Philadelphia, PA   19107

   Attorneys for Appellant

Gerlad J. Pappert
   Attorney General
Calvin R. Koons (Argued)
   Senior Deputy Attorney General
John G. Knorr, III
   Chief Deputy Attorney General
Office of Attorney General
Appellate Litigation Section
15th Fl., Strawberry Square

2

Harrisburg, PA   17120

Attorneys for Appellee

———————

OPINION OF THE COURT

———————

AMBRO, <u>Circuit Judge</u>

This matter is the most recent in a line of cases involving the Commonwealth of Pennsylvania's Department of Public Welfare ("DPW") and various mental/nursing institutions administered by that agency.[1]   At issue once again is the Commonwealth's alleged failure to comply effectively and

---

[1] <u>See</u>, <u>e.g.</u>, <u>Frederick L. v. Dep't of Pub. Welfare</u>, 364 F.3d 487 (3d Cir. 2004) (vacating District Court's order entering summary judgment in favor of DPW and remanding for an inquiry into whether DPW could demonstrate a commitment to action to bring Norristown State Hospital into compliance with the American with Disabilities Acts); <u>Helen L. v. DiDario</u>, 46 F.3d 325 (3d Cir. 1995) (holding that DPW violated the ADA by requiring that plaintiff receive required care services in a nursing home rather than in her own home through an attendant care program); <u>Kathleen S. v. Dep't of Pub. Welfare</u>, 10 F. Supp. 2d 460 (E.D. Pa. 1998) (finding that DPW had violated the ADA and the Rehabilitation Act in its treatment of residents of Haverford State Hospital).

3

expediently with the integration mandate and non-discriminatory administration provisions of Title II of the Americans With Disabilities Act ("ADA"), 42 U.S.C. §§ 12131-12134, and Section 504 of the Rehabilitation Act ("RA"), 29 U.S.C. § 794. We hold that DPW's asserted defense to the integration mandate claim of Plaintiff-Appellant Pennsylvania Protection and Advocacy, Inc. ("PP&A") is legally insufficient and that the District Court erred in its legal conclusion that the non-discriminatory administration provisions were not violated. As such, we remand for further proceedings consistent with this opinion.

## I. **Factual Background and Procedural History**

PP&A is a nonprofit Pennsylvania corporation designated by the Commonwealth as the advocate and protector of the rights of individuals with disabilities, including those who are institutionalized. PP&A brought this action on behalf of residents of South Mountain Restoration Center ("South Mountain"), a "psychiatric transitional facility" run by DPW's Office of Mental Health and Substance Abuse Services ("OMHSAS"). South Mountain is the only nursing-type facility operated by the Commonwealth.

Under Pennsylvania's Mental Health and Mental Retardation Act of 1966 ("MH/MR Act"), 50 P.S. §§ 4101-4704, DPW is charged with providing suitable services to persons with mental illness and retardation. It endeavors to do

4

so as a matter of official policy "in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d). Consistent with this policy and the MH/MR Act, county mental health and retardation offices plan for and develop community-based mental health and retardation services, including residential services, for individuals who have serious and persistent mental illness and/or retardation.

DPW also provides services in the community for Pennsylvanians who are elderly and/or medically fragile, including programs that feature on-site nursing staff and extensive assistance with daily living activities. Some of the participants in these programs suffer from serious and persistent mental illness and also receive psychotherapeutic services. DPW employs state and federal funds to implement its programs.

The services and support offered by DPW enable many persons with mental disabilities who are also elderly and/or have serious medical needs, including those who might require nursing-facility level care, to live productively in their communities or other integrated settings. PP&A argues that residents of South Mountain are systematically denied participation in these varied and successful programs, depriving them of integrated treatment in violation of the ADA and the RA.

5

As of August 31, 2001, South Mountain had 175 residents (down from 1,091 in 1969 and 800 in 1985). The median age of the residents was 75, and over 90% of the residents were admitted from state psychiatric facilities. Many South Mountain residents have been institutionalized for decades in state-operated facilities (approximately 40 residents of whom have been institutionalized for more than 50 years).

In June 2000, in response to an inquiry from the Statewide Community Hospital Integration Planning Committee concerning the need for community-based services for residents of OMHSAS facilities, professional staff of South Mountain determined that 80% of its residents "could function in the community now if the necessary community support services were in place and operational" and that none of its residents were precluded from leaving "due to serious medical problems that cannot be met in the community." DPW concedes this report was submitted, but "dispute[s] that the statements are material" because the figures were computed on the assumption that "resources were unlimited, and resources are not unlimited."

PP&A filed its initial complaint in September 2000 and its second amended complaint, which is before us here, approximately one year later. The second amended complaint alleged that DPW was operating South Mountain in violation of

6

the ADA and RA[2] because its failure to include South Mountain residents in integrated treatment programs (instead limiting them to institutionalized treatment at South Mountain) ran afoul of the laws' (i) mandate to integrate patients, where appropriate, in the community, and (ii) prohibiting against discriminatory administration. DPW vigorously disputed these allegations.

In January and February 2002, the parties filed cross-motions for summary judgment. In January 2003, after extensive discovery and briefing in connection with these motions, the District Court issued a Memorandum and Order granting DPW summary judgment and denying PP&A the same. The Court held as a matter of law that granting PP&A relief would require a fundamental alteration of DPW's programs, and thus it was shielded from liability by the "fundamental alteration" exception to the integration mandate described in Olmstead v. L.C., 527 U.S. 581 (1999). The District Court's decision rested solely on this fundamental alteration ground. On the basis of its disposition of the integration mandate claim, the District Court also granted summary judgment to DPW on PP&A's discriminatory administration claim.

We review the District Court's grant of summary judgment here and, for the reasons described below, vacate the District Court's order and remand the case for further

---

[2] PP&A also asserted claims based on Title XIX of the Social Security Act, 42 U.S.C. §§ 1396a–96v, which are not before us.

proceedings consistent with this opinion.

## II. **Jurisdiction and Standard of Review**

PP&A filed its lawsuit pursuant to 42 U.S.C. § 1983, Title II of the ADA, 42 U.S.C. §§ 12131-12134, § 504 of the RA, 29 U.S.C. § 794, and Title XIX of the Social Security Act, 42 U.S.C. § 1396 et seq.  The District Court had subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343.  We have appellate jurisdiction under 28 U.S.C. § 1291.

"We exercise plenary review over a district court's grant of summary judgment and apply the same standard as the district court; i.e., whether there are any genuine issues of material fact such that a reasonable jury could return a verdict for the plaintiffs."  Debiec v. Cabot Corp., 352 F.3d 117, 128 n.3 (3d Cir. 2003) (citing Fed. R. Civ. P. 56(c)).  We are required to review the record and draw inferences in a light most favorable to the non-moving party, id., yet the non-moving party must provide admissible evidence containing "specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e); see Pamintuan v. Nanticoke Mem'l Hosp., 192 F.3d 378, 387 n.13 (3d Cir. 1999); Wetzel v. Tucker, 139 F.3d 380, 383 n.2 (3d Cir. 1998).

8

III.  **Applicable Law**

A.    **ADA and RA Integration Mandate**

Primarily at issue in this case is the integration mandate embodied in the regulations that implement the ADA and RA.[3] This mandate requires states to "administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities."  28 C.F.R. § 35.130(d) (implementing the ADA's integration requirement); see also 28 C.F.R. § 41.51(d) (implementing the RA's integration requirement).  "[T]he most integrated setting appropriate to the needs of qualified individuals with disabilities" is a setting that "enables individuals with disabilities to interact with nondisabled persons to the fullest extent possible." 28 C.F.R. pt. 35 app. A.  "In short, where appropriate for the patient, both the ADA and the RA favor integrated, community-based treatment over institutionalization." Frederick L., 364 F.3d at 491–92.

The integration mandate is qualified by the "fundamental alteration" exception, which provides that

---

[3] In light of the similarities between the integration provisions of the ADA and RA and their implementing regulations, we construe and apply them in a consistent manner.  Frederick L., 364 F.3d at 491; Helen L., 46 F.3d at 325, 330–32.

> [a] public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, *unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity*.

28 C.F.R. § 35.130(b)(7) (1998) (emphasis added).

This case requires us to construe the "fundamental alteration" defense to the integration mandate in light of the Supreme Court's opinion in Olmstead and our subsequent decision in Frederick L.[4]  In Olmstead, a plurality of the Supreme Court held that a violation of the integration mandate should be found when:

> [1] the State's treatment professionals have determined that community placement is appropriate,
>
> [2] the transfer from institutional care to a less restrictive setting is not opposed by the affected individual, and

---

[4] Our Court first interpreted § 35.130(d) as mandating the integration of unnecessarily segregated disabled persons in Helen L. in 1995.  Helen L., 46 F.3d at 332.

> [3] the placement can be reasonably accommodated, taking into account [a] the resources available to the State and [b] the needs of others with mental disabilities.

Olmstead, 527 U.S. at 587.  The third prong of this Olmstead test embodies the fundamental alteration defense and thus is the object of our focus.

In Frederick L. we considered this third prong.  We explained that the Olmstead plurality "characterized the state's available resources and responsibility to other institutionalized mental health patients as primary considerations in evaluating a fundamental-alteration defense."  Frederick L., 364 F.3d at 493. In assessing these primary considerations, we noted:

> [F]actors that are relevant to the fundamental-alteration defense . . . includ[e] but [are] not limited to the state's ability to continue meeting the needs of other institutionalized mental health patients for whom community placement is not appropriate, whether the state has a waiting list for community placements, and whether the state has developed a comprehensive plan to move eligible patients into community care settings.

Id. at 495 (citing Olmstead, 527 U.S. at 605–06).

11

1.    *Scope of Budgetary Constraint Analysis*

Though clearly relevant, budgetary constraints alone are insufficient to establish a fundamental alteration defense.[5] Id. at 495 (explaining that "a singular focus upon a state's short-term fiscal constraints will not suffice to establish a fundamental-alteration defense"); see also Townsend v. Quasim, 328 F.3d 511, 520 (9th Cir. 2003) (explaining that budgetary considerations are insufficient to establish a fundamental alteration defense and focusing on "whether [the asserted] extra costs would, in fact, compel cutbacks in services to other [benefits] recipients"); Fisher v. Oklahoma Health Care Auth., 335 F.3d 1175, 1182–83 (10th Cir. 2003) ("the fact that [a state] has a fiscal problem, by itself, does not lead to an automatic conclusion that [the provision of integrated treatment] will result

---

[5] This principle should not be construed to limit a district court's broad discretion in crafting an appropriate remedy when liability is established. At issue is the sufficiency of budgetary constraints to establish a fundamental alteration defense to *liability*, not the effect of budgetary constraints on a district court's analysis of the appropriate *remedy*. See Frederick L., 364 F.3d at 500–01 (recognizing that, in light of budgetary constraints, it would be "inappropriate for us to direct DPW to develop 60 community residential slots per year as Appellants request[ed]," but nonetheless remanding to the District Court to determine if a more appropriate remedy was required).

in a fundamental alteration"). The appellants in <u>Frederick L.</u> argued that the District Court erred in focusing exclusively on budgetary constraints. <u>Frederick L.</u>, 364 F.3d at 491. Despite an erroneous statement by the District Judge implying that budgetary constraints alone *would* support a fundamental alteration defense,[6] we upheld his ultimate conclusion, finding that he had properly analyzed a host of relevant factors, including: i) "unsuccessful attempts at fund procurement"; ii) "evidence that [the defendant] had responsibly spent its budgetary allocation, re-allocated overtime savings to increase funding for community-based mental health services, and had a favorable bed closure rate"; iii) the fact that defendant's "ability to increase the number of community care placements was hampered by community opposition to further expansion"; and iv) "that increasing the number of community placements would eventually lead to a diminution of services for institutionalized persons." <u>Id.</u> at 496. We agreed with the <u>Frederick L.</u> appellants, however, that it would have been legal

---

[6] The District Judge erroneously wrote: " Even if cost savings may eventually be achieved through deinstitutionalization, *the immediate extra cost, and the concomitant lack of immediate aggregate cost saving, [are] sufficient to establish that a 'fundamental alteration' would be required* if the relief sought by plaintiffs–accelerated community placements–were granted in this case." <u>Frederick L. v. Dep't of Pub. Welfare</u>, 217 F. Supp. 2d 581, 593 (E.D. Pa. 2002) (internal citations omitted) (emphasis added).

13

error for the District Court to find a fundamental alteration solely on the basis of budgetary constraints.  Id. at 495.

2.    *"Commitment to Action"*

In Frederick L., stressing that "what is at issue is compliance with two federal statutes enacted to protect disabled persons," we read Olmstead's third prong to require that a state agency asserting a fundamental alteration defense "be prepared to make a commitment to action in a manner for which it can be held accountable by the courts."   Id. at 500.   That is, the fundamental alteration defense cannot be read to exempt *in toto* noncomplying agencies.  A state cannot meet an allegation of noncompliance simply by replying that compliance would be too costly or would otherwise fundamentally alter its noncomplying programs.  *Any* program that runs afoul of the integration mandate would be fundamentally altered if brought into compliance.   Read this broadly, the fundamental alteration defense would swallow the integration mandate whole.  See Townsend, 328 F.3d at 518–19 ("[P]olicy choices that isolate the disabled cannot be upheld solely because offering integrated services would change the segregated way in which existing services are provided.  .  .  .  [S]uch a broad reading of fundamental alteration regulation would render the protection against isolation of the disabled substanceless.").

Instead, the only sensible reading of the integration mandate consistent with the Court's Olmstead opinion allows

14

for a fundamental alteration defense only if the accused agency has developed and implemented a plan to come into compliance with the ADA and RA. Frederick L., 364 F.3d at 500. When such a plan exists, a remedy that would force the agency to abandon or alter its long-term compliance efforts could sacrifice widespread compliance for immediate, individualized relief. Imposing such a remedy might be penny-wise and pound-foolish. Thus, as the Supreme Court explained, the larger plan must be taken into account in assessing the immediate need: "[s]ensibly construed, the fundamental-alteration [defense] would allow the State to show that, in the allocation of available resources, immediate relief for the plaintiffs would be inequitable, given the responsibility the State has undertaken for the care and treatment of a large and diverse population of persons with mental disabilities." Olmstead, 527 U.S. at 604. The states have undertaken this responsibility in part because they are obliged to do so under applicable federal law, including the ADA and RA. It would make no sense to exempt a state from liability under the ADA and RA in a particular case on the basis of its need to fulfill its larger obligation to the mentally disabled as a whole while at the same time relieving the state of its larger obligation. Any interpretation of the fundamental alteration defense that would shield a state from liability in a particular case without requiring a commitment generally to comply with the integration mandate would lead to this bizarre result.

When an agency *has* implemented a sufficient

15

compliance plan (i.e., when it has demonstrated a commitment to comply with the ADA and RA), we must be wary of judicial mandates that could thwart or undermine the agency's authority to carry out that plan as it sees fit.[7] Yet when a person with standing brings suit alleging violation of the ADA and RA in a particular case, we discharge our responsibility by confirming that a general plan does exist and by imposing upon the agency, as a condition to the assertion of a fundamental alteration defense, the minimal burden of demonstrating "that there will be ongoing progress toward community placement" under the general plan. Frederick L., 364 F.3d at 500. Without such a preliminary showing, an agency cannot establish a fundamental alteration defense.

B.    **Prohibition Against Discriminatory Administration**

The implementing regulations of the ADA provide, inter alia, that

---

[7] See, e.g., Olmstead, 527 U.S. at 600 (Kennedy, J., concurring) (noting the "federalism costs inherent in referring state decisions regarding the administration of treatment programs and the allocation of resources to the reviewing authority of the federal courts" and stressing that "courts [must] apply [the Olmstead] decision . . . with appropriate deference to the program funding decisions of state policymakers").

16

> [a] public entity may not, directly or through contractual or other arrangements, utilize criteria or methods of administration: (i) [t]hat have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability; [or] (ii) [t]hat have the effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program with respect to individuals with disabilities[.]

28 C.F.R. § 35.130(b)(3)(i)-(ii). The RA contains virtually identical provisions. 28 C.F.R. § 41.51(b)(3)(i)-(ii). Having laid out the regulatory framework and governing precedent, we now apply them to this case.

IV.  **Analysis of This Case**

A.    **ADA and RA Integration Mandate**

The District Court concluded that it "need not determine" if the first two prongs of the Olmstead test were satisfied because summary judgment in favor of DPW on the basis of its fundamental alteration defense was warranted under Olmstead prong three. Pa. Prot., 243 F. Supp. 2d at 193. We thus turn to the third prong first.

17

1.    *Olmstead* Prong Three

a.    *Scope of Budgetary Constraint Analysis*

PP&A argues that the District Court erred as a matter of law in endorsing DPW's fundamental alteration defense solely on the basis of its analysis of budgetary constraints. We agree.

Writing *before* the publication of our Frederick L. opinion, the District Court understandably could not divine the dictates of that decision. It concluded that "Defendant[] is entitled to summary judgment on the ADA and RA claims on the basis of *that part of its fundamental-alteration defense asserting that it does not have sufficient resources* to move South Mountain residents into the community and provide services for others with mental-health needs."[8] Id. (emphasis added). As discussed at Section III.A.1, supra, this basis is insufficient as a matter of law under Frederick L.

Unlike the Frederick L. decision, the District Court's opinion here does not disclose additional relevant factors such

---

[8] The District Court's conclusion about the insufficiency of DPW's resources was based entirely on its thorough review of the budgetary evidence presented by both parties and their competing interpretations of that budgetary evidence. Pa. Prot., 243 F. Supp. 2d at 192–95.

as unsuccessful attempts at fund procurement, evidence that DPW responsibly spent its budgetary allocations, evidence of a favorable bed closure rate, defendants' ability to increase the number of community care placements in light of community opposition to further expansion, or the potential diminution of services for institutionalized persons. The presence of these additional factors (or other similar factors) is required in order to credit an agency's fundamental alteration defense. Without consideration of these factors, the District Court's grant of summary judgment on the basis of the fundamental alteration defense lacks sufficient underpinning.

                b.      *"Commitment to Action" – DPW's Fatal Flaw*

The District Court also failed to require DPW to demonstrate a reviewable commitment to action. On the basis of our independent review of the record, we conclude as a matter of law that DPW cannot show that such a commitment exists in this case and thus DPW's fundamental alteration defense must fail.

Admissions made by DPW during the course of this litigation foreclose the genuine contention that it has made a commitment to bring South Mountain into compliance with the ADA and RA. To begin, DPW admits that "OMHSAS does not consider [South Mountain] residents—even those transferred from its state psychiatric hospitals—to be part of the mental

19

health system." App. at 224, 245. "DPW does not require the County MH/MR Offices to plan for or develop community-based services . . . for [South Mountain] residents," and "OMHSAS does not expect the counties to request funding to provide community-based services to residents of [South Mountain]." Id. at 225. DPW further admits that, consistent with this policy, "[South Mountain] social workers no longer consider at all [county-run] community-based residential [mental health/mental retardation] programs for [South Mountain] residents because *such programs are not available for [South Mountain] residents*." Id. at 224 (emphasis added).

This exclusion of South Mountain residents from the county-run mental health/mental retardation programs is the result of an explicit omission of those residents from OMHSAS's Olmstead-compliance planning process. OMHSAS is in "the final stages of developing a statewide plan to address" Olmstead problems in its mental health system. App. at 228. This planning process resulted in the June 2000 inquiry that led the staff of South Mountain to conclude that 80% of its residents could function in the community if the necessary community support services were available to them. Despite this report, DPW concedes "OMHSAS subsequently determined that the statewide plan [would] not include any provisions concerning the development of alternative community mental health services for [South Mountain] residents." Id. at 228, 246–47. DPW, through OMHSAS, decided to exclude South Mountain residents from the programs it was implementing that benefit

20

similarly situated Pennsylvanians.

Despite this seemingly incontrovertible evidence, DPW urges us to find as a matter of law that it has a sufficient plan in the form of "policies and procedures that demonstrate DPW's commitment to deinstitutionalization, and a history of progressive deinstitutionalization that shows that the policy is in effect." Appellees' Br. at 20. At the core of this argument,[9]

---

[9] DPW begins by offering a host of general information about its myriad programs for community-based treatment. Crucially, it fails to discuss the extent to which it has included South Mountain residents in (or excluded them from) these programs, which is our only concern.

DPW also presents several arguments that are irrelevant to our analysis of its commitment to action. First, it argues that community placement is inappropriate for most of South Mountain's residents. If true, this fact would justify the grant of summary judgment for DPW on the basis of Olmstead prong one, which requires PP&A to show that community placement would be appropriate. See Section IV.A.2, infra (remanding for consideration of Olmstead prongs one and two). But for prong three this inquiry is irrelevant.

Similarly, DPW argues that, to the extent community placement is possible for certain South Mountain residents, it is too costly. But, as we have explained, a commitment to action is a precondition to the assertion of a fundamental alteration defense. See Section III.A.2, supra. Only when DPW can demonstrate this does its budgetary argument become a relevant

DPW contends:

> First, DPW has continually placed, and continues
> to place, [South Mountain] residents in alternative
> community programs whenever and wherever
> appropriate for the resident, as determined by the
> resident's interdisciplinary team of treatment
> professionals.    Second, . . . the treatment
> professionals at [South Mountain] are required to
> re-assess each resident of [South Mountain] every
> sixty (60) days to determine whether they
> continue to require a nursing home level of care.

Id. at 22–23.

South Mountain's routine, individualized review of
patients does not amount to a sufficient deinstitutionalization
plan, notwithstanding any past success it has had in discharging
patients.  In Frederick L. we explained that "it [is] unrealistic (or
unduly optimistic) [to] assum[e] past progress is a reliable
prediction of future programs."  Frederick L., 364 F.3d at 500.
We also stressed that "policies and procedures . . . utilized for
ongoing review of patients from the minute they come in and for
discharge planning for each patient individually . . . fall[] far
short of the type of plan . . . the Court referred to in Olmstead."
Id.  Thus DPW's first two contentions are legally insufficient to

---

factor in the consideration of its fundamental alteration defense.

establish a compliance plan.

DPW's third and last contention in support of its claim
that it has a plan is that "each resident's team of treatment
professionals reassesses the resident at least every ninety (90)
days to determine if he or she can live in a more integrated
setting, based on how well the resident is, and has been,
functioning in each treatment team member's area of specialty
. . . ." Appellees' Br. at 23. This argument misleads. DPW
makes this claim after i) describing its various treatment
programs and the different settings in which DPW provides its
services, including its county-run community-based programs,
and ii) asserting that "individuals who are medically frail and
elderly liv[e] in all of [the] settings" in which DPW provides
services for "over 320,000 mentally disabled individuals."
Appellees' Br. at 20. A natural implication of its assertion in
this context is that South Mountain treatment professionals
regularly determine whether each resident can be placed in
DPW's community programs and that they do so even if a
patient requires nursing facility-level care. Yet, as PP&A
persuasively argues, South Mountain staff evaluations consider
only the patients' potential for discharge to a nursing facility or
generic home care. No plan exists for the integration of South
Mountain residents into community treatment programs.

In short, we find no evidence of a commitment to bring
South Mountain into compliance with the integration mandate
of the ADA and RA. To the contrary, DPW has chosen not to

23

make integration provisions for the residents of South Mountain by excluding them from participation in its varied, successful community treatment programs.  We thus hold that PP&A is entitled to summary judgment with respect to the insufficiency of DPW's fundamental alteration defense.  Because we do not agree with the District Court that DPW is entitled to summary judgment based on <u>Olmstead</u> prong three, we turn to the first two <u>Olmstead</u> prongs.

2.     *Remaining <u>Olmstead</u> Prongs*

The parties vigorously dispute whether "the State's treatment professionals have determined that community placement is appropriate."  <u>Olmstead</u>, 527 U.S. at 587.  The June 2000 report by South Mountain treatment professionals—concluding that 80% of South Mountain residents "could function in the community now if the necessary community support services were in place and operational" and that none of SMRC's residents were precluded from leaving "due to serious medical problems that cannot be met in the community"—seemingly "leave[s] no doubt that a rational jury would find" that such a determination was made.  <u>Glanzman v. Metro. Mgmt. Corp.</u>, 391 F.3d 506, 514 (3d Cir. 2004).

The evidence presented on this issue was voluminous, however, and because this is "a factual issue, subject to substantial eviden[tiary] review," we conclude that the analysis should be "performed by the District Court in the first instance."

24

MCI Telecomm. Corp. v. Bell Atlantic, 271 F.3d 491, 522 (3d Cir. 2001). We thus leave the prong one analysis for the District Court on remand. Cf. Townsend, 328 F.3d at 520 (remanding an ADA integration claim for consideration of an Olmstead prong not reached by the trial court).

We similarly conclude that the District Court should first consider on remand whether "the transfer from institutional care to a less restrictive setting is . . . opposed by the affected individual[s]." Olmstead, 527 U.S. at 587.

B.    **Prohibition Against Discriminatory Administration.**

The District Court did not reach the merits of PP&A's discriminatory administration claim. Instead, it held that its award of summary judgment to defendants on the integration claim foreclosed PP&A's discriminatory administration claim. Pa. Prot., 243 F. Supp. 2d at 195. Because the District Court's disposition of the integration claim was based solely on its conclusion that DPW successfully asserted a fundamental alteration defense, the Court must have concluded that DPW's fundamental alteration defense also defeated PP&A's discriminatory administration claim.[10] Thus, our rejection of

<hr />

[10] Because the District Court merely stated that its "[j]udgment [would] also include the claim that Defendants violated the ADA and RA by using discriminatory methods of

25

DPW's fundamental alteration defense undermines the District Court's grant of summary judgment to DPW on PP&A's discriminatory administration claim. For this reason, we vacate that judgment and remand the discriminatory administration claim for reconsideration.

## V.  **Conclusion**

We vacate the District Court's grant of summary judgement. The Court should i) enter summary judgment in favor of PP&A with respect to the legal insufficiency of defendants' fundamental alteration defense and ii) conduct further proceedings consistent with this opinion.

---

administration," Pa. Prot., 243 F. Supp. 2d at 195, we do not know its reasoning.